1

2                     UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
3                           EASTERN DIVISION

4     UNITED STATES OF AMERICA,

5              Plaintiff,            Case No. 1:16CR265
                                     Akron, Ohio
6          vs.                       Monday, March 12, 2018

7     ERICK JAMAL HENDRICKS,

8              Defendant.

9

10                      TRANSCRIPT OF TRIAL
                 VOLUME 7, PAGES 1048 THROUGH 1278
11             BEFORE THE HONORABLE JOHN R. ADAMS
                  UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14    For the Government:  Matthew W. Shepherd
                           Office of the U.S. Attorney - Cleveland
15                         Carl B. Stokes U.S. Courthouse
                           801 Superior Avenue, West, Suite 400
16                         Cleveland, Ohio 44113
                           (216) 622-3600
17
                           Mark S. Bennett
18                         Office of the U.S. Attorney - Akron
                           2 South Main Street, Room 208
19                         Akron, Ohio 44308
                           (330) 375-5716
20
                           Rebecca A. Magnone
21                         U.S. Department of Justice
                           960 Pennsylvania Avenue, NW
22                         Washington, DC 20530
                           (202) 353-9472
23
      For the Defendant:   David L. Doughten
24                         Attorney at Law
                           4403 St. Clair Avenue
25                         Cleveland, Ohio 44103
                           (216) 361-1112

1049

```
 1                              Stephen D. Hartman
                                Attorney at Law
 2                              1st Floor
                                320 North Michigan Street
 3                              Toledo, Ohio 43604
                                (419) 690-4604
 4

 5   Court Reporter:           Caroline Mahnke, RMR, CRR, CRC
                                Lori A. Callahan, RMR, CRR
 6                              Federal Building & U.S. Courthouse
                                2 South Main Street, Suite 568
 7                              Akron, Ohio 44308
                                (330) 252-6021
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.
```

1    (March 12, 2018, outside the presence of the jury:)

2         THE COURT:  Counsel, are we ready to proceed?

3         MR. SHEPHERD:  The government is, Your Honor.

4         MR. DOUGHTEN:  The defense is.

00:22:00  5    THE COURT:  All right.  We'll have the jurors

6    brought forward.

7         (Jury in 9:10.)

8         THE COURT:  Sir, you're still under oath.

9    Counsel, you may cross-examine at this time.

00:23:56  10    MR. DOUGHTEN:  Thank you, Your Honor.

11         CROSS-EXAMINATION OF STEVEN JANE

12    BY MR. DOUGHTEN:

13    Q.    Good morning, Agent Jane.

14    A.    Good morning.

00:24:02  15    Q.    On Friday you gave a lot of opinions and conclusory

16    beliefs.  I'm going to go over those a little bit today.

17         But before I do that, I'm going to go into kind a

18    little bit about your background knowledge so we know what

19    this was based on, if you will.

00:24:20  20         As some preliminary matters, how fluent are you in

21    Arabic?

22    A.    I'm not fluent.

23    Q.    Okay.  And so the -- the reason I'm asking, my

24    understanding is, and correct me if you have a different

00:24:37  25    understanding, is that a lot of the language of Arabic

1   depends upon intonations, I understood, for example, that

2   the same word with a different intonation may have a

3   different completely meaning.  Is that your understanding?

4   A.    I don't think I would make that characterization of

00:24:52  5   Arabic.

6         Intonation, like meaning tone?

7   Q.    Yeah, by tone or the way you finished a sentence, or,

8   you know, how you pronounced word, the two words that

9   basically are spelled the same way that in a different usage

00:25:06  10   may have a completely different meaning?

11   A.    Connotation, you know, context.

12   Q.    Yes.

13   A.    Can matter, certainly.  Certainly.

14         THE COURT:  One at a time, please.

00:25:15  15         THE WITNESS:  Yeah, I'm sorry.

16   BY MR. DOUGHTEN:

17   Q.    But what you're telling us this morning is that the

18   intonation doesn't mean anything in your opinion?

19   A.    Intonation.  Are we talking about pronunciation?

00:25:26  20   Q.    Yes.  And also the tone and how long you might

21   pronounce a vowel or if you finished with your voice going

22   up at the end of a phrase?

23   A.    Maybe intonation could imply a question versus a

24   statement.

00:25:40  25   Q.    But that's your basic understanding?

1    A.    I think that there's a -- I can think of other

2    languages where intonation has a greater impact.

3    Q.    I'm only asking about Arabic.

4    A.    Right.  And I'm saying relative to Arabic.  I don't

00:25:54  5    really, in my formal Arabic training, intonation has not

6    been stressed.  Pronunciation, of course, matters and

7    context of course, matters.

8    Q.    Would you agree that when you're reading Arabic words

9    on a screen shot, you can't get that intonation or context

00:26:14 10    because we're talking about, in many cases, abbreviations?

11    A.    It is correct that on a screen, it's not the same as

12    spoken Arabic.

13    Q.    Okay.  And just to get this out of the way, there were

14    references to wives of Mr. Hendricks having multiple wives.

00:26:37 15           And if you don't have the background for this, that's

16    fine, just let me know.

17           But you would agree that Islam, like lot of the major

18    religions, have many different sects and many different

19    believes of the same -- of the Koran, correct?

00:26:52 20    A.    Correct.

21    Q.    And, in fact, in the Koran, there's a sura which

22    allows up to four wives.  Are you aware of that?

23    A.    Correct.

24    Q.    But there are very strict situations for that,

00:27:04 25    correct?

1    A.    Correct.

2    Q.    It's not in the main, presently, correct?  Most of

3    Islam don't practice multiple wives; is that correct?  Or do

4    they?

00:27:12  5    A.    The Islamic word consists of about 1.6 billion people

6    around the world.  So it's difficult to kind of summarize

7    1.6 billion people.

8    Q.    So it's not that unusual for someone who was a

9    believer in the black letter of the Koran to have multiple

00:27:33 10    wives; is that correct?

11    A.    That is, yes.  Yes, sir.

12    Q.    And it was mentioned by -- something about divorce.

13    Do you know the divorce proceedings once you're married in

14    Islam.  Are you aware of that?

00:27:46 15    A.    I'm somewhat familiar, yes.

16    Q.    It's a 90-day process; is that correct?

17    A.    It depends on certain understandings of about, but

18    that sounds familiar to me.

19    Q.    Okay.  So the fact that Mr. Hendricks has multiple

00:28:00 20    wives in and of itself doesn't suggest any type of

21    radicalism?

22    A.    No, I would not say that.  Certainly I'm not saying

23    that.

24    Q.    Okay.  I want to get to your work in general as an

00:28:15 25    undercover.  And you've had nine years of counterterrorism

1    training, correct?

2    A.    Yes, sir.

3    Q.    And if I understand your work -- and correct

4    me -- that a lot of what you do is you're on a computer and

00:28:32 5    you're trolling and you're looking for key words; is that

6    right?

7    A.    That is not correct, sir.

8    Q.    Give us an idea of how you're able to find a person in

9    a chat room or what is it that triggers, you know, that

00:28:48 10    something may be going on here?

11    A.    Sure.  So often is the case, as it was in this

12    investigation, that I was tasked with investigating the

13    original subject, the original target.

14            There was independent reasons to give -- for the chief

00:29:06 15    investigator to give me the authorization to pursue that

16    original target.

17    Q.    So if I understand right then, you were assigned a

18    certain person.  And in following this person, you noticed

19    him talking to somebody else that --

00:29:20 20    A.    Right.

21    Q.    Okay.

22            Now, again, just a little bit of background.

23            The two main religions in Islam or sects are Sunni and

24    Shia, correct?

00:29:33 25    A.    Those are the two largest sects within Islam.  There's

1   additional sects within Islam, but those with are the two

2   largest.

3   Q.    If you can, can you tell us the difference between the

4   two sects?  And I know it's complicated, but just generally.

00:29:48   5   If you can't, if you can't that's fine.

6   A.    No, no.  I can.  It depends on how much time you want

7   me to spend on it.

8   Q.    Let me give you a parameter so maybe you can answer my

9   question better.

00:30:02   10       Let's talk in general.  Is there such a thing as a

11   typical terror suspect, or are they all different?

12   A.    Being every two humans are different.

13   Q.    Correct.

14   A.    There's a lot of trends in belief systems and there's

00:30:18   15   a very codified belief system with ISIS terrorists and

16   similar terrorists to ISIS.

17       I mean, it's very --

18   Q.    Let me stop you there.  Let me stop you there because

19   you're getting to the point I want you to make.

00:30:29   20       ISIS in general is Sunni; correct?

21   A.    They come from the Sunni background, that is correct.

22   Q.    And is there a reason for this?

23   A.    A reason why ISIS comes from the Sunni background?

24   Q.    Correct.

00:30:44   25   A.    Yes.

1    Q.    And could you explain to the jury what that reason is?

2    A.    So this is -- there's a lot that can go into this

3    question.

4    Q.    Okay.  Let me do this.  Let me ask you my

00:30:54  5    understanding and tell me if you agree with it or not.

6    A.    Okay.

7    Q.    Is it true that ISIS believes that there's a caliphate

8    or state, that there's a true state that doesn't recognize

9    national borders?

00:31:12 10    A.    Yes, very much true.

11    Q.    And is it true that part of ISIS, which grew out of, I

12    guess, the 2004 war; is that accurate?

13          Did ISIS, did they exist before the 2004 invasion of

14    Iraq?

00:31:29 15    A.    This is kind of a historical and academic argument.

16    You could make that academic argument.  ISIS has morphed

17    into its current state and does have historical connections

18    and tentacles back to 2004 with Abu Masab al-Zarqawi who is

19    al-Qa'ida in Iraq at that time.  And the leadership of

00:31:51 20    al-Qa'ida in Iraq in 2004 later morphed into what we

21    currently know to be ISIS today.

22    Q.    But a like --

23    A.    A lot of this is kind of his historical.

24    Q.    It is.  Because there's a lot of confusion and I think

00:32:04 25    the background will assist us.

1    Is there a different between ISIS and al-Qaeda?

2  A.    Yes.

3  Q.    And is ISIS also a Sunni-based organization?

4  A.    So al-Qaeda also comes from a Sunni background.  Now,

00:32:20  5  their ideological linnage begins in Sunni Islam.

6    I think it's worth noting that if you were to take a

7  group like ISIS and a group like al-Qaeda, there are other

8  concentric circles, or sects -- basically ISIS is a sub-sect

9  within a sub-sect within a sub-sect.

00:32:39  10    And you can build that out to get to a very large here

11  is Islam, here is Sunni Islam.  And then you can kind of

12  bracket into smaller circles until you gets to the target

13  group.

14  Q.    S I'm sorry.  So I think the point you're making is

00:32:51  15  within these concentric groups, there's disagreements on how

16  to interpret the religion, correct?

17  A.    Yes.  And there are significant disagreements between

18  ISIS and al-Qaeda.

19  Q.    Okay.  Now -- for the -- in your work for the -- in

00:33:13  20  trying to ferret out, if will you, violent radicals, if you

21  will, do they associate themselves or practice Sunni versus

22  Shia religion in the United States?

23  A.    ISIS and al-Qaeda are certainly exclusively Sunni and

24  are not Shia in the U.S. and around the world.

00:33:35  25  Q.    And in your experience, do the people that you

1    investigate, do they associate themselves particularly with

2    one or the other main religious groups of Islam?

3    A.    There are extremists and violent extremists and

4    terrorists that come from a Shia backgrounds.  I do not

00:33:56 5    investigate them.

6          My focus is on violent extremists and terrorists that

7    have a Sunni background.

8    Q.    So in this case, for instance, with the original

9    person you were assigned to, do you have any idea what that

00:34:11 10   person's Islam backgrounds is, if they are a follower of one

11   group or the other?

12   A.    Yes, I did.

13   Q.    How is that determined?

14   A.    Part of it is the background information that was

00:34:20 15   given to me in advance by the investigating agents who were

16   follow with that individual.

17         And then also in the process of just talking to him, I

18   was able -- you know, he explained his identify logical

19   background.  So a combination of both.

00:34:35 20   Q.    And from that -- well, you don't ever ask somebody, do

21   you follow Sunni or do you follow Shia?  Is that a question

22   you ask?  Or do you just determine it from your

23   conversations?

24   A.    Often it's both.

00:34:47 25   Q.    Okay.  Now, when you're trying to ferret a suspect

1     out, one of the tasks you have is to make them believe that

2     you are of a like mind; is that correct?

3     A.    A goal is to present a persona that would appear that

4     is amenable to the thoughts of the subject.

00:35:14 5     Q.    That's kind of convoluted.  I'm trying to pin you

6     down.

7     A.    Sure.  I can state it again or a different way, if you

8     would like.

9     Q.    Okay.

00:35:24 10     A.    So yes.  My goal is to present a persona that is also

11     prone or like-minded, at matching the subject.

12     Q.    Because the more you put out there that you may be

13     radical and receptive to their ideas, the more they're going

14     to open up to you, correct?

00:35:45 15     A.    Actually I would say vice versa, you know, whereas if

16     I see a behavior that they exhibit and then I match them, I

17     reflect those, then they're more likely to talk more to me.

18     Q.    Okay.  And so your goal is to make that suspect, or

19     whoever it may be, believe that you're receptive to their

00:36:07 20     radicalism.  Correct?

21     A.    Yes, and in that process is also to reflect that

22     they're committing, what they are putting out so they will

23     then trust me and share more of what they're really thinking

24     and what their goals are.

00:36:23 25     Q.    Now, in your training, yourself and other officers,

1    are you permitted to basically say something like, you know,

2    we have to do violent jihad in order to get like

3    basic -- can you come out there and saying, "I'm looking for

4    brothers that are willing to do violent jihad," hoping you

00:36:41  5  can then attract people who --

6    A.    No.  I'm strictly forbidden from entrapping an

7    individual.  We have plenty of legal training in advance to

8    make sure we do not entrap someone.

9    Q.    Okay.  So this leads me to a question.  I want to talk

00:36:57 10  a little bit about Garland, Texas.

11         You did a lot to explain that if you put out, if I got

12   this correctly, a response to accepted, that was the person

13   that you were following, tear up Texas, correct?

14   A.    That was when I was talking to Elton Simpson, I used

00:37:15 15  the phrase.

16   Q.    Elton Simpson?

17   A.    I was talking to Elton Simpson, the Phoenix-based

18   deceased shooter from Garland, Texas.

19   Q.    Now, in that -- there was no question mark on that

00:37:27 20  particular comment, correct?

21   A.    No, because --

22   Q.    Tear up Texas, but there's no question mark there?

23   A.    That is because I was answering his question, or as a

24   follow up to his statement when he said, "I wonder what

00:37:42 25  someone else would say, a third party."

1     Q.    Okay.  But I understand, but you didn't put a question

2     mark at the end of that statement, correct?

3     A.    No, I did not.

4     Q.    Now, if you had suggested that, that would have been

00:37:56  5     improper under your guidelines, correct?

6     A.    If I had suggested that --

7     Q.    Yeah, if you said -- if he, for instance -- this is

8     hypothetical, I understand.

9          But if he would have said, you know, "We and the

00:38:09 10     brothers want to take action against Pamela Geller," and you

11     would have said, "Tear up Texas," meaning suggesting that

12     they do something violent, that would have been improper,

13     correct?

14     A.    If the subject suggests the violent act first, then it

00:38:26 15     is not improper for me to reflect like mindedness.

16     Q.    Okay.  But it's up to you to determine whether the

17     subject has suggested violence.  That's what you can do

18     independently, correct?  You have the training, and then you

19     read the text message, and then you determine whether that

00:38:46 20     message reflects violence, correct?

21     A.    Yes.

22     Q.    And if you believe it does, then you're allowed to

23     rely up to that level.  Would that be a fair assessment?

24     A.    Yes.

00:38:56 25     Q.    So there is a certain amount of independent judgment

1  on your part?

2  A.    Yes.

3  Q.    And it's dangerous that you don't misinterpret, isn't

4  it?

00:39:03  5  A.    Yes.

6  Q.    Okay.  And so you're aware in your context that -- let

7  me start over again.

8        In your experience on the web, isn't it fair to say

9  that you have to be on the lookout for misinformation by

00:39:27  10  your contacts?

11  A.    Yes.

12  Q.    And it's pretty common that there's misinformation,

13  correct?

14  A.    The way that the -- the person he was talking to was

00:39:35  15  using some very crafty misinformation which was not the norm

16  in my experience.

17  Q.    Just asking you in general.  In your background, in

18  general, what you're first talking to somebody, they're

19  trying to avoid detection, correct?

00:39:48  20  A.    Correct.

21  Q.    And the way they do that is they won't give any

22  biographical information, correct?

23  A.    Yes.

24  Q.    And if they do, oftentimes it's incorrect?

00:39:59  25  A.    Yes, that's common practice.

1    Q.    So that when you're talking to a subject that you're

2    vetting, you have to be careful as an agent on identifying

3    what misinformation is, correct?

4    A.    Correct.

00:40:20 5    Q.    And that's difficult to do when all you have is screen

6    shots?

7    A.    Correct.

8    Q.    Now, you were talking a lot about your general

9    theories about how suspects react.  But I think you also

00:40:43 10    said that they're constantly changing their tactics,

11    correct?

12    A.    Depends on the individual, but that's a trend.

13    Q.    Well, originally when you first started contacting the

14    person -- and I think it was sham_reason, and you can

00:41:02 15    correct me, but you didn't catch the screen shots because

16    you were supervised that they deleted their account faster

17    than you thought.

18          You were caught off guard by that?

19    A.    I was.

00:41:14 20    Q.    So, in fact, this was a tactic that the person used

21    that you hadn't seen before?

22    A.    That's probably a fair statement.

23    Q.    And that's why we only got one side of that

24    conversation?

00:41:26 25    A.    Right.  At the time when those conversations were

1064

1    happening, I thought it was just an ancillary -- I wasn't

2    sure what to make of this associate.  This associate hadn't

3    risen to the level of interest to where I would be, you

4    know, very purposeful about capturing those screen shots

00:41:43 5    immediately.  It was just in the beginning of a

6    relationship.

7    Q.    I understand.  But the point is, it would have been

8    nice if you would have been able to get both sides of the

9    conversation, correct?

00:41:52 10    A.    It would have been preferred, yes.

11    Q.    Even an experienced Agent, such as yourself, were

12    caught off guard when the other side of the conversation was

13    deleted quickly?

14    A.    That is correct.

00:42:03 15    Q.    So in fact, tactics do change, and part of you, you

16    have to be aware that things could be changing in how they

17    go about recruiting, changes over time, correct?

18    A.    Yes.

19    Q.    There was a lot of words that, you know, that were out

00:42:29 20    there that were -- yesterday, and you would say, "Well, in

21    this field, in this limited field, this word means this,"

22    correct?  A number of times yesterday?

23          Let me give you an example.

24          There were some screen shots where the person you were

00:42:53 25    talking to talked about having brothers in Texas, correct?

1   A.    He alluded to having brothers in the southwest, or

2   confirmed that he wanted to meet three brothers in the

3   southwest.

4   Q.    And there was also references to deserts, correct?

00:43:16  5   A.    Correct.

6   Q.    And, in fact, there was an identifying screen shot of

7   maybe the stereotypical Arab man with the Arab headdress in

8   the bright sunshine in white robes, and you didn't believe

9   that was who this person was, correct?

00:43:37  10   A.    I was suspicious as to whether that was really him or

11   not.

12   Q.    Well, it was a young, good looking, healthy Arab man,

13   correct?

14   A.    It looked like a model in the picture.  It doesn't

00:43:47  15   look like an authentic regular picture.  I mean it looked

16   like a staged photo.

17   Q.    That was an example of misinformation because the

18   person didn't want to you know who he or she was, correct?

19   A.    That was -- that, and the nature of the picture, the

00:44:02  20   picture just looked phony, for lack of a better term.

21   Q.    And the references to the desert, I mean there's

22   nothing more stereotypic than associating Arabs with the

23   desert?

24         Wouldn't you agree that?

00:44:22  25   A.    I would have to recognize there was a stereotype, a

1    generic stereotype of an Arab in the desert, yes.

2    Q.    Now, you never met sham_reason; is that correct?

3    A.    In person, I did not.

4    Q.    Okay.  And going all the way down through accepted and

00:44:36  5    itsnotme, you never actually met that person, correct?

6    A.    Correct.  I only had online communication with that

7    person.

8    Q.    And I think it was your opinion that some of what that

9    person was saying was obviously wrong, but some of it you

00:44:53 10    believed was accurate?

11    A.    Correct.

12    Q.    And so basically you were picking out the parts of the

13    conversation that fit your theory?

14    A.    Well, I was using my discretion and judgment.

00:45:04 15    Q.    That's right.

16    A.    And to compare consistent narratives to where the

17    outliers were, and I suspected the outliers was the

18    deliberate misinformation.

19    Q.    And that's your job?

00:45:16 20    A.    Correct.

21    Q.    You're trained to do that to try to separate the

22    misinformation from what might be accurate?

23    A.    Correct.

24    Q.    And you're doing this based solely upon your

00:45:27 25    experience and training and the screen shots, what you're

1    seeing on the screen shots?

2    A.    Right, as a professional in this trade, that's what I

3    get paid to do.

4    Q.    And you have nothing else to go on but what the screen

00:45:40 5   shots are?

6    A.    That and my judgment, education, profession, and

7    training.

8    Q.    So your conclusions that you reached were based upon

9    your judgment, education and training, correct?

00:45:48 10  A.    Correct.

11   Q.    But if things changed and words changed, and usages

12   changed, that's dangerous for an agent because you might

13   possibly get something wrong, correct?

14   A.    That danger could exist.

00:46:06 15  Q.    Now -- and this is a general question.  But in your

16   experience, are all -- and I'm going to say radical, and in

17   the context I'm saying I mean violently radical.  I'm not

18   talking about a subset.

19        But do all radicals come out of the same handbook?  I

00:46:24 20  mean, don't different people that you investigate use

21   different tactics?

22   A.    Yes, they do.  They share a lot of commonalities, but

23   every two humans are different.

24   Q.    Let's talk about one of the commonalities.  You talked

00:46:38 25  about Anwar Al-Awlaki?

```
 1   A.    Um.

 2   Q.    And I think you indicated he was the number one

 3   English speaking influence on a lots of ISIS recruiting.

 4   Would that be fair to say?

 5   A.    Absolutely.

 6   Q.    And so his lectures, he has a number of lectures on

 7   the Internet that a lot of people that were being I guess

 8   for lack of better term groomed are sent to that particular

 9   site?

10   A.    Yes, that's a common trend.

11   Q.    Okay.  And so his lectures, are there -- does he talk

12   in his lectures about, you know, the battle of the trenches,

13   for instance?

14   A.    Yes.

15   Q.    And does he talk about crossbows, for instance?

16   A.    I think so.

17   Q.    And does he talk about the body, the limbs being

18   across other countries and the head being ISIS, or the brain

19   being -- come out of Syria?

20   A.    So you said Anwar Al-Awlaki was killed before ISIS

21   existed.  So --

22   Q.    When was he killed?

23   A.    I think it was 2014.  Or I'm sorry, I think it

24   was -- I don't recall exactly what year it was that he was

25   killed.
```

1069

1   Q.    I thought you said ISIS kind of grew out of 2004,

2   2006?

3   A.    I mean, ISIS did emerge and declare the caliphate in

4   Mosul in July 2014, but Anwar Al-Awlaki was killed well

00:48:11  5   before that.  So Anwar Al-Awlaki was never alive to comment

6   on ISIS.

7   Q.    Not the word ISIS, but in his teaching, doesn't he

8   refer to the fact that in his radicalism, that, in fact, the

9   caliphate is like the head of the organization?

00:48:28  10   A.    Yes.

11   Q.    And doesn't he also in his lectures talk about that

12   the body are frankly the recruits, the brothers, the true

13   believers, whoever you want to be, which would be all over

14   the world?

00:48:38  15   A.    I can't quote him, but he speaks to that kind of

16   concept in general.

17   Q.    Okay.  So when this person that you're referring to,

18   and sham_reason, the progeny, because this is all the same

19   person, correct?

00:48:55  20   A.    Correct.

21   Q.    So this person referring to a head and limbs, that's

22   really consistent with Al-Awlaki's teachings, isn't it?

23   A.    Essentially, yes.

24   Q.    Now, did Al-Awlaki also, in his lectures, talk about

00:49:22  25   this concept of being off the grid, getting out of the Ian

1    then coming back into the grid?

2    A.    So my understanding, familiarity with Anwar Al-Awlaki

3    is he spoke much more to the religious justification for use

4    of violence against the United States and nonMuslims.

00:49:42 5    Q.    So he was very attracted to young Muslims who were

6    frustrated and may want to branch into violence, correct?

7    A.    Yes, he was very charismatic and also very influential

8    in providing a religious justification for killing

9    nonMuslims.

00:49:59 10    Q.    I don't think.

11    A.    I can't really think of him talking specifically about

12    tactics, about how to execute those violent actions.  He is

13    more of an ideologue.

14    Q.    But his lectures are easily acceptable -- sorry.

00:50:16 15    Wrong word -- accessible on the Internet and have been for

16    quite some time?

17    A.    Correct.

18    Q.    I want to ask you a little bit now on Garland, Texas

19    to make sure we have that correctly.

00:50:39 20        Now, you got permission from your supervisors to go to

21    Garland, correct?

22    A.    Yes.

23    Q.    And at that time were you aware of Mr. Soofi and Mr.

24    Simpson?

00:50:50 25    A.    Was I aware of them in general?

1      Q.    Yes.

2      A.    I was aware of Mr. Simpson.

3      Q.    But you didn't know anything about Mr. Soofi at that

4      time?

00:51:00  5      A.    I don't think I did, and if I did, it was not very

6      much.  Of course, I never talked to him either.  And so, no,

7      I didn't have -- I didn't really have any background

8      knowledge on Mr. Soofi at that time.

9      Q.    I want to make sure I understood your testimony Friday

00:51:17  10     correctly.

11          When you went to Garland, this was for the draw a

12     picture of Muhammad contest, correct?

13     A.    Yes.

14     Q.    And that was set up by Pamela Geller in response to

00:51:33  15     the Charlie Hedbo incident in Paris, France, about four

16     months earlier?

17     A.    I don't know her specific motives and reasons nor

18     organizing the event.  That sounds likely.

19     Q.    Well, in Paris, wasn't that attack taken out because

00:51:50  20     their editors of the newspaper had put in a caricature of

21     Muhammad?

22     A.    From what I recall, yes.

23     Q.    So in Texas, a similar contest was set up basically

24     just to say, "You're not going to tell us what we can and

00:52:06  25     cannot do," correct?

1    A.    Correct.  That's what I understood the objective of

2    that event to be.

3    Q.    So I got to believe the FBI would think that that

4    Garland, Texas would be a major target for possible

00:52:22  5    reprisal?

6    A.    That was a certain.  And for that reason, the FBI, in

7    advance, set up a command post on-site and there was robust

8    security.

9    Q.    And you knew that when you were driving -- did you

00:52:35  10    drive to Texas?

11    A.    No, I flew there.

12    Q.    And so you, I think we heard your conversations, but

13    you were aware that there were many other FBI agents in the

14    area, correct?

00:52:44  15    A.    Yes.  I didn't know the details of what the FBI was

16    doing --

17    Q.    Sure.

18    A.    -- there?  I had a pretty narrow task to sit in a car

19    in a parking lot and I -- you know, I had some knowledge,

00:52:58  20    but I didn't have intimate knowledge of the FBI's presence

21    physically there.

22    Q.    Is it fair to say that you felt a little more secure

23    in your capacity because you were aware that security

24    measures had been taken?

00:53:11  25    A.    Yes.

1  Q.    Now, did you have any idea, when you were sitting in

2  the parking lot taking pictures, that Simpson and Soofi were

3  even in Texas?

4  A.    I did not definitively know.  I was concerned.  I was

00:53:28  5  concerned for the obvious, that you also stated, and that

6  is, this is a very lucrative a target because it was

7  designed to be very provocative --

8  Q.    I'm sorry.  My question was Soofi and Simpson, did you

9  have independent knowledge that Soofi and Simpson were going

00:53:47 10  to be at the convention center at the same time you were?

11  A.    I definitely did not have that knowledge.

12  Q.    So basically in all your conversations with

13  accepted -- and that was the user name at the time, correct?

14  A.    Correct.

00:54:03 15  Q.    At no time did accepted say, "Watch out for other

16  brothers who may be there."  That's correct, isn't it?

17  A.    That is correct.

18  Q.    In fact, when you indicated, "Look, I can't get

19  close -- the security" -- I'm paraphrasing -- "the security

00:54:18 20  is too close," accepted indicated to you, wait until I get

21  there; isn't that correct?

22  A.    One is I did not say that I could not get too close.

23  I did not say that in my communication with the user of

24  accepted.

00:54:32 25  Q.    Okay.  Go ahead and say what you said.

                1    A.     I'll paraphrase.

                2    Q.     Paraphrase is fine.

                3    A.     So I briefed him on -- I briefed him on the security

                4    posture.  I wanted him to think I was giving him an accurate

00:54:48        5    briefing on the security posture.

                6    Q.     You indicated to him that you couldn't get close

                7    enough for your voice to be heard, correct?

                8    A.     I told him that I was going to go in and get closer.

                9    I did not tell him that I could not.

00:55:01       10    Q.     And then he said, "If you can't get there, wait for

               11    me," correct?

               12    A.     I recall him saying that "Maybe I can get there or

               13    maybe you can wait for me" -- maybe -- I would have to look

               14    at the raw verbatim screen shots to see exactly what he

00:55:18       15    said.  But he did bring up waiting for his arrival.

               16    Q.     Which --

               17    A.     And then I think he also --

               18    Q.     Let me stop you there.  Just answer what I ask so we

               19    can kind of keep this tighter.

00:55:28       20    A.     Okay.  Sure.

               21    Q.     But he did say to you in a text -- I say, text, he did

               22    communicate to you, "Wait until I get there.  If you

               23    can't -- if you can't -- if you have a problem letting your

               24    voice be heard, wait until I get there," correct?

00:55:43       25    A.     I think I recall him saying that he could not get

1    there in time.

2    Q.    Okay.  But you don't remember the word wait?

3    A.    No, I do.  I do.  And I remember him after that also

4    saying --

00:55:53  5    Q.    Which would be an indication that obviously he wasn't

6    there, correct?

7    A.    He was not physically in Texas.

8    Q.    And at no point in time did he indicate to you, in

9    your testimony, that, "Hey, there may be other brothers in

00:56:08 10    the area"?

11    A.    He told me to try to contact Mr. Simpson who was in

12    Arizona -- or he understood Arizona.

13    Q.    My question was a yes or no question?

14    A.    Okay.

00:56:21 15    Q.    But he didn't say to you "Be careful because there are

16    other brothers in the area."  That was never communicated to

17    you.  "There's other brothers at the convention center"?

18    A.    That statement was not communicated to me.

19    Q.    And so I think your testimony was, when you drove down

00:56:38 20    the road and you turned around to come past security and

21    there was a car in front of you that was going slow.  Was

22    that car weaving back and forth, or just going slow?

23    A.    It wasn't weaving.  It wasn't driving like a regular

24    traffic behavior.  It was -- there was something odd with

00:56:56 25    the way the car was driving.  It was a little bit kind of

1  closer to the shoulder of the road and driving a little bit

2  slower.  So is it wasn't like normal traffic.

3  Q.    Well, what was the miles per hour?  25, 35 in that

4  area if you can remember?

00:57:10 5  A.    It was probably 25 or 30.

6  Q.    And so did you have a weapon on you at that time?

7  A.    No.

8  Q.    And so if I understand it correctly, everything

9  happened, what, within 25 seconds?

00:57:20 10  A.    Approximately.

11  Q.    And so one of the reasons that you tried to drive

12  around is you had nothing that you could protect yourself

13  with, or stop the attack?

14  A.    At the time of the shooting?

00:57:30 15  Q.    Yes.

16  A.    At the time of the shooting, my -- the forward

17  momentum of my vehicle was already moving past them.  I was

18  driving and passing them while the shooting was happening.

19       And I had no weapon, so I quickly got out of the area

00:57:48 20  because I was literally in the crossfire.  So I gunned it

21  with my car to get out of there as fast as possible so I

22  didn't get shot.

23  Q.    I'm going to back up.

24  A.    Sure.

00:57:57 25  Q.    You were in the cross -- some of the agents were on

1    the other side of the road?

2    A.    So like to my right were the security officers,

3    including one police officer.

4          After -- in front of them were the two shooters, Mr.

00:58:09  5    Simpson and Mr. Soofi.

6          And then I was right behind them as I was passing

7    them.

8          So as I look over my shoulder, my right shoulder, I

9    saw the line of fire in both directions.

00:58:19  10   Q.    Was your car struck?

11   A.    It was not.  I mean, I would estimate that I was like

12   a half second of getting out of the line of fire.  I mean, I

13   saw the shooting.  And I heard it all kind of behind my

14   right shoulder as I looked back over my right shoulder.

00:58:35  15   Q.    All right.  So afterwards, I think your -- sorry.  Let

16   me start again.

17         That was May 2 of 2015?

18   A.    The shooting was on May 3.

19   Q.    May 3.  I'm sorry, you're right.

00:58:50  20        Did you have any direct communication with accepted

21   the day before?

22   A.    Yes.

23   Q.    Did you have any direct communication with -- or were

24   you aware of any direct communication with Mr. Simpson or

00:59:04  25   Mr. Soofi the day before?

1    A.    No, I did not.

2    Q.    So you talk to accepted on May 3, and it was the next

3    day that you heard from accepted again, correct, May 4?

4    A.    It was -- so I sent a message just after midnight

5    which was early morning of May 4.  And then I think it was

6    May 5 that accepted -- or the user of accepted contacted me

7    from a new account.

8    Q.    Okay.  And so basically Garland was national news,

9    correct?

10   A.    Yes.

11   Q.    And so everybody knew quickly that there were two

12   people that were killed, correct?

13   A.    Yes.

14   Q.    And so when accepted said to you, "Look, I figured out

15   that it couldn't be you," it would be pretty obvious to do

16   that when they knew two people were dead and you

17   communicated with him after the shootings, correct?

18   A.    Yes.  I was still alive.

19   Q.    So -- leave it at that.

20         Now, you also talked a little bit about some of the

21   other Surespot -- Surespot.

22         I think you indicated yesterday that it's your belief

23   that Surespot wasn't capable of multiple apps?  Did you

24   testify to that?

25   A.    I think what I said was that at that time Surespot,

1    one Surespot account could be used on one phone.

2    Q.    Are you aware that if -- or is it your belief that if

3    Surespot could be on -- as long as it's the same user name

4    could be on two different applications?  Two different

01:00:48  5    phones?

6    A.    So in 2015, my understanding of the technological

7    capabilities of Surespot was that it was limited such that

8    only one account could be used on one phone.

9         So one user of one account could only be used on one

01:01:02  10    phone.

11         You could not have two users using the same account on

12    two different phones.  Surespot was designed with the

13    encryption to where that is physically impossible.

14    Q.    Do you know if that changed?

01:01:14  15    A.    Since 2015?

16    Q.    Is it your belief that Surespot still operates in that

17    case -- that means.

18    A.    I don't know of any jihadis that use Surespot in 2018.

19    And so I don't know the capabilities of Surespot in 2018.

01:01:33  20    Q.    All right.  And speaking of which, there was testimony

21    about telegraph.  Do you know what telegraph is?

22    A.    Telegram?

23    Q.    Telegram.  Thank you.

24    A.    I'm familiar with telegram, yes.

01:01:47  25    Q.    And what is telegram?

1    A.    Telegram is another encrypted mobile messages app with

2    additional features and functions, but it allows for

3    peer-to-peer encrypted messaging.

4    Q.    Are you aware from your experience whether telegraph

01:02:01 5    is now a favored --

6    A.    Telegram is currently very popular amongst terrorists,

7    jihadis, and ISIS supporters.

8    Q.    I just have a few more things.  I just want to kind of

9    clean up some areas.

01:02:23 10        Did you testify Friday that one of the tactics that

11   somebody may use is keeping off the grid?  Did you testify

12   about that?

13   A.    I testified that the user of all these accounts

14   promoted this idea of living off of the grid as his

01:02:43 15   preferred tactic for avoiding detection.

16   Q.    All right.  And when you're talking off the grid, that

17   would mean -- correct me if I'm wrong -- you know, not

18   having accounts in your name, paying things in cash, not

19   having receipts, that sort of thing?

01:02:59 20        Is that what we're talking about?

21   A.    Well this concept of living off the grid was defined

22   by the user of these accounts.  And so I could tell you what

23   he told me how to live off the grid or how he described

24   that.

01:03:09 25   Q.    Okay.  But getting a hotel and using your driver's

1    license and providing them your actual name and actual Email

2    and being accurate, that's really not consistent with living

3    off the grid, is it?

4    A.    If you're defining living off the grid in the pure

01:03:30  5    sense of living a lifestyle that can't be detected, then

6    yes, that would be against -- I think there is different

7    grades of living off of the grid.  It depends on how any one

8    person wants to define that.

9          I mean, you could say living off the grid means you

01:03:46 10    only ride a bicycle.

11    Q.    I think you testified, you know, yesterday that

12    staying off the grid was referred to as disconnecting from

13    society?

14    A.    To some degree, yes.

01:03:57 15    Q.    But it's all degrees?

16    A.    Yes.

17          MR. DOUGHTEN:  Could I have one second, Your

18    Honor?

19          THE COURT:  Yes, you may.

01:05:13 20    BY MR. DOUGHTEN:

21    Q.    I just have a couple more questions.

22    A.    Sure.

23    Q.    In your capacity as working undercover, did you at any

24    time in 2015 -- well, between January and May of 2015, did

01:05:29 25    you update or change your profile?

1082

```
        1              In other words, do you have a profile so that the

        2    other person can vet you out?  Accepted, did accepted have a

        3    way of vetting you out?

        4    A.    So accepted was aware of the Twitter account I was

01:05:45 5    using at the time, was aware of the Surespot account, and

        6    then the Wickr accounts.

        7    Q.    And during that period of time, did you update your

        8    profile or make a new profile of any sort?

        9    A.    I did not change my Twitter account.  That remained

01:05:59 10   constant during the entire information.

       11              And then I only changed my Surespot accounts and Wickr

       12    accounts in concert with the person I was talking with.

       13    Q.    Okay.

       14    A.    And often at their direction.

01:06:13 15             MR. DOUGHTEN:  One second.  I'm sorry, Your

       16    Honor.

       17              THE COURT:  That's all right.

       18    BY MR. DOUGHTEN:

       19    Q.    And in context with that, in your undercover, you

01:06:44 20   would never put your working user name on your public

       21    domain, would you?  You would keep those separate?

       22    A.    Like my -- like a personal account?

       23    Q.    Yes.

       24    A.    I would not -- I'm sorry.  Can you -- I would not mix

01:06:58 25   my personal account with an account I was using for work.
```

1    Q.    That's obvious.

2    A.    I don't think I understood the question.

3    Q.    You know what.  I'll drop that question.  I'm sorry.

4    It's kind of convoluted.

01:07:09  5         The last question I was, just to clarify Garland,

6    accepted never told you what to do, correct, except for

7    he --

8    A.    He said to go make my unique one-man protest and make

9    my voice heard against Pamela Geller in the context of

01:07:27 10   using, you know, the tools that I had available to me.

11   Q.    And you interpreted that he didn't specifically say,

12   "This is what you need to do?"  He left that up to you?

13   A.    He did not -- give me have explicit orders to commit

14   an act of violence against Pamela Geller.  I mean, it

01:07:45 15   was --

16   Q.    Thank you.

17            MR. DOUGHTEN:  No further questions, Your Honor.

18            THE COURT:  Thank you.

19       Any redirect of this witness?

01:07:50 20           MR. SHEPHERD:  Yes, Your Honor.

21             REDIRECT EXAMINATION OF STEVEN JANE

22   BY MR. SHEPHERD:

23   Q.    Good morning, Agent Jane.

24   A.    Good morning, sir.

01:08:06 25   Q.    I first want to get -- ask you a little bit about some

1084

1    of the locations that you were asked about.

2            So as I understood it, you testified just a minute ago

3    that you flew to Garland, Texas?

4    A.    Correct.  Flew to Dallas, Texas and then drove to a

01:08:22  5    suburb of Dallas, which is Garland, Texas.

6    Q.    Where did you fly from?

7    A.    I flew from at that time I was in Cleveland, Ohio.  I

8    flew out of Cleveland.

9    Q.    And during the course of these communications, where

01:08:35 10    were you physically located?

11    A.    I was in a variety of states, to include California

12    and Ohio.

13    Q.    Would that have been in the Cleveland area?

14    A.    Yes.

01:08:47 15    Q.    The day before you flew to Garland, Texas, did you

16    receive any communications from accepted on where accepted

17    was located?

18    A.    Yes, I did.

19    Q.    Where was that?

01:08:58 20    A.    He said he was in Maryland, Baltimore, Maryland.

21    Q.    Did he indicate what he was doing on that day in

22    Baltimore, Maryland?

23    A.    At the time there were riots, significant riots going

24    on in Baltimore, Maryland.  On May 2, the riots were dying

01:09:15 25    down.  And he also told me that he was going to meet with

1   another brother, which would be called the Pennsylvania

2   brother.

3       And that was -- the Pennsylvania brother is someone

4   that the user of accepted put me in contact --

01:09:31  5               MR. DOUGHTEN:  Objection.

6               THE COURT:  Sustained.

7   BY MR. SHEPHERD:

8   Q.    And you earlier were asked about living off the grid.

9   And you said what you learned from living off the grid was

01:09:43 10   what you were told.  What were you told living off the grid

11   meant by accepted?

12   A.    So it was consistent with the concept of kind of

13   detaching from society.  As an example, you know, paying

14   with cash so you didn't leave a trail of receipts.  Like

01:10:03 15   changing your residence, moving around, being nomadic.

16   Q.    If we could pull of Government Exhibit I believe 5

17   page 43.

18       Taking a look at the bottom of the screen, without

19   reading it, what was this person here after at this time,

01:10:34 20   advising you to do?

21   A.    To live off the grid.

22   Q.    And if we move forward to page 44, what was the

23   further advice beyond living off the grid?

24   A.    That I needed to get trained.

01:10:49 25   Q.    And then what was the following advice in the middle

1   of the page?

2   A.     And then after getting trained, then I would go back

3   to society to live on the grid.  Just go back and live in

4   overt living like a normal person.

01:11:05 5   Q.     Okay.

6   A.     So the end goal was to live and appear as if you're a

7   normal person in society.

8   Q.     If we can hold on for just a minute.

9          You were asked a lot about the reliance on your own

01:11:27 10   training and judgment in this job.

11          What is your sort of judgment based on when you're in

12   a case like this?

13   A.     It's a combination of experience, training, education,

14   etcetera.  But, of course, I'm looking for indications that

01:11:47 15   this person is inclined to commit a crime, in this case in

16   the terrorism context, to commit an act of violence, or

17   support an act of violence or support a terrorist

18   organization.

19          So I'm looking for physical indications that the

01:12:05 20   person is committed to that and is willing to take action?

21                MR. SHEPHERD:  May I have a moment, Your Honor?

22                THE COURT:  You may.

23                MR. SHEPHERD:  Your Honor, no further questions.

24                THE COURT:  Thank you.

01:12:55 25          Anything further of this witness?

        1          MR. DOUGHTEN:  No.  Thank you very much.

        2          THE COURT:  All right.  Ladies and gentlemen,

        3   we're going to take a very, very quick break.  I need to

        4   confer with the attorneys briefly.  Just give us about five

01:13:10 5   minutes.  We'll be back with you.

        6          Leave your notepads on your chairs.  Remember all the

        7   discussions we've had about not discussing the case among

        8   yourselves or with anyone else.  They all apply.

        9          We'll see you in about five or ten minutes, please.

01:13:23 10   Thank you very much.

       11          All rise.

       12          (Jury out, 10:00 a.m.)

       13          THE COURT:  Just be seated very briefly.

       14          I want to let the witness be removed from the

01:14:17 15   courtroom.

       16          Procedurally, just give me a preview of your day,

       17   counsel for the government, just while we have a few minutes

       18   here.

       19          MR. SHEPHERD:  Yes, Your Honor.

01:14:27 20          Our next witness is an expert witness who has

       21   been -- we provided notice to the defend counsel and they've

       22   had an opportunity to discuss with him prior -- his

       23   testimony prior to coming in.

       24          We then have a couple of witnesses who should be

01:14:43 25   pretty short.

1    One is the eyewitness to the shooting in Garland and

2    the other two deal with the recovery of two cell phones that

3    we're going to present evidence on later.

4    And then we have, first a surveillance officer who saw

01:15:00 5    this meeting between the defendant and an informant in

6    Baltimore, Maryland, and then if we get there, the informant

7    himself would be next.

8    That would be the end of the day, Your Honor.

9    THE COURT:  That's an ambitious day.

01:15:13 10    MR. SHEPHERD:  If we get through it.  We

11    understand we may not get through all that.

12    THE COURT:  The only question I have, I know I

13    already made a decision about the Garland, Texas photos, the

14    defendant isn't charged with any conduct, as I understand

01:15:25 15    it, or a crime related to Garland, Texas.

16    So do you need more Garland, Texas.

17    MR. SHEPHERD:  Your Honor, item let Mr. Bennett,

18    since it's his witness, respond.

19    MR. BENNETT:  Yes, Your Honor.  As we argued in

01:15:40 20    our response in opposition to the motion in limine, part of

21    what is in the actual indictment itself talks about the acts

22    there at Garland, Texas.

23    There's subparts in the count as far as the manner and

24    means that were there.

01:15:56 25    We noted in our response that we intended to call the

1    individual that was actually involved in the shooting, the

2    officer that was there as one of our witnesses.

3         And during opening, we, on behalf of the government,

4    suggested they would hear, based on your order, testimony

01:16:14 5    from that individual.

6         All we've had so far is this agent's kind of "I've

7    been driving by and kind of saw it in the rear view mirror."

8         We think it's important for the jury to understand

9    this was not just some philosophical discussion online about

01:16:31 10    jihad.  These were actual acts of violence that occurred on

11    U.S. soil, and that the defendant was involved, knew what

12    was going on, encouraged that activity, and those are, you

13    know, the underpinnings of the indictment.

14         And a promise has been made to the jury.

01:16:46 15    The case law that we cited talks about gaps in the

16    story and gaps in the testimony.

17         We're not going to show any photographs of anything

18    nefarious or gore in any way.  It's just simply the act

19    itself, how it occurred, and this individual's involvement

01:17:03 20    in it.

21         THE COURT:  But this witness will tell us about

22    the act and how it occurred, right, the witness you intend

23    to call?

24         MR. BENNETT:  Yes.

01:17:11 25         THE COURT:  Does that witness know anything about

1    Mr. Hendricks or have any communication with Mr. Hendricks,

2    or have any knowledge of Mr. Hendricks?

3              MR. BENNETT:  He does not, Your Honor.

4              THE COURT:  So my question is why is that not

01:17:22  5    simply cumulative.  What does it add to the case?  I don't

6    think there's any dispute that the jury already knows what

7    happened in Garland, Texas, about the two individuals in

8    question that were shot and killed.

9         So I'm -- what -- why do we need to hear from this

01:17:38 10   witness further, I guess, is my question?

11             MR. BENNETT:  Your Honor, with all due respect, I

12   would disagree that the jury -- it's clear as to what

13   exactly happened in Garland, Texas.  They heard from an

14   agent who was driving by, and by his own testimony sped off,

01:17:51 15   kind of saw something in the back of his window and heard

16   some exchange of gunfire.

17        We -- this is a part of the underlying indictment, the

18   counts that are there.  It brings forth the actual act of

19   violence and planning an act of violence that is an element

01:18:09 20   and an aspect of what Mr. Hendricks is charged with.

21             THE COURT:  All right.  We'll take it up at the

22   appropriate time.  I'm getting ahead of myself -- after we

23   hear from defendant's counsel.

24        So let's get the jury back in.  I just wanted to take

01:18:28 25   a break, let this witness.

        1          MS. MAGNONE:  Your Honor, may we take a brief

        2    comfort break?  This next witness is lengthy.

        3          THE COURT:  All right.  Let's take a break, use

        4    the restroom.

01:18:38  5        I don't know if Mr. Hendricks needs to leave.  Are you

        6    all right?

        7          THE DEFENDANT:  No, sir, I'm good.

        8          THE COURT:  All right.  Let's take a break.  Come

        9    back in ten minutes and let's get started.

01:18:50 10          MS. MAGNONE:  Thank you, Your Honor.

       11        (Recess taken, 10:05 a.m.)

       12        (Jury in, 10:15 a.m.)

       13          THE COURT:  Counsel, you may call your next

       14    witness.

01:31:42 15          MS. MAGNONE:  Thank you, Your Honor.  The

       16    government calls Dr. Lorenzo Vidino.

       17          THE COURT:  Sir, if you would just approach the

       18    witness stand and remaining standing while administer the

       19    oath or affirmation.

01:32:09 20                    LORENZO VIDINO,

       21       of lawful age, a witness called by the United States,

       22          being first duly placed under oath, was examined

       23                  and testified as follows:

       24          THE COURT:  Please be seated in the witness

01:32:13 25    stand, if you would.  Just a couple brief instructions, if I

1    may.

2         Please wait until the attorneys finish their questions

3    before you begin to respond.  It's difficult for the

4    listeners and the court reporters in this case if two people

01:32:26  5    are talking at the same time.

6         If there is an objection to any question, please do

7    not respond to the question until I rule on the objection.

8    Of course, if I sustain the objecting, you will not answer

9    the question.  And, of course, you need to respond verbally

01:32:39 10    to all the questions as the court reporters have to

11    transcribe your answers.

12         Thank you very much.

13              THE WITNESS:  Thank you.

14              THE COURT:  Counsel, you may inquire.

01:32:46 15              MS. MAGNONE:  Thank you, Your Honor.

16              DIRECT EXAMINATION OF LORENZO VIDINO

17    BY MS MAGNONE:

18    Q.    Can you please tell the jury your full name and spell

19    it for the court reporter?

01:32:51 20    A.    Sure.  It's Lorenzo Vidino and that's L-O-R-E-N-Z-O,

21    V-I-D-I-N-O.

22    Q.    Dr. Vidino, are you currently employed?

23    A.    Yes, I am.

24    Q.    And where are you employed?

01:33:05 25    A.    I'm the director of the program on extremism in the

 1   George Washington University in Washington, D.C.

 2   Q.    What is the program on extremism?

 3   A.    It's a research outfit that basically conducts

 4   research on extremism, various nature of the United States.

01:33:22  5   We mostly focus on ISIS and the ISIS-related mobilization in

 6   the United States.

 7   Q.    Do you also, as part of that program, make any efforts

 8   to review online materials or social media of extremist

 9   groups like ISIS?

01:33:37 10   A.    Yes.  That's a component of what we do.  We have a

11   small team of five, six individuals who basically works on

12   sort of monitoring online communication and studying those

13   communications basically 24/7.

14   Q.    Now, you mentioned that you produce some reports.  Are

01:33:55 15   any of those reports specifically related to ISIS?

16   A.    Most of them are, yes.  We publish some six, seven

17   reports, basically all of them on ISIS.

18   Q.    Can you just briefly give us a summary of what

19   specifically about ISIS they are about?

01:34:11 20   A.    Sure.  Different aspects.  Our latest report, for

21   example, it's call The Travelers.  It's 120 pages, and we

22   looked at 65 Americans who traveled to Syria and Iraq and

23   joined ISIS or other groups.  And we basically looked at

24   their lives.  We tried to get as complete of a picture as

01:34:32 25   possible on them, their radicalization process, their

1    traveling, and what they did over there.

2        We've published a couple reports about online

3    activities, how ISIS supporters use Facebook, Twitter, and a

4    variety of other platforms.

01:34:49 5        And our big report, which was one of the first ones we

6    did was December of 2015, which looked at the individuals

7    who have been arrested in the United States.  It was called

8    ISIS in America.  And we studied all the 120 individuals who

9    have been arrested for ISIS-related activities.

01:35:06 10   Q.    Thank you.

11        Are there any particular agencies or organizations

12   that use the products, these reports that you produce, your

13   organization produces?

14   A.    Sure.  The products are publicly available.  We put

01:35:19 15   them on our website.  We're not commissioned by any agency,

16   but we know they're using them in training by the FBI, by

17   the Department of Justice, by the Department of Homeland

18   Security, and we often receive calls from them to go and

19   teach or provide at least sort of a seminar, workshop

01:35:38 20   briefing.

21   Q.    What about policymakers?

22   A.    We interact quite a bit with -- we're Washington based

23   so we are a few blocks from the White House and from

24   Congress.  So we work quite closely with Congress.

01:35:52 25   Particularly I have personally testified in the last few

1    years before Congress.  So has my deputy.  We also provide a

2    lot of formal briefings and seminars to individual

3    congressmen, senators, or staffers.

4    Q.    Are you also the director to the terrorism program at

01:36:19  5    the Institute For International Studies in Milan, Italy?

6    A.    I am.

7    Q.    And what is your connection to Italy?  We notice that

8    you have an accent.

9    A.    Yes.  It's not a midwest accent.  Born and raised in

01:36:33  10   Italy.

11   Q.    Did you receive any education in Italy?

12   A.    I had my first degree which was a law degree from the

13   University of Milan in Italy.

14   Q.    Have you received any degrees in the United States?

01:36:42  15   A.    Yes.  I have a master's and a doctorate from the

16   Fletcher School, Tufts University in Boston.

17   Q.    What was your focus of your master's degree?

18   A.    Security studies focused on the Middle East.

19   Q.    And can you tell us what that means, security studies?

01:36:57  20   A.    It's basically the study, studying different ways in

21   which military force is used in international relations.

22          So I focused specifically on terrorism and insurgency.

23   Q.    And you mentioned your degree also focused on the

24   Middle East.  Did that include Islam and Islamic

01:37:18  25   civilizations?

1    A.    Yes, I took quite a few classes on the subject.

2    Q.    You mentioned you obtained a Ph.D. as well?

3    A.    Correct.

4    Q.    What was the focus on the Ph.D.?

01:37:29 5    A.    On the Muslim brotherhood in the West.  Basically a

6    dissertation of the Ph.D.s in security studies.

7              THE COURT:  Just a little bit slower, please, for

8    the court reporter.

9              THE WITNESS:  I apologize.

01:37:43 10              THE COURT:  For both of you, please.  Just slow

11    you down.  Take a deep breath.

12              THE WITNESS:  The doctorate is in security

13    studies with a focus in the Middle East.  And the

14    dissertation was on the Muslim Brotherhood in the West.

01:37:56 15    BY MS. MAGNONE:

16    Q.    And based on your education and your experience, Dr.

17    Vidino, what is your field of expertise?

18    A.    Terrorism.

19    Q.    And how many years are you been studying, researching,

01:38:06 20    training in that area?

21    A.    Eighteen.

22    Q.    Do you focus on any particular area of the world?

23    A.    The West, Europe and North America.

24    Q.    So you referenced the West a couple times and that

01:38:18 25    means North America and Europe; is that correct?

1    A.    Correct.  All of my career is basically between Europe

2    and the United States.  More in the United States, but I

3    also look at Europe, correct.

4    Q.    Okay.  So let's talk a little bit about your work

01:38:29  5    experience.  Have you done any fellowships?

6    A.    Yes.  I've -- I was a fellow at four or five different

7    institutions before settling at the George Washington

8    University.

9    Q.    And just briefly, what is a fellowship?

01:38:42  10    A.    It's basically when an institution hosts you to do a

11    research project.  It's generally a one-year stint at a

12    think tank or university and you work in on a specific

13    project for them.

14    Q.    And where were your fellowships?

01:38:55  15    A.    I was at the Kennedy School At Harvard University.  I

16    was at the United States Institute of Peace in Washington,

17    D.C., the Rand Corporation, also in Washington, D.C.  And

18    then Zurich, Switzerland, the Center of Security Studies.

19    Q.    Have you published any books on the subject of

01:39:15  20    terrorism?

21    A.    Yes, I've published five.

22    Q.    Can you just briefly tell us about those.

23    A.    I have -- my first book was in 2005, was about

24    al-Qaeda in Europe.

01:39:26  25          I've published a couple more books about different

1    dynamics of terrorism and recruitment.  And I'm working on

2    another one, you know, also about ISIS.

3    Q.    Have you written any journal articles about extremism

4    or terrorism?

01:39:45 5    A.    Yes, I would say around a dozen, more or less, peer

6    reviewed.

7    Q.    And what do you mean by peer reviewed?

8    A.    Peer reviewed basically is a process in academia where

9    basically when you submit an article, at least two of your

01:39:59 10   peers, your fellow academics review the article and you have

11   to pass basically a review paper.  You have to say whether

12   it's a thumbs ups or a thumbs down.

13   Q.    You mentioned that you testified before the United

14   States Congress.  What was the subject of your testimony?

01:40:14 15   A.    Different aspects of terrorism.  My last testimony was

16   before the senate, and it was about the future of ISIS.

17   I've testified about different aspects of radicalization,

18   terrorism in the West.

19   Q.    Have you ever testified in Federal Court as an expert

01:40:32 20   on terrorist organizations?

21   A.    Yes, I have.

22   Q.    Can we please bring up Government Exhibit 182?

23         Dr. Vidino, do you recognize this document in front of

24   you?

01:40:45 25   A.    That's the first page of my resume, yes.

1099

1       Q.      And have you had the opportunity to review all 24

2       pages of this document prior to your testimony today?

3       A.      Yes, I have.

4       Q.      And is it a complete representation of the things we

01:40:58 5      just talked about, your books, your publications, your

6       education?

7       A.      Yes, it is.

8       Q.      Are you being paid for your work on this case?

9       A.      Yes, I am.

01:41:11 10     Q.      And what is your hourly fee?

11      A.      $250.

12      Q.      And what do you anticipate your total bill will be for

13      this case?

14      A.      I honestly don't know.  It depends, I guess.

01:41:22 15     Q.      Okay.  So let's talk about ISIS.  That seems to be

16      what you know a lot about.

17              Can you tell the jury, what is your definition of

18      ISIS?

19      A.      ISIS is a terrorist organization that has been

01:41:34 20     operating for at least the last 18 years, although with a

21      different name.  And it's been particularly effective over

22      the last seven, eight years, when it managed to control

23      territory in both Syria and Iraq and establish the

24      caliphate.

01:41:54 25             It is at this point definitely before the downfall of

1    the caliphate, which took place over the last few months, it

2    was by 2014, '15, '16, the most powerful terrorist

3    organization in the world and probably the only one that

4    controlled a large territory, a territory which at some

01:42:14  5    point was the size of France.

6    Q.    Now, you used the word caliphate.  What does that

7    mean?

8    A.    Caliphate is a basically a concept in Islam.  It's

9    basically a state where unites both religious and the

01:42:34 10    political aspects.  The caliph is the subject.  That is the

11    military leader of the state, also the religious leader of

12    the state.

13        ISIS claimed in June, 2014, it basically claimed to

14    have reestablished the caliphate.  The last caliphate that

01:42:52 15    was universally accepted was basically existed until 1924.

16    Since there, there has been no caliphate.

17        What ISIS did what it basically occupied that land in

18    Syria and Iraq, it claimed a bedland was the new caliphate

19    and its leader was the new caliph.  Of course, not all

01:43:14 20    Islams, the vast majority of Islams, do not think that's

21    legitimate caliphate.

22    Q.    You mentioned a leader.  Who is that leader?

23    A.    Abu Bakral Baghdadi.

24    Q.    And can you spell that?

01:43:26 25    A.    A-B-U, then B-A-K-R-A-L, and B-A-G-H-D-A-D-I.

1       Q.      And are there any other names that he goes by?

2       A.      He is referred to by people obviously who are his

3       followers as Amir Al-Mumineen.

4               Do you want the spelling?

01:43:49  5     Q.      Thank you.

6       A.      A-M-I-R, A-L, M-U-M-I-N-E-E-N, which means leader of

7       the faithful.  Leaders of the believers, basically.  So

8       that's obviously the title that only people who actually

9       believe he is the caliphate give him --

01:44:10 10    Q.      Now, you mentioned that most Muslims don't believe in

11      this caliphate.  Can you explain that a little bit more?

12      A.      Most Muslims believe that the creation of the

13      caliphate was ISIS was illegitimate, was illegitimate from a

14      theological perspective, Abu Bakral is basically an imposter

01:44:29 15    and he has a claim for himself a title that the majority of

16      Muslims who reject the interpretation of Islam that ISIS

17      have, is basically unacceptable.

18              So obviously the backlash against ISIS and its

19      declaration and appropriation of what is an important

01:44:43 20    religious title in Islam is something that the majority of

21      Muslims, worldwide, have contested.

22      Q.      So how does one become a member of ISIS?

23      A.      There's different ways.  ISIS operates in a very fluid

24      way.  I think unlike some other terrorist organizations,

01:45:04 25    there's obviously people who go to Syria and Iraq and

1   physically join ISIS by swearing allegiance to the leader,

2   to al-Baghdadi and join the organization physically.

3       But ISIS has been very fluid.  It's a somewhat

4   revolutionary way of operating where basically individuals

01:45:27 5   who don't really have the physical connections, as long as

6   their actions fit into what ISIS wants, as long as they see

7   and perceive themselves as part of ISIS, they're also ISIS.

8       So it's fairly common, for example, it's a dynamic

9   that we've seen with a lot of terrorist attacks in the

01:45:47 10   United States or in Europe, that individuals that carry out

11   attacks have no operational connections to ISIS.  They've

12   never traveled to Syria.  They've never traveled to Iraq.

13       They might have been in touch online, but they really

14   have no operational connection to ISIS.  They carry out an

01:46:06 15   attack, and then they claim to have done so on behalf of

16   ISIS.

17       What happens is ISIS accepts the claim, often calls

18   those individuals soldiers of the caliphate, says, "Our

19   solider, our brother, has conducted this attack."  And so

01:46:25 20   it's a very informal way, if you will.

21       So there's different ways in which you can be a part

22   of ISIS.

23   Q.   Has ISIS ever encouraged people from the West to

24   travel to Syria and Iraq?

01:46:38 25   A.   Yes, particularly in the first years when it was

1   working on seizing territory in Syria and Iraq and when it

2   established the caliphate, the big drive was to attract

3   people from all over the world, the West included, to travel

4   to join the group.

01:46:54  5        The idea was that they were creating a new society, a

6   new state, which obviously was in a state of war with a

7   variety of enemies.  So they needed people there to support

8   their military efforts.

9        So you had a lot of propaganda that was published by

01:47:11 10  ISIS in 2012, 2013, 2014 which was calling on

11  supporters -- and all Muslims in general, their call is to

12  all Muslims.  Of course, most Muslims reject that call, but

13  they appealed to the whole Muslims community to go and join

14  the group, framing it as sort of a religious duty.  You have

01:47:33 15  to come here.  You have to help the caliphate.  It's a

16  religious duty.

17  Q.   Do they still encourage people to do that?

18  A.   Significantly less.  What happened is that as ISIS

19  started to suffer defeats on the ground in Syria and Iraq,

01:47:46 20  it became, first of all, difficult for them to have people

21  cross the border to Syria and Iraq.

22       And they also felt they also didn't need people there.

23  It was more important, particularly for people in the West,

24  for followers in the West, to stay where they were.

01:48:05 25       The idea from ISIS leadership -- I would say that

1    starts around the fall of 2014 -- the message is different.

2    It's no longer come to join us but stay where you are.

3    You're more useful to the cause if you strike the enemy

4    where you are.

01:48:22 5        If you are in France, if you're a French, German,

6    American, Canadian supporter of ISIS, you're not really that

7    useful here on the ground in Syria and Iraq.  You're

8    significantly more useful if you carry out attacks there

9    where you are.

01:48:40 10       So there has been a shift in the messaging from ISIS.

11   Q.    Was there some kind of formal proclamation or

12   announcement of that message?

13   A.    There are quite a few messages.  If you read the

14   magazines from ISIS, for example, Dabiq, Rroumiya, which are

01:48:56 15  the two official magazines, they started putting out that

16   message frequently.

17        There's also a very famous speech that was given by

18   Al-Adnani.

19   Q.    If you could spell that.

01:49:07 20  A.    A-L, A-D-N-A-N-I, who was the number two of ISIS until

21   he was killed, and he gave a very famous speech where he

22   basically advised ISIS followers and sympathizers to carry

23   out attacks wherever they are.

24        The idea was, once, again, "You're much more useful

01:49:32 25  where you are.  We have followers worldwide.  Attack the

1   enemy.  You know where the enemy is."  And, of course, it's

2   most western countries.  Carry out attacks wherever you are,

3   as long as you do it under the ISIS umbrella.

4   Q.    And when was that lecture or message?

01:49:50 5   A.    The first one is in September 2014.  And there's

6   another one in 2015, in early 2015.

7         THE COURT:  Doctor, could you back up, and for

8   the benefit of the court reporters, give us the name of the

9   two magazines.  Could you spell the names, please.

01:50:02 10        Thank you.

11        THE WITNESS:  Yes.  Dabiq, D-A-B-I-Q, and

12   Roumiya, R-O-U-M-I-Y-A.

13        THE COURT:  Thank you.

14        THE WITNESS:  Sure.

01:50:20 15   BY MS. MAGNONE:

16   Q.    Dr. Vidino.  The term "jihad" has come up several

17   times throughout this trial.

18        Can you tell the jury what your definition of jihad

19   would be?

01:50:29 20   A.    Sure.  It's a very complex term, but it has different

21   meanings.

22        Let me back up a second and give you sort of a general

23   premise.

24        ISIS, like other groups, like al-Qaeda, but ISIS in

01:50:45 25   particular, uses a lot of -- misuses a lot of terms that are

1    in mainstream Islam.  The way they do it, is they have a

2    very selective literalist interpretation and twist it, if

3    you will, interpretation of these terms and they use them to

4    their advantage.

01:51:02  5         Jihad is in particular one of those terms which has

6    sort of a meaning in mainstream Islam and a different

7    meaning for ISIS.

8         In mainstream Islam, jihad basically means any effort

9    to please God.

01:51:15 10         So basically, let's say if you're doing something

11   that, you know it's not very easy and you might not like it,

12   but it's good to please God, that's sort of an internal

13   jihad.  So quit smoking.  Be nice to an obnoxious neighbor,

14   these sort of things.

01:51:34 15         You're doing something, your struggling with yourself

16   to please God.  It also always meant in mainstream Islam a

17   war effort, a military effort to please God and to defeat

18   the enemies of Islam.

19         Now, in mainstream Islam there are certain very

01:51:51 20   precise rules of engagement when a Muslim can or should

21   engage in that kind of military effort.

22         The way ISIS uses that is very loose and basically

23   argues that there's a giant conspiracy against Islam, but

24   basically the whole world is out to get true Islam and that

01:52:09 25   it's a duty for all Muslims to engage in jihad, which means

1     basically joining ISIS and fighting enemies or in any way

2     carrying attacks against nonbelievers of Islam.

3     Q.    So how does this concept of jihad relate to ISIS?

4     A.    It's one of the main frames, concepts, that ISIS uses

01:52:31 5     to attract people, to mobilize people to their cause.

6         The idea is, as I said, there's a giant conspiracy

7     against Islam, the West Shia Muslims, Zionists, normal fully

8     believing Muslims.  So it's basically a giant conspiracy

9     that wants to destroy Islam.  And we, ISIS, are the ones

01:52:52 10     defending true Islam against this giant conspiracy.

11         It is a duty for all Muslims, argue ISIS, to defend

12     Islam.  And joining us is a religious duty.  So they play a

13     lot on these kind of religious duties to attract people to

14     their cause.

01:53:11 15     Q.    Earlier you mentioned propaganda, propaganda to

16     encourage people to move to Syria and Iraq and then later to

17     stay where they're at.

18         Do ISIS and their supporters create this propaganda?

19     Or where does this propaganda come from?

01:53:25 20     A.    It works basically in two different ways.  There's

21     sort of a top down and a bottom up propaganda effort.

22         Top down ISIS has created a very, very sophisticated

23     propaganda machine with media offices, really media offices

24     attracting people who are professional, video producers, a

01:53:48 25     lot of people in this room have probably seen in the news

1    ISIS videos.  They're very sophisticated in their

2    propaganda, high qualify Hollywood style, some of them.

3         Gruesome, but high quality from an imaginary point of

4    view, from a narrative point of view, so there's different

01:54:06  5    media production companies that are directly part of ISIS

6    and what ISIS does is it releases these videos, these

7    magazines to a very sophisticated dissemination machine

8    which is mostly online through social media.  That's the top

9    down.

01:54:22 10         The bottom up is what we've seen over the last few

11    years is that thousands and thousands of ISIS sympathizers

12    who do not necessarily have any kind of formal affiliation

13    to ISIS have been producing and disseminating their own

14    propaganda.

01:54:40 15         So anybody with some good computer skills or decent,

16    average computer skills can produce a video.  With today's

17    technology it's fairly easy, especially for young people,

18    produce their own videos with their own pictures and then

19    create hundreds and hundreds of Twitter accounts, Facebook

01:54:57 20    profiles, and be active on a variety of platforms and

21    disseminate.

22         So there's an official effort by ISIS, but it's

23    basically very democratic, if you will, because anybody can

24    become sort of a propaganda machine for the organization.

01:55:13 25    Q.    So these people that are producing from the bottom up,

1    as you describe, they're primarily using the Internet to

2    disseminate this information?

3    A.    Yes, it's mostly --

4    Q.    Or social media?

01:55:24 5    A.    I'm sorry.  Yes.  It's mostly an online effort.

6    Q.    What types of things are you seeing that are being

7    disseminated?  Do you see any common themes or narratives

8    that is coming from this propaganda?

9    A.    Yeah.  ISIS is very sophisticated, not just in its

01:55:40 10    style but in its narrative.  There's a core narrative which

11    is, as I said earlier, there's a giant conspiracy against

12    Islam, true Islam is under attack, and there's a vanguard,

13    only a few people that really understand and want to defend

14    true Islam, and that's us.

01:56:02 15        Obviously ISIS is understood that it has to appeal to

16    people that are different and you have to appeal to

17    different people in different ways.  So some of the videos,

18    some of the propaganda, is very violent, very gruesome, the

19    stuff that's most commonly seen in the West.  The news likes

01:56:23 20    to broadcast the beheadings, the burning alive of people,

21    throwing people off of buildings, and so on.  That's part of

22    it.

23        In a way, it appeals to some people who like violence.

24        There's another message by actually from a

01:56:39 25    quantitative point of view, it's actually the majority of

 1      ISIS propaganda that sort of sends a more positive message.

 2      We're building a perfect society.  There's infidelity, moral

 3      corruption and all the bad things that come with societies

 4      that are not purely Muslim, including, of course, all of the

 5      Middle East because ISIS sees all societies in the Middle

 6      East as not Islamic enough, as corrupt.

 7          And you should come and join the sort of utopian

 8      society we have created.

 9          So you will see some ISIS videos with happy families,

10      smiling children, and so on.

11          So there is different approaches that they use

12      because, of course, different people might be attracted by

13      different aspect so the propaganda in different aspect of

14      the organization.

15      Q.    Does ISIS propaganda ever directly reference the

16      United States?

17      A.    Fairly frequently.

18      Q.    How does -- what kind of light is the United States

19      painted in?

20      A.    It's always very negative.  Of course, the United

21      States is perceived as one of the biggest enemies, not just

22      of ISIS, but in Islam in general.  The obvious is that the

23      United States is an infidel country.  Of course, it's not

24      ruled under Islamic law so, therefore, it's per se a regime

25      that should be destroyed, but also it interferes unfairly in

1      the Middle East.

2              It has attacked ISIS.  Of course, since September 2014

3      the U.S. lead coalition has been attacking ISIS and that, of

4      course, has made ISIS propaganda against the United States

01:58:15  5      even more sacred and more vitriolic and more patriotic.

6              There's different angles in which attack America from

7      almost like a social moral point of view, characterizing

8      America as a decadent, immoral society, and then from a

9      moral like a foreign policy military point of view.

01:58:36 10              So sort of a 360-degree critique by then leads, of

11     course, to calling for attacks against the United States.

12     So it's not just a critique in itself.  It's a critique

13     followed by the order to carry out attacks, the exhortation,

14     at least, to carry out attacks against the United States,

01:58:54 15     against United States' interests abroad.

16     Q.    And so specifically, have there been any publications

17     about U.S. military members?

18     A.    Yes, there has been quite a few that call for attacks

19     on American soldiers, American bases.  There has been

01:59:13 20     actually in some cases ISIS members have put together lists

21     of U.S. servicemen with a lot of details, pictures, address,

22     even the name of the families and the schools in which the

23     children go to, and disseminated those lists, which

24     obviously are quite a dangerous thing, disseminated then

01:59:36 25     online and some ISIS sympathizers in the United States have

1    also redisseminated those lists domestically to other people

2    here in the United States.

3    Q.    Okay.  I would like to turn your attention now from

4    propaganda to recruitment.

5        So I would like you to inform us about how ISIS goes

6    about recruiting new members, if they do.

7        Can you tell us about that?

8    A.    Sure.  Well, there's not one single way obviously.

9    But generally what ISIS does is, as we said, ISIS has been

10   very good at propaganda, sending out a message, which has

11   reached very wide group of people.

12       Now, you're going to find a lot of people who are

13   sympathizers who want to join ISIS.  In the first years in

14   which ISIS operated in Syria, so 2012, 2013, ISIS was fairly

15   open, unlike other groups that operated there, and pretty

16   much accepting anybody that showed up.  It was not very

17   selective.  Things changed a bit in the following years, but

18   at the beginning it was very open.

19       And it has, to some degree, always maintained its very

20   open approach which, as we discussed earlier, anybody that

21   acts on behalf of the ISIS that claims to be working to

22   further the organization goals is part of ISIS.

23       Now, obviously if you want to go to Syria and Iraq and

24   interacts with the organization's leadership, there's a

25   process of vetting obviously.  You have to know the right

1    people.  It's not that easy, not like I could show up there

2    and meet the leadership obviously.  There's a vetting

3    process there.

4         But it is still quite a loose system where recruitment

02:01:27  5    is probably not the right word.  It's sending out a message

6    to anybody who want to pick it up and then act in

7    furtherance of the organization's goal.

8    Q.   Okay.  So why is that so important to them?

9    A.   It is extremely important because they want to, of

02:01:44  10   course, spread from a territory point -- from a territorial

11   point of view, they want to, in the first years in which

12   ISIS operated in Syria and Iraq, the idea was to create a

13   larger and larger army to expand from a territorial point of

14   view.

02:02:02  15        If you look at ISIS propaganda, the territory in which

16   they claim the caliphate would spread to is basically the

17   whole of the Middle East, North Africa and big parts of

18   South Asia.  So it's very large territory so they need more

19   people.

02:02:17  20        At the same time, particularly when it comes to the

21   West, to Europe and North America, they want more people to

22   carry out attacks.  They want more operatives.  So it's not

23   a hyper-selective group.

24        Of course, once you get to the very operational level,

02:02:34  25   there's some vetting.  There's some scrutiny.  They are

1   fully aware that there's infiltration attempts from a

2   variety of governments.

3        But the ideas has always been we want to create as

4   large as possible of a movement and attract as many people

02:02:48  5   as possible.

6   Q.   So in regards to the recruitment in the West, so the

7   more like being in the place where you are and conducting

8   attacks where you are, can you kind of discuss the typical

9   progression of ISIS recruits over social media, how that

02:03:05 10   progression works, how they're able to recruit somebody?

11   A.   Yeah.  Well, once, again, there's not one trajectory.

12   Different people might evolve and operate in different ways,

13   but I would say there's a fairly common trajectory in which

14   people one way or the other first become acquainted with

02:03:26 15   ISIS propaganda.  They become interested in it.  And it is

16   often in relatively open spaces online.

17        In many cases there's also, of course, an offline

18   component, people are active online, but might have friends

19   in real life with whom they discuss ISIS ideology and

02:03:44 20   propaganda.

21        But online basically you generally have access to ISIS

22   propaganda on certain open platforms.  I mean, the magazines

23   we were referring to earlier are available on online.

24   Anybody can Google them and you can find them.

02:03:57 25        Facebook, particularly in the beginning of the ISIS

1    mobilization in the United States, was sort of the platform

2    of choice around 2012, 2013.  So it would be fairly easy for

3    anybody to find ISIS propaganda and groups of sympathizers,

4    groups on Facebook, for example, where people discussed ISIS

02:04:18  5    propaganda.

6         Then the deeper you get into your interest and

7    commitment, in United States propaganda, the more you start

8    interacting with certain individuals who are like-minded.

9    And you obviously understand -- of course, it depends on how

02:04:33  10    wise and smart of an operator one is -- but you generally

11    understand by the conversation you're having is problematic

12    and might attract the attention of law enforcement, so

13    there's sort of this shift to other platforms to where it's

14    more difficult for law enforcement to monitor the

02:04:51  15    conversation.

16         So a variety of encrypted platforms, or at least

17    direct messaging on Twitter, it changes from case to case,

18    from individual to individual, but you generally migrate

19    from one -- from the more open to the more encrypted and

02:05:10  20    secretive platforms.

21    Q.    Do some of these social media accounts advocating this

22    radical ideology, do they ever get deleted or deactivated

23    from online?

24    A.    All the time.  It's extremely frequent.  What has

02:05:24  25    happened is that companies like Facebook, like Twitter, have

1    been under a lot of pressure over the last few years from

2    many governments, including the U.S. government, but not

3    only, to be more proactive in shutting down accounts,

4    understanding that their platforms are being used by

02:05:41  5    radicals to spread their propaganda.

6            So all these companies have systems, it's both, you

7    know, individuals and algorithms basically that shut down

8    accounts when they are linked to ISIS or spreading extremist

9    ideas.

02:06:00  10           So I think Twitter has shut down in the hundreds of

11   thousands of accounts linked to ISIS over the lags few

12   years.

13           Obviously the community of ISIS sympathizers online

14   has caught up to that and it's not difficult to set up a new

02:06:17  15   Twitter account once your account is shut down.

16           It's fairly frequent we observe that in the work that

17   we do, that a lot of people who set up initially a

18   hundred -- let's say a hundred different accounts with more

19   or less the same name.

02:06:34  20           So let's say if I were an ISIS sympathizer, it

21   wouldn't be uncommon for me to create let's say Lorenzo 1,

22   Lorenzo 2, Lorenzo 3, Lorenzo 3, and once Lorenzo 1 is shut

23   down, I have Lorenzo 2 ready to go right there.  And Lorenzo

24   2 will basically start doing exactly what Lorenzo 1 was

02:06:55  25   doing, which is spreading basically ISIS propaganda.

1      The informal community of ISIS sympathizers also has a

2  system where basically they advertise the fact that a new

3  account has been set up to replace the one who was shut down

4  exists.

02:07:13 5      So if Lorenzo 1 gets shut down, basically I would

6  inform one or two of my friends online that my account was

7  shut down, but I'm now active on Lorenzo 2, and they will

8  tweet out or on Facebook or any other platform, they would

9  send out the message, say, "Hey, if you follow Lorenzo 1, he

02:07:34 10  is now active on Lorenzo 2."  So in a way, I would regain

11  all my followers and the community remains there.

12      So it's a cat and mouse game that has been sort of

13  playing in the last few years between attempts to shut them

14  down and their ability to sort of survive.

02:07:47 15  Q.    Are you familiar with the term shout-outs?

16  A.    Yeah, basically shout-outs are the accounts on Twitter

17  that do exactly what I described.  So they tell the

18  community of ISIS sympathizers that the "Account so and so

19  had been shut down but, hey, start following the new one,

02:08:08 20  the Lorenzo 2, the replacement account."

21  Q.    What, if any, security measures are taken by ISIS

22  supporters on social media?  So in other words, what kind of

23  things do they do to protect themselves?

24  A.    Again, it depends.  It depends on the sophistication

02:08:26 25  that different sympathizers have.  There's some that are not

1    very careful about how they operate online and some that are

2    quite smart and quite savvy.

3        Generally the idea is, first of all, to move to more

4    encrypted platforms.  It's, as I said earlier, very frequent

02:08:47  5    that a conversation that starts on a relatively open

6    platform, then is moved to a platform that is more encrypted

7    and really the number of platforms that are used are -- it's

8    endless.

9        It's now platforms like telegram, like KIK, Snapchat,

02:09:05 10   What's Up, you name it, they're always looking for new ones

11   where they think the encryption level is higher and the

12   difficulty for law enforcement to monitor is higher.

13       There's a system called TOR, which basically is a

14   system of routers that allows the user a high level of

02:09:27 15   basically of secrecy because it makes it very difficult for

16   authorities to identify the IP address.  The IP address is

17   basically the address that allows people to locate where

18   you're accessing the Internet from.

19       And that system basically, it's a system of dozens and

02:09:43 20   dozens of relays all over the world.  So even if you're

21   accessing something from, let's say, Washington, D.C., it

22   looks like you're accessing it from Malaysia or Japan.

23       So there's a lot of systems, a lot of softwares that

24   people download for free or are passed from one individual

02:10:04 25   to the other to make it very difficult for authorities to

1    track individuals.

2    Q.    Okay.  I would like to switch gears for a minute and

3    talk to you about some prominent ISIS supporters.

4          Are you familiar with the name Junaid, J-U-N-A-I-D,

02:10:20  5    Hussain, H-U-S-S-A-I-N?

6    A.    Yes, I am.

7    Q.    And who is Junaid Hussain?

8    A.    Junaid Hussain was a fairly prominent British member

9    of ISIS.  He was a computer hacker, very smart kid, started

02:10:39 10   as a hacker when he was 11, managed even to hack into the

11   prime minister's -- British prime minister's Email account.

12         Then he joined ISIS and he became sort of one of the

13   leaders of the cyber caliphate, basically, the ISIS hacking

14   team.

02:10:58 15        ISIS had a special division of individuals that had

16   very sophisticated computer skills.  And basically two

17   things:

18         One was doing hacking for ISIS.  And so they managed

19   to hack into a variety of government agencies websites, for

02:11:16 20   example, including here in the United States.  And what they

21   do is they also created a network of ISIS sympathizers

22   online worldwide.  So they started connecting with people in

23   the United States, Europe, mostly English speakers.  And, of

24   course, with them they spread propaganda, but they also

02:11:38 25   became more operational, started inciting/planning attacks.

1120

1    Q.    And who is Sally Jones?

2    A.    Sally Jones is Junaid Hussain's wife.  She was a

3    British convert who also moved to Syria to join ISIS and she

4    was also active in propaganda online.

02:12:00  5    Q.    Was Sally Jones still an active ISIS leader in May of

6    2015?

7    A.    Yes, she was.

8    Q.    And where are Sally Jones and Junaid Hussain today?

9    A.    Junaid Hussain was confirm killed two years ago.

02:12:16 10    Sally Jones was believed to have been killed in 2017.  It's

11    unconfirmed.

12    Q.    Now, turning your attention to this specific case,

13    have you reviewed the indictment in this case?

14    A.    Yes, I have.

02:12:30 15    Q.    And have you reviewed online communications in this

16    case?

17    A.    I have.

18    Q.    Which communications did you review, just generally

19    speaking?

02:12:38 20    A.    It's the communications with the undercover and with

21    Elton Simpson.

22    Q.    Okay.  So specifically referring to the communications

23    with the undercover.  Were those communications consistent,

24    in your opinion, with the ideology of ISIS?

02:12:58 25    A.    Very much so.

1    Q.    And can you tell us why you would say so?

2    A.    Because from different points of view, the

3    conversations I reviewed really fit into the model of how

4    ISIS members, supporters, sympathizers act online.

02:13:17 5          I would say from an ideological point of view, it's

6    fairly clear that the defendant, has absorbed ISIS ideology.

7                   MR. DOUGHTEN:  Objection.

8                   THE COURT:  Sustained.

9    BY MS. MAGNONE:

02:13:31 10   Q.    Just if you can refer to it as the person

11   communicating with the undercover.

12   A.    Sure.

13   Q.    Thank you.

14   A.    The person communicating with the undercover shows a

02:13:40 15   high degree of understanding of ISIS ideology.  I mean, we,

16   as I said earlier, we analyze a lot of the communications of

17   ISIS sympathizers in the U.S.  And if I were to put it on a

18   spectrum, I would say this is somebody that is very high in

19   terms of having to absorb the ideology and being able to

02:14:04 20   write about it.  It's clearly someone who is quite

21   sophisticated in comparative terms.

22          The ability to understand religious terms, the

23   ability -- and use religious terms, the ability to

24   understand where ISIS stands and what ISIS wants.  And I

02:14:24 25   think that's, from a tactical, strategic point of view, the

1    person writing those messages clearly understands the

2    strategic needs of ISIS and it's somebody that sees himself

3    or is working as -- not as a simple recruit, but as a

4    recruiter, as somebody who has a certain status, in vetting

02:14:51 5    formal communication of ISIS and ISIS supporters in the

6    United States.

7    Q.    What about vetting of new recruits?  Have you seen any

8    patterns with that in your research that were reflected in

9    those communications?

02:15:04 10   A.    Yeah, it's fairly common.  As we said, it depends, of

11   course, on the level of sophistication of the person, but

12   most individuals who are ISIS sympathizers will start

13   talking about things online, understand that potentially

14   their communications are being monitored.

02:15:22 15        And also they are afraid that their interlocutor who

16   they might not have met in the physical space might be an

17   undercover, might be not a fellow ISIS sympathizer.  So it's

18   fairly common to start doing sort of a vetting trying to

19   understand if the person bears a deep understanding of

02:15:42 20   Islam, of ISIS, just you want to check the credentials of

21   the other person as much as you can.

22        So the person doing that does so in a fairly

23   sophisticated way.

24   Q.    The user speaking to the undercover oftentimes splits

02:15:57 25   up words in his communications or leaves letters out of

1    words.

2         Have you seen that?  Is that -- what would the purpose

3    of that be?

4    A.    It's a fairly common, although not overly

02:16:10  5    sophisticated tactic, to try to fool the algorithm of any

6    kind of software that would detect the conversation.

7         So obviously there were softwares that detect certain

8    key words, like jihad, that are used by ISIS sympathizers.

9    And so obviously if you split up the word, you think that

02:16:30 10    software will not be able to catch that word, although there

11    are some softwares that do catch that.

12    Q.    Okay.  Was there anything you noticed about these

13    conversations that was a little different than your average

14    ISIS supporter or other communications you've reviewed as

02:16:46 15    part of your research?

16    A.    I would say, saying earlier, on a spectrum, this is

17    somebody who is slightly more -- I'll say significantly more

18    active in the sense of seeing himself as a recruiter, seeing

19    himself as somebody that is trying to bring together people.

02:17:07 20         Most other people, I would say, are ISIS sympathizers,

21    are ISIS supporters.  Yeah, they talk to fellow ISIS

22    supporters about propaganda.  They share links.  They

23    discuss certain topics, or they have try to mobilize.  They

24    try to find a way to go to Syria.  They try to maybe even

02:17:27 25    talk about certain operations.  "I want to do something."

1        This is a bit -- in this case, it's a bit different

2   because the individual communicating there is talking about

3   creating a whole network of people.  It's somebody who is

4   basically claiming to be going around the country, talking

02:17:47 5  and vetting ISIS sympathizers, and creating this sort of

6   nationwide network of ISIS followers where they eventually

7   will be deployed to carry out attacks.

8        And he's also claiming to be in contact with ISIS

9   leadership.  And we've seen only a handful of cases in the

02:18:08 10 U.S. where people are actually in contact with ISIS

11  leadership.  Most people are sort of wanna be's, and they

12  try to, but don't really manage to establish that kind of

13  connection.

14  Q.   Okay.  Let's talk about some of the user names in this

02:18:23 15 case.  Starting with at sham_reason.

16       Does sham mean anything to you?

17  A.   Sham is the Arabic word for the region of Syria.  In

18  English, it would be the Levant.  So it makes greater Syria,

19  Syria, which is Lebanon and part of Jordan and north of

02:18:42 20 Palestine basically.

21       So the name ISIS, basically the final S stands sham.

22  So the Islamic State Iraq and sham, so it's commonly used by

23  ISIS sympathizers.

24  Q.   What about ummah one, does ummah mean anything to you?

02:19:03 25 A.   Ummah in Arabic is the community of believers.  It's

1     the community of Muslims worldwide.

2     Q.    What about Abu Harb, H-A-R-B?  What does Abu Harb

3     mean?

4     A.    Abu means father, Harb means war.  It's very common

02:19:21  5   for ISIS militants to give themselves what is known as the

6     Kunya in Arabic, K-U-N-Y-A.  So it's sort of a name for the

7     battle that they take.  Generally it's father of.  Generally

8     if your first born -- you take your first born's name.  So

9     if your son's name is Adam, you would be Abu Adam.

02:19:40 10          So Abu Harb in this case is father of war.

11          Again, a fairly common name.

12    Q.    What about the word haqq?  We see the haqq frequently

13    spelled H-A-Q, or H-A-Q-Q?

14    A.    Double Q.  It means truth.  It's an Islamic concept of

02:19:59 15   truth.  So if you believe in true Islam, you believe in the

16    truth.

17    Q.    And then the last one -- and I'm going to mispronounce

18    this, Willaya TX, does that mean -- and Willaya is spelled

19    W-I-L-L-A-Y-A.  Does that mean anything to you?

02:20:13 20   A.    Yeah.  Wilayah means province basically.

21          The way ISIS has been operating is, as we discussed,

22    ISIS had created sort of a central state in Syria and Iraq,

23    but it was the caliphate, but it had global ambitions of

24    establishing or spreading throughout the word and create

02:20:37 25   provinces, which it called Willaya in Arabic.

1        So, for example, there's a Willaya in the Sinai

2   Peninsula in Egypt.  There's a Willaya in the Northern Sinai

3   area.  There's Willaya in Afghanistan.  It's different

4   provinces which are basically linked to the central group.

02:21:03  5        So in that case, I can speculate that Willaya TX might

6   stand for Willaya Texas.  In the communications I reviewed,

7   I see that the person writing is talking about really

8   creating sort of a basically a Willaya province of the

9   Islamic State in America.

02:21:24 10        At some point, it specifically says "So we are

11   creating the Islamic State in America."

12        So I can assume because also there are some other

13   references to Texas in the communication that that person is

14   talking about sort of Willaya in Texas.

02:21:38 15   Q.    Okay.  We've also heard evidence, or in those

16   communications, there's evidence that the person

17   communicating with the undercover referred him to a website

18   called Kallmullah, K-A-L-L-M-U-L-L-A-H.com.  What is that

19   website?  Are you familiar with that website?

02:21:58 20   A.    Yes.  It's a fairly popular website that has books,

21   writings, tapes, by mostly Salafi.  And that means fairly

22   conservative Muslim clerics.  Some of them are ISIS or

23   al-Qaeda sympathizers.  Some are very conservative ones, so

24   it's a very popular website.  If you're an ISIS sympathizer,

02:22:28 25   it's a popular website.  Not just for them but --

1  Q.    Who, if anyone, is featured prominently on that

2  website?

3  A.    I reviewed the website, but there's a lot of

4  publications, tapes, and references to Anwar Al-Awlaki,

02:22:45 5  A-N-W-A R, A-W-L-A-K-I.

6  Q.    And who is Anwar Al-Awlaki?

7  A.    Anwar Al-Awlaki was a very, very prominent jihadist

8  cleric, who was linked with sympathizers that by the late

9  '90's and early 2000s have really reached sort of a rock

02:23:18 10  star status in, of course, a very conservative community,

11  very conservative Islamic environment, so al-Qaeda

12  supporters and so on.

13       The tapes, the writings of Anwar Al-Awlaki became very

14  popular, and he has been the source of inspirations for many

02:23:35 15  people who have carried out attack in the English speaking

16  world, in particular.

17  Q.    Can you briefly describe his background, how he came

18  to be the person that you just described?

19  A.    Al-Awlaki was born in the U S, interestingly, because

02:23:49 20  his father was pursuing a Ph.D. in Colorado, so he was born

21  in the U.S.  He was of Yemeni background, so he went back as

22  a child back to Yemen and came back to the U.S. to study

23  university.

24       By the time he came back, he was already sort of a

02:24:08 25  budding cleric.  And he started base -- basically the reason

1  why he became so popular by the late '90s was that he had

2  very deep knowledge of the texts in Arabic, but spoke

3  English very well and had a very impressive ability to

4  condense very sophisticated Arabic texts with day-to-day

02:24:37 5  references that would resonate quite a bit with people in

6  the West.

7       So he is the kind of cleric that would tell you about

8  this, you know, ancient Arabic poetry, but relate it to your

9  day-to-day life and how you go to McDonald's and you're in

02:24:53 10  line.  That was his ability.

11       And he was very persuasive.

12       And the other reason why Al-Awlaki became so popular

13  was that he was one of the first ones to understand the

14  importance of disseminating his messages online.  So he had

02:25:08 15  his own website.  He has his own YouTube channel.  He had

16  his own network of, again, sympathizers, publishing houses

17  that made his writings and his speeches.

18       He would tape a lot of his speeches.  He would get

19  some of his lectures would be 12 hours, 24 hours, of his

02:25:30 20  lectures, but a lot of people who were or became affiliated

21  with al-Qaeda and then with ISIS found very gripping.

22       He was -- still is, I would say, the main reference

23  for people who embrace al-Qaeda's or ISIS's ideology in the

24  West.

02:25:49 25  Q.   So you mentioned these lectures.  Did they discuss

1    jihad in these lectures that you're referring to?

2    A.    Some do.  Some don't.  Al-Awlaki covered a very broad

3    range of topics.  Some of them were benign.  Some of them

4    purely discuss Islamic State matters in a very conservative

02:26:15  5    way, but nothing problematic about it.

6         Some others were clearly inciting and advocate and

7    providing the theological justification for acts of violence

8    for what he called jihad against, again, the perceived

9    enemies of Islam, the United States included.

02:26:31 10    Q.    Are you familiar with one of his lectures called

11    Constants On the Path of Jihad?

12    A.    Yes, that's one of his most famous.

13    Q.    And just briefly tell us about that one?

14    A.    Yeah, Constants On the Path of Jihad is basically a

02:26:49 15    translation of a very prominent book written by a guy named

16    Yussuf Airyi, Y-U-S-S-U-F, Al, Aiyri, A-L, A-I-Y-R-I.

17         Yussuf Aiyri was a very prominent member of al-Qaeda

18    Afghanistan along side of Osama Bin Laden and created --

19    funded the branch of al-Qaeda in Saudi Arbia, and he had

02:27:20 20    written this book which basically advocates for jihad,

21    argues for what jihad as the title is a constant.  It's

22    forever.  It's until the end of times.  It's basically until

23    all the enemies of Islam are defeated.

24         And what Al-Awlaki did is translated this book into

02:27:37 25    English.  But it's not just a translation.  The translation

1  is interspersed with Al-Awlaki's commentary, again, with

2  Al-Awlaki's ability to relate to his audience in the West.

3  He made it sort of culturally appropriate to his

4  audience who was mostly made up of people in the West.

02:27:56  5  Q.  Now, these lectures were produced almost over ten

6  years ago, correct?

7  A.  Al-Awlaki died in 2011, so yeah.

8  Q.  So you mentioned they're still widely used by ISIS?

9  A.  Very much so.  Al-Awlaki is probably one of the very

02:28:12  10  few clerics, or fought leaders that transcends the division

11  between groups, between ISIS, al-Qaeda.  He is revered by

12  all these groups.

13  The lectures of Al-Awlaki are listened to and shared

14  by ISIS sympathizers today.  In the work that we do, for

02:28:33  15  example, of monitoring activities of ISIS sympathizers

16  online, we see that people that are committed ISIS

17  sympathizers use a picture of Al-Awlaki as their avatar on

18  telegram or other platforms.

19  ISIS even had a battalion which was called the Anwar

02:28:53  20  Al-Awlaki battalion.  So it was sort of like a rock star in

21  that environment.

22  Q.  You said he died in 2014.  What happened to him?

23  A.  '11.

24  Q.  2011.  What happened to him?

02:29:03  25  A.  He was killed in a drone strike in Yemen.

1   Q.    So beyond Al-Awlaki's lectures, the communications in

2   this case also refer to at least one -- or to at least one

3   recruit refers to him to a series of lectures by Ibn Nuhaas

4   on Kallmullah.com.

02:29:24  5        Are you familiar with Ibn Nuhaas?

6   A.    Yes.

7   Q.    Am I pronouncing that name correctly?

8   A.    Yeah.

9   Q.    And that's spelled I-B-N, N-U-H-A-A-S?

02:29:33  10       Please --

11  A.    He was medieval scholar from the 14th Century so

12  different, completely different era.  But he had written a

13  book, which is known as the Book of Jihad.  It's basically a

14  book which extolls the virtue of jihad.

02:29:52  15       And, of course, as typically ISIS and other groups do,

16  they take a lot of things out of context.  That was a book

17  that was written, in medieval times when the Muslims were

18  fighting again the moguls.  It was obviously a book referred

19  to that era.

02:30:09  20       But ISIS and ISIS sympathizers use it today and apply

21  it to today's context, completely out of context, but it's a

22  very popular book in jihadi circles, widely disseminated.

23  Q.    And, finally, the communications of at least one

24  recruit to some named called How to Survive in the West, A

02:30:29  25  Mujahid Guide 2015.  Are you familiar with this guide?

1    A.    Yes.

2    Q.    What is it?

3    A.    Sort of a booklet.  It's around 60, 65 pages.  It's a

4    PDF basically that has been circulating in sort of ISIS

02:30:47 5    sympathizing university online, starting in 2015.

6         It's basically a book, sort of a -- it's a type of

7    sort of survival manual, how you as an ISIS sympathizer can

8    survive in the West.  And there's a large portion of it that

9    is devoted to how to avoid detection from law enforcement,

02:31:09 10    how to communicate, how you use a cell phone, how you use a

11    computer, how you move around.  And then there's another

12    part which is more about how to carry out attacks, bomb

13    making skills, and so on and so forth.

14         So it's something that, if you are in sort of the

02:31:30 15    online bubble of ISIS sympathizer, you have seen.

16    Q.    Now, earlier you discussed a call to the West to

17    commit acts where you're physically located versus traveling

18    to the caliphate.

19         Can you give us any examples of attacks or types of

02:31:46 20    attacks that have been consistent with that message?

21    A.    Well, we have seen since the declaration of the

22    caliphate which is June 2014, we have seen around 65 attacks

23    in the West.  So between Europe and North America, we have

24    seen around 15 in the United States alone.

02:32:07 25         MR. DOUGHTEN:  Objection.

1    THE COURT:  Why don't we do this?  Let's take a

2  break, ladies and gentlemen.  The court reporters need a

3  little bit of a break.  This is intensive testimony.

4    So let's just take a break.  We'll take about ten

02:32:17  5  minutes.  I'll talk to the attorneys and then we'll get back

6  to you.  Rather than keeping weight.

7    Leave your notepads on the chairs.  You need

8  not -- remember all the admonitions I've given you, please.

9    Thank you.

02:32:29 10    (Jury out, 11:20 a.m.)

11    THE COURT:  Counsel, what's the objection,

12  please?

13    MR. DOUGHTEN:  The objection is, Your Honor,

14  although I understand that the courts have previously held

02:33:14 15  that --

16    I apologize.

17    THE COURT:  You will need to keep your mics on.

18    MR. DOUGHTEN:  Your Honor, the objection is, I

19  understand that the background information is relevant and

02:33:31 20  has been permitted by case law, but if we're going to

21  individual attacks and individual tragedies, I don't think

22  this is relevant or necessary under the scope of what the

23  purpose of the doctor's testimony is.

24    The doctor's testimony as to how ISIS operates and how

02:33:49 25  they recruit has been accepted by the courts, I understand.

1    But if we are talking about individual attacks and

2    individuals' deaths and tragedies in the world, I think that

3    goes afield of what the doctor is supposed to be testifying

4    to.

02:34:03  5         THE COURT:  All right.  Thank you.  Counsel, do

6    you want to respond?

7         MS. MAGNONE:  Yes, Your Honor, I was not going

8    anywhere near that.  As the doctor just brought up, attacks

9    in the United States, all I'm trying to get is to the

02:34:11 10   Garland, Texas attack and his familiarity with that and the

11   Prophet Muhammad.  And then the Charlie Hedbo attack and its

12   relation to the Garland attack.  And that's all I was doing

13   with that.

14        THE COURT:  Here is what I will ask you to do.  I

02:34:24 15   think, if my memory serves correctly, the doctor indicated

16   there have been 65 attacks.

17        Why don't you ask him to break that down by how many

18   have been in Europe, how many have been in the United

19   States, and then move on.

02:34:37 20        All right.

21        MS. MAGNONE:  No problem.

22        THE COURT:  All right.  That's what we would like

23   to do, if we can sort of narrow the issue in terms of

24   worldwide -- let's focus on the United States and then go

02:34:47 25   from there.

1    MS. MAGNONE:  Thank you, Your Honor.

2    THE COURT:  Take about ten minutes, Counsel.  And

3  please, I'm sorry, I don't want to belabor it but I can see

4  from the screens, slower.  Take a break between, pause after

5  you ask a question so the court reporters can catch up.

6  Please.

7    Ten minutes, please.

8    MS. MAGNONE:  Yes, Your Honor.

9    (Recess taken 11:20 a.m.)

10    (Jury in, 11:35 a.m.)

11    THE COURT:  Counsel, you may inquire.

12    MS. MAGNONE:  Thank you, Your Honor.

13  BY MS. MAGNONE:

14  Q.    Dr. Vidino, I think we left off when you were telling

15  us about approximately how many ISIS inspired attacks there

16  have been in the United States since 2014?

17    So can you just tell us again how many there have

18  been?

19  A.    15.

20  Q.    And are you familiar with one in particular that took

21  place in Garland, Texas in 2015?

22  A.    Yes, I am.

23  Q.    What do you know about that particular attack?

24  A.    What happened was that two individuals, who are well

25  known ISIS sympathizers, drove up from Phoenix, Arizona, to

1    Garland, Texas with the intention of attacking with

2    automatic weapons an event that was taking place there in

3    Garland that was basically a meeting of the individuals who

4    had basically put together an event, somewhat provocative,

02:53:05  5    basically drawing -- it was called the Draw the Prophet

6    Muhammad contest, which obviously is a bit of a provocation

7    indication because for all Muslims, not just ISIS

8    supporters, but for all Muslims, drawing the Prophet

9    Muhammad, particularly in a cartoonish way is offensive.

02:53:25  10    So these two individuals drove up to the conference

11    center where the event was taking place, started firing.

12    They were eventually both killed by security guards on the

13    site.

14    Q.    Did ISIS claim responsibility for that attack?

02:53:42  15    A.    They did.  A few days after the event took place.

16    Q.    And how did they -- how did they do that?

17    A.    As they do for all their attacks, they put out a

18    variety of communications, through they're very large media

19    apparatus which would basically glory the actions of those

02:54:04  20    individuals, say soldiers of the caliphate, so and so, and

21    then issue additional threats in this case again the United

22    States.

23    Q.    Have there been similar attacks like the one in

24    Garland that involved cartoons of the Prophet Muhammad?

02:54:19  25    A.    Yes.  There has been a few between successful, if you

1    will, and attempted.

2         All jihadist groups, ISIS in particular, see drawing

3    cartoons or in any way offending the Prophet Muhammad as

4    something so blasphemous that it deserves the dealt penalty,

02:54:45  5    deserves death for those who do so.

6         So most famous was there was an attack in January,

7    2015, in Paris, where two individuals, two brothers, two

8    French brothers went inside the office of a French satirical

9    magazine, which had repeatedly drawn the Prophet Muhammad in

02:55:07 10    a mocking, and they killed the individuals who they found in

11    the office at that time.

12         And that action was glorified in jihadi circles, ISIS

13    sympathizers glorified the actions of those two individuals

14    for months and they still do.

02:55:25 15    Q.    What was the name of that magazine?

16    A.    Charlie Hebdo.

17    Q.    And that's C-H-A-R-L-I-E, H-E-B-D-O?

18    A.    Correct.

19    Q.    And now to be clear, you said that all Muslims take

02:55:40 20    offense to cartoon depictions of the Prophet Muhammad.

21         Do all Muslims advocate violence in response to that?

22    A.    Most certainly not.  I think most would be offended,

23    of course, but only a tiny minority would take it upon

24    themselves to do something violent against those who Draw

02:56:03 25    the Prophet.

1    Q.    Okay.  Finally I would like to talk to you about a

2    couple of documents allegedly produced by the defendant.

3          Can we pull up Government Exhibit 51, please.

4          Dr. Vidino, did you previously reviewed this document?

02:56:20 5    A.    Yes, I have.

6    Q.    Now, the title of this document in the middle of the

7    page there says GPS for the Ghuraba in America, the West.

8          What does Ghuraba mean?

9    A.    It means the strangers in Arabic, and it's, one

02:56:39 10   against, an Islamic concept that ISIS uses in a certain

11   particular way.

12          ISIS supporters, particularly those that live outside

13   the land of the caliphate, see themselves and call

14   themselves as strangers.  They are a tiny minority, a

02:56:58 15   vanguard, in enemy territory, if you will.

16   Q.    Did you review this document, it says it's page 1 of

17   19.  Did you review all 19 pages of this document?

18   A.    I did.

19   Q.    And was this document consistent with other documents

02:57:16 20   or propaganda that you've seen disseminated by ISIS

21   supporters?

22   A.    Yes.  It's very similar to a lot of these documents

23   which are generally self-produced by some ISIS sympathizers.

24   They tend to copy one another.  The document we previously

02:57:36 25   mentioned, the Survival Guide For the Mujahid in the West,

1    it's basically in the similar document.  This one is a bit

2    shorter.  They cover more or less the same topics, how to

3    avoid detection, how to communicate, what to do.

4         The idea is, once again, to provide -- its people who

02:58:02 5    see themselves as part of this small vanguard of ISIS

6    members in enemy territory, in America, and they want to

7    help fellow ISIS supporters to avoid detection in carrying

8    out attacks.

9         Fairly common.

02:58:18 10   Q.    Can we please pull up Government Exhibit 66.

11        Is this the document that you were referring to, the

12   guide that we discussed earlier?

13   A.    Correct.

14   Q.    And have you -- based on your testimony, have you

02:58:32 15   previously reviewed this document?

16   A.    Yes, I have.

17   Q.    And is it the same type of document that -- the same

18   guide that you've seen and reviewed on multiple occasions in

19   your research in the past?

02:58:46 20   A.    Yes, very similar.  Yes.

21   Q.    Okay.  Can we pull up Government Exhibit 53, please.

22        Do you recognize the image at the top of page 1 of

23   this document?

24   A.    Yes.  It's the flag used by ISIS.

02:59:02 25   Q.    How frequently do you see this come up in your

1    research?

2    A.    All the time.  It's the avatar of choice of half of

3    the people we follow online.  It's the flag of the group

4    that people follow.  So it's very common.

02:59:18 5    Q.    Now, there's some Arabic underneath the flag.  What

6    does that say?

7    A.    It's the declaration of fate in Islam.  So it says,

8    just in English, I can, on the top line says "There's no God

9    other than God, other than Allah.  And Muhammad is Prophet."

02:59:41 10    In the circle, it says, "Muhammad is the Prophet of God."

11    Q.    Thank you.

12              MS. MAGNONE:  Your Honor, may I have a moment?

13              THE COURT:  You may.

14              MS. MAGNONE:  No further questions.  Thank you.

02:59:55 15              THE COURT:  Thank you, counsel.

16              MR. DOUGHTEN:  One second, Your Honor.

17              THE COURT:  Yes, you may.

18              CROSS-EXAMINATION OF LORENZO VIDINO

19    BY MR. DOUGHTEN:

03:00:10 20    Q.    Good morning.

21    A.    Good morning.

22    Q.    Nice to see you again?

23    A.    Good to see you.

24    Q.    I just have a couple areas, and I mean it.  It will be

03:00:19 25    short.

1       If -- I'm going to ask you about the last two

2   documents that you put up, the GPS for the Ghuraba and How

3   to Survive the West.

4       Now, the How to Survive the West, that's a longer

03:00:31 5   document.  Some 70, 80 pages; is that correct?

6   A.    65 in some variations.  Yes, very, definitely longer,

7   yes.

8   Q.    And I think it's just kind of a guide to, you know,

9   when not to use credit cards, to basically to be off the

03:00:46 10   grid, if you will; is that correct?

11  A.    Correct.

12  Q.    Now, is it fair to say that the GPS for the Ghuraba is

13  really just a condensation of How to Survive in the West?

14  A.    It's a shorter version to some degree.  Covers very

03:01:04 15  much the same topic, so yes, correct.

16  Q.    Now, I think you testified that basically people of

17  that ilk, if you will, copy what each other are doing and

18  just kind of re-edit it and put it out as a separate

19  document, but the ideas is they're still the same?

03:01:19 20  A.    More or less, yes.

21  Q.    And that's been for the last 10 or 15 years that has

22  been going on or longer?

23  A.    Yes, that's fair.

24  Q.    Now, the only other question I have is -- and I don't

03:01:29 25  know if I'm saying this -- what does the Bayat, the Bayat,

 1    some sort of oath.  What is that?

 2    A.    It's Bayat.  It's the oath of allegiance that -- well,

 3    in Arabic the word is just oath of allegiance.

 4          In this specific context, it's -- I believe you're

03:01:48  5    referring to the oath of allegiance that one makes to ISIS.

 6    Q.    Yes.

 7    A.    So ISIS, as we discussed earlier, there's different

 8    ways of becoming a member of ISIS.  It's fairly common for

 9    people who are in that environment to pledge allegiance to

03:02:06 10    ISIS although a lot of sympathizers don't.

11               THE COURT:  Can you spell it for us, please?

12               THE WITNESS:  Yeah, it's B-A-Y-A-T.

13               THE COURT:  Thank you.

14    BY MR. DOUGHTEN:

03:02:16 15    Q.    And just so I understand it, would it be a fair

16    summary to say that that people who are, for lack of a

17    better term, very much into ISIS, would take the Bayat?  Is

18    it required by ISIS that they take it before they're

19    formally a member?

03:02:38 20    A.    Not really because it's much informal than that, as we

21    discussed earlier.  You can be part of ISIS even if you're

22    not really have that kind of formality that entails a

23    swearing allegiance or acting as part of a structure.

24          So, for example, it's fairly common to have people who

03:02:57 25    carry out an attack.  And the only time they swear

1143

1    allegiance, they swear the Bayat, it's in the video that

2    they have taped of themselves before carrying out the attack

3    which is released after they die.  So there's no previous

4    allegiance, swearing of allegiance to the organization.  So

03:03:14 5    it's -- it works in different ways.

6              MR. DOUGHTEN:  One second, Your Honor.

7              THE COURT:  Any redirect?

8              MS. MAGNONE:  Yes, Your Honor.

9              THE COURT:  Oh, I'm sorry.  I'm sorry.  Maybe I

03:03:38 10   jumped the gun, so to speak.

11         That's what happens when you grow up in Wayne County.

12             MR. DOUGHTEN:  Nothing further.  Thank you.

13             THE COURT:  All right.

14         Counsel, do you have any redirect?

03:04:04 15            MS. MAGNONE:  Yes, Your Honor.  Thank you.

16             REDIRECT EXAMINATION OF LORENZO VIDINO

17   BY MR. MAGNONE:

18   Q.    Dr. Vidino, defense counsel just asked you about the

19   contents of How to Survive in the West.

03:04:13 20        Does that manual also include bomb making

21   instructions?

22   A.    It does.

23   Q.    And in terms of Bayats, are you familiar, or do you

24   know if Elton Simpson ever swore allegiance or swore a

03:04:28 25   Bayat?

1    A.    Yes, at the very end it does.

2    Q.    And do you know when he did that, the attacker in

3    Garland is who I'm referring to?

4    A.    At the very end that he is about to carry out the

03:04:42 5    attack.

6                MS. MAGNONE:  Thank you.  No further questions.

7                THE COURT:  All right.  Anything else?

8                MR. DOUGHTEN:  No.  Nothing further.  Thank you,

9    Your Honor.

03:04:56 10                THE COURT:  All right.  Thank you, Doctor.  You

11    may step down.

12          Ladies and gentlemen, rather than start another

13    witness here, I apologize for the schedule a bit, but we're

14    going to take our lunch break now.  I have another

03:05:14 15    proceeding at noon that I'll resolve here over the lunch

16    hour and I need to give the court reporters a break.

17          So let's take about an hour.  Let's reconvene at 1:00.

18    Maybe a little bit longer.  I apologize.  1:00 be back and

19    we'll get started again.

03:05:30 20          Please leave your notepads on your chairs.  Again

21    remember all the admonitions I've given you.  They all

22    apply.  You all remember them.  Please do not violate those

23    specific instructions.

24          Thank you very much, ladies and gentlemen.

03:05:43 25          (Jury out, 11:50 a.m.)

1        THE COURT:  All right, Counsel.  We'll see you at

2   1:00.  Just leave a little bit space at the table.  I have a

3   plea I have to take at noon.

4        MS. MAGNONE:  Your Honor, can I make one request?

03:06:19 5   Would it be allowed that our expert now sit in the courtroom

6   now that he has testified?

7        THE COURT:  Any objection?

8        MR. DOUGHTEN:  No objection.

9        THE COURT:  That's fine.  He can sit in the

03:06:27 10  courtroom, certainly.

11       MS. MAGNONE:  Thank you, Your Honor.

12       THE COURT:  You're welcome.

13       (Recess taken 11:51 a.m.)

14       (Outside the side the presence of the jury 1:05:)

04:18:20 15       THE COURT:  Are we ready to proceed, counsel for

16  the government?

17       MR. SHEPHERD:  Yes, Your Honor.

18       THE COURT:  Counsel for the defendant?

19       MR. DOUGHTEN:  Yes, Your Honor.

04:18:21 20       THE COURT:  Jurors, please.

21       MR. SHEPHERD:  Your Honor, before we bring the

22  jury in, I believe our next witness, if the Court allows it,

23  would be the witness if Garland, Texas, Officer Stevens, so

24  perhaps we should address that before the jury comes?

04:18:22 25       THE COURT:  All right.  Please be seated.

1    Counsel, why don't you, again, and I know you did so

2    briefly before the lunch hour, tell me what you expect the

3    witness's testimony to be and how it is relevant for these

4    proceedings, and if not cumulative, please.

04:18:39  5    MR. BENNETT:  Thank you, Your Honor.  We have

6    called or plan to call Officer Gregory Stevens who was the

7    officer on scene in Garland, Texas, at the time that the two

8    individuals pulled up with the assault rifles and attempted

9    to cause bodily harm to several of the individuals inside of

04:19:00 10    the Garland facility.

11    He was able to -- shots fired at him, but he was able

12    to neutralize the two individuals, shot both of them, such

13    that is incident was avoided.

14    And we believe that as we've discussed here, Your

04:19:16 15    Honor, that there's objects of the conspiracy in the

16    indictment talking about the ability to train individuals,

17    to recruit or an ISIS cell, to commit acts of violence in

18    the U.S. on behalf of ISIS, the actual committing of acts of

19    violence in the U.S. on behalf of the ISIS, and within the

04:19:34 20    manner and means, talking about Mr. Hendricks's involvement,

21    knowledge of, and support of the attack in Garland, Texas.

22    We believe it's important for the jury to see the

23    extent of the violence of the attacks.  We've already agreed

24    that -- your Court has already ruled that the pictures won't

04:19:54 25    come in, but exactly what occurred, how these individuals

1    were armed, to the extent that had Officer Stevens not been

2    successful there may have been additional injuries to

3    civilians that are there.

4         That's all part of the fabric of this case.

04:20:10  5         To the extent that it might prejudice the defendant in

6    any way, it's only to the extent that it assists in his

7    proof of guilt because there's what we're talking about.

8         It's a terrorism case involving ISIS, and the training

9    of individuals for acts of violent in the United States,

04:20:27  10   which actually occurred.  And we believe the jury has a

11   right to see.

12        As the Court is aware, Rules 401 and 403 are rules of

13   admissibility.  They lean towards that.  The Sixth Circuit

14   has said in the Sinn Fein case that it should be viewed in

04:20:43  15   the light most favorable to the proponent to the maximum the

16   probative value and minimize the present that's there.

17        And we believe at that any prejudice that's there, the

18   probative value outweighs that in this case.

19        And as we also argue in our brief in response, the

04:21:01  20   Davis case makes it clear that the government has a chance

21   and has a right to put its case on as it sees fit.  And if

22   there are gaps in the evidence, that the jury is going to

23   then speculate on and try to figure out what happened and

24   what didn't happen --

04:21:14  25             THE COURT:  What are they going to speculate

1       about?

2              MR. BENNETT:  Well, we have in opening statement

3       the suggestion to the jurors that they would hear from the

4       individual, Officer Stevens, who was on site, in Garland,

04:21:29 5     Texas, and who had taken the steps necessary to neutralize

6       these two individuals.

7              THE COURT:  What neutralize?  You mean kill them?

8              MR. BENNETT:  Kill them, yeah.

9              THE COURT:  My concern is that the prejudice to

04:21:39 10    the defendant by going to into some graphic detail, the same

11      thing with the pictures, is outweighed by the, again, by the

12      danger of unfair prejudice here.

13          I haven't heard any evidence -- I've heard some

14      evidence about the defendant having communication with the

04:21:56 15    Garland, Mr. Simpson.  But I haven't heard a substantial

16      amount of evidence to tie him to the Garland event in

17      question.

18          He's -- and again, the issue is identity.  I'm really

19      concerned about inflaming this jury by bringing someone in

04:22:12 20    who I know may be characterized as a hero in the context

21      that he shot and killed two terrorists, really concerns me

22      about that.  Because we already have a witness who came in

23      and said, "Look, he was there."  He saw and observed what

24      happened.

04:22:28 25         So I don't know what more we need beyond knowing

1    exactly what happened.  It's already in the record.

2         So let me hear from the defense side.

3              MR. BENNETT:  Your Honor, if I may.

4              THE COURT:  Quickly.

04:22:39  5    MR. BENNETT:  You mentioned you hadn't heard

6    evidence, and I neglected to clarify that there will be

7    evidence that Mr. Hendricks caused a document -- and it's

8    been touched on, but it will be more clearly put forth in

9    later testimony -- that he caused a document to be put up on

04:22:51 10    the Internet taking credit for this, and threatening

11    additional violence.

12              THE COURT:  Haven't seen it yet.  Maybe now is

13    not the time for this witness.

14         So any way, let me hear from the defendant.  The

04:23:03 15    jurors are waiting.  I want to try to resolve this one way

16    or the other.

17              MR. DOUGHTEN:  Thank you, Your Honor.

18              THE COURT:  Thank you, sir.

19              MR. DOUGHTEN:  Succinctly, Your Honor, even in

04:23:12 20    the light most favorable to the government, there's no

21    connection to this witness and the person alleged to be Mr.

22    Hendricks.

23         All he's going to say is the same thing the previous

24    witness said.  And all it's going to do is highlight that

04:23:25 25    people were killed and that they were going to try to kill,

1   which I think Mr. Bennett just said, had they not been shot,

2   more people would have been killed.

3         He's charged with support.  The evidence of support

4   has already been established in the light most favorable to

04:23:41  5   the government.  And, again, there's no direct contact

6   between who is alleged to be Mr. Hendricks and this

7   particular witness.  This witness was oblivious to this --

8               THE COURT:  I'm not going to allow it at this

9   time.  There hadn't been enough evidence presented to

04:23:58 10   convince me that it's relevant to the issues in this case at

11   this point in time.

12         I already told you the last time we had this

13   discussion, I know I let you address it in opening

14   statement.  I know what you're trying do with Garland and I

04:24:11 15   think you've already established in some respects, I think

16   substantially established what occurred in Garland.  And I

17   don't know this witness is going to do other than perhaps

18   inflame this jury.  And that concerns me.  Greatly concerns

19   me that this witness is going to come on the scene, he's

04:24:25 20   going to testify about what he saw, what he observed, how

21   these individuals were armed, I'm very concerned about

22   fundamental fairness to the defendant.

23         So if you would like to call another witness, you may.

24   At this point, I'm not going to allow this witness to

04:24:41 25   testify.

1    MR. BENNETT:  Thank you, Your Honor.

2    THE COURT:  And, again, I think the other part of

3    it, the other part, just so I make the record, I think it's

4    cumulative.  I think this witness is just going to tell us

5    what we already know.  There has been no dispute about what

6    occurred in Garland, Texas.  There will be no dispute.  I

7    suspect the defendant would even be willing to stipulate

8    there was a terrorist attack in Garland, Texas and that that

9    is public knowledge.

10   So beyond that, this witness isn't -- this wasn't

11   communicating with Mr. Hendricks.  He wasn't involved at all

12   with any of the Internet communication.  He's going to tell

13   us exactly what occurred on the day of the shooting.

14   I don't think we need it.

15   So go ahead, finish your thought, please, for the

16   record.

17   MR. BENNETT:  No, Your Honor.  We accept your

18   ruling, and we would call -- we have several other witnesses

19   here, we would call another with at this point.

20   THE COURT:  Please.  Thank you.

21   Let's have the jurors, please.  I'm sorry.

22   (Jury in, 1:10 p.m.)

23   THE COURT:  Counsel, would you call your next

24   witness, please?

25   MR. BENNETT:  Thank you, Your Honor.  At this

1    point the government calls Brian Marlow.

2              THE COURT:  Sir, if you would just approach the

3    witness stand here to my right and just remaining standing

4    while I administer the oath or affirmation, sir.

5                         BRIAN MARLOW,

6         of lawful age, a witness called by the United States,

7            being first duly placed under oath, was examined

8                      and testified as follows:

9              THE COURT:  All right, sir.  Thank you.  Please

10   be seated in the witness stand.  Just a couple brief

11   instructions, if I may.

12             THE WITNESS:  Sure.

13             THE COURT:  Please wait until the attorneys

14   complete their questions before you begin to respond.  I

15   know we can anticipate questions.  It's important for the

16   benefit of the court reporters.  It's a long trial.

17        So just take your time.  And wait until the questions

18   are completed.

19        If there is an objection to any question, please do

20   not respond to the question until I rule on the option.  Of

21   course, if I say sustained, you'll not answer the question.

22   And you need to respond verbally, not through nods of the

23   head, things of that nature for the court reporters.

24        Thank you very much.

25        Counsel, you may inquire.

1    MR. BENNETT:  Thank you, Your Honor.

2    DIRECT EXAMINATION OF BRIAN MARLOW

3  BY MR. BENNET:

4  Q.    Agent Marlow, can you please identify yourself to the

04:28:34  5  ladies and gentlemen of the jury and spell your last name

6  for the court reporter?

7  A.    My name is Brian Marlow, M-A-R-L-O-W.

8  Q.    Mr. Marlow, where are you employed?

9  A.    I'm a special agent with the FBI.

04:28:45 10  Q.    Okay.  And where are you located?

11  A.    My office is in Dallas, Texas.

12  Q.    And how long have you been a special agent with the

13  FBI?

14  A.    Eleven years.

04:28:55 15  Q.    What are your responsibilities at the FBI?

16  A.    I'm a senior team leader of our Evidence Response

17  Team.

18  Q.    And as far as the evidence response goes, do you

19  receive specialized training in that?

04:29:11 20  A.    Yes.

21  Q.    Can you advise what all that entails?

22  A.    As parts of the Evidence Response Team, we all go to a

23  two-week basic course in crime scene management, evidence

24  collection techniques.  There's also various advanced

04:29:28 25  trainings I've again to as well.

```
        1   Q.    And were you working on the day of May 3 of 2015?

        2   A.    Yes.

        3   Q.    Do you remember, did a certain event happen on that

        4   date?

04:29:39 5  A.    Yes.  There was a shooting incident.

        6   Q.    And do you know at what location?

        7   A.    It was at the Curtis Culwell Center in Garland, Texas.

        8   Q.    Can we bring up Government's Exhibit 71.

        9         I represent to you that this is an aerial photo.  In

04:30:00 10  look at it, are you able to determine what it is a photo of?

       11   A.    It's a photo of the Culwell Center.

       12   Q.    And why were you called to the Culwell center?

       13   A.    There was a shooting incident.

       14   Q.    And what specific city is the Culwell center located?

04:30:21 15  A.    Garland, Texas.

       16   Q.    So is that a suburb of Dallas?

       17   A.    Yes.

       18   Q.    Do you know what time of the day you were called out

       19   to the facility?

04:30:29 20  A.    It was originally at approximately 8:00 in the

       21   evening.

       22   Q.    And were you there for an extended period of time?

       23   A.    Yes, we actually didn't get on scene to process the

       24   scene until 4:00 the next morning.  And then we were there

04:30:51 25  for several hours.
```

|  | |
|---|---|
| 1 | Q.    And what were your jobs responsibilities on the scene? |
| 2 | A.    To process that crime scene, collect evidence. |
| 3 | Q.    And were you part of a group, a team of individuals? |
| 4 | A.    Yes.  I had a team of about 15. |

04:31:04   5    Q.    So once you got on the scene, what did you actually

6    start to do once you were able to get to the actual

7    location?

8    A.    First step in our process is basically to, I guess, do

9    a walk through of the scene.  And then we take photographs

04:31:25  10    of the scene as it is.

11    Q.    In looking at this particular photograph, could you

12    explain where the actual scene was in relation to what's

13    here?  And you can draw on the screen, if you would like?

14    A.    With my finger?

04:31:38  15    Q.    Yes.

16    A.    Okay.  I'll just circle it.

17    Q.    And as you guys are collecting evidence, do you record

18    it in some way?

19    A.    Yes, on our evidence collected item log.

04:31:58  20    Q.    And do you take steps to preserve the evidence in its

21    kind of germane to the state as it's found?

22    A.    Yes, we package it.

23    Q.    Can you bring up Government's Exhibit 104?

24          Can you identify this document?

04:32:17  25    A.    Yes.  This is our evidence recovery log.

1   Q.    And I'll represent for the record it's a 11-page

2   document.  We won't go through this.

3        Do you know, are you the individual responsible for

4   preparing this?  Or do you multiple people contribute to

04:32:32  5   this?

6   A.    Multiple people contribute to it.  Generally we assign

7   somebody to be our evidence custodian.  But in this case,

8   the scene lasted several hours.  So we had multiple folks

9   that were responsible for documenting our evidence

04:32:52 10   collection.

11   Q.    And it looks, down the left-hand side there's a number

12   that is assigned to each item that's found?

13   A.    Yes.

14   Q.    And a description and where found?

04:33:03 15   A.    Yes.

16   Q.    Can we go to page 8 of this document?

17        And if we go not bottom there, there's a reference to

18   an item by AA.  What was that item?

19   A.    Could you repeat the item number, I'm sorry.

04:33:27 20   Q.    AA.  I'll blow it up for you?

21   A.    Oh, yes.  It's identified as a paper ISIL flag.

22   Q.    And if we go to page 10 of 104.

23        And item N.  Can we blow-up the middle there.

24        What is logged there at item N as in Nancy?

04:33:54 25   A.    Samsung Galaxy S5, white.

1  Q.    And where was that particular item found?

2  A.    It was in the glove box of the vehicle.

3        MR. BENNETT:  Your Honor, may I approach the

4  witness?

04:34:09 5        THE COURT:  Yes, sir.

6  BY MR. BENNETT:

7  Q.    I'm handing you what's been previously marked as

8  Government's Exhibit 179.

9        Just before you open it, do you recognize that item

04:34:21 10  itself.

11  A.    This is the item, item number N on our evidence

12  recovery log.

13  Q.    And is that how you normally keep and preserve

14  evidence?

04:34:36 15  A.    Yes.

16  Q.    Can you open it up and identify that it's, in fact,

17  that same item?

18  A.    It is.

19  Q.    And there's paperwork with that document, the binder

04:35:11 20  itself that kind of documents what that item is and how it

21  was processed?  Is that on the front part of the folder?

22  A.    What do you mean by how it was processed?

23  Q.    May I approach?

24        MR. BENNETT:  May I approach, Your Honor?

04:35:36 25        THE COURT:  Yes, sir, go ahead.

1    BY MR. BENNETT:

2    Q.    Within the binder there's evidence as far as who

3    collected, how it was collected?

4    A.    It's our chain of custody, yes.

04:35:43 5    Q.    Okay.  Thank you.

6          What did you do, if anything, with the phone after it

7    was collected from the scene?

8    A.    We turned it into our evidence, our evidence room.  I

9    believe the -- it was further processed by our computer

04:36:04 10   forensic folks.  But I was not involved in that process.

11   Q.    It's your understanding that at some point it goes and

12   gets processed?

13   A.    Yes.

14   Q.    By that it means what?

04:36:14 15   A.    They examine the contents of the phone.  They analyze

16   what's on the phone, the history.  I'm not an expert at

17   that.  So I don't --

18   Q.    But, in essence, the data that's on the phone?

19   A.    Yes, that's my understanding.

04:36:30 20        MR. BENNETT:  No further questions, Your Honor.

21   Thank you.

22        THE COURT:  Thank you.

23        Counsel, any questions.

24        MR. DOUGHTEN:  No cross, Your Honor.

04:36:36 25        THE COURT:  All right, Special Agent.  You may

1   step down.  Thank you, sir.

2            THE WITNESS:  Thank you, Your Honor.

3            THE COURT:  Do you want to hand back the exhibit

4   to the attorney there so you don't leave it laying around?

04:36:46  5      Hopefully it doesn't ring or something of that nature.

6            MR. BENNETT:  I believe it's been disabled, Your

7   Honor.

8            THE COURT:  Just a little humor.  Don't think

9   it's going to ring.

04:36:56 10      All right.

11            MR. BENNETT:  At this time, Your Honor, the

12   government would call Jason Saitta, which is -- well, he'll

13   spell it for you.

14            THE COURT:  Sir, if you would approach the

04:37:40 15   witness stand over here, please, to my right, and just

16   remaining standing.

17                    JASON SAITTA,

18       of lawful age, a witness called by the United States,

19         being first duly placed under oath, was examined

04:37:53 20              and testified as follows:

21            THE COURT:  All right, sir.  Thank you.

22       Be seated in the witness stand.  Just a couple brief

23   requests.

24       Please, if you would, wait until the attorneys

04:38:05 25   complete their questions before you begin to respond.  It's

1    difficult for both the listeners and the court reporters, in

2    particular, if two individuals are speaking at the same

3    time.

4         If there is any objection, just wait until I rule on

04:38:17  5    the objecting before you respond to the question.

6         Counsel, you may inquire.

7              MR. BENNETT:  Thank you.

8              THE COURT:  One last thing, if you're going to

9    use any Arabic terms, please spell them for us, would you

04:38:27 10    please?

11             THE WITNESS:  Certainly.

12             THE COURT:  Thank you.  We've had a number of

13   witnesses and it makes it easier for the court reporter.

14        Thank you very much.

04:38:33 15             DIRECT EXAMINATION OF JASON SAITTA

16   BY MR. BENNETT:

17   Q.   Agent, can you please identify yourself to the ladies

18   and gentlemen and spell your last name for the court

19   reporter?

04:38:38 20   A.   Sure.  My name is Jason Saitta.  Last name is spelled

21   S-A-I-T-T-A.  I'm a special agent with the Federal Bureau of

22   Investigation in Phoenix.

23   Q.   And that's Phoenix, Arizona?

24   A.   Correct.

04:38:52 25   Q.   How long have you been employed as a special agent?

1    A.    Since June of 2014.

2    Q.    What do you do there at the FBI?

3    A.    So I'm on a squad that we investigate domestic

4    criminal activity.

04:39:15  5    Q.    All right.  Do you have any kind of specialized skill

6    or training with regard to recovery of evidence?

7    A.    Yes, so I'm also a member of -- it's called the

8    Evidence Response Team.  And that's a -- we call it a

9    collateral duty, but it's a separate group that is involved

04:39:36 10    in the location, identification, and recovery of evidence

11    for use in criminal investigations.

12    Q.    And were you working on May 4 of 2015?

13    A.    I was.

14    Q.    And were you called out to a scene to recover

04:39:52 15    evidence?

16    A.    I was.

17    Q.    Do you remember where that was at, what the location

18    was?

19    A.    It was in Phoenix, I don't recall the address,

04:40:05 20    apartment complex.

21    Q.    So would 1385 North 19th Avenue sound about right?

22    A.    Yes.

23    Q.    Do you also have any skills with regard to the scene

24    itself, or documenting the layout of a location?

04:40:19 25    A.    So -- yeah, so this particular scene, I would

1  have -- I did the sketch of the residence.  And that's

2  something that I often do as part of my duties on ERT.

3  Q.     And do you have an understanding as to why you guys

4  were out at that particular location?

04:40:37 5  A.     I do.

6  Q.     What was that?

7  A.     So it was my understanding that this was the apartment

8  complex of the two individuals that were involved in the

9  shooting in Garland, Texas.

04:40:48 10  Q.     So they had traveled from Phoenix, Arizona, to

11  Garland, Texas?

12  A.     Yes.

13  Q.     And what were your particular responsibilities on that

14  day?

04:40:59 15  A.     So that particular day, I was responsible for doing

16  the sketch and also evidence recovery.

17  Q.     Were you there as part of a team?

18  A.     I was.

19  Q.     Can we bring up Government's Exhibit 116.

04:41:12 20       Can you identify this document, at least a portion of

21  it, it's a three-page, or two-page document?

22  A.     Yeah, so this is the sketch that I did.  You can see

23  my name in the upper left there.  It says, "Sketcher."

24       It's got the address.  Also on the upper right.  And

04:41:35 25  then this is the layout of the apartment complex.  And then

1    on -- over on the left is the -- these two denote the items

2    that were found in the -- in each room.

3    Q.    And it looks like there has been a letter assigned to

4    each room?

04:41:53  5    A.    Correct.

6    Q.    Can we go to page 2 of Exhibit 116.

7          What does room B represent in your drawing?

8    A.    That's like a living room, if you will.  So this is

9    right when you enter the front of the apartment.  This is

04:42:15 10   kind of the main room that backs to the kitchen.  So room B

11   is kind of the living room.

12   Q.    And there are a number assigned to various items there

13   on the left; is that correct?

14   A.    That's correct.

04:42:30 15   Q.    Looking at item 13, can you decipher where that's

16   found?

17   A.    Yeah, so there was a little coffee table that was in

18   front of the couch.  So this L-shaped object in room B is

19   going to be the couch.  And so that was on a coffee table.

04:42:47 20   Q.    Okay.  So -- are photographs of the apartment also

21   taken during the search?

22   A.    They were.

23   Q.    Can we bring up Government's Exhibit 111.

24         And can you identify this document?

04:43:05 25   A.    Yeah, so this would have been the photograph of that

1    room that I just described.  And this was the clear like

2    glass or plastic coffee table that was in front of the

3    couch.

4    Q.    So that's the same table that's in your sketch and the

04:43:22  5    same items that were there?

6    A.    Correct.

7    Q.    And then can we bring up Government's Exhibit 112.

8          And can you identify what this document is?

9    A.    This is a closeup of that same table.  And there's

04:43:38 10    a -- there's a phone that's on the table.

11    Q.    And is there another, looks like another phone or some

12    electronic device on the table?

13    A.    That's correct.

14    Q.    What happens to these items?

04:43:53 15    A.    So once these are photographed in place and identified

16    on the sketch, then they are collected and placed into

17    proper packaging and sealed up.  And then those go back to

18    evidence storage back at our office.

19    Q.    Can we, just for the of completeness, bring up

04:44:17 20    Government's Exhibit 113.

21          And can you identify this document?

22    A.    Yeah, this is another photo of the same phone.  This

23    is, we call it to scale so that's why it has the -- has a

24    ruler in there so somebody at the lab can see just how big

04:44:36 25    this phone was.

1    But this is going to be a picture of the LG phone.

2    Q.    Okay.  And then Exhibit 114.

3    And can you identify what this document is?

4    A.    Yeah, this is, again, just even more of a closeup of

04:44:52  5    that same phone on the coffee table.

6    Q.    And is a record compiled of everything that's been

7    taken from the search?

8    A.    Yeah, we do not only an evidence log, but then we also

9    do basically a property receipt.  And so that's a form that

04:45:09 10    we will log everything that we take from the apartment.  And

11    that's left with the homeowners or back at the apartment.

12    Q.    So can we bring up Government's Exhibit 115.

13    And can you identify, just in general, what this

14    document is, it's a three-page document, but what we're

04:45:30 15    looking at in Exhibit 115?

16    A.    Yeah, so this is our evidence recovery log.  It's got

17    the item of evidence over on the far left.  And then there's

18    a description in the next column.

19    The middle column there is who the finder was and then

04:45:49 20    who observed it.

21    So we have two people for every item of evidence.

22    Q.    Can you go to page 2 of this document?

23    And can we go to the top there and pull up item 13,

24    please?

04:46:02 25    So you were going through it, but let's look at kind

1    of with regard to that cell phone.  Do you see that evidence

2    there at number 13?

3    A.    I do.

4    Q.    And what all is being put on the recovery evidence log

04:46:18  5    for that item?

6    A.    So -- do you want me to read the whole description on

7    it?

8    Q.    Just in general, just kind of what's there and what

9    else is here in the log as far as where it was found and so

04:46:30  10   forth and so on?

11   A.    Okay.  So this is item 13.  This is going to be the LG

12   cellular telephone.

13         It was found by myself.

14         It was observed by an individual named Jeff Evans.

04:46:43  15        This was found area B, on the coffee table as noted in

16   the sketch.

17         And then this is the date that it was found.

18   Q.    Okay.  And can we bring up Government's Exhibit 119?

19         And do you recognize this photograph?

04:47:06  20   A.    Yeah, this is the phone turned on.

21   Q.    So it's an extreme kind of closeup of the phone?

22   A.    Yes.

23             MR. BENNETT:  May I approach the witness, Your

24   Honor?

04:47:18  25            THE COURT:  Yes, sir.

1   BY MR. BENNETT:

2   Q.    I'm going to hand you what's been previously marked as

3   Government's Exhibit 108.

4          Can you take a look at that and see if you can

04:47:28 5   identify just the packaging itself and then we'll open it

6   up.

7   A.    Yeah, this is going to be item 13, as noted on there,

8   and this is the LG phone that was found on that coffee

9   table.

04:47:46 10  Q.    And there's a sleeve on top that has the kind of

11  documentation that goes along with it?

12  A.    Correct.

13  Q.    Can you open it up and take out the contents.

14         So can you describe for the jury the stage or the

04:48:06 15  state of the evidence at this point?

16  A.    It's -- I mean, it's going to be turned off.  This is

17  in a -- these little silver bags keep it from receiving a

18  signal or anything.  And it's -- so it's taped up here to,

19  you know, we will initial the tape and everything every time

04:48:29 20  the stuff is sealed and unsealed so we know who's the last

21  one to handle the evidence.

22  Q.    Okay.  Can you open it?  Are you able to --

23  A.    There it is.  Yeah, this is the LG phone that was on

24  the table.

04:49:22 25  Q.    The point is; steps are taken to try to preserve how

1    it was found in its most kind of native state?

2    A.    Correct.

3    Q.    And then ultimately what happens to the phone once

4    you've recovered it from the apartment?

04:49:35 5    A.    So it will go back to our -- to evidence storage

6    facility in our office.  And then we will submit a request

7    for the contents of the phone to be basically imaged or

8    downloaded.

9         And that can either happen back at our office or the

04:49:57 10    lab will do it.  And I'm note sure in this case which was

11    done.

12    Q.    It's processed in some way?

13    A.    Yes.

14         MR. BENNETT:  No further questions, Your Honor.

04:50:05 15         THE COURT:  All right.  Thank you.

16         MR. DOUGHTEN:  No cross, Your Honor.

17         THE COURT:  All right.

18    Thank you, sir.  You may step down.  If you would,

19    take your time, return the exhibit to the attorney for the

04:50:16 20    government, please.

21         All right.  Thank you.

22         MR. BENNETT:  At this time, the government would

23    call Todd Shelton.

24         THE COURT:  Is everyone all right with the

04:50:59 25    temperature?  Warm, hot, cold?  Anybody need me to try to

1    persuade management to alter the temperature?

2          All right.  Hearing no complaints, we'll just leave it

3    as it is.

4          Sir, if you would approach the witness stand over

04:51:21  5    here, please, to my right?

6          Please just remain standing and raise your right hand,

7    sir.

8                        TODD SHELTON,

9          of lawful age, a witness called by the United States,

04:51:32  10          being first duly placed under oath, was examined

11                     and testified as follows:

12          THE COURT:  Thank you.  Be seated in the witness

13    stand, if you would, sir.  Just a couple of brief requests.

14          Please wait until the attorneys complete their

04:51:51  15    questions before you begin to respond.  It's difficult for

16    the court reporters and listeners when two individuals are

17    speaking at the same time.

18          Of course, if there is any objection, do not respond

19    until I rule on the objection.  And if I sustain the

04:52:04  20    objection, you will not answer up that very much, sir.

21          Counsel, you may inquiry.

22          MR. BENNETT:  Thank you, Your Honor.

23              DIRECT EXAMINATION OF TODD SHELTON

24    BY MR. BENNETT

04:52:14  25    Q.    Agent Shelton, could you please introduce yourself to

          1    the ladies and gentlemen of the jury and spell your last

          2    name for the court reporter?

          3    A.    I'm Special Agent Todd Shelton of the FBI.  My last

          4    name is S-H-E-L-T-O-N.

04:52:24  5    Q.    And how long have you been employed as a special agent

          6    with the FBI?

          7    A.    Next month will be 21 years, sir.

          8    Q.    And where are you currently stationed?

          9    A.    I'm currently assigned to the Baltimore field office.

04:52:38  10   I'm a team leader in the special operations group,

          11   specializing in physical surveillance.

          12   Q.    And when you say specializing in the physical

          13   surveillance, is that almost exclusively what you do now?

          14   A.    Correct, sir.

04:52:50  15   Q.    And how long have you done that?

          16   A.    Approximately six years, sir.

          17   Q.    Were you working in Baltimore in that capacity on May

          18   2 of 2015?

          19   A.    Yes, sir.

04:53:01  20   Q.    And were you, in fact, doing surveillance activity on

          21   May 2 of 2015?

          22   A.    Yes, sir.

          23   Q.    And what was your role on that particular day?

          24   A.    Myself and my team had been advised that an FBI

04:53:16  25   informant had an opportunity to meet with a subject of

1    investigative interest.

2         We were told that the subject had not been identified,

3    that we should expect that the subject may well be

4    surveillance conscious and our goal was to attempt to

04:53:39 5    document the meeting and identify the subject.

6    Q.    And approximately how many agents were assigned to

7    that task as part of your team?

8    A.    I can review the notes to be specific.  I believe

9    there were ability in total.

04:53:53 10    Q.    The point is, it's not just you.  There's a team?

11    A.    That's correct, yes, sir.

12    Q.    And what all equipment was used in particular for this

13    surveillance?

14    A.    We all -- we had a ground team that operated from

04:54:06 15    vehicles.  We had photographic equipment.  We had

16    binoculars.  We also employed an aircraft for that

17    particular surveillance.

18    Q.    And were the members of the team able to talk to or

19    coordinate, communicate with each other throughout?

04:54:21 20    A.    Correct.  We had FBI encrypted communication channels

21    which allowed us to communicate car to car, as well as with

22    the aircraft.  The aircraft also was down linking video

23    taken from the aircraft during the surveillance.  That video

24    is being monitored by officials at the FBI field office, as

04:54:44 25    well as myself in my vehicle.

1    Q.    And where was your vehicle located or did it move

2    throughout the process?

3    A.    It moved throughout the vehicle -- all of the field

4    deployed ground personnel, myself included, moved with the

04:55:01  5    subject and the FBI informant throughout the day in an

6    attempt to identify the subject.

7    Q.    You had mentioned the FBI informant.  Was it your

8    understanding that he was in contact with the subject?

9    A.    Yes.  We had been told that the informant had been in

04:55:19 10    contact with the subject, that the subject had proposed a

11    meeting.  The exact time and location of the meeting was

12    being withheld by the subject until the day of the event.

13        We interpreted that likely as an opportunity to defeat

14    surveillance by preventing law enforcement from being able

04:55:42 15    to develop strategic surveillance plan in advance of the

16    meeting.

17    Q.    And you mentioned that and you mentioned the

18    counter-surveillance techniques.

19        Can you just in general tell the members of the jury

04:55:53 20    what you mean by that, just what those techniques normally

21    consist of?

22    A.    Generally, although there are several sophisticated

23    techniques to identify surveillance, they all basically come

24    down to one thing.  Multiple sighting over time and

04:56:10 25    distance.

1       If you see the same individual more than once over an

2  extended period of time or over a variety of locations,

3  especially locations that don't necessarily follow a

4  legal -- a logical flow of travel, you begin to rule out

04:56:28 5  coincidence and you begin to identify those people who would

6  be moving with you.  And that is how surveillance is

7  detected.

8       Some of the ways that happen would be to conduct

9  counter-surveillance, have somebody go to an area where you

04:56:45 10  had a strategic position of observation or an over watch

11  point.  And you would look to see other vehicles arriving at

12  the same time, departing at the same time, acting unusually,

13  such as people sitting in their cars, cars idling, and

14  again, consistently seeing the same vehicles throughout an

04:57:09 15  extended route of travel.

16  Q.    And if you were, as part of this counter-surveillance

17  technique, attempting to avoid that, having cars follow you,

18  is there certain type of path that a vehicle would travel to

19  try to avoid being surveilled?

04:57:24 20  A.    If you were attempting to avoid surveillance, you

21  would make illogical or erratic moves potentially.

22       You could do things such as potentially run red

23  lights.  You could do U-turns.  Or you could start at one

24  position and then drive in a nonlinear route to the ultimate

04:57:46 25  location of interest.

1    Q.    With regard to the FBI informant, were you aware in

2    advance what vehicle he would be driving?

3    A.    We were.  We had a description of the vehicle, yes,

4    sir.

04:58:00  5    Q.    And as part of the team effort, was he also, have some

6    microphone or recording device on him?

7    A.    It's my understanding that he did.  But I was not

8    involved in that part of the operation, had no direct

9    contact with the FBI informant, and was not aware of the

04:58:18 10    details of how he was being handled or directed.

11    Q.    Okay.  So tell us how, I guess the -- we'll look at

12    the footage here in a second from the plane you mentioned.

13    But how do you know, as an FBI agent in the surveillance

14    situation, like who you're following and how you're going to

04:58:34 15    follow them?

16    A.    We had made a suggestion early on that if we could get

17    the FBI informant to a known location, we could begin the

18    surveillance there, by maintaining eyes on his car.  And if

19    the location of the initial contact with the subject were to

04:58:53 20    be changed or redirected, we could follow the informant to

21    whatever his ultimate destination would be.

22         So we had -- we initiated the surveillance by picking

23    up observation of the informant and following him to what we

24    believed to be his point of contact with the subject of

04:59:13 25    interest.

```
 1   Q.    And prior to your testimony today, have you had a
 2   chance to look at all of the video footage that was taken as
 3   well as while it was occurring?
 4   A.    Yes, sir.  I was monitoring the video as it was
 5   occurring.  And I've also reviewed those aspects of the
 6   video which I was told would be important to today's
 7   proceedings.
 8   Q.    So the clips themselves.
 9         All right.  So let's bring up Government's Exhibit
10   64A.
11         Can you expand it?  And can we stop it for right now?
12             THE COURT:  Everyone's screen working?  Okay.
13   Good.
14             MR. BENNETT:  I guess we need a moment, Your
15   Honor.
16             THE COURT:  That's fine.
17             MR. BENNETT:  I apologize, Your Honor.  We seem
18   to be -- we had the full video footage of the entire
19   surveillance and we had broken them down into shorter clips
20   and the system seems to be fighting with us to show the
21   clips.  We didn't want to necessarily have the entire
22   played.
23             THE COURT:  Can you play the video and then stop
24   it as it moves through?
25             MR. BENNETT:  Yeah, I think that's probably our
```

04:59:28  5
04:59:39 10
05:00:08 15
05:01:06 20
05:01:18 25

1176

1      best bet at this point.

2                  THE COURT:  Take a moment.  See if you can remedy

3      the problem.  If not, you can play it and stop it as you go

4      through it, I suppose.

05:01:47  5          Do you need to restart it maybe?

6                  MR. BENNETT:  That's what we were doing.  We had

7      this problem this morning.  We rebooted it and it came up.

8      So that was our hope.

9                  THE COURT:  Just take a moment.  It will be all

05:01:59 10    right.

11                MR. BENNETT:  Thank you, Your Honor.

12                  THE COURT:  You're welcome.  If not, our staff is

13     here if you need some technical assistance, just in case.

14     BY MR. BENNETT:

05:03:11 15    Q.   Can we go ahead and play it and see if it's working?

16     And Jon, that we'll be able to stop it once we got it going.

17            So can you just narrate what is happening here and

18     what you're viewing?

19     A.   Yes, sir.  The light colored vehicle is

05:03:23 20    entering -- that's the vehicle driven by the FBI informant.

21            Entering a public park and ride which is just off of

22     Interstate 95 near the intersection with Maryland Route 152

23     in Joppa, Maryland.  He's just gone across Old Mountain Road

24     and entered one of the two lots associated with the park and

05:03:46 25    ride.  The crosshairs are now on the informant's vehicle.

1    Q.    And for some feeling of -- how close are we to

2    Baltimore?  Is this within city limits?  Or is this outside

3    of Baltimore?

4    A.    This is outside the city limits.  During our initial

05:04:04  5    briefing, we had been told to expect that the meeting would

6    likely occur in downtown Baltimore.  And when we were told

7    of the location that the informant had been told to drive,

8    it was well outside of Baltimore city.

9         This is in suburban Baltimore County that is outside

05:04:21 10    the Baltimore beltway, which is the ring road surrounding

11    all of Baltimore City, several miles.  I would estimate ten

12    miles perhaps.

13    Q.    And was there something in particular going on in the

14    city of Baltimore in May of 2015?

05:04:34 15    A.    At the time of this surveillance and at this meeting,

16    there was a protest, some of which had evolved into rioting.

17    Protesting the in-custody death of someone who died in

18    custody of the Baltimore City Police Department.

19    Q.    And, again, is this a true and accurate copy of what

05:04:59 20    you were witnessing and what you reviewed prior tour

21    testimony today?

22    A.    Yes, sir, this would be the FBI's informant's car

23    after the surveillance had started arriving at what we were

24    told may be the upon of initial contact with the subject

05:05:12 25    that we were looking for.

1    Q.    Okay.  Can we bring of Government's Exhibit 64-B, if

2    we're so lucky.

3          All right.  Let's play that.  And, again, if you would

4    just kind of narrate what you're seeing here for the jury?

05:05:25  5    A.    So from that site we, again, we did not know what was

6    happening at the time, at least myself or my team.

7          The FBI informant's car left that lot.  We did not see

8    anyone approach the vehicle.  We did not see the informant

9    get out of the car.

05:05:42 10          The vehicle drove, by what I would describe as a

11   circuitous route, eventually executing a U-turn proceeding

12   back down south down Interstate 95.  He goes around the

13   perimeter rote of the White Marsh Town Center, which is a

14   large retail shopping mall.  And the vehicle parks in this

05:06:04 15   parking lot on the west side of the mall between a 7-Eleven,

16   which is the building on the right.  I believe, it's a

17   convenient store, which is a Burger King, fast food

18   restaurant, which is the building on the left.

19   Q.    And at some point does he get out of his vehicle?

05:06:22 20   A.    He does.  In fact, I believe we see the informant now

21   standing next to his car.  The erratic nature of the video

22   is caused by the intense magnification and winds buffeting

23   the plain.  That's why the less magnify it, the more steady

24   the view.

05:06:43 25          So the informant got out of the car and walked in the

1  direction of the restaurant.

2  Q.    So at this time, the surveillance that's on the

3  ground, what is it doing, yourself?

4  A.    Our team is distributed around the mall.  Again, we

05:07:00 5  are looking to see if someone were to approach or make

6  contact with the subject.  We are trying to maintain

7  distance to keep ourselves from being observed.  And we are

8  monitoring the video feed to try and determine exactly

9  what's happening.

05:07:21 10        We are supporting the aircraft, depending on how clear

11  the picture and what our assessment is of how securely the

12  aircraft is able to stay with the vehicle, that determined

13  how close or how far away we maintain our position.

14        At this moment, we are surrounding the Burger King in

05:07:44 15  a number of the public parking areas associated with the

16  shopping mall.

17  Q.    Okay.  So we saw him go into the Burger King.  At some

18  point, did you see him come out?

19  A.    The informant returns to his vehicle and then his

05:08:05 20  vehicle, which is that light-colored car that the crosshairs

21  are on now, departs the parking lot.

22  Q.    So there is a gentleman getting in currently, correct?

23  A.    Correct.

24  Q.    And did he walk out with someone else?

05:08:17 25  A.    Having -- at the time, at this point in the

1    surveillance, there was someone who was walking and entered

2    the dark-colored van just below the crosshairs now.

3         But while this was occurring realtime, we had not yet

4    assessed that that individual may be involved.  Again, at

05:08:38    5    this point, we are still locked on the informant's vehicle.

6         But the van which later we determined to be of

7    interest is this vehicle where the crosshairs are touching

8    now, that dark-colored van.

9    Q.    And we see some people coming and going in and out?

05:08:55    10    A.    Correct.

11    Q.    At least two people?

12    A.    Shortly, I believe in this clip we'll see --

13    Q.    I was going to say I think this clip has the next

14    activity that you can't comment on yet.

05:09:14    15    A.    So at this point, again, the ground units, myself

16    included, were trying to remain out of view.  We have a long

17    line of sight on the parking lot.  We're using binoculars.

18    We had an agent or two closer.  And they're providing radio

19    communication to the rest of us to describe what's happened

05:09:35    20    allowing the remaining members of the team to have a long

21    off-sight to avoid detection.

22    Q.    And then what are we seeing now?

23    A.    We see the dark-colored van leaving now.  And now we

24    see the FBI's informant's car leaving.  At this point,

05:09:51    25    again, we now see that the informant is changing locations.

1    So we are beginning to change positions to be near all of

2    the egress points or exit points on this ring road to

3    continue a moving vehicle surveillance to stay with the

4    informant.

05:10:08 5    Q.    I think that's the end of this clip.

6          But did it appear to you and your team at this point

7    that the informant was actually following that van out?

8    A.    From this point forward, this Burger King restaurant

9    is on the west side of the shopping mall.

05:10:22 10          The vehicle then moves around the mall, moving to the

11   east side of the mall, and during that movement it becomes

12   apparent that the informant's car seems to be mirroring the

13   movements of that dark-colored.

14   Q.    Let's bring of Government's Exhibit 64C.  I don't know

05:10:43 15   how much we caught of that.

16   A.    So at this point, the vehicles have moved.  They've

17   gone around the mall.  They've moved past another small

18   retain shopping center call The Avenue.  And they've entered

19   a corporate business park, which is on the east side of the

05:11:03 20   mall.

21          During that movement, it appeared to us that the cars

22   were moving together.  That road they just traveled down is

23   Sand Piper Circle.  But this time we're now believing that

24   the van might be of interest.  And you see the vehicles

05:11:17 25   enter and park in an almost totally abandoned corporate

1    business park shopping area, and the reason that it's so

2    sparsely populated is because this was occurring on a

3    Saturday morning.

4    Q.    And then there are individuals at that look like, even

05:11:33 5    though it's out of focus for a second, when you zoom in, but

6    what are the individuals doing with regard to the vehicles?

7    A.    At this point, we see individuals exit the car, two

8    people.  And they stand, appear to be talking together in

9    that empty parking spot in the space between the two cars.

05:11:54 10   Q.    And we didn't show the entire clip, but was it an

11   extended period of time from when they moved from the Burger

12   King to this actual location?

13   A.    There wasn't a significant amount of time from the

14   Burger King to this location.  There was a greater amount of

05:12:09 15   time from the time the informant's car left the park and

16   ride to get back to the mall.

17        If I were to analyze it based on this, I think the van

18   and the light-colored vehicle met up at the Burger King.  At

19   that point, if indeed they had conducted

05:12:23 20   counter-surveillance they may have determined that law

21   enforcement was not in the area and then moved a short

22   distance away to the site of their ultimate meeting which we

23   see here.

24   Q.    And at this point where are you physically located?

05:12:38 25   A.    We are, again, similar to when they were at the Burger

1   King, all of the ground units, myself included, are

2   establishing a perimeter around all of the points of exit in

3   the surrounding parking areas.

4       This parking lot is near the intersections of two

05:12:56 5   roads, corporate drive and Sand Piper Circle.  So we have

6   agents at -- along both of those roads, should the vehicles

7   leave.

8       We have set up a perimeter where no one would have to

9   immediately leave with them.  We would pick them up as they

05:13:12 10  depart the area and we would fall in behind them.

11      Myself was working to coordinate the position of the

12  agents, understand where our units are, again, we're giving

13  them some distance before we have move in to try and observe

14  from the ground the events of the meeting, relying at this

05:13:29 15  point primarily on this video feed from the aircraft.

16  Q.   Are you also able to take photographs from your

17  vantage point?

18  A.   At some point, after they had been in this parking lot

19  and it appeared that they were meeting, believing that this

05:13:43 20  second individual now meeting with the FBI informant may

21  well be the investigative subject we're attempting to

22  identify, we did reposition in order to take photographs.

23      I took several photographs on that day.  For some of

24  them, I got in the rear seat of a vehicle driven by another

05:14:02 25  agent and secreted myself down in the rear seat driving by

1       from Corporate Drive and attempted to take some photographs

2       while the vehicle was moving.

3              Later I took up a position down Corporate Drive and

4       was able to, again, attempt to take some photographs of the

05:14:23  5     meeting.

6       Q.   Let's pull up the photograph -- one of the moves.

7       Exhibit 54, if we could, please.

8              And can you try to get the screen to present preview,

9       get the whole thing down there?  Will that work now?

05:14:47 10             No, we're not going to get it?

11             Okay.  We'll stick with this.

12             Can you identify this document and what it depicts?

13      A.   This is one of the photographs that I took that day.

14      This is one of the photographs that I took while in the

05:15:01 15     moving vehicle along Corporate Drive.

16      Q.   And are these the same two individuals that the

17      surveillance from the aircraft had seen park and were now

18      talking?

19      A.   Correct.  Yes, sir.  In fact, the vehicle in this

05:15:17 20     image is the light-colored vehicle that we had initially

21      started following belonging to the FBI informant.

22      Q.   Can we bring up Government's Exhibit 55?

23             And, again, for each one of these, if you could just

24      identify what is depicted and where you were at with regard

05:15:36 25     to each photograph?

1   A.    Yes, sir.

2         So, again, I'm in a car.  We're driving along

3   Corporate Drive.  I took a series of photos as the car

4   advanced, which changed the perspective.  In the preceding

05:15:50 5   photo, you saw there was a green -- I don't know, a

6   transformer box in the way.

7         In some of these, this lamppost in the image now may

8   be in the way again.  Because as the vehicle is moving, I'm

9   just trying to surreptitiously trying to take a number of

05:16:06 10   photographs as we pass.

11  Q.    Do you have some kind of extension on your camera?

12  A.    Correct.  I had a telescopic lens.  I don't know

13  exactly magnification I was using at that time.

14        This photo depicts both of the vehicles that we have

05:16:22 15  seen in the prior video.

16        The van in the foreground was the dark-colored van

17  that moved from the Burger King to this business park.

18        The car that these two individuals are leaning against

19  was the FBI informant's vehicle that we had been following

05:16:38 20  at the start of the surveillance.

21  Q.    In looking at these two individuals, are you able to

22  decide or tell the ladies and gentlemen of the jury which

23  one is the informant and which one is the subject?

24  A.    At the time, based only on the physical description of

05:16:53 25  the informant, we believe that the informant would be the

1    individual on the right.

2    Q.    Okay.

3    A.    And the individual on the left was someone who we did

4    not know and at the time we believed, from what we had seen

05:17:06  5    before, that this was likely the individual of investigative

6    interest we had been tasked with identifying.

7    Q.    And we'll go through some other photographs, but at

8    some point, did you take steps to get photographs in order

9    to determine who the driver of the van was, the registrant

05:17:27 10    of the van?

11    A.    We had made this drive by in an effort to get a

12    physical photograph of the individual himself, hopefully to

13    be used by investigators later to identify the person.

14            After making this drive-by, I did take -- I returned

05:17:45 15    to my own vehicle.  I parked my car in a position that gave

16    a view of the vehicles, specifically the dark-colored van in

17    the foreground of this picture.  We did take a

18    photograph --

19    Q.    Let me stop you there and see if you recognize

05:18:01 20    Government's Exhibit 59.

21            And can we zoom in on the van.

22            So is this the photograph you were discussing?

23    A.    Yes, sir.  This is the photograph that we were

24    discussing.  You can see the two individuals, the individual

05:18:20 25    we believe to be the informant is largely obscured on the

1    right by trees.  We see the person that we thought was the

2    subject we were trying to identify in the blue sleeve.  You

3    get a partial facial shot there.

4         But in this particular photograph, of greater interest

05:18:37 5    was attempting to document the vehicle.  If we, from a

6    physical surveillance perspective are trying to identify

7    someone, we want to get a photograph, again, it's tough for

8    us to know every person on the face of the earth.

9         So, again, we're trying to find some other material

05:18:52 10   fact that can provide investigative leads that we can use to

11   identify someone.  And one of the things that we use most

12   frequently are vehicle registration license plate.

13        We took this photograph magnifying this image in my

14   camera on the digital screen.  We zoomed in enough to read

05:19:13 15   the alpha numeric characters on the tag.

16        We also got the color of the back -- the background

17   colors of the plate.

18        From that we knew it wasn't a Maryland tag.  We

19   communicated this back to FBI officials at Baltimore field

05:19:32 20   office.  We asked that they initiate a NCIC check, which is

21   an automated check, or collection of databases including

22   motor vehicle information.

23        We asked them to run those tags for all 49 states,

24   knowing that this wasn't a Maryland tag.

05:19:51 25        Current to that, two other members of my team were

1    going through open source Internet material of various state

2    DMV's, attempting to find a background color template that

3    we thought would be this plate.

4         They determined that based on the color and

05:20:10  5    configuration, they believed strongly was it was a South

6    Carolina tag.  We communicated that back to the officials at

7    the Baltimore field office, asked them to try prioritize the

8    search of South Carolina motor vehicle records for the tag

9    IPA665.

05:20:27 10    Q.    And were you able to identify that at some point?

11    A.    Yes, we were.

12    Q.    Can I bring up Government's Exhibit 68?  And we'll

13    just go to page 2 of it.

14         68-2.

05:20:39 15         And can you blow up the vehicle detail down to the

16    address?

17         That's good.

18         Looking at this document, do you see that plate

19    information kind of in the middle there left?

05:20:54 20    A.    I do.  I've not seen this before, but I do see under

21    registration information, midway down on the left, plate

22    IPA665.  And those are the numbers antlers of the tag that

23    we found that day.

24    Q.    And above it, it's suggested its make is a Honda and

05:21:13 25    the model is an Odyssey?

1    A.    That's correct.  That's consistent with the photograph

2    that we took.  That was a Honda Odyssey.

3    Q.    And did you determine at this time that the vehicle

4    was, in fact, registered to a Tyrinda Hendricks at this

05:21:32  5    address in Colombia, South Carolina, or was that done later?

6    A.    While we were out, not myself but another individual

7    on my team was in contact with the agents in the field

8    office after we asked to prioritize this South Carolina

9    inquiry, it did return to us that it was registered to a

05:21:50 10    Tyrinda Hendricks.  And I knew it to have a South Carolina

11    address at the time.  I didn't take note of exactly what it

12    was.

13    Q.    And at some point, was a relationship established

14    between the subject and this Tyrinda Hendricks and who that

05:22:08 15    individual was?

16    A.    We were asked to surveillance, so we have -- at this

17    point in the surveillance, we have the informant and the

18    subject who is driving this van registered to Tyrinda

19    Hendricks.  They're meeting.  We're requesting the vehicle

05:22:24 20    check.  It identifies the name.  And at some point,

21    thereafter, the agents in Baltimore did say that the van was

22    of interest, that they believe they had other investigative

23    leads that they could follow.

24          And we continued the surveillance, but yes.  They

05:22:44 25    communicated to us that they thought this was a significant

1     piece of evidence in identifying the individual whose

2     photographs we had just taken.

3     Q.    I want to go through just for the record the other

4     photographs that are there.

05:22:58    5          Can we bring up Government's Exhibit 56?

6     A.    This is, again, another one of the photographs that

7     was taken on the drive-by.

8     Q.    All right.  Same to individuals, same two vehicles?

9     A.    Yes, sir.

05:23:14   10    Q.    And then exhibit 57?

11    A.    Again, this is the same two vehicles.  You can see one

12    of the two individuals, the informant, in this shot is

13    obscured by a tree trunk.

14    Q.    And is this one where you were driving by?

05:23:32   15    A.    Yes, sir.

16    Q.    Government's Exhibit 58, what is this depicting, the

17    angle of this?

18    A.    This was, again -- this is a drive-by.  Although it

19    was a bit of a risk, we were trying to maintain distance.

05:23:50   20    At some point, I did ascertain that we would drive by once

21    on the opposite side from -- we had driven down Corporate

22    Drive.  We actually did enter the parking lot and drove

23    along the building front, a single pass, and so this is the

24    same two vehicles.  The same two individuals whose backs we

05:24:10   25    see, but it's from the opposite side.

1           And in the background, we see that road, I believe,

2     from this perspective that's Sand Piper Circle, which was

3     the road that on that -- in the aircraft video, that's the

4     road they came down to enter the parking lot.

05:24:28 5     Q.     And then can we go to Government's Exhibit 61?

6     A.     Again, same two -- this is the drive-by.  It's another

7     shot taken from the car.  It's the same two vehicles.  We

8     see the nose of the van.  You can clearly see the Honda

9     emblem, and then we see the informant's, and in this case

05:24:52 10    the informant was obscured by a utility pole.  I believe

11    it's a lamp post which appeared in the other photographs as

12    well.

13    Q.     And then finally --

14    A.     Actually, if I could say, I believe this may be a

05:25:03 15    cropped version of one of the other photographs, or an

16    enlargement of one of the other photographs.

17    Q.     And in looking at Government Exhibit else 60?

18    A.     Same thing.  This is an enlargement of one of those

19    photographs taken on the drive-by.

05:25:19 20         It's simply been cropped to remove some of the

21    peripheral photos.  We were attempt to be get a good facial

22    depiction of the subject to assist with identification.

23    Q.     And when you guys were using the kind of high

24    magnifying lenses, does it bring not only the subject's

05:25:41 25    closer to you, but the things behind the subjects appear to

1    be closer?

2    A.    Correct.  I don't know, if you can recall from the

3    video, they are in a parking lot.  There's a significant

4    amount of space between the subject's cars and the road, as

5    well as their vehicles and the buildings and hedge row

6    behind.

7         So it's just the perspective.  We are, I believe my

8    assessment would be I'm quite close -- the car I'm in is

9    quite close to this hillside, which is the green in the

10   front.  Then there's some space.  Then we see their

11   vehicles.  Then there's a significant amount of empty

12   parking spaces behind them.  And then a hedge row.  And then

13   the buildings.

14   Q.    Even though in this picture the hedge row looks fairly

15   close to the vehicles?

16   A.    Correct.  It does look close, but it is not.  And you

17   could refer back to that overhead video to see exactly how

18   far away it is.

19   Q.    And, again, just for the record, the individual on the

20   report in this photograph is the FBI informant; is that

21   correct?

22   A.    That's correct.

23   Q.    And the individual on the left was the subject that

24   the informant was meeting with?

25   A.    Correct.

1193

1    Q.    Okay.  How long did the meeting, if you know, or can

2    get a general idea, how long did the meeting happen or

3    occur, the talk between the informant and the subject?

4    A.    I would have to refer to the notes and we can have the

05:27:09  5    exact length.

6          For me, in realtime, it was a high pressure

7    surveillance.  A lot was going on.  It seemed to me that

8    they were in that parking lot for an extended time.  I want

9    to say it was probably an hour, but the times would be on

05:27:25 10    our log.

11    Q.    And we can get those specific points.  But do you guys

12    do surveil the entire time?

13    A.    Yes, sir.

14    Q.    Can we bring up Government's Exhibit 64D?

05:27:35 15          We hope it runs like it should.

16          All right.  And then if you could just identify this

17    footage?

18    A.    Again, now this is the same parking lot.  We see the

19    dark-colored Honda Odyssey, which we now knew as a Honda

05:27:55 20    Odyssey, from still photographs that we were taking while

21    the meeting was going on.

22          We see the light-colored car which is informant's

23    vehicle.  We can still see the two individuals standing

24    between them.

05:28:04 25          Again, I apologize for the vibration in the footage,

1    but, again, that's buffeting of the aircraft by wind or

2    turbulence, whatever.

3         And the more they increase the magnification, the more

4    even a subtle movement of the aircraft translates into this

05:28:25  5    kind of violent shaking of the TV screen.

6         So you can see there on the left-hand side, the hedge

7    row depicted in that one photo you asked me about, would be

8    off on their left from this perspective.  And it's not even

9    in sight of this particular video.  It's off screen to the

05:28:43  10    left.  That's how far away it is.

11   Q.    And as far as you know, as part of the surveillance

12   team for the FBI, the informant is wearing a recording

13   device of some kind, but you're not privy, from your

14   location, to hearing what's being said?

05:28:57  15   A.    That's correct.

16   Q.    So my question was going to be, how does it end, but I

17   think there's a video that shows that, the later part of the

18   video shows how the meeting ends.

19   A.    We can wait for the video.  Ultimately both the people

05:29:18  20   depicted in the photograph return to their respective cars.

21   They exit the parking lot.  Briefly we maintain surveillance

22   of both vehicles, believing that the driver or

23   the -- believing that the occupant of the dark-colored van

24   was the person of greater interest to us, we then

05:29:40  25   discontinued surveillance of the informant's light-colored

1    sedan and began to follow the dark-colored Honda.

2         At this point in the surveillance, we believed that

3    the objective of identifying the individual had largely been

4    met.  We did not want to compromise the investigation by

05:30:01 5    being overly aggressive.  We did maintain surveillance of

6    the Honda Odyssey, but at the -- it drove down Interstate

7    95, around the beltway, but at that point, we had an

8    extremely loose surveillance.  The van stops.  And

9    ultimately we decided to discontinue.

05:30:25 10        Prior to discontinuing, the log reflects some physical

11    checks at the lot where the van was no longer present or

12    what we believed to be the van.  And, again, that's just

13    because we at that point felt our objective had largely been

14    met.

05:30:38 15        Here you see that they're departing separately.

16         That's the van exiting the lot and proceeding down

17    Sand Piper Circle.

18    Q.   Were you involved with any of the subsequent, I guess,

19    debriefing of the informant.  Or is that another part of the

05:30:54 20    team?

21    A.   I was not involved in it, nor were any members of my

22    team.  That was other FBI investigators tasked with handling

23    the informant, subsequently met and debriefed him.

24         And, again, if there had been realtime monitoring,

05:31:08 25    they would be privy to that and the results of that.

```
             1            MR. BENNETT:  Just a moment, Your Honor.
             2            THE COURT:  Yes, sir.
             3            MR. BENNETT:  No further questions, Your Honor.
             4    Thank you.
05:31:17     5            THE COURT:  All right.  Thank you, Counsel.
             6            MR. DOUGHTEN:  We have no questions of this
             7    witness, Your Honor.
             8            THE COURT:  All right.  Thank you.
             9        Sir, you may step down.  You're excused.
05:31:29    10            THE WITNESS:  Thank you, sir.
            11            THE COURT:  Do you have another witness
            12    available, please?
            13            MR. BENNETT:  We do, Your Honor.
            14        At this time the government would call Hamza
05:31:38    15    Al-Ansari.
            16            THE COURT:  All right.
            17        Counsel?
            18            MR. BENNETT:  This will be a fairly lengthy
            19    witness.
05:31:45    20            THE COURT:  Why don't we approach at bar?
            21        Would you like to take a break now?  I know this is
            22    going to be a very long witness.  So if you would like, we
            23    can take a break and then reconvene, take 20 minutes.  We're
            24    probably going to go until 4:30, is that that okay?
05:31:59    25        All right.  Let's do that.
```

1       All right.  We'll take a break.

2       I'm sorry, I made an executive decision.  We're going

3   to take a break.

4       We're going to take our break now and then we'll begin

05:32:12  5   with the witness.

6       Thank you very much.

7       Please remember all the admonitions, ladies and

8   gentlemen.  I appreciate that.  Leave the notepads on the

9   chairs.

05:32:20 10       Thank you very much.

11       (Jury out, 2:20 p.m.)

12           THE COURT:  Counsel, depending on how it

13   goes -- I don't know, depending on how long your witness

14   might be.  If the within is more than, you know, an hour and

05:32:57 15   a half, then we'll probably do cross tomorrow morning.

16       Because that way, again, I don't want to get -- I

17   don't want to break up the cross-examine.

18       So if the witness goes until 4:10, then we'll break

19   until tomorrow morning.

05:33:11 20           MR. BENNETT:  Coming back at 2:30 now?

21           THE COURT:  Give them about 20 minutes.

22           MR. BENNETT:  Thank you, Your Honor.

23       (Recess taken 2:20 p.m.) eye.

24       (Jury in, 2:40 p.m.)

05:57:04 25           THE COURT:  Counsel for the government, you may

```
 1    call your next witness.
 2              MR. BENNETT:  Again Your Honor, the government
 3    calls Hamza Al-Ansari.
 4              THE COURT:  Sir, if you would approach the
 5    witness stand over here, please, to my right.
 6         Please remain standing.
 7                   HAMZA AL-ANSARI,
 8      of lawful age, a witness called by the United States,
 9        being first duly placed under oath, was examined
10                 and testified as follows:
11              THE COURT:  All right, sir.  Be seated in the
12    witness stand.  Just a couple of brief instructions,
13    requests.
14         Please wait until the attorneys complete their
15    questions before you begin to respond to the answer -- or to
16    answer.
17         It's difficult for listeners and the court reporters,
18    in particular.
19         If there is an objection to any question, please wait
20    until I rule on the objection before you begin to respond.
21    Of course, if I sustain the objection, you will not answer
22    the question.
23         All right.  Thank you very much, sir.
24         Counsel, you may inquire.
25              MR. BENNETT:  Thank you.
```

```
 1              DIRECT EXAMINATION OF HAMZA AL-ANSARI

 2    BY MR BENNETT:

 3    Q.    Good afternoon, Mr. Al-Ansari.

 4          Can you state your name?  It's Hamza Al-Ansari, and if

 5    I'm spelling it correctly, it's H-A-M-Z-A, is the first

 6    name, and then A-L, hyphen, A-N-S-A-R-I; is that correct?

 7    A.    That is correct.

 8    Q.    Can you tell the ladies and gentlemen of the jury

 9    where you're from generally?

10    A.    So I am from the Philadelphia metropolitan area.

11    Q.    And what do you do in the Philadelphia area?

12    A.    Yes, I'm a computer programer.

13    Q.    And how long have you been in that profession?

14    A.    For about two years now.

15    Q.    And are you also what's considered an FBI informant?

16    A.    Yes.

17    Q.    How did that come about?  How did you become an FBI

18    informant?

19    A.    I was basically recruited when I -- when I went to

20    apply for the United States Army.

21    Q.    And someone from the FBI approached you?

22    A.    Correct.

23    Q.    And just so you know, this microphone is not mobile,

24    so if you would just move the chair a little bit closer?

25              THE COURT:  Well, the chair is not going to move.
```

1200

1    It's attached.

2                 THE WITNESS:  I'll lean forward.

3                 THE COURT:  Your going to have to scoot up.

4    BY MR. BENNETT:

05:59:30  5    Q.    It was fading a little bit.  I wanted to make sure the

6    jury could hear you.

7          Thanks.

8          How long have you been working with the FBI?

9    A.    For approximately six years now.

05:59:39 10    Q.    And do you have an opinion an idea, are you paid as an

11    informant?

12    A.    Yes.

13    Q.    Do you have an idea over that six-year period how much

14    money you've been paid?

05:59:49 15    A.    No, not exactly.

16    Q.    If I told you it was a little over $45,000, would that

17    sound about right?

18    A.    Yes.

19    Q.    Okay.  How do you get paid?  Are you paid based upon

06:00:03 20    results in some way?

21    A.    I'm paid basically -- you can say by results, but

22    there's no -- there's no set pay dates basically.

23    Q.    So it's -- there's not like a sliding scale set up

24    somewhere that if you get an arrest -- or information you

06:00:24 25    provide leads to an arrest, you get a certain amount of

```
 1    money or a conviction, you get a concern amount of money?
 2    A.    No.
 3    Q.    So you're just paid as you go along and do the job?
 4    A.    Yes, correct.
 5    Q.    And what ultimately is working with the FBI you hope
 6    to get out of your involvement with the FBI as an informant?
 7    A.    One day I would like to become an FBI agent.
 8    Q.    And how does it work?  What were you doing as a
 9    informant?  Let the members of the jury know.
10    A.    Yes.  So my work was primarily online.  I would be a
11    member of certain online forums, as well as online websites
12    where malicious people would typically visit and, you know,
13    hang out online.
14    Q.    And when you say malicious people, was there a certain
15    group or type of person that you set up the profiles to
16    attract?
17    A.    Yes.  There would be people who are -- people who are
18    interested in terrorist activity and other extremist types
19    of activity.
20    Q.    Are you given like a target, or do you set it up, if
21    they come to you they come to you?
22    A.    I'm not given any targets.
23    Q.    So once you set up the website -- is it a website, is
24    it Twitter, what social media are you using?
25    A.    Various social media from Twitter.  It could be
```

| | | |
|---|---|---|
| | 1 | Facebook at times and various different websites? |
| | 2 | Q.    So you set them up in a way that would potentially |
| | 3 | encourage those people to reach out and contact you? |
| | 4 | A.    That's correct. |
| 06:02:07 | 5 | Q.    Now, do you, in fact, speak Arabic? |
| | 6 | A.    Yes. |
| | 7 | Q.    Okay.  And are you, in fact, a practicing Muslim? |
| | 8 | A.    I was prior. |
| | 9 | Q.    Okay. |
| 06:02:18 | 10 | A.    Yes. |
| | 11 | Q.    How long had you been a practicing Muslim? |
| | 12 | A.    For about eight years. |
| | 13 | Q.    So you're familiar -- we're going to see some terms |
| | 14 | back and forth.  You're familiar with those from your own |
| 06:02:32 | 15 | personal knowledge? |
| | 16 | A.    Yes, correct. |
| | 17 | Q.    So once somebody reaches out to you on social media, |
| | 18 | what's the next step?  What do you do? |
| | 19 | A.    Well, that really depends on the nature of the |
| 06:02:45 | 20 | conversation.  That determines the next step. |
| | 21 | Q.    Explain that. |
| | 22 | A.    Okay.  So, for example, sometimes there would be guys |
| | 23 | who may reach out, you know, just to say, "Hey," you know, |
| | 24 | or just to -- very basic conversation. |
| 06:03:01 | 25 | So for something like that, that wouldn't typically be |

1  reported unless that, you know, unless the conversation

2  contain something very important.

3  Q.    And do you have individuals at the FBI that you work

4  with and report information to?

06:03:16 5  A.    Yes.

6  Q.    So there's kind of an initial feeling out before you

7  report?  You don't necessarily report every contact?

8  A.    That's correct.

9  Q.    Were you provided any, like formalized training by the

06:03:31 10  FBI?

11  A.    Not exactly, but we would go over different tactics

12  and ways to report and what to look for.

13  Q.    And then if you saw things kind of picking up or

14  getting more along those lines, then you would bring in the

06:03:50 15  FBI agents you work with?

16  A.    That's correct.

17  Q.    Did you ever get contacted by an individual who you

18  later learned to be Erick Hendricks?

19  A.    Yes.

06:03:57 20  Q.    How did that come about?

21  A.    Okay.  So that came about -- that came about from me

22  basically listing my contact info on my Twitter profile.

23  Q.    What do you mean by contact info?

24  A.    Now, that contact -- that specific user name was

06:04:15 25  linked to a social media application called Wickr.  And so

1204

1   that -- so that's basically how I was contacted, through the

2   app called Wickr.

3   Q.    And when was this, approximately?

4   A.    This was 2015.

06:04:31 5   Q.    Okay.  Would the spring of 2015 --

6   A.    Yes.

7   Q.    And did you actually at some point meet Mr. Hendricks?

8   A.    Yes.

9   Q.    If you saw him again, do you believe you would be able

06:04:45 10   to recognize him?

11   A.    Yes.

12   Q.    I would ask you to take a moment, look around the

13   courtroom, and if you notice and see Mr. Hendricks, let us

14   know where he's sitting and what he's wearing?

06:04:56 15   A.    Yes, Mr. Hendricks is standing behind you in a black

16   suit -- sitting behind you.  Sorry.

17   Q.    And what color, do you see a tie that he's wearing or

18   not?

19   A.    It's a bit difficult to see everything from my

06:05:07 20   position here.

21          MR. DOUGHTEN:  No objection to the

22   identification.

23          MR. BENNETT:  Thank you.  May the record reflect?

24          THE COURT:  Yes, the witness will reflect the

06:05:15 25   witness has identified Mr. Hendricks.

1   BY MR. BENNETT:

2   Q.    Okay.  You mentioned Wickr.  We've heard some

3   testimony about Wickr, but from your standpoint, what is

4   Wickr?

06:05:23  5   A.    Okay.  So Wickr basically is a mobile phone

6   application which is said to be more secure than text

7   messaging.

8   Q.    How is it more secure?

9   A.    It's more secure because you have the -- you're able

06:05:40  10   to delete your messages -- the app has basically settings

11   which allow you to delete messages.

12        So, for example, you could set a conversation to

13   delete every five minutes, for example, so it's set to be

14   said to be secure because of those features.

06:06:01  15   Q.    And is there also some kind of encryption in it that's

16   supposed to make it more secure?

17   A.    Yes.

18   Q.    And how is that different than Twitter?

19   A.    That's different from Twitter because Twitter, don't

06:06:12  20   have, to my knowledge, Twitter doesn't have any encryption.

21   And, likewise, Twitter doesn't delete your messages

22   automatically.  So it's more of a manual task that you have

23   to do yourself.

24   Q.    And is Wickr more of a one-on-one communication

06:06:28  25   versus --

```
           1    A.    Yes.

           2    Q.    Twitter that you could blast out to a bunch people?

           3    A.    Correct, yes.

           4    Q.    Do you remember what the general initial conversation

06:06:36   5    or the communication with Mr. Hendricks was when he first

           6    reached out?

           7    A.    The very first conversation basically was just, you

           8    know, the typical way that most people would reach out to

           9    me.  And that was just a basic greeting, kind of getting to

06:06:53  10    know, you know, who the person was.

          11    Q.    Okay.  When you got to a certain point where you were

          12    going to start trying to capture information regarding

          13    communications with you, either Wickr communications or any

          14    kind of direct text, how would you capture that information?

06:07:12  15    A.    Okay.  So that varied also because -- let's say, for

          16    example, Wickr is a mobile application.  So for that, I

          17    would have to take a screen shot of the conversation.

          18    Q.    With what?

          19    A.    With a phone.

06:07:31  20    Q.    So you would have a second phone?

          21    A.    With a mobile phone.

          22    Q.    So you have a second mobile phone trying to take a

          23    picture of this particular phone?

          24    A.    Yes.

06:07:39  25    Q.    Would you do that on the initial stages, as well with
```

1    every communication?  Or did you do that once it started to

2    develop?

3    A.    Yes, once it started to develop more.

4    Q.    So there may have been initial communications with Mr.

06:07:52 5    Hendricks that you did not take a screen shot?

6    A.    Yes.

7    Q.    And are there times where you're just not able to get

8    a screen shot of information?

9    A.    Yes.

06:08:04 10    Q.    For example, what?

11    A.    For example, driving -- like I mentioned before, with

12    the Wickr application, you only have five minutes to -- once

13    you read the message, you only have five minutes after that

14    to be able to access that message.

06:08:22 15          So if I'm driving a car, it's very difficult to hang

16    on to that message for more than five minutes.

17    Q.    So let's pull up Government's Exhibit 34.

18          And for the record, it's a 11-page document.

19          But let's just pull up the top text, the box around

06:08:44 20    the very box all the way around.  You can come up a little

21    bit so we can get it a little bit bigger.

22          There you go.

23          Can you identify this particular document?

24    A.    Yes.

06:08:53 25    Q.    All right.  And what is it?

1    A.    So this is the layout of the Wickr application.  And
2    this is how a conversation looks.
3    Q.    Okay.  And just -- we should make it clear.  Have you
4    had an opportunity prior to your testimony today to look
06:09:07 5    through all of these texts?
6    A.    Yes.
7    Q.    And is this a true and accurate copy of a screen shot
8    that you provided to the FBI?
9    A.    Yes.
06:09:16 10    Q.    Okay.  So let's look at the top right-hand corner.  It
11    identifies that it's Wickr, but what all does it say at the
12    very top there about Wickr and what it's representing with
13    regard to the communications?
14    A.    Okay.  So the layout basically shows me who I'm
06:09:36 15    talking to, their user maim which is at the top middle.
16    Q.    And in this case, what it is?
17    A.    Nowhaq.
18    Q.    And so that was the individual you were talking to?
19    A.    Correct.
06:09:47 20    Q.    And do you know which side of the screen your comments
21    are and which side Nowhaq's comments are?
22    A.    Yeah, so my side would be the right side.
23    Q.    All right.  So the one with the "N" is the first
24    letter of Nowhaq, that's on the left-hand side?
06:10:07 25    A.    Yes.

1      Q.     And then down at the bottom, you said that you can set

2      self-destruct periods.  What's this one currently set to?

3      A.     Yeah, so this one is currently set to one day, or 24

4      hours.

06:10:19  5      Q.     And is that something you're doing?

6      A.     Yes.

7      Q.     For your messages?

8      A.     Yes.

9      Q.     And then if you look underneath, say, the top one,

06:10:26 10      there seems to be -- I'm going to circle it here -- a time

11      there, as well.

12            Do you know what that relates to?

13      A.     Yeah, so that time would relate to the setting of

14      whoever I'm talking to at the time.

06:10:40 15      Q.     And who controls that setting?

16      A.     They control that by themselves.

17      Q.     So -- I don't want to go through all the various terms

18      that we'll see here, but the first two, the greeting to you

19      and your response to him, without having to drive the court

06:11:01 20      reporters crazy by putting it into the record, just in

21      general, what is being said there?

22      A.     That's just a typical greeting that Muslims use

23      between themselves.

24      Q.     Okay.  Now, how does the process work.  If you have a

06:11:21 25      communication with an individual, Mr. Hendricks or elsewise,

             1    and you take a screen shot or series of screen shots, do you

             2    then go to the FBI?  Do you Email them?  Do you hold on to

             3    them for a period of time.

             4          What do you do with these?

06:11:40     5    A.    Everyone depending on the nature of what's said, I

             6    both -- both would be used.  So sometimes if something is

             7    very urgent, I can send it over right away via Email.  Or if

             8    something is starting to move along, but it's not extremely

             9    important, then would I hold on that that, you know, for

06:11:57    10    maybe a few days.

            11    Q.    Okay.  And then you would have like a weekly meeting

            12    or a regular meeting?

            13    A.    Yes, that's correct, in person.

            14    Q.    And have you heard the term handler?

06:12:07    15    A.    Yes.

            16    Q.    So your Agent, you have a handler?

            17    A.    Yes.

            18    Q.    So if I'm looking at this portion of the Wickr screen

            19    shot, there doesn't seem to be a date that shows up?  Or am

06:12:19    20    I missing it?  There's times listed?

            21    A.    Yeah, there's times but no dates.

            22    Q.    Okay.  So for some of these we know for instance that

            23    this was April 13 of 2015.  I'll represent that to you.

            24          Is that something that then is documented by you?

06:12:36    25    A.    Yes.

1    Q.    And the handler separately?

2    A.    Yes.

3    Q.    So let's go to Government's Exhibit 34, page 2.

4          And let's just blow up the first half message.

06:12:52  5          And again, this is with whom, your conversation with

6    whom?

7    A.    With Mr. Hendricks.

8    Q.    Okay.  And he's using the name Nowhaq?

9    A.    Yes.

06:13:06 10    Q.    What does he say there initially, the very first

11    bubble?

12    A.    Right.  So he's saying he forgot who he was talking to

13    basically.

14    Q.    Did that strike you as odd, or how did you perceive

06:13:20 15    that he was not sure who you were that he was communicating

16    with?

17    A.    Not necessarily odd, but maybe that just said to me

18    that he was dealing with multiple recruits at the time,

19    multiple people that he was talking to.

06:13:32 20    Q.    And below your -- that first bubble there's a

21    reference or the use of the word Akhi, which is A-K-H-I.

22    What does that mean?  We'll see that throughout.  Akhi means

23    what?

24    A.    Simply means brother in the Arabic language.

06:13:50 25    Q.    And then are you responding at the very bottom in the

1    right-hand corner?

2    A.    Yes.

3    Q.    And what are you saying?

4    A.    I'm just letting him know who it is, you know, and --

06:14:01  5    Q.    You're saying I'm Hamza.  Is that also the ID that you

6    were using for the Wickr account?

7    A.    It's very similar, yes.

8    Q.    Okay.  So let's go down to the lower part, that second

9    part of this.  And his response to you is what regarding

06:14:20  10   your past communications?

11   A.    Okay.  So he's saying that he has befriended me via

12   Twitter.

13        MR. DOUGHTEN:  Your Honor, can we approach just a

14   second?

06:14:33  15        THE COURT:  Yes.

16        (Discussion at sidebar as follows:)

17        MR. DOUGHTEN:  He's referring to him as Mr.

18   Hendricks, and at this point, he's never been identified.

19   It's just Nowhaq.  I asked the government to identify him by

06:14:59  20   who the actual Wickr name is because he doesn't see Mr.

21   Hendricks until -- I understand --

22        MR. BENNETT:  It's our position he met him.  He

23   knows --

24        THE COURT:  Did he actually met him?

06:15:09  25        MR. BENNETT:  Yeah, according the pictures we

1    just saw.  At this point, right, but still he believed that

2    to be this individual.

3            MR. DOUGHTEN:  It's been disputed.

4            THE COURT:  I understand that.  The based on the

06:15:22 5    fact that this witness did meet Mr. Hendricks, but based on

6    the fact this witness did meet Mr. Hendricks and based upon

7    what I know from the evidence so far is that he's going to

8    testify that he met Mr. Hendricks based on this

9    conversation, subsequently, so I'm going to allow it.  I

06:15:38 10   think it's appropriate.

11          All right.

12            MR. BENNETT:  Thank you, Your Honor.

13          (The following proceedings were had in the hearing of

14    the Jury:)

06:15:52 15   BY MR. BENNETT:

16    Q.    Thank you.  And is there a reference at the top that

17    suggests that there are multiple brothers that this

18    individual is speaking with?

19    A.    Yes.

06:16:01 20   Q.    You ask at the bottom for his name.  But let's switch,

21    because it's on the top of the next page.

22          Can we go to Government's Exhibit 34, page 3, and just

23    blow up the top there?

24          And what is the response?

06:16:19 25   A.    So the resummons is here, "Abu commander."

1    Q.    And have you seen that Abu commander before in your

2    communication was Mr. Hendricks?

3    A.    Yes, that user name was very familiar to me on

4    Twitter.

06:16:33 5    Q.    So that was a Twitter handle?

6    A.    Yes.

7    Q.    Okay.  You also reference at the lower part Kufr, and

8    then we saw in the last one Kufr, what does that relate to

9    in your mind?

06:16:52 10   A.    Yes, so that's words basically mean -- one means

11   disbelief and one means the disbelieving people.  So that

12   word comes from the Arabic language.

13   Q.    So let's scroll down if we could to the top -- the

14   next message's in here.

06:17:11 15         And, again, we saw that was that kind of broken up,

16   fragments.  Is that you taking multiple screen shots?  Or do

17   you know why there seems to be kind of an offset of the

18   messages themselves?

19   A.    Yes, that comes from the screen shots.  And sometimes

06:17:24 20   the entire page isn't captured.

21   Q.    Okay.  So the top of the next page, still from Nowhaq,

22   what's he saying here, "Making moves with" -- and it's

23   B-I-T-H-N-I-L-A-A-H.

24   A.    Yes, this is also a word that comes from the Arabic

06:17:45 25   language where it's basically just means with the permission

            1    of God.

            2    Q.    And do you know what's being referenced here of

            3    brothers making moves?

            4    A.    Not exactly.

06:17:56    5    Q.    And after the brothers who can't make -- and

            6    it's -- the word seems to be broken up, but it's

            7    H-I-J-R-A-H.  What does that word refer to?

            8    A.    Yes, this word referring to moving overseas.

            9    Q.    How did that relate to, you know, your work and what

06:18:16   10    you're looking at with regard to potential terrorists?

           11    A.    Right.  So this word is usually used when

           12    someone -- when someone is moving specifically for purposes

           13    of going to war.  So if, for example, if I was going

           14    to -- if I was planning to move to a war torn place like

06:18:37   15    Syria, for example, I would use this word in order to let

           16    him know that this is my intention once I got there.  So

           17    it's not exactly just moving, but usually when people use

           18    that word, they mean that they're going there for war

           19    purposes.

06:18:52   20    Q.    Okay.  And then the response is, "The A-J-R of Allah

           21    is everywhere."

           22          Do you know what AJR?  IS that a term you've seen?

           23    A.    Yes, this term means reward.

           24    Q.    And what's he saying, the final bubble that's there,

06:19:10   25    to you?

1   A.   Okay.  So the final bubble there is a typo.  That's

2   supposed to be "put" instead of "out."

3   Q.   Okay.  But what is being suggested there?

4   A.   What's being suggested is he is going to put me in

06:19:25  5   contact with someone else.

6   Q.   And we'll get to it, but at some point, did you, in

7   fact, communicate with other brothers that Mr. Hendricks set

8   up?

9   A.   Yes.

06:19:36  10   Q.   Can we bring up Government's Exhibit 34, page 4.  In

11   the middle, can we blow up the middle box there?

12       And the first communication there, I use the term

13   "bubble," but the first bubble, what are you being told?

14   A.   Okay.  So he's telling me to break up words, which

06:20:07  15   basically is supposed to ruin any type of program that may

16   be put in place in order to screen certain words.  So

17   breaking the words up would cause them not to be caught in

18   the program.

19   Q.   So he gives you an example of Allah, A-L, and then

06:20:24  20   space, L-A-H?

21   A.   Yes.

22   Q.   Did you interpret that -- and interpret that and

23   incorporate that into your communications?

24   A.   Yes.

06:20:32  25   Q.   And then can we scroll down to the bottom portion

1217

1    here?

2          And on the top there, what are you being told about

3    who is going to contact you?

4    A.    Okay.  So basically the person who is going to contact

06:20:47 5    me, his user name starts with an A and ends with an N.  And

6    that's basically just to let me know that I'll be talking to

7    the correct person.

8    Q.    And then, we see this a lot, but the J-Z-K.  What is

9    that referring to?

06:21:03 10   A.    Yeah, the J-Z-K is shorthand for writing a term which

11   is also in the Arabic language meaning may God reward you.

12   Q.    Can we go to Government's Exhibit 34, page 5, and just

13   pull up the first.

14          Again at the top, what is -- what -- Nowhaq is

06:21:28 15   informing you of what?

16   A.    Okay.  Right.  So he's saying not to give out my

17   Twitter handle or personal details.

18   Q.    And --

19   A.    Basically just to deal with him.

06:21:41 20   Q.    And he also then at the bottom there gives you the

21   first and last name of the individual who's going to contact

22   you?

23   A.    Yes, the first letter and the last letter.

24   Q.    So if we go to the bottom portion of this and we blow

06:21:55 25   up the first two -- there you go.

1       The statement to the right, what are you saying?

2    A.    That's me saying that he just reached out to me.

3    Q.    And did you convey any other kind of information to

4    him about this individual?  Or are you just letting him know

06:22:16  5    that he had talked to you?

6    A.    Yes, that was just me letting him know that he did

7    indeed contact me.

8    Q.    Because he responds to you, underneath that, yes, and

9    that's him.

06:22:26 10          So was that -- did you take that as some confirmation

11    that he knew you had spoken?

12    A.    Yes.

13    Q.    And then can we go to Government's Exhibit 34, page 6.

14          And just the top there.

06:22:43 15          And what are you saying to him about your interaction

16    with this individual?

17    A.    Yes.  So basically once my meeting was finished with

18    the person he had put me in contact with, this is me now

19    saying that we will all be good brothers.  This trio.

06:23:01 20    Q.    Did you know who the other individual was that reached

21    out to you?  Had you had any previous interaction with that

22    individual?

23    A.    No.

24    Q.    Can we go to page 7, Exhibit 34, page 7.

06:23:15 25          And what are you sharing at the top here?

1    A.    Okay.  That's me sharing a location.

2    Q.    That you were located?

3    A.    Yes.  Yes.

4    Q.    And what is he saying in response with regard to where

06:23:28  5    he's located?

6    A.    He is he saying that they're in Texas.

7    Q.    Just the -- there's a capital M-A on the upper left.

8    And then there's a small m, capital A in the lower right.

9    Is that the same type of a greeting?

06:23:43 10    A.    Yes, it is.  That's the same thing.

11    Q.    What does that relate to?

12    A.    That's shorthand for an Islamic expression which is

13    used when someone says something good.

14    Q.    And then under the comment that "we're in Texas,"

06:24:02 15    there's a suggestion that "There are more sis," and then

16    it's on the H-A, space, Q-Q, and then bros.  What is being

17    referenced there?

18    A.    Yes, sir, this is referencing that there are more

19    females or females who think similarly, more than guys.

06:24:25 20    Q.    And what's on the haqq?

21    A.    That just means truth, so that would mean whatever the

22    correct interpretation of the religion is.

23    Q.    At this point, do you take anything from that

24    information?  Are you forming any opinions about what you

06:24:46 25    guys are talking about at this time?

1    MR. HARTMAN:  Objection, Your Honor.

2    THE COURT:  Sustained.

3    BY MR. BENNETT:

4    Q.    Can we go to Government's Exhibit's 34, page 8.

06:24:55  5    Blow up the text of it.

6    Looking at the lowest -- the bottom bubble that's

7    there, what are you being told there?

8    A.    Okay.  So there I'm being told that I may be tested in

9    some way.

06:25:15  10    Q.    And that he wants to know if you're a hundred percent.

11    What was your interpretation of what it meant to be a

12    hundred percent?

13    A.    My interpretation of 100 percent is basically --

14    MR. HARTMAN:  Your Honor, I'm going to make the

06:25:26  15    same objection.

16    THE COURT:  Sustained.

17    BY MR. BENNETT:

18    Q.    There's a sentence there at the bottom.  They

19    are -- and I don't want to even try to pronounce the word,

06:25:39  20    but it's A-Q-E-E-D-A-H and verification questions.  What is

21    that referring to?

22    A.    Yes, that's referring to a subject of Islamic studies.

23    Q.    And what study was that?  Was it something you were

24    knowledgeable in?

06:25:55  25    A.    Yes.

```
 1    Q.    And what did it relate to?

 2    A.    It relates to theology.

 3    Q.    Can you expound on that, what do you mean theology?

 4    A.    Right, so that's -- this is a major study of most

 5    students of Islamic studies.  And this is said to be one of

 6    the fundamental subjects of the religion.  So most Islamic

 7    students would start with this topic.  And that would vary

 8    from -- that would vary between everything from mono theism

 9    and similar topics.

10    Q.    And if we go to Government's Exhibit 34, page 10?

11          Up at the top there, did you actually end up answering

12    the questions?  Or did you put it off?

13    A.    I did answer the questions, but this is me showing

14    that "I'll do it tomorrow."

15    Q.    And at the very bottom, "How was the conversation, or

16    convo."  Do you know what that's relating to?

17    A.    Yes, so that was relating to the conversation between

18    me and the guy that I was put in contact with.

19    Q.    The same individual where you were told it started

20    with A and ended with the N?

21    A.    That's correct.

22    Q.    And if we go to Government's Exhibit 34, page 11, your

23    bubble on top there is a little cut in half, but can you

24    read what you're saying there?

25    A.    Yes.  I wrote, "He seems like a good brother."  And
```

1    that was referring to the person, as well, who I was put in

2    contact with.

3    Q.    And what is Nowhaq saying in response to that?

4    A.    He's saying that his "Brother can be a little harsh at

06:27:49 5    times.  Hopefully you were not intimidated by him."

6    Q.    And then you're saying, "Not at all."  And then it's

7    A-L, space, H-A-M, and then D-U, space, L-A-H.  What is

8    that?  What are you saying back?

9    A.    Yeah, so this is a very popular Arabic expression as

06:28:12 10    well, and it simply means something similar to praise God.

11    Q.    Can we bring up Government's Exhibit 35, page 1?

12          So I'll represent to you that the date of this is

13    4/16/15.  Were you guys communicating on a regular basis,

14    daily, what would you characterize the communication?

06:28:42 15    A.    I would characterize it as pretty regularly at the

16    time.

17    Q.    And at the very bottom on this screen at least, what

18    are you being asked?

19    A.    Yes, so here I'm being asked just basic questions.

06:29:00 20    What's been good, meaning what's been going on.  And how

21    long have you been a Muslim.

22    Q.    And if we go to the bottom part of this second half of

23    the message.

24          What do you tell him as far as how long you have been

06:29:14 25    a Muslim?

1223

1    A.    About seven years.

2    Q.    And does he tell you how long he has been?

3    A.    Yes.

4    Q.    How long is that?

06:29:21  5    A.    Almost 20 years.

6    Q.    And if we go to Government's Exhibit 35, page 2.

7          And look at the top.

8          So his comment to you is "There's an interesting

9    document floating around Twitter."

06:29:41 10          Did you know what document that was?  Were you aware

11   of it?

12   A.    I was not aware of it.

13   Q.    Can we scroll down to the second half there?

14         In the middle there, does he give you a name of a

06:29:56 15   document to go?

16   A.    Yes.

17   Q.    What is that?

18   A.    The title is "GPS of Ghurabah," which simply means

19   strangers.

06:30:05 20   Q.    And for the record, it's G-H-U-R-A-B-A-H.  Is that

21   correct?

22   A.    Yes.

23   Q.    And it's also, though, for the record, it looks like

24   there's spaces in between the letters?

06:30:18 25   A.    Yes.

```
 1    Q.    And he mentions it's something about in the United
 2    States.  Did you go look for this document?
 3    A.    Yes.
 4    Q.    Can we turn to Government's Exhibit 50?
 5          And can you identify this document?
 6    A.    Yes.  So this is -- this is what I found via Twitter
 7    search.  And this is a random person basically who was
 8    sharing the exact document that was mentioned.
 9    Q.    And if we can blow up the middle there.
10          Is that the same title or close to the title that you
11    had been given?
12    A.    Yes.
13    Q.    Do you happen to know who this individual is, the name
14    in the photograph?
15    A.    No.
16    Q.    Did you in fact download this, or read, I guess, this
17    document?
18    A.    Yes.
19    Q.    Can we bring up Government's Exhibit 51.
20          And can you identify this document?  For the record,
21    it's a 19-page document.  But can you identify it?
22    A.    Yes.  This is the document.
23    Q.    And for the record, this is the "GPS for the
24    Ghurabah"?
25    A.    Yes.
```

```
          1    Q.    If I'm saying that wrong --

          2    A.    That's correct.

          3    Q.    Okay.  And, again, did you have the opportunity to

          4    read this document?

06:31:49  5    A.    Yes.

          6    Q.    And in general, what is this document providing, what

          7    information is it providing?

          8    A.    This document provides security tactics.

          9    Q.    Such as?

06:31:59 10    A.    Such as counter-surveillance, knowledge about agents,

         11    what to look for, what to look for when dealing with agents,

         12    how to get away from agents who may be tailing you, and

         13    similar information.

         14    Q.    And at some point, did you learn who actually wrote

06:32:18 15    this document?

         16    A.    Yes.

         17    Q.    Who's that?

         18    A.    Mr. Hendricks.

         19    Q.    And how did you come to know that Mr. Hendricks had

06:32:25 20    written this document?

         21    A.    During the face-to-face conversation, that was

         22    implied.

         23    Q.    Can we bring up Government's Exhibit 36?

         24          And just blow up the top portion there.

06:32:41 25          Can you identify what is being shown here?
```

```
 1    A.    Yes.

 2    Q.    What is that?

 3    A.    I am being told to wait for a request from a new

 4    account.

 5    Q.    This portion where it says Nowhaq is not a valid

 6    Wickr, can you tried to get in touch with Nowhaq?  Do you

 7    know how that came about?

 8    A.    This is basically me clicking on the profile and

 9    trying to respond to the message.

10    Q.    Okay.  And he's telling you that you'll get another

11    account.  Were you given another account to communicate?

12    A.    Yes, I was contacted later on.

13    Q.    Okay.  So can we go down to the lower part of exhibit

14    36?

15          So what is the account on the top there?  What's the

16    name there now.

17    A.    Now the name is hidingmyrights.

18    Q.    And did you get this shortly after the previous one

19    that said you're going to get a new account?

20    A.    Yes.

21    Q.    At this point, were you communicating with anyone else

22    on Wickr?

23    A.    No.

24    Q.    So let's bring up Government's Exhibit 37.  So this is

25    the same portion of that.  So we need page 2, Exhibit 37,
```

```
 1    page 2?
 2           And, again, are threes screen shots you're taking?
 3    A.    Yes, those are screen shots.
 4    Q.    So let's pull up the top half of 2.  And, again, who's
 5    the person you're communicating with, the user?
 6    A.    Hidingmyrights.
 7    Q.    And at this point, what are you talking about the text
 8    itself?
 9    A.    Okay.  So the text itself here is referring to
10    Twitter.  The "at," was the Twitter user name.
11           I was being asked for my Twitter user name.  Or I was
12    asking for a Twitter user name.
13           And so --
14    Q.    Because at one point it looks like he says, "I can't
15    find it anymore"?
16    A.    Right.  Right.
17    Q.    What is your response to that?
18    A.    So the response is, "I was banned a few days ago."
19    Q.    Explain that.
20    A.    Okay.  So Twitter -- Twitter had been conducting a
21    series of what you would call raids on accounts that looked
22    like they may be spreading extremist material.
23           And so every few days to a week they would be -- they
24    would ban those accounts at on a mass scale.  So maybe, you
25    know, hundreds at a time.
```

1    Q.    So let's go to the second half of 37, page 2, blow

2    that up.

3          So this is the first part of what we were seeing.  So

4    that's there.

06:35:28  5          And underneath you're saying, "I was banned a few days

6    ago."  What information are you providing him there?

7    A.    Okay.  So that is the new Twitter user name.

8    Q.    So, in essence, it looks like your last name and

9    several numbers?

06:35:42  10   A.    Yes.

11   Q.    Did that happen a lot, in your communications with Mr.

12   Hendricks, where he would get a new user and you were doing

13   new user names?

14   A.    Yes, this was pretty much normal.

06:35:55  15   Q.    Was there any particular reason why that was

16   occurring?

17   A.    Two reasons.  One would be for security purposes, and

18   the other, like I said, Twitter would be conducting, you

19   know, sprees of deleting accounts.

06:36:10  20   Q.    And when you say for security purpose, what do you

21   mean?

22   A.    Okay.  So for security purposes, meaning not to have

23   the same account for a certain amount of time.

24   Q.    Or else what?

06:36:23  25   A.    Or else possibly there may be a chance for someone to

1    snoop on the conversation.

2    Q.    We saw trolls finding you.  Trolls stood for what?

3    A.    Trolls -- so that word would basically vary depending

4    on, you know, from person to person.  But what I took troll

06:36:50  5    to mean would be someone who would want to snoop on the

6    conversation such as an agent or someone of that position.

7              THE COURT:  Law enforcement.

8              THE WITNESS:  Yes, anyone there law enforcement

9    basically.

06:37:01 10   BY MR. BENNETT:

11   Q.    Can we bring up Government's Exhibit 38?

12         And just focus on the top half.

13         Now, is this still with Wickr?

14   A.    Okay.  So this is another ID.

06:37:16 15   Q.    And what is this ID?

16   A.    Accepted.

17   Q.    All right.  And again, I'm sorry, let me clarify.

18   Were you still using Wickr at this point?

19   A.    Yes, I was.

06:37:28 20   Q.    It's got the similar format.  I just wanted to make

21   that clear.

22   A.    Yes.

23   Q.    And what does he say in the middle there to you?

24   A.    In the middle he's letting me know that this is his

06:37:40 25   new account.

1    Q.    And what was his old account?

2    A.    Nowhaq.

3    Q.    So you took this to believe it's the same person that

4    you had been dealing with at Nowhaq?

06:37:51  5    A.    Yes.

6    Q.    And then can we go not lower part of this message?

7          Blow up that.

8          And the long sentence there, what are you advising

9    this individual?

06:38:01 10   A.    Okay.  So I'm saying here that the file is very

11   useful.

12   Q.    And his response is what?

13   A.    "Real talk.  That is very important."

14   Q.    And you mention that you're already starting to do

06:38:18 15   that.  Were you, in fact, already starting to implement some

16   of the things in the manual?

17   A.    Yes.

18   Q.    And then if we go to Exhibit 38, page 2.

19          So, again, based on the screen shot, we have the first

06:38:34 20   portion repeated and then what are you being asked?

21   A.    For my Twitter account.

22   Q.    And at some point did you actually provide him with

23   that?

24   A.    Yes.

06:38:44 25   Q.    Same address?

```
 1    A.    Yes.
 2    Q.    Going to Government's Exhibit 38, page 4.
 3          Blow up the text itself.
 4          At the middle there, what are you being asked?
 5    A.    When can I travel.
 6    Q.    And what is your response?
 7    A.    "Not sure exactly, but soon."
 8    Q.    And in your response, what are you -- what do you
 9    believe traveling to entitled.  Why were you traveling
10    everyone from my point of view, travel would be, mostly
11    meaning --
12                MR. HARTMAN:  Objection, Your Honor.
13                THE COURT:  Sustained.
14                MR. BENNETT:  Your Honor, may I approach?
15                THE COURT:  Yes.
16          Thank you.
17          (Discussion held outside of the jury:)
18                MR. BENNETT:  I'm asking what his opinion is,
19    what he took that to mean.
20                THE COURT:  He is not an expert.
21                MR. BENNETT:  It's his communication back and
22    forth -- go ahead.
23                MR. HARTMAN:  Well, he is asking to speculate on
24    what the other person meant, what his interpretation of that
25    is.
```

```
 1              THE COURT:  I agree.  Sustained.  Ask him -- he
 2      can --
 3          (The following proceedings were had in the hearing of
 4      the Jury:)
 5              THE COURT:  Next question, please.
 6              MR. BENNETT:  Thank you, Your Honor.
 7      BY MR. BENNETT:
 8      Q.    Can we go to Government's Exhibit 38, page 5.
 9          Here on the right-hand side, what are you referencing
10      there?
11      A.    Yes, so I was referencing something that I read
12      online, possibly a news article, which stated that someone
13      was recently arrested.
14      Q.    And if you -- and this is a continuation of that
15      previous communication with him regarding travel.
16          If you look at his response for just asking,
17      underneath that, what is the time set to now with regard to
18      this particular communication?
19      A.    Yes, so this here is just saying that the message will
20      self destruct after five minutes and seven seconds.
21      Q.    Is that what you were referencing earlier about
22      difficulty in sometimes getting a screen shot?
23      A.    Yes.
24      Q.    Can we go to Government's Exhibit 38, page 6?
25          And -- okay.  Go ahead.
```

```
 1              So is there a reference to a state here?

 2     A.     Yes.

 3     Q.     And what state is that?

 4     A.     Pennsylvania.

 5     Q.     And had, in fact, somebody been arrested in the

 6     Pennsylvania area?

 7     A.     Yes.

 8     Q.     And then the very lowest part there, it's faded to

 9     see, but it talks about "Need to stop trying to go over

10     there"?

11     A.     Yes.

12     Q.     What is over there?

13     A.     That would mean Syria or --

14              MR. HARTMAN:  Objection.

15              THE COURT:  I'll allow the question.  Go ahead.

16              THE WITNESS:  So there would mean Syria or

17     nearby, nearby countries that were very popular

18     destinations.

19     BY MR. BENNETT:

20     Q.     Can we go to Government's Exhibit 38, page 7?

21              And blow up just the lower half.  We don't need the

22     top.  Just the lower.

23              So again it's cut off, but this is with accepted.

24              What are you referencing at the top there?

25     A.     I'm asking him about rumors about someone named Abu
```

1    Assam Amr Iki.

2    Q.    Just for the record, it's A-B-U, space, A-Z-Z-A-M and

3    then A-M-R, I-K-I, like there's a purposeful space in

4    between that.

06:42:51  5         Who is Amr Iki?

6    A.    He was a very popular Islamic lecturer.

7    Q.    And were you familiar with him?

8    A.    Yes.

9    Q.    And what were the rumors that you were referencing?

06:43:06  10   A.    I don't remember exactly what the rumors were.

11   Q.    But he was someone -- were you knowledgeable about his

12   teachings?

13   A.    Yes.

14   Q.    Can we pull up Government's Exhibit 38, page 8?

06:43:16  15        Just the top part and what were you being asked about

16   yourself?

17   A.    I was being asked about my profession.

18   Q.    And if we could go to the lower part.

19        What do you answer as your profession?

06:43:34  20   A.    Programming.

21   Q.    And then go to Government's Exhibit, page 38, page 9.

22        At the top, does Mr. Hendricks say what his work is?

23   A.    He just says, "This."

24   Q.    And what did you take that to mean?

06:43:57  25   A.    Recruiting.

1      MR. HARTMAN:  Objection, Your Honor.  Move to

2  strike.

3      THE COURT:  Disregard the answer, ladies and

4  gentlemen.

06:44:07  5  BY MR. BENNETT:

6  Q.    And what else is he asking you here in this

7  communication?

8  A.    Have the feds ever called me or visited me?  Have I

9  ever been locked up?

06:44:17 10  Q.    And whether or not you have any disabilities?

11  A.    Yes.

12  Q.    And what do you respond at the bottom?

13  A.    I said, "Never and no disabilities."

14  Q.    And can we go down to the bottom part of page 9?

06:44:34 15      And what is he asking you about your communications?

16  A.    Have I been securing my communication.

17  Q.    And what is your response to him?

18  A.    I said, "Yes, brother, ever since I studied the file,

19  I started tightening everything up."

06:44:45 20  Q.    And what do you mean by that?

21  A.    Meaning taking the tips from the file and applying

22  that to my every day life.

23  Q.    And that was related to some of the security things

24  that you talked about earlier?

06:44:58 25  A.    Yes.

1    Q.    Can we go to page 10 of exhibit 38.

2          Just the top there.

3          And what's he saying in the middle there?

4    A.    "I have a few brothers I want to connect with you."

06:45:13  5    Q.    And, again, what does the small I capital A relate to?

6    A.    This is a shorthand for a term which just means God

7    willing.

8    Q.    So there's other brothers out there.  Did you speak

9    with other brothers?

06:45:27  10   A.    Not at that point, no.

11   Q.    Can we go to Government's Exhibit 39.

12         Now, this seems to be a different -- it's in color.

13   Do you know why this was different than what we've been

14   looking at?

06:45:48  15   A.    Yes, so this is much brighter.  I do not remember

16   exactly.

17   Q.    Okay.  But it's still coming from accepted?

18   A.    Yes.

19   Q.    And it's still a Wickr communication?

06:46:03  20   A.    Yes.

21   Q.    And what is he saying in the middle, Arabic term, and

22   then what's he saying after that?

23   A.    The term basically means praise God.  And then after

24   that he's -- and then A-K-H means brother.  After that he's

06:46:21  25   just saying "My heart is burning, though."

1237

1    Q.    And if it continues on to Government's Exhibit 39,

2    page 2.

3          And at the top what is he referencing?

4    A.    Baltimore.

06:46:35 5  Q.    And what was going on in Baltimore at this time?

6    A.    At that time there were riots going on in Baltimore.

7    Q.    And then he suggested that "That place is full

8    of" -- and the term is broken up, but it's G-H-A-N-I-M-A-H.

9    What does that relate to?

06:46:53 10  A.    Yes.  This term relates to loot or something that you

11   could steal.

12   Q.    Something from whom?

13   A.    Something that looters would steal while rioting, for

14   example, or while fighting.

06:47:09 15  Q.    And what does he say about needing brothers?

16   A.    Yes, he needs some brothers with a backbone.

17   Q.    And what is your response?

18   A.    My response is, "i agree.  I agree, brother."  Once

19   again, I-S-A is a short-term, shorthand for God willing.

06:47:27 20  "We can make a difference and bring some of them into the

21   Deen," which refers to religion.

22   Q.    Deen, D-E-E-N is -- refers to the actual religion?

23   A.    Yes.

24   Q.    Can we go to 39, page 3?

06:47:47 25        And this is with accepted again.  You're speaking at

1    the top.  What are you saying there about voting?

2    A.    Yes, I'm saying, "What's really sad is that many

3    Muslims feel fine voting."

4    Q.    And what is his response?

06:48:04  5    A.    His response is, this is supposed to be because -- so

6    that's a typo.  So this is supposed to be "Because of the

7    sheep milk that their imams feed them."

8         Imam is a leader of the Muslim mosque.

9    Q.    And then he goes on to say, "A real imam would teach

06:48:27 10    his people."  And what is that, the A-L-W-A-L-A and then

11    W-A-L-B-A-R-A?

12    A.    Yes, so this would refer to the word that we actually

13    went over earlier.  The A-Q -- A-Q-U-E-E-D-A-H.  So this is

14    a topic of study related within that subject of Islamic

06:48:48 15    studies.

16    Q.    And then he mentions jihad?

17    A.    Yes.

18    Q.    And what else is he talking about that?

19    A.    Enjoying good and forbidding evil.

06:49:02 20    Q.    So can we go to Government's Exhibit 39, page 5.

21         He's referencing contact from another brother.

22         Were you, in fact, contacted by another brother?

23    A.    Yes.

24    Q.    And then we go to 39, page 6.

06:49:30 25         And what is he asking you at the top?

1    A.    "How was your talk."

2    Q.    And what is your response?

3    A.    I said, "He's a good brother."

4    Q.    And was this individual different than the other

06:49:42  5    individual you had spoken to?

6    A.    Can you repeat the question?

7    Q.    You spoke to an earlier individual that began with an

8    A and ended with an N?

9    A.    Yes.

06:49:53  10    Q.    Is this a different brother?

11    A.    As far as I know, yes, different.

12    Q.    And then page -- Exhibit 39, page 7.

13          In response to your comment that he's a good brother,

14    what is he saying about him?

06:50:12  15    A.    Yes, he's saying that "He is my brother and your

16    brother."

17    Q.    And at the top, it's a repeat, but you're saying some

18    gems about Kuffar and their democracy.  What were you

19    referencing there?

06:50:29  20    A.    So the word Kuffar basically refers to nonMuslim

21    people who have a hate for the religion.

22    Q.    So let's go to Government's Exhibit 40, page 1.  And

23    this is from accepted again.

24          What in the middle are you being asked?

06:50:51  25    A.    It says, "We have been asked to protect the Muslims

1    there," and there being Baltimore.

2    Q.    And then you're asked to come.  Did you, in fact, go?

3    A.    Yes, "If you can come tomorrow and protect the Muslims

4    then your reward is with God."

06:51:09  5    Q.    And what were you going to do to protect the Muslims?

6    A.    Whatever had to be done.

7    Q.    So if we do -- if we look at Exhibit 40, page 2,

8    that's, in essence, your response to him?

9    A.    Yes.

06:51:30  10    Q.    And can we go to Government's Exhibit 41?

11          And can you identify, can we go from the W down to the

12    bottom.

13          Can you identify this document and explain why it's

14    different than the screen shots we've been looking at?

06:51:51  15    A.    Yes, so this document is different from the screen

16    shots because this is from Twitter.

17    Q.    What about the very top where it says, "Wickr last

18    night," and there seems to be a conversation?

19    A.    Right, so the question was, "Did you see the news from

06:52:13  20    Philly?"

21          Now, at that time, there was a lot of turmoil going on

22    in Philadelphia.  And so that was what the news was

23    referring to.

24    Q.    And this A, is that referring to accepted?  Were you

06:52:29  25    having a conversation with accepted?

1241

1    A.    Yes.

2    Q.    Okay.  And then what -- you said something about

3    Twitter.  What are the other references to Twitter you were

4    talking about?

06:52:37 5    A.    Yeah, so these are what you call general tweets on

6    Twitter.

7    Q.    And by general you mean what?

8    A.    General meaning they're accessible to everyone.

9    Q.    And who are they from?

06:52:50 10   A.    They are from Abu Commander, which is the same user

11   name that I was -- that I had basically confirmed earlier in

12   the conversation.

13   Q.    And that related to Mr. Hendricks?

14   A.    Yes.

06:53:02 15   Q.    And in the middle there, what's being said about the

16   Baltimore riots or in reference to the riots?

17   A.    What's being said is, "I'm getting ready for the road.

18   Should I bring anything?"

19   Q.    What above that.  Are you responding to or what's

06:53:18 20   being said by Abu Commander?

21   A.    Oh, right.  So those were tweets.  Like I said, those

22   were general tweets being sent out into the world.  And so

23   the first one reads, "Christianity betrayed you.  It taught

24   you all you needed was belief in God's death and that never

06:53:34 25   been the teaching of any Prophet."

1    Q.    And then there's a hash tag to what?

2    A.    Baltimore riots.

3    Q.    Okay.  And what's the other one?

4    A.    The second one is America.  Judiasm is not God's

06:53:47 5    religion because it's one race.  Christianity is not because

6    God never dies.  Come back to Islam.

7    Q.    And the same hash tag?

8    A.    Yeah, same hash tag.

9    Q.    And, again, did you cut and paste these or take these

06:54:00 10    off Twitter yourself?

11    A.    Yes, those were simply a screen shot from Twitter.

12    Q.    And then what's the last one?

13    A.    Okay.  So the last one is "Whoa to the ones who don't

14    have the blood of evil on the errors.  Their hands are idle,

06:54:15 15    their tongue is idle, and the hearts are idle."

16    Q.    So let's go to guilt's 42.

17          And these are back to the screen shots.  Is that

18    correct?

19    A.    Yes.

06:54:31 20    Q.    And what is being communicated this day?  And I'll

21    represent to you it's May 1 of 2015?

22    A.    Yes.  The first message.

23                MR. HARTMAN:  Your Honor, I'm going to object to

24    that.  We don't have any foundation for that fact.

06:54:46 25                THE COURT:  I agree.  Foundation.

```
        1   BY MR. BENNETT:

        2   Q.    Can we go down to the bottom of this?

        3         Is that you speaking at the top?

        4   A.    Yes.

06:54:54 5  Q.    What are you saying?

        6   A.    "Bro, I wasn't sure if you still wanted to go or

        7   postpone."

        8   Q.    What's the response?

        9   A.    I'm in West Virginia, almost close to Maryland."

06:55:07 10 Q.    So at some point, you, in fact, to Maryland outside

       11   the Baltimore area?

       12   A.    Yes.

       13   Q.    Do you remember what date you went?

       14   A.    Not exactly, no.

06:55:14 15 Q.    So let's go to Government's Exhibit 42, page 2.

       16         And the top part is just a repeat of that -- actually

       17   no.  We've added to the bottom there.  "What are you

       18   saying?"

       19   A.    "I'll still help out.  Just let me know what I can

06:55:36 20 do."

       21   Q.    So can we go down, and what is accepted saying?

       22   A.    Resend.  A-K-H just means brother.

       23   Q.    All right.  And was there a delay for a reason?

       24   A.    Resend meaning resend the message.

06:55:54 25 Q.    What's he saying there regarding a flat?
```

1    A.    Yes.

2    Q.    How did that relate to what you guys were

3    communicating or talking about?

4    A.    Right, so we were trying plan the trip and he had a

06:56:07 5    flat tire.

6    Q.    So let's go on to continuation of this, Government's

7    Exhibit 42, page 3.

8          At the top there, what are you saying in response?

9    A.    "It happens, bro.  Let me know if I can still help out

06:56:22 10    later on.  I'm glad you're safe."

11    Q.    And what's he telling you?

12    A.    "Yes, I'm coming.  Where you at now?"

13    Q.    And what are you saying back to him?

14    A.    "I'm still up north for now.  What did you have in

06:56:36 15    mind."

16    Q.    So you were still in the Philadelphia area at this

17    point?

18    A.    Yes.

19    Q.    Okay.  So can we go the lower portion here.

06:56:43 20          And what is he saying to you about the Baltimore area?

21    A.    Okay.  So he is saying "The Muslim community needs

22    help.  We're going to protects the masjid there and give

23    dawah on the streets."

24    Q.    And what is the masjid which is M-S-A-J-I-D?

06:57:03 25    A.    Masjid means mosque.

1    Q.    And Dawah, D-A-W-A-H?

2    A.    And Dawah means missionary work.

3    Q.    And at the bottom, what are you guys saying regarding

4    timing?

06:57:14    5    A.    We are saying that they have a curfew now at 10:00.

6    Q.    All right.  And are you deciding a time of the day at

7    the bottom there?

8    A.    Yes.

9    Q.    What are you guys deciding?

06:57:26    10    A.    First thing tomorrow morning.

11    Q.    So continuation of that, 42, page 4.

12

13          And what is being discussed here?

14    A.    What's being discussed is we are basically deciding to

06:57:44    15    go the next morning instead of that night.

16    Q.    And you're being asked how long it takes you to get to

17    Maryland?

18    A.    Yes.

19    Q.    And how long did you tell him it took you?

06:57:55    20    A.    At least two hours, depending on traffic.

21    Q.    And if we go to the bottom portion.

22          What is his response to that?

23    A.    Okay.  "Let's do breakfast in the morning."

24    Q.    And then if we go to page 5, so 42, page 5, at the

06:58:11    25    top.

1       There's discussion of "What time was good for you."

2  What are you saying is good for you?

3  A.    "Between 10 and 11."

4  Q.    And then can we go to the bottom portion of that?

06:58:27  5  What is ultimately decided?

6  A.    11:00 is decided.

7  Q.    And then his last statement there, what is he saying?

8  A.    Okay.  The last -- this is supposed to read combining,

9  instead of combing.  And so this would read "Combining the

06:58:48 10  Islamic prayer."  And this word, Musaafir just means someone

11  who is traveling.

12  Q.    So that's just for the record M-U-S-A-A-F-I-R.

13        So did you, in fact, go to Baltimore?

14  A.    Yes.

06:59:08 15  Q.    And how did you get there?

16  A.    I drove.

17  Q.    And prior to going down to Baltimore, did you tell

18  your handler at the FBI about all of this?

19  A.    Yes.

06:59:25 20  Q.    So what was done in preparation for you to go down to

21  Baltimore?

22  A.    Surveillance was prepared.

23  Q.    And did you meet prior to that day with the FBI agent?

24  A.    Yes.

06:59:39 25  Q.    And what was given to you with regard to the meeting

1    itself?

2    A.    A recorder.

3    Q.    Okay.  And were you taught how to use it?

4    A.    Yes.

06:59:50  5    Q.    How did you know -- we saw a time to meet.  But how

6    did you know where to meet Mr. Hendricks?

7    A.    I was contacted during the trip.

8    Q.    Via?

9    A.    Via mobile application.

07:00:05 10    Q.    And what were you told?

11    A.    I was told where to go and each next step.

12    Q.    Okay.  So I would like to bring up Government's

13    Exhibit 64A.

14          Were you aware that aerial surveillance was occurring?

07:00:28 15    A.    Yes.

16    Q.    And what kind of vehicle are you driving?

17    A.    A silver four-door Ford.

18    Q.    Okay.  Does that look to be your vehicle there?

19    A.    Yes.

07:00:39 20    Q.    Where were you told to go initially?

21    A.    I was told to find a spot at this park and ride.

22    Q.    Were you familiar with the general area?

23    A.    No.

24    Q.    So how did you know -- what were you told about this

07:00:53 25    particular park and ride?

1    A.    I was told to get off at this specific exit and go to

2    this park and ride.

3    Q.    Okay.  And then what were you to do?

4    A.    And then wait.

07:01:04   5    Q.    So we see that you park here and you wait.  What

6    happens next?

7    A.    I was contacted and told what to do next.

8    Q.    Okay.  And, again, by a mobile app?

9    A.    Yes.

07:01:15  10    Q.    By Mr. Hendricks?

11    A.    Yes.

12    Q.    What were you told to do next?

13    A.    Next I was told to exit the park and ride and head

14    towards Baltimore.

07:01:23  15    Q.    Okay.  And let's bring up 64B.  Did you, in fact, do

16    that?

17    A.    Yes.

18    Q.    Okay.  So let's play.

19          And then where did you go next?

07:01:33  20    A.    Next I was led to a specific exit.

21    Q.    Okay.  And then where did you go from there?

22    A.    And from there I was led to a Burger King.

23    Q.    And, again, is this all by Mr. Hendricks through a

24    mobile app?

07:01:52  25    A.    Yes.

1    Q.    So is this you pulling into the Burger King?

2    A.    Yes.

3    Q.    And have you had an opportunity to review this prior

4    to your testimony here today?

07:01:58 5    A.    Yes.

6    Q.    So what do you do once you get there and park at the

7    Burger King?

8    A.    I was told to come into the bathroom.

9    Q.    So you went into the men's bathroom in Burger King?

07:02:13 10    A.    Yes.

11    Q.    What occurred then?

12    A.    What occurred then was I met Mr. Hendricks

13    face-to-face in the bathroom.

14    Q.    And what happened at that meeting?

07:02:24 15    A.    During that meeting we basically met each other for

16    the first time.  We had a brief conversation.  And I was

17    given a radio.  And we exited --

18    Q.    What kind of a radio?

19    A.    I was given a two-way radio with multiple channels on

07:02:44 20    it, wireless.  And we had a brief conversation before we

21    exited the Burger King.

22    Q.    Were you told why you were given a radio?

23    A.    Yes, we would now be using this for communication.

24    Q.    And were you told anything about your phone?

07:03:01 25    A.    I was told to turn off my cell phone and take out the

1    battery.

2    Q.    And were you able to do that?

3    A.    I wasn't able to take out the battery, but I was able

4    to turn it off.

07:03:12  5    Q.    And then after the meeting in the bathroom, what

6    happened next?

7    A.    After that meeting, I followed him, and we drove

8    around for about 15 minutes.

9    Q.    When you say we drove around, how?

07:03:30 10    A.    We drove around utilizing the counter-surveillance

11    protocols that were taught in the GPS document.

12    Q.    So I want to stop this, and let's go back to that

13    meeting in Burger King.

14         You said you had a recording device on you?

07:03:49 15    A.    Yes.

16    Q.    Can we bring up Government's Exhibit 62A.

17              MR. BENNETT:  I don't know, we'll see, your

18    Honor, how loud it comes through.

19         (Recording played.)

07:04:10 20    BY MR. BENNETT:

21    Q.    You've had an opportunity to listen to these in

22    advance of your testimony here today?

23    A.    Yes.

24    Q.    And you've had an opportunity to review the full

07:04:17 25    transcript that was written up?

1    A.    Yes.

2    Q.    And was the transcript a true and accurate

3    representation of your conversation?

4    A.    Yes.

07:04:24  5    Q.    With Mr. Hendricks.

6          Do you recognize your voice?

7    A.    Yes.

8    Q.    On this recording.

9          And do you recognize the other voice as that of Mr.

07:04:35 10    Hendricks?

11    A.    Yes.

12    Q.    Okay.  Let's play it.

13          (Recording played.)

14    BY MR. BENNETT:

07:04:58 15    Q.    Does that relate, when it says, "Use that," that the

16    handheld that you're talking about?

17    A.    Yes.

18    Q.    So then after you get the handheld, again, where do

19    you go?

07:05:07 20    A.    I was just told to follow him.  So he was taking lead.

21    Q.    Okay.  Let's continue to play it.

22          (Recording played.)

23          THE COURT:  Don't ask questions while you're

24    playing the recording.  The court reporter can't hear you.

07:05:49 25    BY MR. BENNETT:

1    Q.    My question was simply, is that the sound of you

2    walking?

3    A.    Yes.

4          (Playing recording.)

07:06:09  5    BY MR. BENNETT:

6    Q.    Is that you getting into your car?

7    A.    Yes.

8    Q.    Okay.

9          (Playing recording.)

07:06:14 10    BY MR. BENNETT:

11    Q.    And how are you talking at that point with Mr.

12    Hendricks?

13    A.    Via radio.

14    Q.    And then you said once you left, you drove around.

07:06:35 15          How did you know where to go?

16    A.    I was simply told to follow him.

17    Q.    And did you, in fact, do that?

18    A.    Yes.

19    Q.    And before we go on, I want to bring up Government's

07:06:48 20    Exhibit 63.

21          And I'll represent to you that this is a 36-page

22    document.

23          Can you identify this document?

24    A.    Yes.

07:07:22 25    Q.    What is this document?

```
 1   A.    This is the document with -- this is the audio
 2   basically on paper.
 3   Q.    So the transcript of --
 4   A.    Of the entire conversation.
 5   Q.    Including your interaction with the FBI agents prior
 6   to meeting with Mr. Hendricks?
 7   A.    Yes.
 8   Q.    And from your review, it was a true and accurate
 9   account of what was said?
10   A.    Yes.
11   Q.    Okay.  So can we go back to Government's Exhibit 64B.
12
13         MR. BENNETT:  Any way to speed it up?
14   BY MR. BENNETT:
15   Q.    So there's a McDonald's, or the Burger King.
16         Move it forward a little bit.
17         So at some point you said you came out of the
18   McDonald's and then what happened?
19   A.    Burger King.
20   Q.    Burger King.  Sorry I got that mental block now.
21   A.    I was told to follow him.
22   Q.    All right.  Was he with anyone else in his vehicle,
23   did you see?
24   A.    Yes, he was with one person.
25   Q.    Who was that person, if you know?
```

```
          1    A.    I didn't know at that time, but I knew later on.

          2    Q.    Okay.

          3    A.    Once we stopped.  And that was his wife.

          4    Q.    Did you speak with her at all?  Or was it just with
07:08:58  5    Mr. Hendricks?

          6    A.    Just with Mr. Hendricks.

          7    Q.    How long did you drive around after the Burger King

          8    until the next spot?

          9    A.    I would guess around 15 minutes.
07:09:09 10    Q.    Why don't we jump ahead to 64C when we see him come

         11    out.

         12          And do you see -- what vehicle was Mr. Hendricks

         13    driving in?

         14    A.    The dark-colored van.
07:09:37 15    Q.    And we see that to the left of the screen here?

         16    A.    Yes.

         17    Q.    And are you in the vehicle behind there?

         18    A.    Yes.

         19    Q.    Okay.  So what did you do now?
07:09:46 20    A.    I am parking next to his vehicle.

         21    Q.    And why are you parking next to his vehicle?

         22    A.    This is the location that we had our conversation.

         23    Q.    Was it at his direction?

         24    A.    Yes.
07:09:57 25    Q.    Do you know how long, approximately, your conversation
```

1    was with Mr. Hendricks?

2    A.    I would say it was around two hours long.

3    Q.    And did it all occur here?

4    A.    Yes.

07:10:22  5    Q.    Can we bring up Government's Exhibit 60?

6          Can you identify what this is and what it depicts?

7    A.    Yes, this is a picture of myself and a picture of Mr.

8    Hendricks.

9    Q.    And where on the screen are you located and where is

07:10:47 10    Mr. Hendricks located?

11    A.    I am located on the right wearing a blue jacket.  And

12    Mr. Hendricks is on the left.

13    Q.    Likewise, have you had the opportunity to review these

14    photographs prior to your testimony here today?

07:11:00 15    A.    Yes.

16    Q.    And have you determined, is this a true and accurate

17    representation of where you were at and what you were

18    wearing at the time?

19    A.    Yes.

07:11:08 20    Q.    And what Mr. Hendricks was wearing at the time?

21    A.    Yes.

22    Q.    Can we bring up Government's Exhibit 62B.

23          And can we play this?

24          (Recording played.)

07:12:19 25    BY MR. BENNETT:

1256

1    Q.    So in this clip what does Mr. Hendricks say his name

2    is?

3    A.    Mustafa.

4    Q.    And had you known that name prior?

07:12:25 5    A.    No.

6    Q.    And just so it's also clear, after some Arabic terms,

7    there's kind of an English interpretation in parens.  Did

8    you, in fact, do that?

9    A.    Yes.

07:12:38 10   Q.    So you reviewed it and made those corrections?

11   A.    Yes.

12   Q.    Or expansions, as it were.

13         And can we bring up Government's Exhibit 62B?

14         And play that.

07:13:11 15        (Recording played.)

16   BY MR. BENNETT:

17   Q.    I'm sorry, it should be 62C.  We just did that.

18         62C.

19         (Recording played.)

07:13:22 20   BY MR. BENNETT:

21   Q.    Again, is that Mr. Hendricks' voice speaking?

22   A.    Yes.

23   Q.    And what is he telling you there about Texas versus

24   their actual location?

07:14:47 25   A.    Yes, so he's basically confirming something from

1    earlier when he asked me to give him a nearby state.  And

2    this is the same thing that he did as well.

3    Q.    So where is he actually located or is he actually

4    referencing when he says Texas?

07:15:04  5    A.    Arkansas.

6    Q.    And then what does he say about what he says online

7    versus in person, person to person?

8    A.    He says, "Whenever we conversate online to take that

9    with a grain of salt.  But whenever we meet face-to-face,

07:15:23  10   then we tell the truth."

11   Q.    Can we go ahead and continue.

12         (Recording played.)

13              MR. HARTMAN:  Can we approach?

14              THE COURT:  Stop the tape, please.

07:16:20  15        (Discussion at sidebar as follows:)

16              THE COURT:  Yes.

17              MR. HARTMAN:  Judge, I would object to the

18   portion of the transcript that talks about what the body

19   language was and what it means.  We can't see that.  We have

07:16:38  20   no way to verify that.  And I would like an instruction to

21   the jury that they should ignore it.

22              THE COURT:  Well, I agree.  The evidence is the

23   recording itself.  It's not the transcript.  That's the

24   first instruction I'm going to give the jury.

07:16:57  25              MS. MAGNONE:  Your Honor, you can testify to how

1    you interpreted the witness's body language.

2              THE COURT:  I don't think so.  And I think what

3    you're doing is you're incorporating it into this recitation

4    that he's giving.  I didn't quite frankly know whether or

07:17:11  5    not you had agreed to this transcript of the recordings or

6    not.

7         Has there been a prior agreement?

8              MR. BENNETT:  That was going to my point.  We

9    provided this well in advance to the defense.  We asked

07:17:22 10    several times if there is any objection.  We have heard no

11    objections to it.

12        I will also say that in another clip, he specifically

13    says that he wrote that, the GPS Ghurabah, sorry it's kind

14    of a moot point to whether at this point he made it through

07:17:38 15    body language or not.  It's clear that he wrote it.  And

16    there's going to be testimony that he wrote it.

17              THE COURT:  He wrote what?

18              MR. BENNETT:  That Mr. Hendricks wrote the GPS

19    for the Ghurabah, which is what's being loosely referred to

07:17:50 20    as the paper.

21              MR. HARTMAN:  That's not clear in the transcript.

22    And I don't dispute what you're saying about what comes

23    later.  And I'm not going to object to that.  That is what

24    it is.

07:18:00 25        But -- and frankly, Mark, I may be wrong.  I don't

1    recall the part about the body language, and that being in

2    there.

3              THE COURT:  If you're going to play it, I'm going

4    to give a limiting instruction.  I'm going to tell the jury,

07:18:11  5    number one, you have to -- the tape recording itself is the

6    evidence.  That -- in essence, the commentary by this

7    witness is, you know, this witness's interpretation of what

8    the body language is -- doesn't even know if I'm going to

9    let him make that kind of conclusion.

07:18:29 10              MR. BENNETT:  Again, Your Honor, I didn't delve

11   into that area, but the point is who wrote GPS for the

12   Ghurabah?  Hendricks later says, "I wrote GPS for the

13   Ghurabah."  So whether he thought it at that point is kind

14   of immaterial.

07:18:44 15              THE COURT:  But I'm even troubled when he starts

16   talking opinions about body language.

17        So leave the body language out.

18              MR. SHEPHERD:  Your Honor, surely he could

19   testify if he saw the defendant point to himself.

07:19:01 20              THE COURT:  You can do that, but he can't offer

21   further opinions about that, about what this person means by

22   virtue of the body language.

23        So I don't know how we address it whether or not to

24   use the recording or give some limiting instruction.

07:19:19 25              MR. HARTMAN:  I would ask for an instruction for

1    the jury to ignore that portion of the transcript that talks

2    about the body language, meaning what it supposedly meant.

3            THE COURT:  I'm going to give a limiting

4    instruction.  The transcript is there to aid them, but

07:19:33  5    they're to rely upon the actual body of the recording

6    itself.  That is the evidence.  And any other interpretation

7    that's included in this -- included in this tape recording,

8    that they should disregard it.

9        I am very uncomfortable with interpretation outside of

07:19:51 10    the language.

11            MR. BENNETT:  And if you want, we can redact that

12    when it goes back to the jury so it's not there.

13            THE COURT:  Make sure you do that at the

14    appropriate time.

07:20:00 15            MR. BENNETT:  Thank you, Your Honor.

16        (The following proceedings were had in the hearing of

17    the Jury:)

18            THE COURT:  Ladies and gentlemen, let's me give

19    you a brief instruction.

07:20:12 20        You are listening to certain audio recordings.  And

21    the recordings vary in quality.  To aid and assist you, you

22    actually have -- you do have certain transcripts or

23    transcriptions of the conversations.

24        Let me stress the evidence itself is the recordings.

07:20:33 25    The transcript is not the evidence.  And any commentary

1    included in the transcripts are not evidence.

2          So there may be certain portions of the transcripts in

3    which the witness is expressing an opinion, which I'm

4    instructing you to disregard.

07:20:51 5          But we are going to allow you to view the transcript

6    with that limiting instruction.

7          Again, the evidence is actually the recording itself.

8    And if there is any differences between -- that you may

9    notice between the audio recording and the transcript, you

07:21:08 10   rely on the audio recording.  All right?

11          The transcript is, again, is to aid and assist you.

12   It's a supplement.

13          Thank you very much, ladies and gentlemen.

14          Counsel, go ahead.

07:21:19 15          MR. BENNETT:  Thank you, Your Honor.

16   BY MR. BENNETT:

17   Q.   There's also a reference to whether or not you saw a

18   paper.

19          Throughout your interactions with Mr. Hendricks, did

07:21:30 20   he point you to various documents that you should be -- or

21   manuals that you should be reading?

22   A.   Yes.

23   Q.   And one that we saw earlier was the GPS for the

24   Ghurabah?

07:21:40 25   A.   Yes.

1    Q.    I want to show you what's been previously marked as

2    Government's Exhibit 65.

3          Do you recognize this?

4    A.    Yes.

07:22:02  5    Q.    What is this?

6    A.    This is my handwriting.  And this is what I wrote down

7    from him.

8    Q.    During this meeting?

9    A.    Correct.

07:22:12 10    Q.    Okay.  And what is the top sentence or manual

11    referencing?

12    A.    The top manual is How to Survive in the West Mujahid

13    Guide.

14    Q.    And is that something in a you looked at?

07:22:29 15    A.    Yes.

16    Q.    Can -- and what's the middle there?

17    A.    The middle is a website which was called

18    kalamullah.com.

19    Q.    And let me just, for the record, how do you spell

07:22:42 20    that?

21    A.    K-A-L-A-M-U-L-L-A-H.com.

22    Q.    Okay.  And what is it referencing lectures of whom?

23    A.    Anwar Al-Awlaki.

24    Q.    And what is underneath there?

07:22:58 25    A.    This is the title to a specific book that I was also

```
         1   told to check out.  And that title is in Arabic.

         2   Q.    And we'll leave that.

         3         This was something you wrote down during this meeting

         4   with Mr. Hendricks?

07:23:14 5   A.    Yes.

         6   Q.    And how were you provided this information?

         7   A.    Yes, I was told this information.

         8   Q.    So I want to pull up Government's Exhibit 66 while

         9   we're here.

07:23:26 10        Can you identify this document?

        11   A.    Yes.

        12   Q.    What is this document?

        13   A.    How to Survive in the West.

        14   Q.    Okay.  And what's the title below the individual is

07:23:38 15  what?

        16   A.    A Mujahid Guide.

        17   Q.    And what does mujahid mean?

        18   A.    Mujahid is someone who embarks on jihad, which means a

        19   war.

07:23:50 20  Q.    And gist for the record, it's M-U-J-A-H-I-D, and this

        21   was one of the manuals that Mr. Hendricks directed you to?

        22   A.    Yes.

        23   Q.    Can we look at page 4?  So Exhibit 66, page 4.

        24        And can we blow up from contents just down to

07:24:23 25  resources?
```

1       Can you identify this portion of this manual?

2    A.    Yes.

3    Q.    What is this?

4    A.    This is the table of contents.

07:24:35  5    Q.    So these are the subject matters that are covered in

6    this manual?

7    A.    Yes.

8    Q.    Chapter 8 discusses what?

9    A.    Bomb making.

07:24:52 10    Q.    And if we look at page 7, so Exhibit 66, page 7, and

11    at the bottom, what is this talking about?

12    A.    Being an undercover agent.

13    Q.    And then at the very -- the middle sentence that's

14    there, in simple terms, from this guide book, what is it

07:25:29 15    that's being suggested that you'll be able to become?

16    A.    You will learn how to become a sleeper cell which

17    activates at the right time when the ummah needs you.  And

18    the ummah relates to the Islamic world.

19    Q.    And can we go to page 27 of this document?  So 66-27.

07:25:51 20          What is this chapter referencing?

21    A.    This chapter is referencing weapons.

22    Q.    And what is it suggesting is the referred weapon?

23    A.    AK-47 assault rifle.

24    Q.    And can we go to page 37?

07:26:06 25          And what's the chapter title here?

1    A.    "Bomb Making At Home."

2    Q.    And have you had a chance to look through the various

3    types of bombs that it suggests can be made?

4    A.    Yes.

07:26:25  5    Q.    And can we go to page 52.  So 66-52.

6          And what is this referencing at the top?

7    A.    This is referencing mobile phone security.

8    Q.    And what are you supposed to do?

9    A.    Okay.  So there were many protocols regarding mobile

07:27:00  10    phone security such as taking out the battery when

11    traveling.

12    Q.    And why would you do that, according to this manual?

13    A.    You would do that so you can avoid being tracked.

14    Q.    All right.  And we can pull back out.

07:27:16  15          Can we go back to Exhibit 65, please?

16          And so, again, this was something that Mr. Hendricks

17    suggested you obtain and review?

18    A.    Yes.

19    Q.    The last reference there, little bullet point there,

07:27:35  20    what is that referring to?

21    A.    The first line, the constant on the pal of jihad,

22    that's just a title of a book.  But the two things

23    underneath are two points that he spoke on briefly during

24    the face-to-face meeting.  And so I thought that was

07:27:54  25    important to write down as well.

```
         1   Q.    What were those two things?

         2   A.    Persistence and this second word just means sincerity.

         3   Q.    And just for the record, it's spelled I-K-H-L-A-S.

         4         Correct?

07:28:09 5   A.    Yes.

         6   Q.    Do you know who wrote the Constant on the Path of

         7   Jihad.  Are you familiar with that as well?

         8   A.    I am familiar with the book, but I am not sure who the

         9   author is.

07:28:21 10  Q.    Can we go back to Exhibit 55.

         11        You go through these.

         12        Just for the record, can you identify what this

         13  document represents and who is pictured in the document?

         14  A.    Yes.  This picture represents myself as well as Mr.

07:28:50 15  Hendricks.

         16  Q.    And you're to the right and Mr. Hendricks is to the

         17  left?

         18  A.    Correct.

         19  Q.    Can we go to Exhibit 56.

07:28:57 20        What is this?

         21  A.    This is at the same meeting.

         22  Q.    So it shows you to the right, Mr. Hendricks to the

         23  left?

         24  A.    Correct.

07:29:10 25  Q.    And you're in the same vehicles, in the same parking
```

1    lot?

2    A.    Correct.

3    Q.    Can we bring up Government's Exhibit 61?

4          Does this appear to be just a closeup of that same

07:29:22 5    photograph?

6    A.    Yes.

7    Q.    And then can we bring up Government's Exhibit 57?

8          Who is the individual you can see in this photograph?

9    A.    This is Mr. Hendricks.

07:29:36 10   Q.    And you seem to be kinds of hidden behind this tree?

11   A.    Yes.

12   Q.    Same vehicles in the same parking lot?

13   A.    Yes.

14   Q.    Paragraph 58.

07:29:46 15        What is this document showing?

16   A.    This document is showing the same view but from

17   behind.

18   Q.    So whose vehicle is pictured at this point?

19   A.    My vehicle is pictured.

07:30:02 20   Q.    And in this picture, where are you located?

21   A.    I am located on the left.

22   Q.    And then Mr. Hendricks is to the right?

23   A.    Yes.

24   Q.    And then what are you facing?

07:30:13 25   A.    I am facing a van.

1    Q.    Okay.  In this picture, is that van door open?

2    A.    Yes.

3    Q.    Was there somebody in the van?

4    A.    Yes.

07:30:23  5    Q.    Who was in the van?

6    A.    The wife of Mr. Hendricks.

7    Q.    Did you actually get a chance to meet her, or do you

8    just see her?

9    A.    I just saw her.

07:30:33  10    Q.    Okay.  I want to go back to Government's Exhibit 62C,

11    if we could.

12        And --

13            MR. BENNETT:  Just one moment, Your Honor.

14            THE COURT:  Yes, sir.

07:31:08  15            MR. BENNETT:  Are you able to go to the end of

16    the --

17    BY MR. BENNETT:

18    Q.    We talked about this briefly before, but I would like

19    to go back.  He talks about going overseas.  What was

07:31:21  20    overseas?  What did it mean to go overseas as it related to

21    your discussion?

22    A.    Going to different countries such as Syria.

23    Q.    And then he references something there about

24    "Experience with the big boys"?

07:31:37  25    A.    Yes.

| | | |
|---|---|---|
| | 1 | Q.    What does that mean? |
| | 2 | A.    The FBI. |
| | 3 | Q.    Did you have any discussion with him further or have |
| | 4 | any knowledge of his involvement with the FBI? |
| 07:31:49 | 5 | A.    No. |
| | 6 | Q.    Can we go to Government's Exhibit 62D? |
| | 7 | And can we just play this? |
| | 8 | (Recording played.) |
| | 9 | BY MR. BENNETT: |
| 07:33:19 | 10 | Q.    Again, is this Mr. Hendricks's voice? |
| | 11 | A.    Yes. |
| | 12 | Q.    And the other voice is yours? |
| | 13 | A.    Yes. |
| | 14 | Q.    There's a reference to a plan they do in Texas? |
| 07:33:28 | 15 | A.    Yes. |
| | 16 | Q.    What did you take that to mean? |
| | 17 | MR. HARTMAN:  Objection, Your Honor. |
| | 18 | THE COURT:  Sustained. |
| | 19 | BY MR. BENNETT: |
| 07:33:38 | 20 | Q.    Were you aware of anything going on in Texas that |
| | 21 | would relate to a conversation you were having with Mr. |
| | 22 | Hendricks? |
| | 23 | A.    Yes. |
| | 24 | Q.    What was that? |
| 07:33:44 | 25 | A.    There was a drawing contest going on in Texas, and |

1  this, this is a competition or a contest of some sort in

2  which people would gather together in one place just to draw

3  pictures of what they think the Prophet Muhammad may have

4  looked like.

07:34:05 5      And so --

6  Q.    And does that cause some issues within the Muslim

7  religion?

8  A.    Yes, this is very serious because Muslims believe that

9  no one is allowed to depict the Prophet Muhammad's face

07:34:18 10 whatsoever.

11 Q.    And he also here says, "Tie your camel."  Are you

12 familiar with that term?

13 A.    Yes.

14 Q.    What does that phrase -- I guess I would say that's a

07:34:29 15 phrase.  What does that phrase mean?

16 A.    Yes, so the phrase is "Tie your camel," but "Tie your

17 camel," but trust in God.

18      And so what this phrase means is to -- to have faith

19 in God, but still do your best to make things happen rather

07:34:56 20 than simply, for example, pray for something to happen

21 without taking action.  You have to do both.

22 Q.    So let's continue playing the recording, please.

23      (Recording played.)

24 BY MR. BENNETT:

07:36:06 25 Q.    "Put it on the line," what were you taking that to

1271

1      mean?

2                    MR. HARTMAN:  Objection.

3                    THE COURT:  Sustained.

4      BY MR. BENNETT:

07:36:13  5    Q.    It suggests that you have to lose everything.  Lose

6      everything in relation to what?

7      A.    What I took that to mean would be worldly possessions.

8      Q.    And you put it on the line for who?

9                    MR. HARTMAN:  Objection.

07:36:27 10              THE COURT:  Sustained.

11                   MR. BENNETT:  Let's keep playing the tape.

12              (Recording played.)

13     BY MR. BENNETT:

14     Q.    What does Mr. Hendricks say about weapons?

07:37:51 15    A.    That he has weapons.

16     Q.    And what about the land?

17     A.    He has weapons -- little weapons and a little land.

18     Q.    Did you know where the land was located?

19     A.    No.

07:38:04 20    Q.    And then what else does he suggest that is needed?

21     A.    Sacrifice.

22     Q.    And he references one or two brothers.  Do you know

23     how many people were involved?

24     A.    No, I had no idea.

07:38:21 25    Q.    Okay.  Can we go on?

1    (Recording played.)

2  BY MR. BENNETT:

3  Q.    Is this what you were referring to earlier about the

4  drawing?

07:40:03  5  A.    Yes.

6  Q.    Do you know who Geller is?

7  A.    Yes, Pamela Geller.

8  Q.    And who is Pamela Geller?

9  A.    She is the woman who, she basically was in charge of

07:40:15 10  the drawing contest.

11  Q.    And training, what training were you going to be

12  required to do?

13  A.    There weren't any specifics.

14  Q.    Was that something you were willing to do, if

07:40:29 15  necessary?

16  A.    Yes.

17  Q.    Go ahead.

18    (Recording played.)

19  BY MR. BENNETT:

07:41:08 20  Q.    There seems to be another voice that inserts itself a

21  couple times.  Do you recognize or know who that was?

22  A.    Yes.

23  Q.    Who is that?

24  A.    That's the wife of Mr. Hendricks.

07:41:19 25    (Recording played.)

BY MR. BENNETT:

Q.   Do you happen to know who the reference is there to the pastor, Robert with the big mustache?

A.   Yes, he was a very famous guy at that time.

Q.   Do you remember his name?

A.   No, I don't.

Q.   Just out of curiosity, there seems to be a lot of scratch background noise of the recording.  Do you know why that was, where the device was on your body?

A.   Yes.  This is due to where the device was, which was in one of my pockets.

Q.   So every time you would move, it would rub against it?

A.   Correct.

Q.   And then can we play 6-E --

MR. BENNETT:  Your Honor, I've got a significant more with the rest of recordings.  I don't know if you --

THE COURT:  How much longer do you think it would take?

MR. BENNETT:  I probably got another 45 minutes.

THE COURT:  Okay.  We'll take our evening break then.  It's 4:30.  It will be much longer than I think our jurors will be able to accomplish today.  Let's leave it at that.

All right.  Ladies and gentlemen of the jury, we're going to adjourn for the day.  Leave your notepads on your

1274

1    chairs.  It's extremely important, I'm required to repeat

2    them, that you follow my admonitions.

3        Do not discuss the case among yourselves, with anyone

4    else.

07:43:40  5        Do not form or express any opinions on the matter.

6    You don't have all the information you need to make any type

7    of decisions whatsoever in this case.

8        Please, do not do any research on the Internet, do not

9    let anyone else talk about this case with you or them

07:43:57 10  indirectly do any research, all the things I've discussed

11   with you earlier.  Please follow those instructions.  It's

12   important that you do so to be fair to both sides in the

13   case.

14        Also, avoid reading any media accounts there may be of

07:44:11 15  this case.  I don't know if there will be or will not be

16   tomorrow.  I just don't know.  It depends on -- again, I

17   can't tell you.

18        Please, if there are any such accounts, ignore them

19   and don't let anyone else read them or discuss them with

07:44:24 20  you.  Anything like that would be improper.

21        I really appreciate your time, your courtesy.

22        We'll see you tomorrow morning at 9:00.

23        Thank you very much.

24        (Jury out, 4:30 p.m.)

07:44:58 25        THE COURT:  Sir, you can step down.

1    While I just talk to the attorneys.

2    Just have a seat very briefly, please.

3    After this witness's testimony, Counsel, how many

4    additional witnesses does the government have?  I'm just

07:45:14 5    trying to plan ahead as best I can.

6    Do you have any rough idea?

7        MR. SHEPHERD:  Approximately seven, Your Honor.

8        THE COURT:  All right.

9        MR. SHEPHERD:  And, Your Honor, I anticipate we

07:45:26 10    would probably wrap up on Wednesday at the current pace.

11        THE COURT:  All right.  Thank you.

12    That's helpful.

13    And that will mean we'll have to deal with exhibits.

14    Hope any we can organize them as best we can, admission of

07:45:40 15    the government's exhibits, any motions and go from there and

16    probably not start -- well, depending on the timing of the

17    day.

18    So be prepared, Counsel, with that probably be

19    prepared to start on Thursday would be my guess.

07:45:54 20        MR. DOUGHTEN:  That's our understanding, yes.

21        THE COURT:  If they wrap up, then we can start on

22    Thursday.

23    All right.  Anything else?

24        MR. SHEPHERD:  Not from the United States, Your

07:46:02 25    Honor.

1    MR. DOUGHTEN:  Nothing from the defense.

2    THE COURT:  All right.  Thank you very much.

3    Have a good evening.  We'll see you tomorrow morning.

4    (Proceedings concluded at 4:30 p.m.)

1                              I N D E X

2                               -   -   -

3

4       DIRECT EXAMINATION OF BRIAN MARLOW

5       BY MR. BENNET

6       DIRECT EXAMINATION OF JASON SAITTA

7       BY MR. BENNETT

8       DIRECT EXAMINATION OF TODD SHELTON

9       BY MR. BENNETT

10      DIRECT EXAMINATION OF HAMZA AL-ANSARI

11      BY MR BENNETT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1278

1          C E R T I F I C A T E

2

3          I certify that the forgoing is a correct

4     transcript from the record of proceedings in the

5     above-entitled matter.

6

7               S/Caroline Mahnke          3/12/18

8               Caroline Mahnke, RMR, CRR      Date

9

10              S/Lori A. Callahan          3/12/18

11              Lori A. Callahan, RMR, CRR      Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25