<pre>
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3

     UNITED STATES OF AMERICA,
 4
                 Plaintiff,            Case No. 1:16CR265
 5                                     Akron, Ohio
            vs.                        Thursday, March 8, 2018
 6
     ERICK JAMAL HENDRICKS,
 7
                 Defendant.
 8

 9
                       TRANSCRIPT OF TRIAL
10              VOLUME 5, PAGES 595 THROUGH 821
             BEFORE THE HONORABLE JOHN R. ADAMS
11               UNITED STATES DISTRICT JUDGE

12

     APPEARANCES:
13
     For the Government:  Matthew W. Shepherd
14                        Office of the U.S. Attorney - Cleveland
                          Carl B. Stokes U.S. Courthouse
15                        801 Superior Avenue, West, Suite 400
                          Cleveland, Ohio 44113
16                        (216) 622-3600

17                        Mark S. Bennett
                          Office of the U.S. Attorney - Akron
18                        2 South Main Street, Room 208
                          Akron, Ohio 44308
19                        (330) 375-5716

20                        Rebecca A. Magnone
                          U.S. Department of Justice
21                        960 Pennsylvania Avenue, NW
                          Washington, DC 20530
22                        (202) 353-9472

23   For the Defendant:   David L. Doughten
                          Attorney at Law
24                        4403 St. Clair Avenue
                          Cleveland, Ohio 44103
25                        (216) 361-1112
                          Stephen D. Hartman
</pre>

```
 1                          Attorney at Law
                            1st Floor
 2                          320 North Michigan Street
                            Toledo, Ohio 43604
 3                          (419) 690-4604

 4
        Court Reporter:     Caroline Mahnke, RMR, CRR, CRC
 5                          Lori A. Callahan, RMR, CRR
                            Federal Building & U.S. Courthouse
 6                          2 South Main Street, Suite 568
                            Akron, Ohio 44308
 7                          (330) 252-6021

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.
25
```

1       (March 8, 2018 9:08 a.m.)

2       (Sealed proceedings, pages 597 through 607)

3       THE COURT:  Counsel, are we ready?

4       At this time, I'm going to bring forward the jurors.

00:00:07 5   I'm provide them, as we discussed, some preliminary

6   instructions of law about the two charges, elements of

7   conspiracy to provide material support and resources to a

8   foreign terrorist organization, and as well as the other

9   count related to the other charge which we will set forth as

00:00:33 10  I've previously advised the parties.

11      Both sides have a copy of the preliminary

12  instructions.  Just so it's clear for the record, does

13  anyone have any objection to the provisions or the

14  instructions I intend to provide the jurors at this time?

00:00:52 15      Counsel for the government?

16          MR. SHEPHERD:  No, Your Honor.

17          THE COURT:  Counsel for the defendant?

18          MR. DOUGHTEN:  No, Your Honor.

19          THE COURT:  All right.  Then we'll proceed as

00:00:57 20  I've indicated as of yesterday.

21      Ms. Kestner, we'll ask that the jurors come forward,

22  please.

23      (Jury just a moment, when the jurors begin to enter

24  the courtroom, we would ask that you all please rise.

00:01:11 25      (Jury in, 9:10 a.m.)

1            THE COURT:  Good morning, ladies and gentlemen,

2      thank you again for your service to the Court.

3            In a few moments, you're going to hear opening

4      statements from the attorneys.  Before they begin with their

00:03:52  5      opening statements, I believe it would be helpful to you to

6      have a summary of certain instructions of law related to the

7      issues in this case.

8            I may give you further instructions during the course

9      of the trial, and I will provide you with more detailed

00:04:07 10      instructions at the end of the case.

11            Please listen carefully as best possible.  I will

12      review these instructions with you at this time.

13            The elements of conspiracy to provide material support

14      and resources to a foreign terrorist organization.

00:04:24 15            The defendant is charged in Count 1 of the

16      superseding -- or we will call it indictment -- with

17      conspiracy to provide material support and resources to a

18      foreign terrorist organization.

19            In order for the defendant to be found guilty of this

00:04:39 20      crime, the government must prove each of the following

21      elements beyond a reasonable doubt:

22            First, from on or about December 1, 2014, through on

23      or about May 31, 2015, two or more persons reached an

24      agreement or came to an understanding to provide material

00:05:00 25      support or resources to a designated foreign terrorist

1       organization, namely, Islamic State of Iraq and the Levant,

2       ISIL, also known as the Islamic State of Iraq and Syria

3       ISIS, Al Qaeda and Iraq and the Islamic State.

4               And second, that the defendant became a member of the

00:05:23  5     conspiracy knowing of its object and intending to help

6       accomplish it.

7               Third, at the time the defendant knew that ISIL was a

8       designated foreign terrorist organization or engaged or was

9       engaging in terrorist activity or terrorism.

00:05:40 10     And fourth, the defendant is a national of the United

11      States, or the offense occurred in whole or in part within

12      the United States, or the offense occurred in or affecting

13      interstate or foreign commerce.

14              Agreement.  With regard to the first element, a

00:05:59 15     criminal agreement, the government must prove that two or

16      more persons conspired or agreed to cooperate with each

17      other to commit the crime of providing material support or

18      resources to a designated foreign terrorist organization,

19      namely ISIL.

00:06:17 20     This does not require proof of any formal agreement,

21      written or spoken, nor does this require proof that everyone

22      involved agreed on all the details.

23              But proof that people simply met together from time to

24      time and talked about common interests or engaged in similar

00:06:35 25     conduct is not enough to establish a criminal agreement.

1          These are the things that you may consider in deciding

2     whether the government has proved an agreement, but without

3     more, they are not enough.

4          What the government must prove is that there was a

00:06:51 5     mutual understanding, either spoken or unspoken, between two

6     or more people to cooperate with each other to commit the

7     crime of providing material support or resources to a

8     designated foreign terrorist organization, namely ISIL.

9          This is essential.

00:07:09 10         An agreement can be proved indirectly by facts and

11    circumstances which lead to a conclusion that an agreement

12    existed.  But it is up to the government to convince you

13    that such facts and circumstances existed in this particular

14    case.

00:07:25 15         Defendant's connection to the conspiracy.  If you are

16    convinced that there was a criminal agreement, then you must

17    decide whether the government has proved that the defendant

18    knowingly and voluntarily joined that agreement.

19         To convict the defendant, the government must prove

00:07:43 20    that he knew the conspiracy's main purpose and that he

21    voluntarily joined it intending to help advance or achieve

22    its goals.

23         This does not require proof that a defendant knew

24    everything about the conspiracy or everyone else involved or

00:07:56 25    that he was a member of it from the very beginning.  Nor

1    does it require proof that a defendant played a major role

2    in the conspiracy or that his connection to it was

3    substantial.

4         A slight role or connection may be enough.  But proof

5    that a defendant simply knew about a conspiracy or was

6    present at times or associated with members of the group is

7    not enough even if he approved of what was happening or did

8    not object to it.

9         Similarly, just because a defendant may have done

10   something that happened to help a conspiracy does not

11   necessarily make him a conspirator.

12        These are all things that you may consider in deciding

13   whether the government has proved that a defendant joined a

14   conspiracy.  But without more, they are not enough.

15        A defendant's knowledge can be proved indirectly by

16   facts and circumstances which lead to a conclusion that he

17   knew the conspiracy's main purpose.  But it is up to the

18   government to convince you that such facts and circumstances

19   existed in this particular case.

20        Elements of attempting to provide material support and

21   resources to a foreign terrorist organization.

22        The defendant is charged in Count 2 of the indictment

23   with attempting to provide material support and resources to

24   a foreign terrorist organization, namely, the Islamic State

25   of Iraq and Levant, ISIL, also known as the Islamic State of

1    Iraq and Syria, ISIS, Al Qaeda and Iraq and the Islamic

2    State.

3        In order nor the defendant to be found guilty of this

4    crime, the government must prove each of the following

00:09:42  5    elements beyond a reasonable doubt:

6        First, that the defendant attempted to provide

7    material support or resources to a foreign terrorist

8    organization; second, that the defendant knew or intended

9    that the support or resources was going to that

00:09:57 10    organization, commonly known as ISIL.

11        Third, at the time the defendant knew that ISIL was a

12    designated foreign terrorist organization or engaged or was

13    engaging in terrorist activity or terrorism.

14        And fourth, the defendant is a national of the United

00:10:18 15    States or the offense occurred in whole or in part within

16    the United States, or the offense occurred in or affecting

17    interstate or foreign commerce.

18        A defendant may be found guilty of an attempt if he

19    intended to provide material support to a designated foreign

00:10:35 20    terrorist organization and voluntarily and intentionally

21    carried out some act which was a substantial step toward

22    that crime.

23        A substantial step must be something more than mere

24    preparation, yet may be less than the last act necessary

00:10:52 25    before the actual commission of these substantive crime.

1           In order for behavior to be punishable as an attempt,

2       it need not be incompatible with innocence, yet it must be

3       necessary to the consummation of the crime and be of such

4       nature that a reasonable observer, viewing it in context,

00:11:13  5     could conclude beyond a reasonable doubt that it was

6       undertaken in accordance with a design to violate the

7       statute.

8           A few relevant definitions.

9           The government must prove beyond a reasonable doubt

00:11:28 10     that the defendant knowingly conspired or attempted to

11      provide material support or resources to a foreign terrorist

12      organization.

13          Here the government has alleged that the material

14      support included personnel, specifically the defendant

00:11:43 15     himself, AA and UCE, those are abbreviations, and others and

16      services to a foreign terrorist organization, namely ISIL,

17      which at all relevant times was designated by the Secretary

18      of State as a foreign terrorist organization.

19          The term "material support or resources" means any

00:12:07 20     property, tangible or intangible, or service, including

21      currency or monetary instruments or financial securities,

22      financial services, lodging, training, expert advice or

23      assistance, safe houses, false documentation or

24      identification, communications equipment, facilities,

00:12:32 25     weapons, lethal substances, explosives, personnel, and

1    transportation, but does not include medicine or religious

2    materials.

3        The term "training" means instruction or teaching

4    designed to impart a specific skill as opposed to general

00:12:51  5    knowledge.

6        The term "expert advice" or "assistance" means advice

7    or assistance derived from scientific, technical, or other

8    specialized knowledge.

9        The term "personnel" means one or more persons which

00:13:08  10   can include the defendant's own person.  However, no person

11   can be convicted for a violation of this statute in

12   connection with providing personnel unless that person has

13   knowingly attempted to provide a foreign terrorist

14   organization with one or more individuals who may include

00:13:27  15   the defendant, to work under that terrorist organization's

16   direction or control or to organize, manage, supervise or

17   otherwise direct the operation of that organization.

18       Individuals who act entirely independently of the

19   foreign terrorist organization to advance its goals or

00:13:48  20   objectives are not considered to be working under the

21   foreign terrorist organization's direction and control.

22       The term "foreign terrorist organization" has a

23   particular meaning under this statute.  In order for an

24   organization to qualify as a foreign terrorist organization,

00:14:06  25   the organization must have been designated as such by the

1    Secretary of State through a process established by law and

2    have been designated at the time the crime occurred.

3        For a person to act knowingly means that he realized

4    what he was doing and was aware of the nature of his conduct

5    and did not act through ignorance, mistake, or accident.

6        Knowledge of foreign terrorist organization.  The

7    government must prove beyond a reasonable doubt that in

8    conspiring to provide or in attempting to provide material

9    support or resources to a designated terrorist organization,

10    the defendant knew that the organization was a designated

11    terrorist organization or that the organization had engaged

12    or was engaging in terrorist activity or terrorism.

13        Specifically, the government must prove that at the

14    time the defendant conspired or attempted to provide the

15    material support or resources in question, he knew that they

16    would be provided to ISIL.

17        Further, you must find beyond a reasonable doubt

18    either that the defendant knew that ISIL had been designated

19    by the United States government as a foreign terrorist

20    organization or that he knew that the organization had

21    engaged in or was engaging in terrorist activity or

22    terrorism.

23        The term "terrorist activity" means any activity which

24    is unlawful under the laws of the place where it is

25    committed or which, if it had been committed in the United

1    States, would be unlawful under the laws of the United

2    States or any state, it and which involves any of the

3    following:

4         The highjacking or sabotage of any conveyance,

00:16:00  5    including aircraft, vessel or vehicle, the seizing and

6    detaining and threatening to kill, injure or continue to

7    detain another individual in order to compel a third person,

8    including a governmental organization, to do or obtain from

9    doing any act as an explicit or implicit condition for the

00:16:21 10    release of the individual seized or detained, a violent act

11    upon an internationally protected person or upon the liberty

12    of such a person, an assassination, the use of any

13    biological agent, chemical agent, or nuclear weapon or

14    device, or explosive, firearm, or other weapons or dangerous

00:16:44 15    device other than for mere personal monetary gain with

16    intent to endanger, directly or indirectly, the safety of

17    one or more individuals, or to cause substantial damage to

18    property or a threat, attempt, or conspiracy to do any of

19    the foregoing.

00:17:03 20         The term "engage in terrorist activity" means in an

21    individual capacity, or as a member of an organization, to

22    commit or to insight to commit under circumstances

23    indicating an intention to cause death or serious bodily

24    injury, a terrorist activity, to prepare or plan a terrorist

00:17:26 25    activity, to gather information on potential targets for

1    terrorist activity, to solicit funds or other things of

2    value for a terrorist activity, or a terrorist organization.

3         The term "terrorism" means premeditated, politically

4    motivated, violence perpetrated against noncombatant targets

00:17:47 5    by sub national groups or clandestine agents.

6         Just a couple very brief definitions.

7         The term "national of the United States" means a

8    citizen of the United States or a person who, though not a

9    citizen of the United States, owes permanent allegiance to

00:18:09 10   the United States.

11        The term "interstate commerce" includes commerce

12   between one state, territory, possession, or the District of

13   Columbia and another state, territory, possession or the

14   District of Columbia.

00:18:24 15        And foreign commercial means commerce with a foreign

16   country.

17        Those are the preliminary instructions that I would

18   like you to consider.

19        At the conclusion of the case, you'll see, more likely

00:18:37 20   than not, all of these instructions along with additional

21   instructions to help you in your deliberations.

22        To set your mind at ease, those instructions will be

23   in writing.  There will be a copy for each of you during the

24   course of your deliberations and for your use.

00:18:51 25        At this time, the attorneys will begin with their

618

1    opening statements in this case.

2         Opening statements are not evidence.  They should not

3    be argument.  They're designed to provide you with a

4    preview, an overview of what each side believes the evidence

00:19:07 5    will be in this case.

6         Please give both sides your close attention.  The

7    opening statements are important.  I've already discussed

8    with you the brief timeline or the time constraints that

9    we're going to follow.  And I'm confident the attorneys will

00:19:24 10   do so within the timeframe as we've previously discussed.

11        At this time, counsel for the government, you may

12   proceed with your opening statement.

13             MS. MAGNONE:  Thank you, Your Honor.

14             THE COURT:  And, ladies and gentlemen, if at any

00:19:42 15  time, you can's here or see any of the demonstratives on the

16   screens, please let us know.  Sometimes things do

17   malfunction.  We want to be sure that you see and hear

18   everything.

19             MS. MAGNONE:  Your Honor, there's a question.

00:19:54 20            A JUROR:  My screen is not on.

21             THE COURT:  Your screen is not on?

22        Are they all on at this time?

23             A JUROR:  All just went off.

24

00:20:08 25            THE COURT:  Counsel, do you have -- is it a

619

1  laptop issue, or is it a more technical issue?

2       Are they on now?

3          A JUROR:  No.

4          MR. BRIMER:  Give them a second, Your Honor.

00:20:23  5          THE COURT:  That is one of our technical people

6  in the back.  Just give them a moment to warm up, I suppose,

7  might be the issue.

8       I know we tested them yesterday?  Are they working

9  now?  No?

00:21:13  10          Do you want to step forward and see if you can remedy

11  the problem?

12       Just one moment.

13       It will take about two minutes for the system to

14  reboot.  So just bear with us.

00:22:27  15          (Pause.)

16          THE COURT:  While we're waiting, ladies and

17  gentlemen, I'm afraid to say this, but I'll let you know.

18  We will keep tabs on the weather.  I don't know that there's

19  any major snow coming our way, but we will keep tabs in the

00:23:26  20  event there's some issue.  Hopefully there will not be,

21  either today and/or tomorrow.  But we will try to keep tabs.

22          MR. DOUGHTEN:  Your Honor, can we approach the

23  sidebar if we have a moment?

24          THE COURT:  Yes.

00:24:32  25          (Discussion at sidebar off the record.)

620

1          THE COURT:  It's now rebooting, ladies and

2     gentlemen.  Can you see the screens?

3          All right.  Just one moment, please.  Thank you.

4          All right.  Thank you, ladies and gentlemen.  If at

00:26:37 5    any time the screens are not activated or you cannot see,

6     let us know, please.

7          Don't ask me.  I'm sorry.  I'm not sure exactly what's

8     that's all about.

9          As long as it's not looking at me I'm happy.

00:27:00 10         All right.  Counsel, are we ready?

11              MS. MAGNONE:  Yes, Your Honor.

12              THE COURT:  All right.  Thank you.  Let's get

13    started.

14              MS. MAGNONE:  Good morning, ladies and gentlemen.

00:27:16 15   Erick Jamal Hendricks was trying to build a terrorist cell

16    in the United States.  He attempted to recruit fighters, and

17    he tried to purchase land to train those fighters.

18         He wrote and disseminated propaganda, and he vetted

19    new recruits.  And he did all of this in the hopes of

00:27:35 20   committing violent acts in the United States, in America's

21    own backyard on behalf of the ISIS, also known as the

22    Islamic.

23         Now, you're going to hear a lot about ISIS throughout

24    this trial.  I know most, if not all of you, have at least

00:27:54 25   heard of name of this terrorist organization.

1        But we're going to bring in an expert witness that

2   will tell you more about ISIS, about their broad strategic

3   goal to inspire and recruit homegrown terrorists to conduct

4   attacks in the United States.

00:28:10  5        You're also going to hear a lot about social media in

6   this trial, things like Twitter and Facebook.  But you're

7   also going to hear about some social media that you might

8   not have heard about, like Wickr and Surespot.

9        Those you will hear are known as encrypted apps,

00:28:29 10   applications that are more difficult to track and trace.

11        And the reason that you're going to hear about social

12   media is because the evidence will show that the defendant

13   was using the Internet, was using social media, to further

14   his crime.

00:28:44 15        So let's talk about those crimes.  The judge just told

16   you this is a two-count indictment.

17        Count 1 is conspiracy to provide material support and

18   resources to a designated foreign terrorist organization.

19   In this case ISIS.

00:28:59 20        The government is required to prove an agreement.

21   That is what conspiracy is.

22        Count 2 is attempting to provide material support or

23   resources to a designated foreign terrorist organization.

24   Again, that is ISIS in this case.

00:29:16 25        Attempt is merely an intent to commit the crime.  The

1    government is not required to prove, for example, that this

2    defendant was working with ISIS leaders in Syria or Iraq.

3    All that we're required to show is that he intended to

4    provide material support or resources to a designated

00:29:36  5    foreign terrorist organization.

6        So let's talk about what he did.  You will hear from

7    not one, not two, not three, but six different witnesses

8    that will come in here and tell you that he tried to recruit

9    them, that he tried to radicalize them, that he tried to

00:29:55  10    indoctrinate them with ISIS propaganda, and that even in a

11    couple of instances, tried to get them to conduct violent

12    acts.

13        So you will hear evidence that some of these witnesses

14    were paid informants.  But we would ask that you wait to

00:30:11  15    hear their testimony before you make a determination about

16    their credibility or their reliability because these are not

17    your typical informants.  These are not the type of

18    informants you see on TV or movies.

19        All of these interactions, communications, occurred in

00:30:30  20    the spring of 2015.  And they culminated on May 3, 2015 in

21    Garland, Texas, where a thwarted terrorist attack took

22    place.

23        Now, this defendant did not plan or participate in

24    this attack, nor is he on trial for this attack.  But the

00:30:48  25    evidence will show that he was unequivocally tied to this

1    attack.

2           So let me tell you what happened on May 3, 2015.

3           Elkton Simpson and Nadir Soofi drove from Phoenix,

4    Arizona to Garland, Texas, to the Curtis Cullwell Center.

5    They were dressed in black and shielded in body armor.

6           Inside of the Curtis Cullwell Center were over 200

7    people who were there to attend a Prophet -- Draw the

8    Prophet Muhammad cartoon contest.  These people had

9    purchased tickets to view cartoons and caricatures of the

10   Prophet Muhammad which our expert will tell you is offensive

11   to some Muslims.

12          So as the event was coming to a close, Simpson and

13   Soofi drove up to the facility.  They stopped their car

14   approximately where that circle is on the slide, and they

15   got out.

16          Now, the evidence will show that between the two of

17   them they had six weapons, assault -- semi-assault weapons.

18   They had rifles.  They had pistols, and they had over 15

19   rounds of ammunition and they began to fire.

20          What they didn't count on was the heroic actions of

21   one armed police officer who was able thwart their attack

22   and take down those terrorists.  And he will testify in this

23   trial.

24          Ultimately that day, Simpson and Soofi lost their

25   lives on behalf of the ISIS.  And this defendant was in

1    contact with Simpson just days before the attack.

2         He was calling him "brother" and "friend" just days

3    after the attack, and the evidence will show that he posted

4    a manifesto online taking credit for this attack on behalf

5    of the his friend just days after the attack.

6         But let me back up for a second.  The evidence will

7    show that the defendant was in contact with one of the

8    Garland attackers, Simpson.

9         The evidence will also so that he was in contact with

10   an undercover FBI agent.  That undercover FBI agent will

11   testify.  And he will tell you that the defendant told him

12   he was in contact with senior leaders from ISIS.  That agent

13   will also tell you that the defendant put him in contact

14   with Simpson, the Garland attacker just days before the

15   attacks.

16        And that agent will tell you that the reason for that

17   was that the defendant asked him to vet Simpson to see if he

18   would be a good ISIS recruit for his cell, for his network.

19        And this is a pattern that you will see throughout

20   this trial.

21        The defendant had a system for vetting new recruits,

22   that he used time and time again.

23        So let's talk about some of the patterns that you will

24   see in this trial.

25        What he would do is he would go on Twitter and find

1    people or people would be referred to him.  And then he

2    would reach out to those people over direct messaging.  You

3    will learn that direct messaging is like Facebook messenger.

4    It's like text messages over the Internet.  You can

00:34:02  5    communicate one on one with people.

6        One he was communicating with people on direct

7    messaging, he would tell them to move to an encrypted app,

8    as you I mentioned earlier, Surespot, Wickr.  So that their

9    conversation could not be tracked or traced.  And that's

00:34:17  10   where he would talk to them about his ISIS affiliations and

11   his plans.

12       He would tell them their user names and he would

13   change those user names frequently so that it would be

14   harder to track.

00:34:28  15       He would change social media platforms.  He would jump

16   from one to another again to make it more difficult to track

17   him.

18       Once he trusted one of these people that he met

19   online, he would ask them for names of other potential

00:34:43  20   recruits, other people that he could reach out to to build

21   his network.  And then he would vet those people by testing

22   their religious knowledge, their religious backgrounds,

23   etcetera.

24       And oftentimes, he would use his recruits to vet new

00:34:56  25   recruits, which is what occurred on May 2, 2015, when he was

1    asking the FBI undercover agent to vet Simpson, the Garland

2    attacker.

3         So these are patterns that you should pay attention to

4    during this trial.

5         So on May 2, 2015 -- and I know these screen shots are

6    blurry.  Let me address that.  You will see a lot of screen

7    shots throughout this trial.  Some are better than others.

8    These in particular are somewhat blurry, but we will have

9    some that are better for you to view.

10        So on May 2, not only did the defendant put the

11   undercover agent in contact with Simpson, but he actually

12   told him to go to Garland, Texas.  So this first text

13   message says -- not text message but message over this

14   communication platform.

15        "I wish someone could go to TX," Texas, and

16   "harass them during the night.  A good solid protest.  A

17   unique one-man protest."

18        He went on.  And you can see the screen shot a little

19   clearer.  "See what you and bro Juda can do.  At least be

20   heard."

21        The evidence will show that bro Juda did a reference

22   to Elkton Simpson, Juda or Juba was an online moniker that

23   he would using.

24        And so the undercover agent went to Garland on May 3

25   and he went to the vicinity of the Draw the Muhammad cartoon

1    contest.  And he will tell you that he was in communication

2    with the defendant throughout the day.

3        Here is example of one of those communications on May

4    3.

5        The defendant says, "Maintain distance and observe.

6    If you see that pig Pam" -- and Pam you will learn is a

7    reference to Pamela Geller, the organizer of the

8    event -- "make your voice," in quotes, "heard against her."

9        He then goes on to ask about security.  He asks about

10   things he's casing the event.  So he asks, "How is security?

11   How many?"

12       Some other questions he'll go on to ask is "How big is

13   the gathering?  How big is the building?  Do you see feds

14   there?  Do you see snipers?  How many media?"

15       Eventually this agent will tell you that he asked him

16   about weapons, and if he had a weapon that he could use.

17       And these communications continued almost up until the

18   moment that Simpson and Soofi got out of their car to

19   conduct their attack.  And you will hear about all of this

20   in detail throughout this trial.

21       So where was the defendant when this was happening?

22   Well, the evidence will show that the defendant was in

23   Baltimore, Maryland meeting with another ISIS recruit.  You

24   can see in this photo that the defendant is on the left

25   underneath the arrows and the recruit is on the right.

1          He will testify -- and, ladies and gentlemen, he was

2     also working undercover at the time -- but he will testify

3     about this in-person meeting.  He will tell you how it came

4     about and what they talked about.

00:37:47 5          He will tell you that the defendant, during their

6     meeting, brought up Pam Geller again, the organizer of the

7     cartoon contest, and that that was the type of scenario that

8     he was looking to attack.

9          This Baltimore witness will also tell you about the

00:38:03 10   fact that the defendant told him that day about a document

11    he wrote.  A document he wrote, a manual that he wrote with

12    his wife, one of his wives, called GPS for the Ghuraba in

13    the U.S.

14         Now this document you will have.  You will have the

00:38:20 15   full 19 pages by the end of this trial.  But the purpose of

16    this document was threefold.

17         First it was supposed to teach you about counteracting

18    law enforcement surveillance.  Second, providing

19    technological advice, and third, communicating protocols for

00:38:35 20   those planning to conduct attacks in the United States.  It

21    was a manual on how to do these things.

22         It also provided ways to support the mujahideen.

23    Mujahideen is term used for warrior, and he had sectionin

24    entitled "Fight with your hands, fight with your wealth,

00:38:54 25   fight with your tongue, use a cell phone, use a computer."

1        These are all areas -- again, you will be able to see

2   this document.

3        He also offered some final advice.  He encouraged

4   brothers and sisters of the faith not to allow themselves to

00:39:09  5   be imprisoned.  And here is an excerpt from this document.

6   He told them to stop going to jail willingly.  "If your

7   cover is blown or you are waiting for them to convict you,

8   die shaheed."  Shaheed is a martyr.

9        He goes on to say, "Stop going to jail, brothers.

00:39:26 10   Boobie trap your homes.  Lay in wait for them.  Never leave

11   your home without your AK-47 or your M16."

12        So, again, you will have this document.

13        So finally in this face-to-face meeting, the defendant

14   told this Baltimore witness that his goal was to creat a

00:39:47 15   sleeper cell, to be trained and housed in a secure compound,

16   that the purpose of the sleeper cell was to conduct attacks

17   in the United States, future targets included military

18   members whose information had been released by ISIS.  And he

19   also again brought up the woman who organized the Draw the

00:40:04 20   Prophet Muhammad contest.

21        So these are all conversations that the defendant had

22   with the witness in person.  And you will hear that

23   testimony.

24        After the attack, just a couple days later, the

00:40:17 25   defendant reached out to the same witness and pointed him to

630

1    a document online.  This is the front page of that document

2    that he called the New Era and, we'll have our expert coming

3    in and explain this document to you.  But he will tell you

4    that this is an ISIS flyer.  And this document took credit

00:40:32  5  for the attack in Garland.  And not only did it take credit

6    for the attack in Garland, but it also threatened future

7    attacks in the United States.

8         And the evidence will show that the defendant also

9    authored this document.

00:40:45  10  And we know that because we're going to bring in a

11   witness who posted it online at his direction.  She will

12   tell you that he reached out to her, that he told her that

13   he was friends with the shooters, that one of the shooters

14   was a close brother who left a letter that he wanted

00:41:00  15  published after the attack.  And that this document was

16   allegedly that letter.

17        So he forwarded the paragraphs of this document to

18   this woman, and she posted them online and she will tell you

19   why she did that.

00:41:14  20  He also asked her to send this document to fighters in

21   Syria, which she also did.  And she will tell you why she

22   did that.

23        Now, ladies and gentlemen, you're still going to hear

24   from more recruits than that.  You're going to hear from a

00:41:26  25  recruit whose actually in custody.  He has been convicted of

631

1    crimes similar to this one.  And he will tell you that the

2    defendant reached out to him, told him he was, quote,

3    "looking for good people," that he had friends and brothers

4    in Texas and Mexico that he was attempting to get to meet

00:41:43 5    face-to-face.  And that the reason that he wanted them to

6    meet face-to-face was so that they could train together.

7         This recruit, this witness, will also tell you that he

8    asked the defendant, asked him if he was willing to go to

9    Texas.

00:41:57 10        You'll hear from another woman who was so freaked out

11   by the defendant's radical views that she immediately

12   contacted the FBI.  She was concerned.  And she was

13   concerned because he told her he had land, that he hoped to

14   obtain more land, and that the purpose of that land was to

00:42:14 15   train ISIS fighters on weapon use, on gun use.

16        And the evidence will show that in 2014, December

17   2014, he actually did try to buy land.  You'll see in this

18   picture -- and let me explain this picture to you.

19        So he tried to purchase the land that's in the red

00:42:28 20   outline near the bottom center of the flyer.  But this is an

21   overlay of a large piece of land.  You can see underneath in

22   the top right-hand corner there's some graphs.  The rest is

23   desert, mountain.  You will see some green specs as

24   vegetation and trees.  So clearly this piece of land is in

00:42:47 25   the middle of nowhere, California.

1          He also tried to purchase this land or talked about

2     purchasing this land in New Mexico.  Again, you can see it

3     is in the middle of nowhere.  It is quote/unquote "off the

4     grid, secure," could easily go unnoticed.  These are the

00:43:01  5     types of land that he was looking for to train his fighters.

6     His cell.

7          So ultimately, ladies and gentlemen, the government is

8     going to have to show that all these communications, all

9     these screen shots, all these documents were actually

00:43:15 10     authored by the defendant.  Most of this takes place online.

11     And so there will be quite a bit of testimony regarding

12     technology.

13          The type of technology is oftentimes complicated, but

14     we will do our best to simplify it for you.

00:43:30 15          One thing I can tell you you will hear about is IP

16     addresses.  IP addresses go back to locations.  And we will

17     show you that the defendant was using online accounts and

18     user names that will tie back to locations like his mother's

19     house and both of his wives' houses to prove that those

00:43:48 20     accounts were actually his.

21          The evidence will show that he also went to great

22     lengths to hide his location, hide his location from law

23     enforcement.  And he used a technology called Tor and you

24     will hear more about that in this trial.

00:44:06 25          Ultimately, though, he was tracked down by law

1    enforcement.  That's why we're here today.  And evidence

2    will show that in the weeks after the Garland attack, the

3    defendant suspected he had been caught.  He spotted some

4    surveillance, some FBI surveillance, on or about May 13,

00:44:19  5    2015.

6         His response to that was he immediately ceased his

7    communication with all of his recruits and he shut down his

8    online accounts.

9         Now, you may hear evidence during this trial that

00:44:30 10   there was a time that he was employed by the FBI, but I will

11   tell you that was long before any of these crimes took place

12   and frankly has nothing to do with this case.

13        But, ladies and gentlemen, I will end where I began.

14        Erick Jamal Hendricks was trying to build an ISIS cell

00:44:46 15   in the United States so that he could commit violent acts

16   upon U.S. citizens in America's own backyard.

17        We are confident that once you hear all the testimony

18   and see all the evidence, you will find the defendant

19   guilty.

00:44:59 20        Thank you.

21        THE COURT:  Thank you, counsel.

22   You may take down the screen shot, please.

23        At this time, counsel for the defendant, you may begin

24   with your opening statement.

00:45:15 25        MR. DOUGHTEN:  I hope we're not having the same

634

```
          1    problem.

          2             THE COURT:  I hope not.  There we go.  It's

          3    beginning.  Let's see if it's going to be displayed here in

          4    a moment.

00:45:27  5             MR. DOUGHTEN:  Is it on the screen?

          6             THE COURT:  Are your screens all on?

          7             JURORS:  Um-hum.

          8             THE COURT:  Thank you.

          9             MR. DOUGHTEN:  Again, I always wonder what jurors

00:45:39 10    believe in a case like that, an opening, from a defense

         11    standpoint, what we're worried about and there were a lot of

         12    questions from the Judge about the nature of this case

         13    because it's very serious to both parties, if it might

         14    effect you.

00:45:50 15        We're trying to get to you relax.  Part of the voir

         16    dire process and opening is when you have an idea what's

         17    going on, you can kind of forget about extraneous things and

         18    just listen to the evidence which is important, because if

         19    you are relaxed, if you are sitting back, then you're going

00:46:09 20    to be able to take things in and process them better.

         21        And it's also very important as the judge stressed

         22    that you wait until the end of the case before you make up

         23    your mind, because if you were to go back right now, you

         24    would think, "Wow, the government has some case.  What are

00:46:23 25    we doing here?"
```

1          But let me assure you, that's not the case.  And I

2    want to address things.

3          I'm not going to address everything the government

4    says, but there are key points that you have to keep your

00:46:33  5    mind open to that we believe the evidence will show that are

6    important.

7          The most important things is, is the Judge talked a

8    lot about the presumption of innocence.  And what that means

9    is things aren't always what they appear to be.  You can't

00:46:47 10    go on first blush.  You need to go into the background to be

11    able to put the evidence in contact.  And this is certainly

12    one of those cases.

13          The bottom line is, in a nutshell, is a lot of what

14    the government said is accurate.  And let me give you an

00:47:05 15    example.  There was an attack in Garland.  There was a

16    person who was having the conversations that the government

17    said he was.  But the government won't establish that was

18    Erick Hendricks.

19          This is an interesting case.  The pathology of this

00:47:21 20    case is really a lot of Internet action and how it works and

21    who becomes how, and how you can trace who says it and if

22    someone had the capability to use somebody else's computer,

23    IP address, how can that happen.

24          There will be a lot of argument, testimony along those

00:47:38 25    lines.  And just right upfront the issue the person on the

1    Internet that the government believed to be Erick Hendricks,

2    we believe they aren't going to be able to establish is

3    Erick Hendricks.

4         So in a nutshell, that's where we're coming from.

00:47:55 5         There are a few things that are factual that we have

6    to address.  In fact, Erick did go to Baltimore on May 2.

7    He was there.  He did meet with a person who ended up being

8    an informant.  You're going to find out was an informant,

9    and he did have these conversations.

00:48:10 10         But you need to understand the background of Erick and

11    the background of this case to be able to properly assess

12    this.

13         To go back, Erick is a Muslim.  I think the evidence

14    will show that he had converted as a relatively young man.

00:48:27 15    And at the time this happened, he had been a Muslim for a

16    long time.  And he was a very devout Muslim.  You

17    heard -- let me give you an example of that.

18         You heard this -- the prosecutor in opening indicate,

19    you know, multiple wives.  And let me explain how that is

00:48:46 20    because I think the evidence is going to come out.

21         In the Koran, I guess old school, there's a sect that

22    believes that a Muslim can have multiple wives as long as

23    they're treated equally and they are raised equally.  That

24    is not accepted in modern.

00:49:07 25         Erick referred to them as wives, but he wasn't

637

1     actually married.

2          There was the person that he had been married

3     to -- and you'll hear this name, Tyrinda Hendricks.  She'll

4     also be referred to in the evidence as Aaminah, which is two

00:49:22  5     A's.  Aaminah.  And they had been married.  They had been

6     divorced, but they were back together.  They didn't formally

7     get married again, but that was his wife.

8          So when you hear about the term "wives," it's really

9     girlfriends in this situation.  But under his religious

00:49:39 10    belief, that was the terminology he used.  So this isn't a

11    bigamous situation, this isn't a situation where there were

12    civil proceedings for multiple reasons.  This was his

13    particular belief and his interpretation of the Koran.

14         We disagree with the government on the importance of

00:50:00 15    the fact that Erick had worked as an informant, as a paid

16    informant for the government.  And this becomes very

17    important in understanding this case.

18         He had first been approached by the FBI to become an

19    informant, I believe in Alexandria, Virginia, in 2009, 2010.

00:50:22 20    And, in fact, over a number of years he had been paid -- not

21    a lot of money -- but probably in the range of 20 to

22    $30,000.

23         And what he was supposed to do for that was that he

24    was going to, if he heard -- he attended a mosque there.

00:50:38 25    The mosque had an imam that was seen by the government as

1    being radical.  He is no longer there.  But they wanted

2    somebody, which is totally fine, to keep their eyes and ear

3    open and if they heard any radical talk, would you please

4    let us know.  Absolutely nothing wrong with that.  I think

00:50:58  5    we're all glad that that's going on.

6         The problem was when they asked Erick to start doing

7    it, Erick, there will be evidence, the government thinks he

8    was a radical.  There will also be some evidence that he was

9    moderate because the government, I think the evidence will

00:51:15  10    show, that that's why he was approached.

11         And over time he did provide multiple names of

12    informants to the FBI for them to investigate.

13         There was no formal training.  You know, this wasn't a

14    matter where they took him in to a school or they had

00:51:31  15    courses or he went to Quantico or somewhere and they said,

16    "Here, Mr. Hendricks, this is how we want to you approach

17    this issue."

18         It was more of an informal, look, if you -- if what

19    you're doing, if you come across anything that we need to

00:51:47  20    know, please let us know.  It was more along those lines.

21    So it wasn't an every day thing.  He wasn't given a "Here is

22    your duties for today."

23         He was to go on and live his life normally.

24         However, part and parcel of that is in order to

00:52:02  25    attract -- it was Mr. Hendricks belief, that he had to come

1    off as a little bit more of a radical because how else are

2    you going to have somebody approach you if you don't feel

3    that you're approachable and you don't present that you have

4    those particular ideas?

00:52:16  5      I would know say that Erick was a super-successful

6    informant -- handler -- you'll hear the term "handler."

7    What happens, and this is with everybody, including the

8    government's informants, the person who trains and works

9    with somebody who is being a paid informant is called a

00:52:39  10   handler.  That's just the expression they use because the

11   person is to report back to them.  The handler will reach

12   out to who is working for them and ask, you know, "What's

13   going on?  What are you hearing?"  And report fairly

14   regularly.  And if they do hear anything, they go back to

00:52:55  15   the handler.

16       In about -- Erick first started in the Alexandria,

17   Virginia area.  He then moved to South Caroline.  You'll

18   hear most of what happens is in Columbia, South Carolina.

19   And, in fact, Erick ended up doing work in South Carolina

00:53:17  20   also.  And this was about a four-year heard.  Again, not

21   that there was a lot, but he was working for about a

22   four-year period until they terminated his contract in early

23   summer of 2014.

24       Now, what's important about that, at the

00:53:28  25   terminated -- frankly, he hadn't produced a lot.  So at that

1  point in time, for whatever reasons, they indicated to him

2  that, you know, we're no longer -- we're not going to pay

3  you anymore.  However, keep your eyes and ears open.  If you

4  hear anything, keep your eyes and ear open.  And that

00:53:46  5  becomes very important for the context of what happens

6  later.

7      Erick interpreted that as it was -- things were kind

8  of open.

9      In the meantime, you'll hear that Erick provided for

00:53:59 10  himself and his wife.  He had a phone business.  And the

11  phone business was that he fixed those.  It wasn't very

12  complicated.  It wasn't super sophisticated.  But he would

13  do covers on phones, glass, and he would travel a lot to

14  purchase the phones for doing so.

00:54:17 15      And he had been doing this off and on for a number of

16  years.

17      In the fall of 2014, he sold his business.  And I

18  believe the evidence will come out that he sold it for

19  $11,000.  And it was a check was written out to him and he

00:54:34 20  cashed it.  And he used this money to go west.

21      He and his wife, Tyrinda again referred to as his

22  wife.  They weren't actually still married, but they did go

23  west.  They did go to the locations that the government said

24  that they did.  They did ask to go look at parcels of land.

00:54:56 25  They had never been west before.  They had -- neither of one

1    of them were working.  They had the money to go on.  And

2    they just did, I guess for lack of better term, by

3    serendipity decided to go where they were going to go, what

4    they were going to look, and they did, which is unusual but

5    not illegal, that they did go look at land that was off the

6    grid that weren't anywhere near what you would expect, but

7    they also did the normal thing that you would do in a trip

8    out west.

9        When they returned from that -- his mother lived in

10   Arkansas.  So at that point in time, he returned to Arkansas

11   and that's where they lived.  Because at this point in time,

12   they still had some cash to live on, but he's going to start

13   his phone business up again.  And he did, in fact, take

14   trips in relation to his phone business from that point

15   until -- in Baltimore.

16       A key dinner, which you'll hear evidence of, and I

17   believe the government is going to argue and talk about, is

18   on March 19 where he went to Baltimore, again, with Tyrinda

19   and they went -- they had dinner with somebody who was a

20   friend of his wife and other people they knew.

21       And this person is going to say that at that dinner

22   that Erick was espousing radical information.  But it's key,

23   is this person, who was not paid by the government at the

24   time, no evidence of it.  They will show there's no phone

25   clips, no conversations of their voice.  It's simply her

1    saying that is what Erick and Tyrinda said.

2         The social media platforms, again, we're not going to

3    disagree.  There will be lots and lots of screen shots.

4    There will be lots and lots of information as the government

00:56:53 5    said on what platforms were used and why.

6         There's not going to be objections there because we

7    agree that those things were done.  It just wasn't Erick.

8         So when he went to Baltimore, here is what else you'll

9    find out from the informant.  Part of having a contract with

00:57:14 10    the government is you have to produce.  If you don't

11    produce, you don't keep the contract.

12         And so the problem with that is, the evidence is going

13    to show, is that if you want to stay and are paid -- you

14    know, some people are paid a lot of money -- people have to

00:57:34 15    be uncovered.  So you have to do what you have to do to be

16    able to provide names.

17         The Garland, Texas matter which I addressed earlier

18    simply wasn't Erick.  Simply wasn't Erick.

19         The names that went on, the people who provided the

00:57:54 20    names, the pathway to the names that I think the evidence is

21    going to show, that although circumstantially it appears

22    that it might be because of words that are used and

23    conversation and phrasing, that's far different than

24    establishing that it was him.

00:58:11 25         In fact, there are no devices -- there will be no

1    devices shown to you in this case.  They did not obtain any

2    devices.  This isn't a matter -- and the expert will explain

3    it.  This isn't a matter where this is the device that was

4    used.  It just simply doesn't work like that.  And, in fact,

00:58:29  5    the devices aren't here for you to view during this trial.

6         Erick did -- the government is also right that

7    following Baltimore, following Garland, Texas, Erick did

8    notice aerial surveillance.  And you will see that he

9    panicked at this point in time.  There's no question, but he

00:58:49 10   did reach out to his handler.  He did reach out and say,

11   "What's going on?"  He did reach out and say, "I'm very

12   concerned with what's happening here.  You know, after I've

13   done all this stuff for you, what's going on?  Why are you

14   doing this?"

00:59:03 15        And he became paranoid that he was being framed for

16   his beliefs and frankly he wasn't sure.  And the evidence

17   really doesn't reveal his paranoia, but it does.

18        What Erick then does, to kind of -- after he has

19   contact with the handler, he does want to get in and show,

00:59:27 20   "Look, I wasn't doing anything for nefarious purposes," and

21   so he reports somebody else there.  He finds out, because

22   he's out there, there was some indication, and there's some

23   Russians that he thought were doing some nefarious stuff at

24   a flee market a month or so later.

00:59:45 25        And so, in fact, he does contact his handler -- and I

1    think he had a new handler at that point in time.  And he

2    says, "Look.  Here is somebody else."

3         So he didn't just immediately go underground and hide.

4    That's not what happened.  In fact, he was right out in the

5    open.

6         At which point the evidence is going to show the

7    government did not trust him and they took no action.  They

8    didn't hear from him, and then, in fact, all contact with

9    the government ended at that point.  You'll find that he was

10   arrested almost a year later.

11        One of the key things in this case is going to be the

12   credibility of the informant.  And here are some of the

13   things you need to look about which may motivate.  One of

14   the informants is a person named Al-Ghazi, and he was the

15   person that the government referred to as being charged with

16   a similar thing and having had contact with Mr. Simpson and

17   Mr. Soofi in Garland, Texas.

18        What you have to pay close attention is he was given

19   quite a plea bargain.  He was given quite a plea bargain

20   which he entered and pled guilty to which would give great

21   incentive as to why he would testify consistent with the

22   government.

23        Lynne Miller was provided over a period of time almost

24   $90,000 for being an informant.

25        Matthew Palmer was at one point paid about $6,500 a

1   month for a period of time.

2          The person in Baltimore, Al-Ansari, he was being paid

3   at the time.

4          And so what you have to judge, and what you'll be

01:01:16  5   asked and the Court will give instructions, is how much did

6   this affect their credibility?  How much did this affect

7   their incentive to come up with things to please the

8   government?

9          As I said, informants must produce or you're no longer

01:01:33  10   going to be an informant, which Mr. Hendricks knows.

11          Most importantly, the evidence connecting Erick to

12   ISIS is simply very weak at best.  It's based on the

13   credibility of people who should have no credibility.  The

14   evidence is going to show that Erick himself, the person

01:01:55  15   they believed to be Erick, had never had any direct contact

16   with anybody that was associated with ISIS.

17          And, again, our position is it simply wasn't Erick.

18   By even the person that used all these names, there's no

19   direct contacts with ISIS.  There might have conversations

01:02:14  20   espousing ISIS ideology, but there's no direct contact.

21          Also, again, I agree with the government.  You're

22   going to hear terms, "Hacking," Tor, malware, social media

23   platforms, encryptions, private and public keys.  These are

24   all things -- and believe me, as attorneys, when I first

01:02:35  25   looked at this, I had to go to my kids like everybody else

1   to understand how to use Netflix.

2       So when you sit there, it's intimidating.  But the

3   people who are going to be called -- and frankly are

4   government witnesses -- are very good at explaining this.

01:02:51  5   And I believe at the time they're testifying, don't be

6   intimidated by those terms.  They will be put in ways that

7   you can process and assess these properly per the Court's

8   instructions.

9       One of the things to look for as an example is all

01:03:07 10   these user names.  And they're going to run through it.  The

11   government will show you it started out with a user name of

12   sham_reason.  And the person who was sham_reason kept

13   switching names, which is consistent with somebody trying to

14   hide.  And they're going to have these lineage of names that

01:03:26 15   keeps going down by the time the this Baltimore, the person

16   is accepted, and again, our position is that's not Erick.

17       And one of names you will see is itsme17.  The

18   government is going to argue that this is Mr. Hendricks.

19       That particular -- the evidence usage, the person with

01:03:43 20   that name, was still active as in less than a month ago.

21       And Mr. Hendricks has not been using it.

22       So these are things that have to be explained and

23   these are also reasons why we believe the government can't

24   show that this lineage of user names is Mr. Hendricks.

01:04:01 25       Finally, after you listen to all the evidence, follow

1    the Court's instructions, the evidence, although clearly

2    there's reason to suspect -- and we're not arguing there

3    isn't -- but when you put it all together and you consider

4    the problems with credibility, the problems with

01:04:22  5    establishing a connection to ISIS, the problem with the user

6    names being connected to Mr. Hendricks, we don't believe the

7    government is going to be able to prove either of the counts

8    beyond a reasonable doubt.

9         Thank you very much.

01:04:35 10         THE COURT:  Thank you, Counsel.

11         Ladies and gentlemen, we're going to take our morning

12    break at this time.  It's about 10:15.  Take about 15

13    minutes, perhaps a few minutes longer.  Please leave your

14    notepads on your chairs.

01:04:48 15         Remember all the admonitions I've given you about not

16    discussing the case among yourselves, or forming or

17    expressing any opinions on the matter.

18         Please refrain from texting, messaging, Facebook, all

19    the instructions I've given you in great detail.  So please

01:05:05 20    follow those instructions.  We'll see you in about 15, 20

21    minutes.

22         Thank you very much, ladies and gentlemen.

23         (Jury out 10:15 a.m.)

24         THE COURT:  Just very briefly for the record.  I

01:05:47 25    know the defendant's counsel wanted to preserve their

1    objection to the so-called Garland, Texas issue.  We'll note

2    their objection to the Court allowing references to be made

3    to that incident in opening statement.  That's preserved for

4    the record.

01:06:00  5         Secondly, very quickly, I want to be sure that -- I

6    know yesterday there was some discussion about perhaps some

7    additional discovery to which the defendant was entitled.

8         Has that issue been cleared up, counsel for the

9    defendant?

01:06:13 10             MR. DOUGHTEN:  It has, Your Honor.  We met with

11   the government yesterday and they provided us everything we

12   had requested.  So we're fine.

13             THE COURT:  All right.

14        Anything else before we break and begin with testimony

01:06:23 15  near about 15, 20 minutes?

16        Any other issues?

17             MR. SHEPHERD:  Not from the United States, Your

18   Honor.

19             MR. DOUGHTEN:  Nothing further, Your Honor.

01:06:28 20             THE COURT:  The other thing I would just call to

21   your attention quickly, is the press of business will be if

22   you could just leave a bit of space at the table.  I have a

23   sentencing hearing at noon.  It shouldn't take -- well, we

24   will see how long it takes, but I do have a sentencing

01:06:43 25  hearing which will start at noon.  So we'll break about five

1    to the lunch -- noon for our lunch hour and I will complete

2    that proceeding and then we will come back.

3         Thank you very much for your courtesy.  We'll see you

4    in about 15, 20 minutes.

01:06:58 5         (Recess taken, 10:15 until 10:35 a.m.)

6         (Outside the presence of the jury.)

7              THE COURT:  Let's just take one moment.  The

8    court reporters are printing off the portion of the

9    transcript that I indicated we would provide both sides.  So

01:26:47 10   just take one moment.  I'll ask that be done and then we'll

11   address a couple other issues before the jury comes into the

12   courtroom.

13        (Pause.)

14             THE COURT:  All right.  Counsel, a couple of

01:27:52 15   issues.  I know there's several stipulations the government

16   would like me to proceed before the testimony begins.  I

17   will do that.  The stipulations regarding business records,

18   also stipulations regarding the designated terrorist

19   organization.  Those are the two you would like me to read,

01:28:11 20   counsel for the government?

21             MR. SHEPHERD:  Yes, Your Honor.  I believe that

22   will assist in the presentation of evidence if we've already

23   read the business record stipulation, Your Honor, and that

24   will make it easier to present evidence throughout the

01:28:22 25   trial.

650

1          THE COURT:  Is it necessary for me to read the

2     entirety of the list of exhibits as you've spelled them out

3     here?

4          MR. SHEPHERD:  Your Honor, I don't believe so.

01:28:31  5     And I think one option would be, Your Honor, if you

6     just -- you could -- I guess one option would be just to

7     read the portion of the stipulation that doesn't name all

8     the exhibits and just indicate that the government and

9     parties have stipulated regarding a number of exhibits

01:28:49 10     without reading all of them.  I think we would all be

11     satisfied with that.

12          MR. DOUGHTEN:  That's correct, Your Honor.

13          THE COURT:  All right.  That's number one.

14        The second stipulation would be the stipulation

01:29:00 15     regarding designated terrorist organization.  You would like

16     me to read that as well?

17          MR. SHEPHERD:  Yes, Your Honor, so that way the

18     jury knows from the beginning that that's not an issue.

19          THE COURT:  All right.

01:29:09 20        Counsel, you have no objection on behalf of the

21     defendant?

22          MR. DOUGHTEN:  Yeah.  No objection.

23          THE COURT:  The additional issue, it's procedural

24     in nature, with regard to the publication of exhibits, if

01:29:24 25     there are no objections to exhibits, meaning if the parties

1    have agreed and there has been a viewing previously of the

2    various exhibits, and if there is not going to be an

3    objection, then you can go ahead and publish them without

4    asking the Court's permission.

01:29:40  5    If there are exhibits, however, that there's going to

6    be some dispute about the admissibility, please, we'll need

7    to, before, before we're published to the jury, you'll need

8    to call that to my attention so we can address that.

9    So I guess in a broad sense, the way we'll proceed

01:29:58  10    procedurally is if there were no objections, you may go

11    ahead and publish the exhibit, display it to the jury on the

12    screens.

13    Any exhibits, however, that might be in dispute or

14    there might be some objection, you'll have to ask my

01:30:09  15    permission before you publish it to the jury so that the

16    other side can be heard.

17    Any questions about that on behalf of the government?

18    MR. SHEPHERD:  No, Your Honor.

19    MR. DOUGHTEN:  Your Honor, just so the record is

01:30:18  20    clear, we have been provided exhibit books, and we have gone

21    over them with the government.

22    At this point in time, the only exhibits that we're

23    objecting to are the Garland, Texas exhibits, as the Court's

24    aware.

01:30:31  25    But the rest of them -- we'll look over the night

1    before, if there is something we see that we missed, we'll

2    bring it to the Court's attention.

3              THE COURT:  Thank you.

4         The so-called Garland, Texas exhibits, when will they

01:30:42  5    be presented, just roughly, if you know?  Next week

6    sometime?

7              MR. SHEPHERD:  Yes Your Honor.  Except there

8    would be testimony about the undercover's communications

9    regarding Garland tomorrow.

01:30:56 10              THE COURT:  Okay.  I'm just concerned

11    about -- not just, but the major concern for me is the

12    pictures, the pictures that might be viewed as inflammatory

13    of the scene after the two individuals were shot and killed,

14    those kind of exhibits are things we're going to have to

01:31:12 15    discuss that I'll have to rule upon before they're displayed

16    to the jury.

17              MR. SHEPHERD:  Your Honor, that would likely be

18    no earlier than Monday.

19              THE COURT:  All right.  We'll have time to

01:31:21 20    address it.

21              MR. SHEPHERD:  Yes, Your Honor.

22              THE COURT:  All right.  Then we'll have the

23    jurors brought forward and we can begin.

24         Thank you very much.

01:31:27 25         Ms. Kestner.

1          (Jury in, 10:40 a.m.)

2               THE COURT:  Ladies and gentlemen of the jury, at

3     this time, as I referenced in my opening remarks or

4     instructions, there are certain things the parties may agree

01:32:52  5     to.  Those agreements are referred to as stipulations.  And

6     there are stipulations that I would like to read to you now

7     before the testimony of the witnesses begin.

8          There's a stipulation regarding business records, it

9     will be clearer to you when you -- you will actually have

01:33:09 10     the written stipulation with you in the jury room.  It may

11     be clearer, but the attorneys have agreed, the United States

12     by and through its attorneys, as well as Mr. Hendricks, by

13     and through his attorneys, have stipulated and agreed to a

14     series of exhibits.

01:33:24 15          I won't read them all to you now.  There's probably 20

16     or 30 or more.

17          Most of them are records, records for Twitter,

18     Facebook records, Google records, Twitter records, Surespot

19     records, the parties have agreed that these documents,

01:33:41 20     again, will be presented to you.  That they are business

21     records, in essence, business records of which they were

22     made and kept at a time, the time by and from information

23     transmitted by someone with knowledge.  They were kept in

24     the regularly conducted activity of a business organization,

01:34:00 25     occupation or calling, making the records the regular

1     practice of that activity.  And they're referred to for

2     technical reasons under the rules of evidence as business

3     records, which you will have an opportunity to see and view

4     here during the course of the proceedings.

01:34:17  5          The parties have agreed to that.

6          Secondly, there's a stipulation regarding designated

7     terrorist organization.  And the parties, once again,

8     through their attorneys, the United States through the

9     attorneys representing the government, and the attorneys

01:34:32  10    representing Mr. Hendricks, hereby stipulate and agree to

11    the following:

12         At all times relevant to the indictment, the Islamic

13    State of Iraq and the Levant, also known as the Islamic

14    State of Iraq and Syria, ISIS, al-Qaeda in Iraq and the

01:34:51  15    Islamic State was a designated foreign terrorist

16    organization under Section 219 of the Immigration and

17    Nationality Act and was a specially designated global

18    terrorist entity under Section 1B of the Executive Order

19    13224.

01:35:10  20         So the parties are agreeing, again, that the various

21    entities ascribed were, in fact, designated terrorist

22    organizations.

23         That essentially is what that stipulation means.

24         And, again, you'll have a copy of these stipulations

01:35:23  25    with you in the jury room, I believe.

1          So with that, counsel for the government, would you

2     call your first witness, please.

3          MR. SHEPHERD:  Yes, Your Honor, the United States

4     calls Special Agent Ryan Presley.

01:35:34  5          THE COURT:  Ladies and gentlemen, one other

6     matter.

7          Special Agent, you can approach.

8          One other matter I would just call to your attention,

9     because of the awkward position of the podium, the podium

01:35:43 10     itself, there are electronics underneath it that cannot be

11     moved, and so it may block the vision of some of the

12     participants.

13          So some of the participants, may, if you see them

14     moving their chairs, moving around a bit, it's so they can

01:35:56 15     see and observe the witness which is important for the

16     participants as it is of course, for you us a jurors.

17          All right.  Thank you.

18                    RYAN A PRESLEY,

19          of lawful age, a witness called by the United States,

01:36:04 20          being first duly placed under oath, was examined

21                    and testified as follows:

22          THE COURT:  Please be seated.  Adjust the

23     microphone so your testimony may be heard.

24          Just a couple of brief instructions.  Please wait

01:36:21 25     until the attorneys complete their questions before you

1    begin to respond.  It's difficult for the court reporters

2    and listeners when two individuals are speaking at the same

3    time.

4          Of course, if there is an objection, do not answer the

01:36:33  5    question until I rule on the objection.  And we would

6    appreciate your cooperation in that regard.

7          Counsel, you may proceed.

8                MR. SHEPHERD:  Thank you, Your Honor.

9                DIRECT EXAMINATION OF RYAN A. PRESLEY

01:36:43 10    BY MR. SHEPHERD:

11    Q.    Would you please state your full name for the record?

12    A.    Ryan A. Presley.

13    Q.    And would you spell your last name, please?

14    A.    P-R-E-S-L-E-Y.

01:36:51 15    Q.    And where do you work, sir?

16    A.    I work for the FBI in the Cleveland field office.

17    Q.    And are you a special agent?

18    A.    I am.

19    Q.    Special Agent Presley, what's your current job?

01:37:02 20    A.    I'm the acting supervisory special agent for the

21    Cleveland joint terrorism task force.

22    Q.    And how long have you done that?

23    A.    Since November of 2017.

24    Q.    Prior to become being the acting supervisor of the

01:37:16 25    joint terrorism task force, what were you doing for the FBI?

1    A.    I was a supervisory special agent in the FBI's

2    counterterrorism division located in Washington, D.C.

3    Q.    And how long were you in D.C.?

4    A.    For a period of 18 months.

01:37:30  5    Q.    Prior to going to Washington, where were you assigned?

6    A.    I was a special agent assigned to the Cleveland field

7    office joint terrorism task force.

8    Q.    And how long were you assigned in Cleveland?

9    A.    Since 2009.

01:37:43  10    Q.    Do you have any other prior law enforcement

11    experience?

12    A.    I do not.

13    Q.    As an FBI agent, have you received any particular

14    training, especially as it relates to counterterrorism?

01:37:55  15    A.    Yes.

16    Q.    Can you please brief describe that?

17    A.    I, like all FBI agents, received specialized

18    counterterrorism training while at the FBI academy.  Since

19    graduating from the academy, I received both online and

01:38:09  20    in-person training facilitated by the FBI and other

21    government agencies.

22    Q.    So approximately how many years have you been involved

23    in investigating counterterrorism offenses?

24    A.    Nine years.

01:38:19  25    Q.    Special Agent Presley, are you one of the

1    investigators or agents who was involved in the Erick

2    Hendricks investigation?

3    A.    Yes.

4    Q.    How did you become involved in that investigation?

01:38:34 5    A.    I was the lead.  I was the lead case agent for the

6    Cleveland field office's investigation of Amir Al-Ghazi.

7    Q.    And when you refer to Amir Al-Ghazi, that's somebody

8    different from Erick Hendricks?

9    A.    Yes.

01:38:47 10   Q.    So how was it that your investigation of Amir Al-Ghazi

11   led to Erick Hendricks?

12   A.    During an interview with Mr. Al-Ghazi post-arrest, I

13   asked him if he had been in contact with any other

14   individuals who may be involved in terrorist activities.

01:39:07 15        And specifically I referenced, for example, the

16   Garland, Texas shooting incident.

17   Q.    And what was the response that led you to further

18   investigation?

19   A.    He said, yes, that he had been in contact with an

01:39:20 20   individual who went by the moniker of Abu Harb.

21   Q.    And were you provided with any social media accounts

22   that were used?

23   A.    Yes.

24   Q.    What was the social media account that you were

01:39:32 25   provided?

1    A.    He was first contacted by this individual via Twitter

2    direct messaging conversation.  And he provided me with the

3    profile of @sham_reason.

4    Q.    Let's back up Special Agent Presley.  So who was Amir

01:39:51  5    Al-Ghazi?

6    A.    Amir Al-Ghazi was a Cleveland based subject.  We

7    opened an investigation on him in 2012 after we discovered

8    that he was the owner of a Facebook profile that just

9    espoused general jihad rhetoric and appeared to show support

01:40:08  10    for various terrorist organizations such as al-Qaeda.

11    Q.    Did the investigation eventually involve his possible

12    support for ISIS?

13    A.    Yes.  Approximately in June of 2014, Mr. Al-Ghazi

14    transitioned to support two ISIL or ISIS.  He made specific

01:40:28  15    statements indicating that he had pledged his allegiance to

16    ISIS.  He made statements indicating his intent to incite

17    violence on behalf of the ISIS in the United States, and he

18    took steps to make propaganda and recruiting videos for

19    ISIS.

01:40:44  20    Q.    And was that the basis for your session then into

21    early 2015 into Mr. Al-Ghazi?

22    A.    Yes.

23    Q.    At some point, was Mr. Al-Ghazi arrested?

24    A.    Yes, he was arrested on June 19, 2015.

01:40:56  25    Q.    What were the immediate circumstances of his arrest?

1    A.    The immediate circumstances were that he had produced

2    multiple audio files that were to be used in propaganda

3    videos he thought would be leveraged by ISIS.  And he also

4    purchased an AK-47 and several rounds of ammunition from an

01:41:16 5    undercover FBI employee.

6    Q.    Earlier you described an interview with Mr. Al-Ghazi.

7    Did that take place immediately after this arrest you just

8    described?

9    A.    Yes.

01:41:23 10   Q.    After this interview with Mr. Al-Ghazi where he

11   identified the social media account you mentioned earlier,

12   what were some of the investigative steps that you took next

13   to try to further the investigation?

14   A.    To corroborate his testimony, we served a search

01:41:41 15   warrant on his Twitter account in July of 2015.

16   Q.    Now, at the same time, was there also, to your

17   knowledge, an ongoing investigation related to Erick

18   Hendricks?

19   A.    Yes.

01:41:52 20   Q.    And did you become familiar with that investigation?

21   A.    Generally, yes.

22   Q.    And if you could just briefly describe at that time

23   the status of the investigation, when you started following

24   up on the leads from your interview with Mr. Al-Ghazi?

01:42:06 25   A.    Generally speaking, the investigation into Erick

1    Hendricks was based upon the FBI's discovery that an unknown

2    individual at that time was communicating with individuals

3    online, and he was making attempts to recruit and organize

4    these individuals for purposes of forming a terrorist cell

01:42:25 5    in the United States.

6    Q.    And when Mr. Al-Ghazi was being investigated -- where

7    was Mr. Al-Ghazi physically located?

8    A.    He was located in Sheffield Lake, Ohio, which is a

9    suburb of Cleveland.

01:42:37 10    Q.    Now, you mentioned also that you had taken steps to

11    corroborate Mr. Al-Ghazi's information, including a search

12    warrant; is that correct?

13    A.    Correct.

14    Q.    What did he get a search warrant for?

01:42:48 15    A.    We got a search warrant for Mr. Al-Ghazi's Twitter

16    account, which contained the name of Amir Al-Ghazi and the

17    handle of @amiralghazi76.

18    Q.    And was that search warrant served on Twitter?

19    A.    Yes.

01:43:03 20    Q.    And did you receive results back?

21    A.    Yes.

22         MR. SHEPHERD:    I would like to pull up on the

23    screen to show you Government's Exhibit 25.

24    BY MR. SHEPHERD:

01:43:17 25    Q.    Special Agent Presley, on the screen before you is

1    Government's Exhibit 25.

2         Have you previously reviewed Government's Exhibit?

3    A.   Yes.

4    Q.   It consists of a total of 184 pages, but page 1 is

01:43:30 5    displayed?

6    A.   Yes.

7    Q.   What is Government's Exhibit 25 that you previously

8    reviewed?

9    A.   This is the general subscriber information associated

01:43:37 10    with account amiralghazi76.

11    Q.   And the whole 184-page exhibit, what is that?

12    A.    It contains direct messaging conversations, a list of

13    his followers, a list of individuals whom he followed as

14    well as content contain on his page.

01:43:53 15    Q.   I would like to on this exhibit explain a couple thing

16    to the jury.

17         If we could highlight or enlarge the account section

18    in the middle, please.

19         Special Agent Presley, in this account information

01:44:15 20    there's something called an account ID?

21         Do you see that?

22    A.   Yes.

23    Q.   Can you please read the account ID this account?

24    A.   2308199430.

01:44:25 25    Q.   And for this account, what does -- what does that

1    number mean?  What is that?

2    A.    That is a unique numerical ID tied to Al-Ghazi's

3    Twitter account.

4    Q.    And in your experience, have you obtained documents or

01:44:43 5    records from Twitter in the past?

6    A.    Yes.

7    Q.    Is that something that frequently you have done in

8    your nine years of terrorism investigations?

9    A.    Yes.

01:44:51 10   Q.    So have you seen this number, this type of account ID

11   number consistently in your experience?

12   A.    Yes.

13   Q.    And where does it indicate what the screen name would

14   be for this account?

01:45:05 15   A.    Up at the top you'll see it says,

16   "amiralghazi76-ccount."

17         And then also down in the left-hand side, you'll see

18   "screen_name:"  And there, again, you'll see

19   "amiralghazi76."

01:45:23 20   Q.    So when somebody is on Twitter and the records you

21   receive, do they show a record of what's called a follower

22   someone who is being followed?

23   A.    Yes.

24   Q.    Could you briefly explain that concept for the jury?

01:45:38 25   A.    Sure.

664

1        When a Twitter user follows or is followed by another

2   Twitter user, this enables them to see tweets on each

3   other's pages, allows them to receive updates in term of

4   content on those pages, and probably most importantly, it

01:45:56  5   permits them to conduct direct or private messaging with one

6   another.

7   Q.    Now I would like to move to page 8 of exhibit 25.

8        And if we could enlarge, sort of the top portion of

9   the list of names along with the title, please.

01:46:16 10       So on page 8, what does page 8 of exhibit 25, what is

11   that showing?

12   A.    It is a list of Amir Al-Ghazi's Twitter followers.

13   Q.    And what is the third one from the top?

14   A.    sham_reason.

01:46:33 15   Q.    Does -- is this one of the facts that you were looking

16   for in response to the information you were provided by Mr.

17   Al-Ghazi?

18   A.    Yes, it corroborated details from his interview.

19   Q.    Okay.  Can we now move to page 33, please.

01:46:48 20       And, again, I would like to highlight sort of

21   the -- enlarge the top half of this screen, please?

22        And what does page 33 of Exhibit 25 show?

23   A.    This shows the list of Twitter users that Amir

24   Al-Ghazi was following.

01:47:11 25   Q.    And in this list, did you identify, again, that

1    sham_reason account?

2    A.    Yes.

3    Q.    And can you see it on the screen?

4    A.    Yes.

01:47:22  5    Q.    Can you please, with your finger, try to underline it?

6    A.    (Complying.)

7    Q.    So is that the account that you just underlined in

8    red?

9    A.    Yes.

01:47:35 10    Q.    Now, based on the fact -- earlier you mentioned based

11    on the fact that there was following -- they were following

12    each other.  There's the ability to do directness messages?

13    A.    That is correct.

14    Q.    What do you mean by that?

01:47:44 15    A.    That means that they're able to communicate in text

16    form with one another privately without other Twitter users

17    seeing the contents of their conversation.

18    Q.    Now, within Exhibit 25, were you able to identify a

19    conversation between amiralghazi76 and sham_reason?

01:48:05 20    A.    Yes.

21    Q.    And if we could, please, pull up Exhibit 25 A, please.

22          While we're pulling up that exhibit, in review of

23    Exhibit 25, were you able to isolate that conversation

24    between amiralghazi76 and sham_reason?

01:48:42 25    A.    Yes.

```
          1    Q.    And have you reviewed Exhibit 25A?

          2    A.    Yes.

          3    Q.    What does Exhibit 25A show?

          4    A.    This shows a direct message communication between

01:48:53  5    amiralghazi76 and sham_reason.

          6    Q.    And if we could enlarge the middle of the page,

          7    please.

          8          In the middle of the page where I'm going to circle

          9    with my finger, there's like three rows of stars on this

01:49:16 10    record.  What does that indicate?

         11    A.    That there were multiple conversations between these

         12    two users.

         13    Q.    So the -- I want to start with this -- at the very

         14    bottom there's texts there.

01:49:32 15          Could you read the text, please?

         16    A.    Underneath the area you have circled.

         17    Q.    Yeah, I'll identify the one I'm looking for.

         18          I just, with my finger, indicated the text message at

         19    the bottom of the screen?

01:49:49 20    A.    "Walaikum sallam and no thank you for the

         21    opportunity."

         22    Q.    And who is listed as the sender ID?

         23    A.    That would be Amir Al-Ghazi.

         24    Q.    And how do you that?

01:50:01 25    A.    By looking at the sender_id.  That is the unique
```

1    numerical ID that we previously discussed.

2    Q.    And there's something called recipient ID.  What does

3    that show?

4    A.    That shows the receiver of the message.

01:50:17 5    Q.    And does that also provide one of those unique

6    identification numbers?

7    A.    Yes.

8    Q.    If we could go back to the full exhibit, please.

9          So taking a look at Exhibit 25A, is this the complete

01:50:31 10    conversation that you identified between at amiralghazi76

11    and at sham_reason?

12    A.    Yes.

13    Q.    Just taking a look at this, would it be fair to say

14    this is sort of confusing to read?

01:50:46 15    A.    Yes.

16    Q.    Are you aware of whether a separate transcript has

17    been made of this conversation?

18    A.    Yes.

19    Q.    And have you reviewed that document?

01:50:53 20    A.    Yes.

21    Q.    And does it appear to you to be an accurate transcript

22    of the communications in Exhibit 25 A?

23    A.    Yes.

24    Q.    And before we leave 25A, on this exhibit, are the

01:51:07 25    conversations going in chronological order from the bottom

```
 1   of the page is earlier and the top is higher?

 2   A.    That is correct.

 3   Q.    So if we could please pull up Exhibit 25B, please.

 4         So what is Exhibit 25 B?

 5   A.    This is the previous conversation listed in Exhibit

 6   25A.  And it's been put in a chart form for ease of review.

 7   Q.    And is it also in chronological order from the

 8   earliest first?

 9   A.    Yes.

10   Q.    In addition to obtaining records or reviewing records

11   related to amiralghazi76, were any records also obtained

12   from -- related to the sham_reason, sham_reason Twitter

13   account?

14   A.    Yes.

15   Q.    I would like to pull up Government Exhibit 140,

16   please?

17         First, have you reviewed Government Exhibit 140 prior

18   to your testimony today?

19   A.    Yes.

20   Q.    And what is Government Exhibit 140?

21   A.    This is the general subscriber information for Twitter

22   account ID 2918880924.

23   Q.    And is that the same account ID that was on

24   Government's Exhibit 25A in those conversations?

25   A.    Yes.
```

1   Q.    It also lists an Email account associated with this

2   account?

3   A.    Yep.

4   Q.    And what is that account?

01:53:00  5   A.    sham_reason@gmail.com.

6   Q.    And what is the screen name that's listed?

7   A.    sham_reason.

8   Q.    Now often, I've been using the terminology referring

9   to an account with an "at" something before reading the

01:53:15 10   screen name.

11        Are you familiar with what that is?

12   A.    Yes.

13   Q.    Can you please explain that?

14   A.    It just refers that they're located at that particular

01:53:26 15   account.

16   Q.    I would like to move to page 3 of Exhibit 140.

17        Just generally, what does -- what does page 3 of

18   Exhibit 140 start to show?

19   A.    It appears to be an IP history associated with account

01:53:51 20   ID 2918880924.

21   Q.    In your experience, have you dealt with records

22   related to IP's?

23   A.    Yes.

24   Q.    And first, what does IP stand for?

01:54:06 25   A.    Internet protocol address.

1   Q.    Now, the questions I'm asking are just based on you're

2   personal experience using these.

3        In your experience, what does that tell you?

4   A.    Well, I'm not an expert.  Very simply what it shows is

01:54:20  5   you when a particular device or computer connects to an

6   Internet service provider, it will generate an IP or

7   Internet protocol address.

8   Q.    If we could enlarge like the upper third of this

9   exhibit, please.

01:54:36  10        Just taking, for example, the first one where it says

11   "last_login_ip," there's a number listed.

12   A.    Yes.

13   Q.    Is that the number you were referring to as an IP?

14   A.    Yes.

01:54:56  15   Q.    Now, as an investigator, what are you able to do with

16   that number?

17   A.    If you have a user's IP address, you're then able to

18   connect that to a particular Internet service provider.

19        If you serve legal process to that Internet service

01:55:12  20   provider and provide them with that IP address, they're then

21   able to identify the user behind that IP address and will

22   provide you with general subscriber information.

23        So sometimes that could include name, address, Email

24   addresses, physical addresses.

01:55:28  25   Q.    Now, are you always able to get a location from an IP

1     address?

2     A.     Not always.

3     Q.     And assuming you are able to get a -- get further

4     information, can that pinpoint the exact user at all times?

01:55:43 5     A.     Not always, but normally so.

6     Q.     And what fact can it most do if you're able to follow

7     that chain with the IP address?

8     A.     You are able to determine the subscriber of record for

9     the particular Internet service and obtain their physical

01:56:00 10     address.

11     Q.     In order to -- since it's just a number here, how do

12     you typically go about knowing which service provider to

13     obtain further records from?

14     A.     There are a variety of commercially available IP

01:56:15 15     address finders.  You can simply take that IP address, plug

16     it into a text box on any one of these websites, and it will

17     generate for you who the Internet service provider is.

18     Q.     If we could please go back to the full exhibit.

19           And about -- if we could enlarge, sort of right about

01:56:41 20     there.  Do a box, a little bit further down, please.  That

21     will work.

22           So taking a look at the entry that -- there's three

23     entries currently displayed on the screen.  I would like you

24     to take a look at the third entry at the bottom that's 2015,

01:57:02 25     March 1 at 14:22 and 19 seconds.  Do you see that?

```
 1   A.    Yes.

 2   Q.    First of all, for those who might not have been in the

 3   military, what does the 14:22 stand for?

 4   A.    2:22.

 5   Q.    And do you see an IP address down there?  What's the

 6   IP address?

 7   A.    98.25.38.236.

 8   Q.    Is this an IP address that the FBI in its

 9   investigation of Mr. Hendricks obtain further records on?

10   A.    Yes.

11   Q.    And during the process of doing that, was that

12   commercial database process used to determine the service

13   provider?

14   A.    Yes.

15   Q.    And then what was the service provider in this case

16   for that 97.25.38.236?

17   A.    Time Warner.

18   Q.    And if we could also look at -- if we could go back to

19   the bottom of page 3, and just enlarge the very bottom of

20   page 3.

21         Did that same IP address appear again?

22   A.    Yes.

23   Q.    At what time?

24   A.    At 17:45:19.

25   Q.    And what date?
```

                1    A.    On February 28, 2015.

                2    Q.    And if we could go back to -- now move to page 4,

                3    please.

                4          And if we could highlight sort of right in the middle,

01:58:38  5    please.

                6          And enlarge that.

                7          And do you see that same IP address again?

                8    A.    Yes.

                9    Q.    And what was the date of that login?

01:58:48 10    A.    February 27, 2015 at 18:04.

               11    Q.    Now, you said this service provider was Time Warner.

               12    Were records obtained from Time Warner in this

               13    investigation?

               14    A.    A grand jury subpoena was issued.

01:59:02 15    Q.    And as a result of that, were records related to this

               16    IP address obtained?

               17    A.    Yes.

               18    Q.    Can we please bring up Exhibit 156, please?

               19          If we could go to page 2 of this exhibit.

01:59:20 20          If we could please enlarge the subscriber record at

               21    the top.

               22          First, is Exhibit 156 the records you obtained from

               23    Time Warner?

               24    A.    Yep.

01:59:38 25    Q.    And have you previously reviewed them prior to today?

1    A.    Yes.

2    Q.    What does it -- who does it say is the subscriber in

3    this document?

4    A.    Andrea Hansen.

01:59:51 5    Q.    And does it identify the IP address anywhere in this

6    document?

7    A.    Yes.

8    Q.    And what does it say?

9    A.    98.25.38.236.

02:00:06 10    Q.    And does it indicate how long that IP address has been

11    associated with this account?

12    A.    It indicates that it's been held since January 18,

13    2015.

14    Q.    Are you familiar with who Andrea Hansen is?

02:00:18 15    A.    Yes.

16    Q.    Who is Andrea Hansen?

17    A.    Based upon my review of jail calls involving Mr.

18    Hendricks, she is one of his two Islamic wives.

19    Q.    And when you indicate two Islamic wives, what do you

02:00:33 20    mean?

21    A.    Again, based upon my review of jail calls, I also know

22    him to refer to an individual by the name of Tyrinda

23    Hendricks as his wife.

24    Q.    If we could please go back to Government's Exhibit

02:00:49 25    140, please.  And, again, what was Government's Exhibit 140?

1   A.     This is the initial subscriber information for Twitter

2   account sham_reason.

3   Q.     And if we could again go forward to page 3, in the

4   middle of page 3, please.

02:01:09  5          I would like to draw your attention to the third entry

6   down in the middle of page 3.

7          What is the IP address indicated there?

8   A.     98.101.201.226.

9   Q.     And what is the date and time?

02:01:35 10   A.     March 1, 2015 at 14:13.

11   Q.     Okay.

12          And could we please go back to just on the bottom of

13   page 3, the final three or four entries, please.

14          At the bottom of page 3, do you see that same IP

02:01:54 15   address again?

16   A.     Yes.

17   Q.     And what is the IP address listed?

18   A.     98.101.201.226, dated February 28, 2015, at 21:58.

19   Q.     And right above that, do you see another entry with

02:02:13 20   that same address?

21   A.     Yes.

22   Q.     Okay.

23          Can we please go to page 4, the top third of the page?

24          Do you see any additional -- do you see any additional

02:02:31 25   entries with that same IP address?

1    A.    Yes.   The first and third entry, both dated February

2    27, 2015 at 23:39 and 21:55 respectively.

3    Q.    Was that commercial database lookup done that you

4    described earlier for this IP address as well?

02:02:52 5    A.    Yes.

6    Q.    And what did you find about the service provider?

7    A.    It also was Time Warner.

8    Q.    Did you also learn any information about the kind of

9    IP address?

02:03:01 10    A.    Yes.

11    Q.    And what was that?

12    A.    This particular address was dynamic in nature as

13    opposed to static.

14    Q.    And what's the difference between the two?

02:03:16 15    A.    So a static IP address never changes.  And dynamic

16    address can change over a prescribed period of time per the

17    Internet service provider.

18    Q.    And had you also done that with the prior one that

19    belonged to Andrea Hansen?

02:03:34 20    A.    Yes.

21    Q.    And are you sure which one was static and which one

22    was dynamic?

23    A.    Yes.

24    Q.    Can we please move to exhibit -- first, before we move

02:03:47 25    to Exhibit 157, did you also obtain records from Time Warner

1    for that IP address?

2    A.    Yes.

3    Q.    And what was the IP address -- or take that back for a

4    second.

02:04:02  5         Could we please pull up Exhibit 157?

6         Was this the response to the legal process to Time

7    Warner?

8    A.    Yes.

9    Q.    Can we please go to Exhibit 2, please -- or page 2 of

02:04:27 10   Exhibit 157.

11        And without enlarging anything, generally what does

12   this show?

13   A.    Generally this shows target information or detailed

14   information for IP address 98.101.201.226.  Specifically it

02:04:49 15  indicates that the subscriber was an extended stay hotel

16   location in Colombia, South Carolina.

17   Q.    And is there a type of account listed?

18   A.    It is a commercial account.

19   Q.    And an activation date?

02:05:01 20  A.    There's an activation date of December 9, 2010.

21   Q.    Let me ask you again, Special Agent Presley, taking a

22   look at this now, earlier you discussed static versus

23   dynamic.

24        Do you recall whether this was the static one or the

02:05:17 25  dynamic one?

678

1          THE COURT:  Do you want to blow it up for him?

2          MR. SHEPHERD:  Sorry.  Can we blow up the top

3     entry.

4          THE WITNESS:  I believe this one was the dynamic

02:05:47  5     address.

6          Feel free to correct me if I'm wrong.

7          THE COURT:  Special Agent Presley, are there any

8     documents I can provide to you that might help confirm by

9     was static and which was dynamic that you previously

02:06:11 10     reviewed prior to your testimony?

11          THE WITNESS:  Yes, there would be some

12     information contained in the original return.

13          MR. SHEPHERD:  Your Honor, may I approach the

14     witness.

02:06:20 15          THE COURT:  You may.

16          THE WITNESS:  Based on my review of this

17     information, I got the IP addresses mixed.  So this would

18     have been a static IP.

19          THE COURT:  Just one moment, counsel.

02:06:47 20          Counsel, I apologize for the interruption.  Is your

21     computers operational in terms of the realtime?  It is?

22          MR. HARTMAN:  Ours is not.

23          THE COURT:  Let's take a moment, please, just a

24     moment.

02:07:01 25          (Pause.)

1          THE COURT:  I'm sorry.  We can do it at the lunch

2     hour.  We'll have to do it the old-fashioned way.  I just

3     wanted to be sure we were all not getting it rather than

4     some of us having it available and not all of us.

02:10:03  5          Let's continue on.

6          MR. SHEPHERD:  Yes.  Thank you, Your Honor.

7     BY MR. SHEPHERD:

8     Q.    On Exhibit 157, it indicated a location for

9     the -- where the IP address came back to on page 2.

02:10:19 10          What was the location it came back to?

11    A.    It came back to extended stay hotels located at 450

12    Grayson Road in Colombia, South Carolina.

13    Q.    I would now like to pull up Government's Exhibit 159,

14    and while he is doing that.  Were any records obtained from

02:10:40 15    the Extended Stay America related to an Extended Stay

16    America in Colombia, South Carolina?

17    A.    Yes.

18    Q.    And have you reviewed Government Exhibit 159?

19    A.    Yes.

02:10:49 20    Q.    And what is Government's Exhibit 159?

21    A.    It is a listing of guests who stayed that particular

22    Extended Stay location for a prescribed period of time.

23    Q.    If we could move forward to page 2, please.

24          And taking a look at this exhibit, there's a big black

02:11:11 25    bar here under it says, "Guest."

1       Would those be names of guests who are not related to

2   this case?

3   A.    Yes.

4   Q.    And were those -- are those redacted for purposes of

02:11:24 5   protect being the privacy of those individuals?

6   A.    Yes.

7   Q.    I would like to move forward to page 4, please.

8       And if we could highlight this entry at the very

9   bottom.

02:11:39 10      Where it indicates room 317?

11       Who is listed as the occupants?

12  A.    Tyrinda Hendricks.

13  Q.    Who is Tyrinda Hendricks?

14  A.    Tyrinda Hendricks, again, per my listening of jail

02:11:59 15  calls as recently as February 24 of 2018, is one of two of

16  Erick Hendricks's Islamic wives.

17  Q.    And if you could, please, go back to the full page.

18  This particular date, what's the date for this listing?

19  A.    It's as of February 27, 2015.

02:12:21 20  Q.    Okay.  And if we go back, does it also list an arrival

21  departure date for Tyrinda Hendricks?

22  A.    Yes.

23  Q.    And what are the arrival departure dates?

24  A.    The arrival is February 24, 2015.  The departure is

02:12:37 25  March 1, 2015.

1    Q.    And if we move forward in time to the next page of the

2    exhibit.

3          Move forward to page 6, please.

4          And what date does the page 6 start the records for?

02:13:02 5    A.    As of February 28, 2015.

6    Q.    If we could, again, move forward to, I believe, page

7    9.

8          Is Tyrinda Hendricks still listed as a guest as of

9    February 28, 2015?

02:13:24 10   A.    Yes.

11   Q.    So the chain of information we just went through, what

12   did that show you as an investigator?

13   A.    It showed that at least on two occasions the Twitter

14   account @sham_reason was logged into using IP addresses that

02:13:47 15   are directly attributable to two of Erick Hendricks's known

16   Islamic wives.

17          MR. SHEPHERD:  Your Honor, may I have one moment

18   to consult, please?

19          THE COURT:  You may.

02:14:27 20          MR. SHEPHERD:  No further questions at this time,

21   Your Honor.

22          THE COURT:  Thank you.

23       Counsel, you may cross-examine.

24          MR. HARTMAN:  Thank you, Your Honor.

02:14:36 25          CROSS-EXAMINATION OF RYAN A. PRESLEY

```
              1   BY MR. HARTMAN:

              2   Q.    Good morning, Agent Presley.

              3   A.    Good morning.

              4   Q.    Are you familiar with how Internet service at a hotel

02:14:49      5   works?

              6   A.    Yes.

              7   Q.    And that's not a -- usually a private network?

              8   Multiple people can get on the network?

              9   A.    Yes.

02:14:59     10   Q.    That's correct?

             11   A.    Correct.

             12   Q.    So all those redacted guests who were at that Extended

             13   Stay Hotel on that night, any one of them could have been on

             14   Internet through that same network?

02:15:12     15   A.    Correct.

             16   Q.    Okay.  And we have no idea who was at Andrea Hansen's

             17   house between February 27 and March 1 of 2015, correct?

             18   A.    Correct.

             19   Q.    So we have no idea who was using the IP address,

02:15:30     20   right?

             21   A.    Correct.

             22   Q.    And same thing for the Extended Stay Hotel, we have no

             23   idea who was using that IP address on February 27 to March 1

             24   of 2015, correct?

02:15:42     25   A.    Correct.
```

1    Q.    How close are these two locations to each other?

2    A.    I don't know the geographical proximity.

3    Q.    Now, you made mention of Mr. Hendricks having multiple

4    Islamic wives.

02:16:02 5          Are you familiar with a part of the Koran that allows

6    a person of Islam to have multiple wives if they're treated

7    equally?

8    A.    Yes.

9    Q.    And certain sects of Islam still believe that?

02:16:25 10   A.    Yes.

11              MR. HARTMAN:  Judge, can I have a moment?

12              THE COURT:  You may.

13              MR. HARTMAN:  Thank you, Special Agent Presley.

14    I have no further questions.

02:16:51 15             THE COURT:  Thank you, sir.

16         Any redirect of the witness?

17              MR. SHEPHERD:  No, Your Honor.

18              THE COURT:  All right, sir.  Thank you.  You may

19    step down.  You're excused.

02:16:57 20        Do you have another witness, please.

21              MR. SHEPHERD:  Yes, Your Honor.  May we approach

22    briefly?

23              THE COURT:  Yes.

24         (Discussion at sidebar as follows:)

02:17:15 25             MR. SHEPHERD:  Yes, Your Honor, our next witness

1    is the in-custody witness.  It will take them just a minute

2    to get him up here.  I don't know if the Court would want

3    to -- we're a few minutes early for a possible lunch break,

4    but I just wanted to check with the Court.

02:17:27    5    THE COURT:  How long is this witness's testimony

6    going to be?

7    MR. SHEPHERD:  I think mine will be probably 30

8    minutes, to 45 minutes.  And I expect extensive cross.

9    MR. DOUGHTEN:  May be be more, maybe an a half

02:17:41 10   hour cross.

11   THE COURT:  You know, I don't want to break it

12   early, but we will because I think both sides, particularly

13   the defendant, you need the realtime so you have the

14   testimony.  So we'll take a break.

02:17:55 15   MR. SHEPHERD:  Thanks, Your Honor.

16        (The following proceedings were had in the hearing of

17   the Jury:)

18   THE COURT:  Ladies and gentlemen, given the

19   length of the next witness's testimony, and certain other

02:18:06 20   matters I would like to clear up, we're going to take an

21   early lunch.  I apologize.

22        Again, sometimes these things happen.  And I think it

23   will also make things go more smoothly this afternoon.

24        So we'll break for about an hour, maybe a little bit

02:18:21 25   longer.  I hope not.  I do have another proceeding starting

1    at noon which I'll deal with expeditiously.

2          But, please, leave your notepads on your chairs.

3    Remember all the admonitions I've given you about not

4    discussing the case among yourselves, forming or expressing

02:18:38  5    any opinions on the matter.  And then we'll see you at about

6    12:30, perhaps a little bit -- hopefully not much later than

7    that.

8          Thank you very much, ladies and gentlemen.

9          All rise.

02:18:48  10          (Jury out 11:27 a.m.)

11          THE COURT:  All right, Counsel.  Just leave a

12    little space at the table for the other proceeding I have at

13    noon.  We'll see you about 12:30, thereabouts.

14          (Lunch recess taken.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Afternoon Session.)

 2              (Outside the presence of the jury:)

 3                   THE COURT:  Everyone ready?  Everyone situated?

 4                   MR. SHEPHERD:  Yes, Your Honor.

 5                   MR. DOUGHTEN:  Yes, Your Honor.

 6                   THE COURT:  All right.  Our jurors are ready.

 7       They've been ready for us for a few minutes, so let's get

 8       started.

 9              Ms. Kestner.

10              (Jury in, 12:35.)

11                   THE COURT:  Please be seated, ladies and

12       gentlemen.

13              Counsel for the government, please call your next

14       witness.

15                   MR. SHEPHERD:  Yes, Your Honor, the government

16       calls Amir Al-Ghazi to the stand.

17                   THE COURT:  Thank you, at this time, Mr.

18       Al-Ghazi, please.

19              Just be careful, Mr. Al-Ghazi.  The seat is a little

20       bit uncomfortable.

21              Are you ready to sir.

22                   THE WITNESS:  Yes, sir.

23                   THE COURT:  I'm required to administer the oath.

24       At this time, I'll administer the oath or affirmation.

25
```

03:25:35  5
03:25:43 10
03:27:14 15
03:27:54 20
03:28:05 25

1                        AMIR AL-GHAZI,

2          of lawful age, a witness called by the United States,

3             being first duly placed under oath, was examined

4                          and testified as follows:

03:28:17  5          THE WITNESS:  I a firm.

6          THE COURT:  All right.  Thank you, we'll note

7    that.

8          Let me give you some brief instructions before we

9    begin.

03:28:22 10          Listen carefully to the question.  Please respond only

11   to the question that's asked.

12          If there is any objection to any question, please do

13   not respond to the question until I rule on the objection.

14   Of course, if I say objection -- then you'll not answer the

03:28:36 15   question.

16          Please wait until the attorneys complete their

17   questions.  Sometimes we can anticipate answers, but wait

18   because the court reporters have to transcribe what's being

19   said here in the courtroom.  And you must respond verbally

03:28:48 20   to all the questions, not through nods, shakes of the head,

21   again, because of the court reporters.

22          We appreciate your cooperation, sir.

23          Thank you very much.

24          Counsel, you may inquire.

03:28:57 25          MR. SHEPHERD:  Thank you, Your Honor.

```
 1              DIRECT EXAMINATION OF AMIR AL-GHAZI

 2    BY MR. SHEPHERD:

 3    Q.    Would you please state your full name?

 4    A.    Amir Said Abdul-Rahman Al-Ghazi.

 5    Q.    Mr. Al-Ghazi, will you please spell for the court

 6    reporter?

 7    A.    A-M-I-R, S-A-I-D, A-B-D-U-L, dash, R-A-H-M-A-N, A-L,

 8    dash G-H-A-Z-I.

 9    Q.    Mr. Al-Ghazi, where are you originally from?

10    A.    Cleveland, Ohio.

11    Q.    And is Amir Al-Ghazi the name you were given when you

12    were born?

13    A.    No.

14    Q.    What was that name?

15    A.    My name was Robert Cecil Macullem, Jr.

16    Q.    And can you say the middle name just a little slower,

17    please?

18    A.    Cecil.

19    Q.    When did you change your name?

20    A.    I changed my name in 2015.

21    Q.    Why did you change your name?

22    A.    I changed my name because according to my religion it

23    is a tradition to change the name once you -- not once you

24    become a Muslim, but once you found a name that fits, you

25    change your name.
```

1    Q.    And you say according to your religion.

2          Are you a Muslim?

3    A.    Yes, I'm a Muslim.

4    Q.    For how long?

03:30:10    5    A.    I've been a Muslim since December 1, 2006.

6    Q.    And Mr. Al-Ghazi, if you could just slow down a little

7    bit as you speak, that would help the court reporters; okay?

8    A.    I apologize.

9    Q.    And does your name have any particular meaning?

03:30:21   10    A.    To me, yes.

11    Q.    And what is that?

12    A.    Amir means leader or prince.  Said means happy, and

13    Abdul-Rahman means slave of the most merciful.  Al-Ghazi

14    means the conquerer or the fighter.  In Arabic, it's one who

03:30:44   15    is -- has went to a battle and won and came home, literally.

16    Q.    And, Mr. Al-Ghazi, are you currently in custody?

17    A.    Yes.

18    Q.    And are you awaiting sentencing in a case?

19    A.    Yes.

03:30:58   20    Q.    Did you plead guilty in Federal Court to attempting to

21    provide material support to a terrorist organization?

22    A.    Yes.

23    Q.    Did you also plead guilty to two counts of being a

24    felon in possession of a firearm?

03:31:12   25    A.    Yes.

1    Q.    And are you currently awaiting sentencing in that

2    case?

3    A.    Yes.

4    Q.    And as part of that case, did you enter into a plea

03:31:23  5    agreement with the government?

6    A.    Yes.

7    Q.    Now, I want to ask you a few questions about that

8    agreement.

9          Did you agree, as part of that agreement with the

03:31:34 10    United States, to cooperate with the government?

11    A.    Yes.

12    Q.    In your own words, what did you agree to do?

13    A.    I agreed to tell the truth about a conversation I had

14    over social media.

03:31:47 15    Q.    And as part of that agreement, did the government

16    agree to dismiss any of the other charges in your case?

17    A.    Yes.

18    Q.    Were you also charged with multiple counts of

19    marijuana trafficking?

03:32:02 20    A.    Yes.

21    Q.    And as part of that agreement, are you expecting or

22    hoping to receive any kind of benefit at your sentencing?

23    A.    Yes.

24    Q.    What are you hoping to receive?

03:32:17 25    A.    I'm hoping to receive the deal that we agreed upon in

1    my plea agreement.

2    Q.    And what is that specifically you're hoping to

3    receive?

4    A.    192 months, 16 years.

03:32:31  5    Q.    But who ultimately will sentence you?

6    A.    My judge.

7    Q.    And do you also have a prior record before this case

8    came about?

9    A.    Yes.

03:32:44  10   Q.    Specifically, do you have felony convictions from 1996

11   for drug abuse?

12   A.    Yes.

13   Q.    From 2006 for having weapons under disability?

14   A.    Yes.

03:32:56  15   Q.    From 2010 for attempted having weapons under

16   disability?

17   A.    Yes.

18   Q.    And in 2010 another weapons under disability and

19   multiple trafficking charges?

03:33:06  20   A.    Yes.

21   Q.    And were those all in state court in Ohio?

22   A.    Yes.

23   Q.    When approximately were you arrested in the case

24   you're currently awaiting sentencing on?

03:33:18  25   A.    On June 19, 2015.

1    Q.    And where were you arrested?

2    A.    North Olmsted.

3    Q.    Where were you living at that time?

4    A.    Sheffield Lake, Lorain County, Ohio.

03:33:36  5    Q.    At that time were you active on Twitter and social

6    media?

7    A.    Yes.

8    Q.    What kinds of things were you using social media for

9    at that time?

03:33:48 10    A.    I was using social media for -- I don't know the word

11    I'm looking for.  I was fuming about the State of Islam

12    today and the allegiance.  Islamic State, I guess, would be

13    the succinct answer.

14    Q.    And when you refer to the Islamic State, what are you

03:34:22 15    referring?

16    A.    I'm referring to the group and the causes of the

17    Islamic State.

18    Q.    And where are they located?

19    A.    They were located in Syria and Iraq.

03:34:29 20    Q.    Are there any other names that you knew them by?

21    A.    ISIL, ISIS, al-Qaeda in Iraq, I believe.

22    Q.    And at that time, before you were arrested, were you a

23    supporter of the Islamic State?

24    A.    Yes.

03:34:43 25    Q.    Why was that?

1    A.    At the time in my ignorance, I believed that they were

2    a group trying to implement Sharia law in the lands they

3    control, and I believed in my religion that was proper, I

4    guess.

03:35:05   5    Q.    Now, was there a time in which you pledged allegiance

6    to that group?

7    A.    Yes.

8    Q.    How did you do that?

9    A.    I retweeted a template on social media.

03:35:15  10   Q.    In your social media accounts, how open were you about

11   your support for the Islamic State?

12   A.    Very.

13   Q.    What do you mean by very?

14   A.    Very open.  Too open, you could say.  I don't

03:35:35  15   know -- what do you want me to say?

16   Q.    What kinds of things would you post online that showed

17   your support for the Islamic State?

18   A.    I would retweet anything that someone posted about

19   Islamic State, photos, templates, quotes.

03:36:01  20   Q.    Would that also include also videos sometimes?

21   A.    Yes.  Excuse me, videos as well.

22   Q.    And at that time was that -- was there a group of

23   other similarly minded ISIS supporters that you would also

24   communicate with?

03:36:15  25   A.    Yes.

1    Q.    And would they also do the similar types of things on

2    social media?

3    A.    Yes.

4    Q.    Now, did you -- specifically did you use Twitter

03:36:31 5    during this time?

6    A.    Yes, very much so.

7    Q.    Now, what is meant when you have a follower on

8    Twitter?

9    A.    Excuse me?

03:36:40 10    Q.    I'm sorry.  What does it mean to have somebody follow

11    you on Twitter?

12    A.    If someone is following you on Twitter, you can see

13    their quotes or their tweets and they can see yours and

14    respond to them.  And you can respond to theirs in kind.

03:36:56 15    Q.    Now, are you also able to communicate directly with

16    people?

17    A.    Yes.

18    Q.    And how does that work?

19    A.    If I remember correctly, someone can directly tweet

03:37:06 20    you or send you to a -- or they can send you like an

21    instance message or direct message and you can talk

22    privately where only you and them can see.

23    Q.    And were you doing that in the spring of 2015?

24    A.    Yes.

03:37:20 25    Q.    And would you have communications on Twitter with

1    other followers of ISIS at this time?

2    A.    Yes.

3    Q.    Do you remember what any of your user names were on

4    Twitter?

03:37:33 5    A.    Any of mine?

6    Q.    Yes.

7    A.    Abdu Sadiq Al-Ghazi, Amir Muwahid, Abu Muwahid, Amir

8    Al-Ghazi.

9    Q.    Did you have multiple accounts on Twitter?

03:37:48 10    A.    Yes.

11    Q.    Is there a reason why?

12    A.    Twitter would delete the accounts once they -- there

13    were so many, so many of us at that time, that they would

14    delete the accounts once they found that you were a follower

03:38:04 15    of ISIS or you were retweeting these different posts.

16    Q.    So if your account got deleted, what did you do?

17    A.    You would open up another account.

18    Q.    Was amiralghazi76 one of your Twitter accounts?

19    A.    Yes.

03:38:20 20    Q.    Now, during the spring of 2015, did anyone ever

21    contact you through Twitter that you knew as Abu Harb?

22    A.    Yes.

23    Q.    How did that happen?

24    A.    Someone tweeted me, or messaged me and said that they

03:38:42 25    had been looking for me.

```
 1              And we went to a -- the direct message on Twitter.
 2       And he directed me to a secure chat room.
 3       Q.   At that time were you using -- you say a secure chat
 4       room.  At that time were you typically using secure chat
 5       rooms to communicate?
 6       A.   No, not at all.
 7       Q.   Do you remember the Twitter account of the person who
 8       contacted you?
 9       A.   @sham_reason.
10       Q.   I would like to pull up Government Exhibit 25 at this
11       time.
12              If we could go to page 8, please.
13              Mr. Al-Ghazi, Government's Exhibit 25 is on the page.
14              First, at the top there's a line that says,
15       "amiralghazi76."  Do you recognize that name?
16       A.   Yes.
17       Q.   And just to clarify, what is that?
18       A.   What is what?
19       Q.   amiralghazi76?
20       A.   That's my user account.
21       Q.   On Twitter?
22       A.   Yes.
23       Q.   And do you see on here the account you were just
24       talking about who contacted you on Twitter?
25       A.   Yes.
```

1    Q.    And which one is it?

2    A.    It's the third one down.

3    Q.    And could you read it for us, please?

4    A.    Sham-reason.

03:40:12  5    Q.    And this a list of your followers on Twitter at that

6    time, based on the heading at the top?

7    A.    Yep.

8    Q.    And if we could go to page 33?

9    A.    I'm sorry, yes.

03:40:26  10    Q.    Again, this is page 33 of Exhibit 25 with the heading

11    "amiralghazi76-following."

12          Again, on this list, do you again see the Twitter

13    account that you communicated with?

14    A.    Yes.

03:40:46  15    Q.    And which one is it again?

16    A.    It's about 15 down.

17    Q.    And could you read it for us, please?

18    A.    Sham-reason.  It's up under Sh_AnwarAwlaki and

19    jazrawi_camels.

03:41:08  20    Q.    Mr. Al-Ghazi, prior to your testimony today, have you

21    reviewed a -- a copy of communications with sham-reason?

22    A.    Have I reviewed a copy --

23    Q.    Did you review a copy of communications with

24    sham-reason from the Twitter account?

03:41:29  25    A.    Yes.

```
         1    Q.    Could we please move to Government's Exhibit 25A?

         2          And if we could advance to page 8, please.

         3          Does this look familiar to you, Exhibit 25A?

         4    A.    Yes.

03:41:57 5    Q.    I'm going to circle how this conversation begins,

         6    these first three lines.

         7          Does this -- again, does this look familiar what I've

         8    just circled?  The top three entries?

         9    A.    Yes.

03:42:16 10   Q.    And starting at the one on the bottom, could you

        11    please start with that?

        12    A.    It says, "wa salamu alaikm ahki."

        13    Q.    And what does that mean?

        14    A.    It means "May peace and blessings be upon you,

03:42:31 15   brother."

        16    Q.    And what's the response too that?

        17    A.    The response is "wa salamu alaikm ahki."

        18    Q.    Can you slow down with that, please?

        19    A.    Wa salamu alaikm ahki.

03:42:44 20   Q.    So typed here I see the letters WR and WB.

        21    A.    Yes.

        22    Q.    What does the WR stand for in what you just said?

        23    A.    Wah rahmatullah.

        24    Q.    Are you able to spell that?

03:42:57 25   A.    If you want me to.
```

1   Q.    Please do for the court reporter?

2   A.    W-A-H, Rahmatullah, R-A-H-M-A-T-U-L-L-A-H.

3   Q.    And then what about the WB?

4   A.    Wah Barakaa Tuhu.

03:43:21 5   Q.    And could you spell that, please?

6   A.    Wah, W-A-H, Barakaa Tuhu, B-A-R-K-A-A, T-U-H-U.

7   Q.    Then what's the third entry at the top of the page?

8   A.    Someone says, "I've been trying to get up with you,

9  akhi."

03:43:48 10   Q.    Do you remember receiving that message?

11   A.    Yes.

12   Q.    Did that message mean anything to you at the time?

13   A.    Yes.

14   Q.    Please explain what you mean by that?

03:43:59 15   A.    It obviously meant that he had been looking for me,

16  but it sent my spider signals off, but he said "I been

17  trying to get it with you, Ahki," and that would only one --

18  well, there would be only one reason why he would be trying

19  to look for me.

03:44:17 20   Q.    Why do you say that?

21   A.    I am posting crazy messages on Twitter.  Why would you

22  try to get up with me if he weren't trying to have something

23  in common with me?

24   Q.    And what -- when you say crazy message on Twitter,

03:44:31 25  what kinds of crazy messages?

```
 1    A.    Well, if you look at my history on social media, I'm
 2    talking -- I don't know the word.  I'm saying things on
 3    Twitter in support of Islamic State.  And I'm saying them
 4    out loud and bold.
 5          Do you understand what I mean?
 6    Q.    So would it be fair to say you're holding yourself out
 7    there?
 8    A.    I guess.
 9    Q.    I would like to pull up Government's Exhibit 25B.
10          Mr. Al-Ghazi, I'm showing you Government Exhibit 25B
11    which is a transcript of Exhibit 25A.
12          Do you see that?
13    A.    Yes.
14    Q.    Does this conversation look to you to be the same one
15    that was in 25A that we were just looking at?
16    A.    Yes.
17    Q.    I would like to start where we left off.  There's a
18    message received by you, "I've been trying to get up with
19    you, akhi.
20          How did you respond?
21    A.    I responded, "Subhan' Allah i've found a bro on the
22    manhaj in America, Lol."
23    Q.    What does the Subhan' Allah mean?
24    A.    Subhan' Allah means glory be to God?
25    Q.    And the manhaj?
```

1    A.    Manhaj means the way or the path.

2    Q.    And so the phrases that you've been providing

3    definitions for, are these words and phrases that are part

4    of the Islamic faith?

03:46:13  5    A.    Yes.

6    Q.    Do you speak Arabic?

7    A.    A little.

8    Q.    Do you understand those parts relevant to the Islamic

9    faith?

03:46:20  10    A.    Yes.

11    Q.    There's also a response, "What's up, Akhi."  What does

12    Akhi mean?

13    A.    Akhi means my brother.

14    Q.    And then moving down, the third entry from the top,

03:46:39  15    will you please reads that entry?

16    A.    It says, "We need secure chat.  Not here.  Kuffar try

17    to make things out that's not real."

18    Q.    And was that a message you received from the

19    sham-reason Twitter account?

03:46:53  20    A.    Yes.

21    Q.    What does Kuffar mean?

22    A.    Kuffar means nonbelieveers or non-Muslims.

23    Q.    And how is that term used or how was that term used at

24    this time among ISIS supporters?

03:47:08  25    A.    Well, the term denotes anyone who is not a Muslim.

1    Q.    And what would be the sort of Islamic State, as you

2    understood it at the time, as a supporter of the Islamic

3    State, what would be the opinion of the Kuffar?  What would

4    have been your opinion of nonbelievers at that time?

03:47:33 5    A.    My opinion of nonbelievers at that time would have

6    been the opinion of the Islamic State that they are not with

7    us, not -- you know, I don't want to say expendable, but so

8    much of that.  But that's not quite the case.

9    Q.    Okay.  What do you mean by that?

03:47:55 10   A.    Nonbelievers have rights as well.  And I don't

11   know -- I can't remember at that time if the Islamic State

12   is upon that opinion but that's the truth of the matter.

13   That's something they can't deny even as Muslims.

14   Q.    Okay.  And then there's further discussion about

03:48:14 15   setting innocent people up.

16         Do you remember that conversation?

17   A.    Yes.  He says they set people up, innocent people.

18   Q.    Now, when you're doing these direct messaging

19   conversations, does it always work that there's a clean

03:48:28 20   question, answer, or statement in response?

21   A.    Say that again for me.

22   Q.    Let me rephrase.  When you're responding on one of

23   these instance messages or direct messages, are you

24   sometimes responding to an earlier question by the time you

03:48:45 25   type your response?

1    A.    Oh, yes, because -- because sometimes it's either

2    delayed or maybe I'm typing too fast or he's typing too

3    slow.

4    Q.    Let's move on to page 2, please.

03:49:01  5          Okay.  There's a response at the top.  All human doll

6    little what?

7    A.    A hum do la.

8    Q.    A hum do la.  What does that mean?

9    A.    A hum do la means that all things are for God alone.

03:49:20 10    Q.    And what was your response to that?

11    A.    I say, yes, I know.

12    Q.    And then what was your next response?

13    A.    "This is my 6 account."

14    Q.    That was that referring to?

03:49:32 15    A.    Referring to Twitter.

16    Q.    As you explained earlier about having to set up new

17    accounts?

18    A.    Yes.

19    Q.    There's then a couple of messages from @sham-reason.

03:49:45 20    What were those?

21    A.    Chat Secure and Surespot.

22    Q.    And what are Chat Secure and Surespot?

23    A.    Chat Secure and Surespot are correct chat rooms,

24    secure chat rooms, excuse me.

03:50:04 25    Q.    And are those additional ways you could communicate

1    with someone?

2    A.    Yes, they are platforms where you can communicate

3    without the government or someone else seeing your

4    conversation.

03:50:15  5    Q.    As this conversation is going on, what did you think

6    the purpose of these communications was?

7    A.    It was obvious to me that he wanted to talk to me

8    alone without the eyes of the government or someone else, or

9    the Kuffar.

03:50:32 10    Q.    Did he suggest any other possible applications?

11    A.    Here Wickr and I believe that was it.

12    Q.    And then did he also suggest where -- what kind of

13    device you could use to fine these applications?

14    A.    The Android market.

03:50:50 15    Q.    Let me move to page 3, please.

16          So during this communication, did you also discuss

17    with him the sort of benefits of any particular application?

18    A.    The benefits of the social media application?

19    Q.    Yes.

03:51:17 20    A.    Yes.

21    Q.    And what did you guys talk about?

22    A.    Here it says that Chat Secure is the recommended one.

23    And he sees brothers using Surespot so that it can be a

24    secure platform.

03:51:33 25    Q.    Did you indeed download one of these other social

1    media applications?

2    A.    Yes.

3    Q.    Which one did you download?

4    A.    I downloaded Chat Secure.

03:51:45  5    Q.    And did you tell him that in this chat?

6    A.    Yes.

7    Q.    There's a response -- would you read after you say,

8    "Downloading Chat Secure," what was his response?

9    A.    "Good.  It would take a little sabr to complete."

03:52:02  10    Q.    What does sabr mean?

11    A.    Sabr means patience.

12    Q.    And what was your response?

13    A.    "In sha allah."

14    Q.    And what does that mean?

03:52:09  15    A.    In sha Allah means God willing.

16    Q.    Had you ever used Chat Secure before?

17    A.    Never.

18    Q.    So did you have -- even have an accountant Chat

19    Secure?

03:52:18  20    A.    No.

21    Q.    Did sham-reason provide you instructions and how to

22    proceed?

23    A.    Yes.

24    Q.    And is that reflected here in this transcript?

03:52:27  25    A.    Yes.

1    Q.    Okay.

2          If we can please move -- well, before I move to page

3    4, can you read the entry from sham-reason, third from the

4    bottom?

03:52:38 5    A.    It says, "Make up a new user name, nothing Islamic,

6    then it's going to ask domain."

7    Q.    When you received that instruction, nothing Islamic,

8    what did you think was meant by that?

9    A.    So that it wouldn't be looked upon as an Islamic

03:52:58 10   account.

11   Q.    And why would that be important to you?

12   A.    Because I was on Twitter putting myself out there.

13   And if someone happened to follow our conversation, they may

14   be able to know that I was going to Chat Secure with an

03:53:12 15   Islamic account.

16   Q.    Now, please go to page 4.

17         Did you ultimately creat a user name for Chat Secure?

18   A.    Yes.

19   Q.    What user name was that?

03:53:27 20   A.    I picked the name Bobbiemac.

21   Q.    Why was that?

22   A.    My name previously was Robert Macullem.  Bobby is

23   short for Robert and Mac is short for Macullem.

24   Q.    And did you provide your user name to @sham_reason?

03:53:43 25   A.    Yes.

```
 1   Q.    Okay.  If we could please move to page 5.
 2         Were you able to sign in to Chat Secure?
 3   A.    No, I had to sign out.  He told me to sign out, sign
 4   back in.
 5   Q.    Were you ultimately successful in getting on to Chat
 6   Secure?
 7   A.    Yes.
 8   Q.    And did you have a conversation on Chat Secure with
 9   this @sham_reason?
10   A.    Yes.
11   Q.    Now, I want to look at -- there's a time listed here.
12   The second entry down, it says sign out and back in.
13         Do you see that entry?
14   A.    Yes.
15   Q.    What's the time listed?
16   A.    The time is 22:39.
17   Q.    On what day?
18   A.    March 25, 2015.
19   Q.    And when is the next entry?
20   A.    March 26, 2015 at 50.
21   Q.    So what happened during that gap in time between those
22   two entries?
23   A.    Between that gap in time, we had a conversation.
24   Q.    And where was that conversation held?
25   A.    On Chat Secure.
```

1    Q.    Did he give you his name when you were communicating

2    with him on Chat Secure?

3    A.    No.

4    Q.    Did he call himself by any name on Chat Secure?

03:54:56  5    A.    No, I believe his -- the profile thing was Abu Harb.

6    Q.    His user name on Chat Secure?

7    A.    Yeah.  Yes.

8    Q.    What did you discuss with Abu Harb on Chat Secure?

9              MR. DOUGHTEN:  Objection.

03:55:16 10              THE COURT:  Sidebar, please, real quickly.

11         (Discussion at sidebar as follows:)

12              THE COURT:  What's the basis for the objection?

13              MR. DOUGHTEN:  Judge, I mean there's not -- your

14    going into conspiracy.  There's no conspiracy established

03:55:35 15    yet, so it's just pure hearsay.  I don't know the content of

16    what he's going to say.

17              MR. SHEPHERD:  Your Honor, we submit this is

18    statements of a party opponent because this is the same

19    account that he just came from @sham_reason, and that we had

03:55:50 20    prior testimony to establish that that account was tied into

21    locations that are tied to the defendant.  And our position

22    is that Abu Harb is the defendant, so it would be statements

23    of a party opponent.

24              THE COURT:  I'm going to allow it I think at this

03:56:06 25    point, based on what we've heard in the testimony so far.

```
 1              MR. DOUGHTEN:  Okay.

 2              THE COURT:  Thank you.  I'll just overrule it.

 3         (The following proceedings were had in the hearing of

 4    the Jury:)

 5              THE COURT:  All right the objection is overruled

 6    at this time.

 7         Counsel, you may proceed.

 8              MR. SHEPHERD:  Thank you, Your Honor.

 9    BY MR. SHEPHERD:

10    Q.    Mr. Al-Ghazi, what did you discuss with Abu Harb on

11    Chat Secure?

12    A.    Abu Harb asked me where was I located?  How did I

13    earn?  Did I know the punishment for snitching or telling on

14    a Muslim?  Would I be willing to come to Texas and train,

15    that he was a recruiter.

16         He didn't say for ISIS, but he said that he was a

17    recruiter.

18         He said that we must meet face-to-face so that we

19    could have military training in Texas.  Did I know any other

20    brother -- did I have any other brothers with me.

21    Q.    Did he ask you at all about what your intentions were

22    or willingness was?

23    A.    Yes.

24    Q.    What did he ask you?

25    A.    Am I willing to wage jihad on the Kuffar.
```

1    Q.    Did he mention anything about where he was located?

2    A.    He said he was in Texas, would I be willing to travel.

3    Q.    Did he state whether or not there are other people

4    involved?

03:57:56 5    A.    I asked him that, was he by himself.  He said that

6    there were more of us in Texas.

7    Q.    Was there any discussion of weapons?

8    A.    He asked me did I know how to use weapons.  He didn't

9    say that he had any weapons.

03:58:12 10   Q.    Was there any reference to the concept of Jena, or

11   Jannah?

12   A.    Paradise?

13   Q.    Yes.

14   A.    I believe he asked me did I know that to die as a

03:58:33 15   martyr we will, Muslims receive paradise.  And I said yes.

16   Q.    You stated earlier he asked you how you earned.  What

17   was meant by that?

18   A.    I assume he asked me how I made money.

19   Q.    And what was your response?

03:58:55 20   A.    I told him that I sold weed.

21   Q.    How did he respond to you about that?

22   A.    He said that a jihadi doesn't do that.

23   Q.    Was there anything important to you about that

24   response?

03:59:13 25   A.    Yes, at the time I believed that either he was an FBI

1    agent or that he was from the west because he used the word

2    jihadi.

3         In my experience, people from overseas use the word

4    mujahid.  A mujahid is the proper term.  A mujahid is one

03:59:35  5  who practices in jihad.  A person from the west was saying

6    the term jihadi.  It's the term that CNN uses or people from

7    the west use and it caught my attention.

8    Q.    What about the criticism of how you earned?  Did that

9    catch your attention as well?

03:59:53 10  A.    When he asked me how I earned and I told him I sold

11   weed, he seemed angry and it made me think that he was the

12   real deal probably.

13   Q.    Why?

14   A.    Why else would he be angry?  Real Muslims -- I don't

04:00:09 15  want to say real Muslims don't sell weed, but real

16   mujahideen don't sell drugs.  And I just told him that I

17   sold weed.

18   Q.    What was your overall reaction to this conversation?

19   A.    Fear.

04:00:30 20  Q.    Why?

21   A.    Well, he asked me where I was, where was I located.

22   And I lied to him.  I didn't -- if he was the real deal,

23   then I don't want this guy knowing where I'm at.

24   Q.    So what did you tell him?

04:00:45 25  A.    I believe I told him Indiana.

1    Q.    Did he ask you to provide him with anything?

2    A.    I believe he asked me did I have any -- were there any

3    people with me, meaning any brothers willing to -- that felt

4    the same as I did.  And I told him there was another brother

04:01:05 5    in Baltimore and that I will relay that information to him.

6    Q.    Did you provide any information to Abu Harb about that

7    other brother?

8    A.    I believe I gave that brother's in Baltimore his name,

9    his user name.

04:01:19 10    Q.    Is that someone else you were communicating with

11    online?

12    A.    Yes.

13    Q.    So during this conversation that you were having on

14    Chat Secure, who did you think he was recruiting for?

04:01:44 15    A.    I believed him to be a recruiter for the Islamic

16    State.

17    Q.    Why is that?

18    A.    The Islamic State were the prolific group in the world

19    at that time.  They had just came out, or they were -- they

04:01:56 20    were the only ones who I was pledging allegiance to.  So if

21    you were looking for me -- well, you wouldn't be looking for

22    me if I was pledging allegiance to the Taliban or Boko

23    Haram.  If you say you were looking for me, I was pledging

24    allegiance to ISIS at the time.

04:02:14 25    Q.    So after the chat on this -- this conversation on Chat

1    Secure -- well, first, strike that.

2         Going back to this initial conversation, did you feel

3    at all like he was testing you during this conversation?

4    A.    Yes.  He asked me did I know the punishment for

04:02:33  5    telling on a Muslim or betraying the Muslims.  And I told

6    him, yes, the punishment is death.

7    Q.    After the conversation on Chat Secure, did you again

8    communicate on Twitter?

9    A.    Immediately after -- not after that, though, but

04:02:53 10    immediately after coming out of the Secure Chat Room.

11    Q.    After you came out of the chat room, taking a look at

12    page 5 of Exhibit 25B, are those communications on Exhibit

13    25 B?

14    A.    Yes.

04:03:12 15    Q.    What was sham_reason talking about after this

16    conversation?

17    A.    Honestly, he made it up.  I have no idea.  He said

18    that he was happy -- he was glad that we spoke probably for

19    the interview for his article and journalists and bloggers

04:03:34 20    under scrutiny too, but there was no interview.

21    Q.    Was any of that true?

22    A.    Not at all.

23    Q.    During the communications on Chat Secure, did you

24    receive any other advice on how to communicate with other

04:03:45 25    people?

```
            1    A.    From him?

            2    Q.    From him.

            3    A.    Not that I recall.

            4    Q.    Was there any other discussion of secure ways of
04:03:57    5    communication?

            6    A.    Besides Chat Secure?

            7    Q.    Or other -- right, besides Chat Secure.  Were any

            8    other applications discussed with him?

            9    A.    Not that I can remember.
04:04:08   10    Q.    Now, after this conversation on Chat Secure and then

           11    on Twitter, do you recall if you had any other

           12    communications with this Abu Harb?

           13    A.    No.  I -- I'm sorry.  I mentioned to him the guy from

           14    Baltimore's name.  But I don't remember getting a response
04:04:31   15    from him.  You can get back on Chat Secure and say -- it's a

           16    streamline platform.  And I think I got back on at a later

           17    date and gave him the name of the guy from Baltimore, but I

           18    don't remember him responding.

           19    Q.    Did you ever communicate with that guy from Baltimore?
04:04:50   20    A.    Yes.

           21    Q.    And did you ever discuss with him this conversation

           22    you had with Abu Harb?

           23    A.    Yes.

           24    Q.    I would like to pull up Government's Exhibit 26 at
04:05:01   25    this time.
```

 1              What is -- do you see Exhibit 26 on the screen?

 2    A.    Yes.

 3    Q.    What is Exhibit 26?

 4    A.    Exhibit 26 is mean talking to the brother from

04:05:17  5    Baltimore.

 6    Q.    And on what communication application is this?

 7    A.    I think this is Chat Secure.

 8    Q.    Who is Abu Sadiq, the name at the top?

 9    A.    Abu Sadiq is me.

04:05:44 10    Q.    Are you sure this is Chat Secure just looking at it?

11    A.    No, I'm not sure.  But it may be -- it may be Twitter.

12    It's been a long time since I look at any social media.

13    Q.    Do you recognize this conversation, the content,

14    however?

04:06:01 15    A.    Yes.

16    Q.    And let's move forward to page 2, please.

17          Actually let's go back to page 1.

18          So what's the date of this conversation?

19    A.    4/6/15.

04:06:19 20    Q.    And so is this after the conversation you had with Abu

21    Harb?

22    A.    Yes.

23    Q.    In the middle there's a reference to no talking on

24    Twitter or Google Plus.  What did you mean by that?

04:06:33 25    A.    We can't discuss anything of any sketchy nature.  This

1   may be in Google Plus.

2   Q.   I would like to move forward to page 2.

3        Okay.  In the middle of this page, will you read the

4   communications in the middle of page 2, please.

04:06:57  5   A.   "Now IS is here in Texas, I believe."

6   Q.   Was that you sending those communications?

7   A.   Yes.

8   Q.   What did you mean by "Now IS is here"?

9   A.   Now the Islamic State is here.

04:07:13 10   Q.   What prompted you to say that?

11   A.   Abu Harb had told me so.

12   Q.   And what was the reference to Texas?

13   A.   That's where he was at.  Where he said he was at.

14   Q.   Was this a reference to that same conversation?

04:07:26 15   A.   Yes.

16   Q.   Move to page 3, please.

17        And just taking a look here, what does this summarize

18   here?  Or what is this series of communications saying?

19   A.   This communication is somewhat summarizing my

04:07:45 20   communication with Abu Harb.

21   Q.   And what are you telling this other person?

22   A.   I'm telling the brother in Baltimore about the

23   conversations that me and Abu Harb had.

24   Q.   And does that include the "Told me to put bros in

04:08:02 25   contact with him"?

```
 1      A.    Yes, it does.

 2      Q.    And did you essentially summarize the conversation you

 3      had with Abu Harb to this other brother?

 4      A.    Yes.

 5      Q.    And what did you say at the bottom of this page?

 6      A.    He asked could I travel.

 7      Q.    Please move to page 4.

 8            And what did you respond here?

 9      A.    I said, "Not immediately."

10      Q.    What else did you tell --

11      A.    I told him I don't know -- I told him -- he asked me

12      how I earned.  I told him I sell weed or I sold bud.

13      Q.    Is that a reference to marijuana?

14      A.    Yes.

15      Q.    Okay.  And if you would please move to the next page.

16            And what were you stating on this page?

17      A.    He said a mujahid doesn't do this.  That's the

18      response to the question that he asked me about how did I

19      earn.

20            The guy from Baltimore asked me what's his user name

21      on Twitter.

22            I said, "So in case he the police or thinks we are to

23      keep everyone safe."

24            I believe I was telling him about being on Chat

25      Secure, but the messages are delayed.
```

```
         1   Q.    Please move to the next page, page 6.
         2         And what were you saying here?
         3   A.    I told the guy from Baltimore that Abu Harb said he
         4   says everyone has to meet in person and that's all I know.
04:09:39 5         And then I tell the people, which mean the federal
         6   government, are on to me, though.  My accounts are being
         7   targeted.
         8   Q.    At that time did you believe your accounts were being
         9   targeted?
04:09:52 10  A.    Yes and no.
        11   Q.    Move on to page 7, please.
        12         And what did you say on page 7?
        13   A.    I said, "I don't know.  We all might be in the feds
        14   for life or in paradise."
04:10:17 15  Q.    What did you mean by that reference?
        16   A.    I meant by that reference that if he found that we
        17   agreed to do what he wanted us to do that we would be caught
        18   by the federal government and possibly be in prison for life
        19   or die in paradise.
04:10:31 20  Q.    Then what was the next thing you wrote?
        21   A.    I said, "He didn't say we was going to do anything."
        22   Q.    Go to page 8, please.
        23         And first, what did you mean by that statement?
        24   A.    He didn't give me any information.  Abu Harb didn't
04:10:54 25  give me any information about doing anything.  All he said
```

1    was we should meet face to face and all the brothers should

2    meet each other.

3         He didn't give any instructions after that.

4    Q.    And then on page 8, what were you telling this other

04:11:08  5    brother?

6    A.    Abu Harb -- I was telling him that Abu Harb had told

7    me that he reminded me that the punishment for telling on a

8    Muslim was death.

9         "I said I know I'm not the cops, haven't heard from

04:11:22 10    him since."

11    Q.    Mr. Al-Ghazi, after this communication with the

12    brother in Baltimore, did you ever hear back from Abu Harb?

13    A.    No.

14    Q.    At any point did you ever become afraid because of the

04:11:45 15    conversation you had had with Abu Harb?

16    A.    Yes.

17    Q.    When was that?

18    A.    Almost immediately.

19    Q.    And again, why was that?

04:11:53 20    A.    Either one of two things.  Either he was the real

21    deal, and a real Islamic State recruiter, or he was the

22    federal government.  Both would have been bad.  You can get

23    in trouble for talking to -- to have these conversations.

24    You can also get -- if you're a weaker-minded individual,

04:12:21 25    you can get roped into whatever Abu Harb was trying to get

1    you to do.  Both are bad.  So I was immediately -- I had a

2    wife and children at home.

3    Q.    Where were you physically located when you were having

4    these conversations with Abu Harb?

04:12:36  5    A.    In my house.

6    Q.    And where was that house located?

7    A.    Sheffield Lake.

8    Q.    And is that in Ohio?

9    A.    Yes, Sheffield Lake, Lorain County, Ohio.

04:12:46 10    Q.    Mr. Al-Ghazi, why are you here today?

11    A.    I'm here today to atone for the things that I've done.

12    In my religion, you have to follow bad deeds with good

13    deeds.  The only way that I can atone for the things that

14    I've said and done, referring to this, is to be absolutely

04:13:16 15    honest and transparent, you know, me sitting in a cell is

16    one thing, but I would never be able to say "I'm sorry"

17    socially.  I would never be able to say "I made a mistake

18    socially."

19         This is the only way I can do it by disassociating

04:13:31 20    myself from Abu Harb or the guy from Baltimore, whoever

21    these people are that are associated with these type of

22    people.

23             MR. SHEPHERD:  No further questions, Your Honor.

24             THE COURT:  Thank you.

04:13:40 25         Mr. Al-Ghazi, are you ready to go?  Are you okay?

```
 1              THE WITNESS:  Yeah.
 2              THE COURT:  Do you need restroom, water or
 3      anything like that.
 4                 CROSS-EXAMINATION OF AMIR AL-GHAZI
 5      BY MR. DOUGHTEN:
 6      Q.    Good afternoon sir.  Is it okay if I call you Mr.
 7      Al-Ghazi?  Or is there a way you prefer to be addressed?
 8      A.    No, Mr. Al-Ghazi is fine.
 9      Q.    Let me tell you what I'm going to do.  I'm going to
10      ask you some questions, a little bit about your background,
11      how you got into Islam.  Then I'm going to ask you about
12      what you said in direct, and then I'm going to ask you
13      lastly about your plea agreement.  All right?
14      A.    Sure.
15      Q.    Okay.  Now, what religion were you raised?
16      A.    No religion.
17      Q.    Okay.  And so if you could tell us about what
18      attracted you to Islam?
19      A.    My first wife died in my arms.  She was a Christian.
20      And her death was so traumatic, that I found myself looking
21      to find out where she went after death, to be honest.
22      Q.    Okay.
23      A.    So I started searching religions.  And in doing so, it
24      led me to Islam.
25      Q.    About how old were you then?
```

1    A.    When she died or when I became a Muslim.

2    Q.    I'm sorry.  When you became a Muslim.

3    A.    Maybe about 30-something.

4    Q.    And what year was that?

04:15:13  5    A.    2006.

6    Q.    All right.  Now, you would agree with me, like many

7    religions, there's many sects of Islam and many particular

8    beliefs in Islam?

9    A.    Sure.

04:15:23 10    Q.    Okay.  And at first, was your beliefs, were they

11    radical right at the beginning?

12    A.    No.  Not at all.

13    Q.    Okay.  And so at some point in time, if I heard you

14    correctly, you became more radical over time; is that right?

04:15:40 15    A.    I didn't say that.  No.

16    Q.    Well, okay.

17          Did you become more radical over time?

18    A.    Yes.

19    Q.    Okay.  What caused that?

04:15:49 20    A.    I was in prison.  And my Islamic education was yet

21    unfinished.  And I was being taught Islam in prison by a man

22    who was angry.  And he was teaching me something called al

23    wala walbara.  That means to hate with what God hates and

24    love what God loves.

04:16:13 25          This section in Islam is really under the jihad

 1    section of being taught anyway.

 2         Long story short.  I wound up getting out before my

 3    education was complete.

 4    Q.   Now, when you're saying you were educated, this is by

04:16:28  5    another inmate?

 6    A.   Yes.

 7    Q.   And do you know what his background was?

 8    A.   I found out later that he was in jail for rape.

 9    Q.   I didn't mean that.  I'm sorry.

04:16:35  10         His religious background.  I guess my question is,

11    what was it about this person that caused you to believe

12    that he was telling you the correct version?

13    A.   I didn't know if it was the correct version or not.  I

14    was young and impressionable, and I was looking for

04:16:58  15    brotherhood, to be honest.

16         And he provided that.  And he was teaching maybe about

17    12 of us.

18    Q.   So would it be fair to say you were vulnerable at that

19    time?

04:17:10  20    A.   Yes.

21    Q.   And --

22         MR. SHEPHERD:  Objection, Your Honor, to

23    relevance.

24         THE COURT:  It's overruled.

04:17:16  25    BY MR. DOUGHTEN:

1    Q.    And so because of your situation, I guess, for lack of

2    better term, that was the only aspect of Islam that you had

3    been taught in, correct?

4    A.    Well, like I was saying, my education was incomplete.

04:17:34  5    He started to teach us and -- I may have gotten the first

6    part of the sentence, but I wound up getting out before he

7    finished his sentence.

8          Do you understand what I'm saying?

9    Q.    Yes, I do.

04:17:46  10         So were you aware at that time that your education was

11   incomplete, or was this something you realized years later?

12   A.    I realized it later.

13   Q.    At the time you believed it was complete, correct?

14   A.    I believed I was on the right track.

04:17:58  15   Q.    Okay.  In what year did you get out?

16   A.    I got out from there in 2008.

17   Q.    Okay.  Now, what did you do from 2008 until

18   essentially -- I'm talking religious-wise.  From 2008 to,

19   say, 2014, did you become increasingly radical in your

04:18:20  20   opinion?

21   A.    Not so much.  Not until about 2013.

22   Q.    Okay.

23   A.    2012, maybe.

24   Q.    So let's go there.

04:18:36  25         What was it that caused you to take a more, I guess,

1    radical view of Islam that you had previously?

2    A.     Trying to learn Islam is like trying to teach

3    yourself -- by yourself is like trying to teach yourself

4    algebra by yourself.

5          I didn't have a teacher, so to speak, that would touch

6    on the State of Islam at that time.

7          What I mean by that is I sat at the foot of two

8    sheikhs, but when you -- when I asked them about --

9    Q.     Let me interrupt you.  A sheikh, what's a sheikh?

10   A.     A sheikh is a knowledgeable Muslim scholar.

11   Q.     Okay.  Go ahead.

12   A.     When I asked the question about jihad and about the

13   plight of the Muslims today in the world, I would get no

14   answer.

15         And what someone told me was because the Muslims in

16   America today are so afraid of the government that they

17   won't speak about Jihad which left my education unfulfilled.

18   Q.     Let me stop you because you said a lot, and I want to

19   make sure we have it right.

20         When you said the State of Islam in America, are you

21   saying right now or at that time?

22   A.     At that time.

23   Q.     And so you used the term "jihad."  Now, I've heard

24   that there's both a militant meaning for jihad and a

25   nonmilitant meaning for jihad.  Is that accurate?

1    A.    Yes, that's accurate.  I know that now.  I didn't know

2    that then.

3    Q.    When did you think then?

4    A.    I thought then that jihad meant holey war.  But it

04:20:11 5    doesn't mean that.  Jihad actually means --

6    Q.    Go ahead, I'm sorry.  Finish.

7    A.    Actually means to strive or struggle.

8    Q.    Now, back then, you thought it meant holy war.  In

9    your mind, did this mean violence?

04:20:26 10    A.    Yes.

11    Q.    So at this time, did you feel that it was your duty as

12    a Muslim to commit violence?

13    A.    No.

14    Q.    So explain that.

04:20:40 15    A.    I didn't feel like it was my duty.  I did know that

16    jihad came with conditions.  There must be a group, a Muslim

17    ruler, to send out the Muslim soldiers, the mujahideens, but

18    like I'm saying, my education was incomplete at that time,

19    so.

04:21:06 20    Q.    I understand.  That's what I was going to ask.

21          So how did you educate yourself once you got out?  Was

22    it through the Internet?  Was it talking to sheikhs?  How

23    did you do it?

24    A.    The sheikhs wouldn't discuss it.  I started to read.

04:21:19 25    I started to buy books, and I started to look at Twitter and

1   YouTube.  I'm not saying my education was all about jihad.

2   I'm speak about jihad because that's what the Islamic State

3   was really upon, right.

4   Q.    Okay.  And I think you're referring to about 2015,

04:21:40 5   which you would agree was maybe the height of the caliphate,

6   would that be correct, in your view?

7   A.    Oh, I don't know.  I don't have that answer.

8   Q.    Okay.  Well, at some point in time, late 2014, late

9   2015, you unabashedly putting on social media platforms

04:22:03 10   pretty radical views, correct?

11   A.    Yes.

12   Q.    So I'm asking about, what discussed that transition

13   where you were so open about it?

14   A.    Unfortunately I was I inebriated and ignorant and

04:22:20 15   angry.

16   Q.    By inebriated, you mean alcoholic and drunk?

17   A.    No.  I was abusing drugs at the time and I chose to

18   push the envelope.  I chose to be loud.  I was angry.

19   Q.    And what did you -- how did you believe that you

04:22:38 20   pushing the envelope, so to speak, would work in your favor?

21   A.    I didn't think it would work in my favor, but like I

22   was going to explain, jihad has facets.  It's not always

23   about the gun or violence.

24         Jihad can be with the tongue, to speak out against

04:22:56 25   oppression, and things that are wrong.

1          So I wasn't -- I'm not a sheikh or scholar.  The only

2     thing that I had was allowed voice and social media.  And I

3     was angry and I pushed the envelope.  I said things that

4     other people weren't saying to cause a reaction.  This is

04:23:17 5     the result of that reaction.

6     Q.    Okay.  But, for example, what type of things did you

7     put on social media before Abu Harb contacted you?  What

8     type of things were you putting out there?

9     A.    Well, I can't remember anything specific.

04:23:30 10     Q.    Just generally.

11     A.    I don't know.  It's been a long time.

12     Q.    Well -- and again, correct me if I'm wrong.  You were

13     becoming angry with your situation in life.  And as a young

14     man, you were just taking out that anger by venting?

04:23:52 15     A.    Yes.

16     Q.    Negative things on social media, correct?

17     A.    Yes.

18     Q.    And part of those vents was supported of ISIS,

19     correct?

04:24:01 20     A.    Yes.

21     Q.    So what I'm trying to understand is how did you vent,

22     prior to Abu Harb, your support of ISIS?

23     A.    There were 800 to 1,000 of us on Twitter.  A lot of

24     this was retweeting and parroting things that I heard from

04:24:23 25     this group that calls themselves the Islamic State, a lot of

729

1    this retweeting and parroting stuff other people say.

2    Q.    I'm trying to understand what stuff.  What was the

3    content of your, for lack of your better word, your vitriol,

4    your anger?  What was the content of these platform

04:24:41  5    statements that you were retweeting with other people?

6    A.    What was the state of Syria.  I was angry about how

7    Bashar Al-Assad was killing his own country people and how

8    America, America was all for getting him out of office at

9    first.  And then all of the sudden, you know, they changed

04:25:07 10    direction.

11        And I felt it was my duty as a Muslim to, you know,

12    speak against that.

13        Then you had officers in America killing unarmed black

14    men and I was angry about a lot of things.

04:25:24 15    Q.    So how is this pro-ISIS, because what you seem to be

16    saying to us here is that you were venting legitimate

17    political dissent?

18    A.    Yes.

19    Q.    How was this pro-ISIS?

04:25:38 20    A.    ISIS was the 800-pound gorilla in the room at the

21    time.  I'm a nobody with just a voice.  You know, I felt

22    that the only way that I could gain some attention on the

23    social media stage is to adhere myself to this 800-pound

24    gorilla in the room.  Do you understand?

04:25:59 25    Q.    That was my question.  So you were doing this to gain

1    attention.  Whose attention were you hoping to be gain?

2    A.    I don't know.  Anybody's.  You know, no one knows me.

3    No one knew me.  No one still knows me.

4    Q.    So is it fair to say that your tweets were basically

04:26:17 5    to vent?  It wasn't really to cause anybody to join with you

6    or cause any particular goal?

7    A.    Yes.  It would be safe to say that.

8    Q.    Okay.  Now, I'm going to ask you a little bit about

9    how your mind changed.  And then I want to come back to

04:26:37 10   where we were.

11          So as you sit here today, are you still a Muslim?

12   A.    Yes.

13   Q.    Okay.  What changed your view, or what changed your

14   position about ISIS?

04:26:49 15   A.    Honestly?

16   Q.    Yes.

17   A.    Sobriety and education.  I haven't indulged in any

18   illegal substance while in prison at all from the last three

19   years.  I've also had the opportunity to have a good Islamic

04:27:08 20   library and brothers around me to teach me.

21          Then you can blatantly see for yourself that if the

22   Islamic State was who they say they were at all, they would

23   have been successful.

24   Q.    Okay.  So if I'm hearing you today, you've rejected

04:27:22 25   the position of the Islamic State?

```
 1    A.    Of course.

 2    Q.    We got to be clear?

 3    A.    Yes.

 4    Q.    Okay.  So about when did you come to the realization

 5    that you were, I guess, misled by ISIS?  When did that

 6    occur?

 7    A.    Probably my first year in prison, to be honest.  You

 8    hear reports about these people raping the Yazidi women,

 9    using people as human shields and killing women and

10    children.

11          As Muslims, even in war, we don't do that.  So if you

12    are truly the caliphate that you said that you are, then you

13    will not do that.

14    Q.    Now, you mentioned -- I'm going to go back to before

15    you -- and I'm -- I may not have the time frame right, so

16    correct me if I'm wrong.

17          And you thought Sharia law was the way.  I think you

18    said that, at one point in time, you thought Sharia law was

19    the way.

20          Did you say that in direct examination?

21    A.    I don't think so.

22    Q.    Did you mention Sharia law in direct examination?

23    A.    What is direct examination?

24    Q.    Answering the prosecutor's questions.

25    A.    No, I didn't.
```

```
            1    Q.    Do you know what Sharia law is?

            2    A.    I absolutely do.

            3    Q.    What is Sharia law?

            4    A.    Sharia law is the divine law from God.

04:28:46    5    Q.    Is that radical or not radical or just the true

            6    meaning of Islam, in your opinion?

            7    A.    In my belief as a Muslim, Sharia law is the law that

            8    is handed down in the Koran by God.

            9    Q.    Is it, in your opinion, in any way advocate violence?

04:29:05   10    A.    No.

           11    Q.    And is it your opinion that, in fact, it's peaceful?

           12    A.    If followed correctly?

           13    Q.    Yes.

           14    A.    It can be misinterpreted by those that are in power.

04:29:18   15    Q.    But at this point, your belief is that this is -- it's

           16    a religion of piece, correct?

           17    A.    Islam?

           18    Q.    Yes?

           19    A.    I believe Islam to be a religion of submission.

04:29:28   20    Q.    To a law?

           21    A.    Yes.

           22    Q.    But in general there's nothing inherently violent

           23    about Islam; is that correct?

           24    A.    No, I can't say that.  If a Muslim country is met with

04:29:39   25    violence, they may respond in kind.  Same thing with
```

```
      1    America.  Is that true?
      2                 THE COURT:  I'm not allowed to answer questions.
      3                 THE WITNESS:  I'm sorry.
      4    BY MR. DOUGHTEN:
04:29:56 5   Q.    Now, you indicated at the time when you were
      6    retweeting on Twitter and you were exchanging view points
      7    with many followers, you were just retweeting what was
      8    interesting to you to other people, correct?
      9    A.    So to speak.
04:30:09 10  Q.    And what does retweet mean, explain this process?
      11   A.    Retweeting is to -- let's say you tweet something and
      12   I agree with it.  I like it and then I take your message and
      13   retweet it again in my name.
      14   Q.    Okay.  And so at some point in time, you say this Abu
04:30:30 15  Harb contacted you, correct?
      16   A.    Yes.
      17   Q.    Now, in any of your conversations with Abu Harb, at
      18   any time did this Abu Harb character advocate any particular
      19   illegal act should be done?
04:30:48 20  A.    I would say yes.
      21   Q.    Okay.  What was that?
      22   A.    I would say he said he was a recruiter.  So if I'm to
      23   give him the names of other brothers or meet.
      24   Q.    But he didn't say recruit for what.  Didn't you
04:31:16 25  indicate?
```

1          MR. SHEPHERD:  Objection, Your Honor.

2          THE COURT:  It's overruled.

3          MR. SHEPHERD:  The witness can't answer the

4    question.

04:31:21  5          THE COURT:  Just one at a time.

6          THE WITNESS:  Am I going to fast?

7          THE COURT:  No.  No.  Go ahead.  Respond to the

8    question, sir.

9          THE WITNESS:  He did not say he was a recruiter

04:31:28  10   for ISIS.

11   BY MR. DOUGHTEN:

12   Q.    That was your interpretation, correct?

13   A.    Yep.

14   Q.    And when you moved over, just so it's clear, he moved

04:31:40  15   you over to Chat Secure, correct?

16   A.    Um-hum.

17   Q.    And so there's no record of anything that was said in

18   Chat Secure, correct?

19   A.    I have no idea.

04:31:49  20   Q.    Well, you can't keep any record of the conversation,

21   correct?

22   A.    No.

23   Q.    Has anyone ever shown you any transcription of any

24   conversation you had with Abu Harb?

04:32:00  25   A.    No.

```
 1    Q.    So all we have to go on as far as accuracy is what
 2    you're telling the jury here today, correct?
 3    A.    Yes.
 4    Q.    Okay.  And so at some point in time you were arrested
 5    for very serious charges, correct?
 6    A.    Yes.
 7    Q.    In fact, similar charges to what we're here today for,
 8    correct?
 9    A.    Yes.
10    Q.    And at that point in time, you came in and sat down
11    with the government and talked with them, correct?
12    A.    Yes.
13    Q.    And it was indicated to you that, "Look, if you tell
14    us what you know, we can do you some good," correct?
15    A.    So to speak.
16    Q.    Okay.  And you were working with your lawyer, correct?
17    A.    Yes.
18    Q.    Now, anything you provided them was word of mouth
19    other than your accounts, correct?
20    A.    No.  They had proof of what I said to the guy --
21    Q.    I'm sorry.  Finish.
22    A.    In Baltimore about the conversation.
23    Q.    But any of your conversation not on Twitter with Abu
24    Harb, that's just coming from you?  That's just you telling
25    them what you remember the conversation?
```

```
  1    A.    I suppose so, yes.

  2    Q.    About how many times would you say that you had

  3    conversations with Abu Harb?

  4    A.    I had one conversation with Abu Harb.

  5    Q.    On Chat Secure?

  6    A.    Yes.

  7    Q.    How many days, how many occasions did you actually sit

  8    and chat with Abu Harb?

  9    A.    I had one conversation with Abu Harb.

 10    Q.    Okay.  And at some point in time, Abu Harb indicated

 11    to you that somebody was setting up innocent people?

 12    A.    He said that the Kuffar set up innocent people.

 13    Q.    And the Kuffar refers to nonbelievers, correct?

 14    A.    Yes.

 15    Q.    And was he inferring directly about the FBI?  Or what

 16    was your opinion about who he was referring to?

 17    A.    The Kuffar is a general term.  It can be the FBI.  It

 18    can also be my mother.

 19    Q.    Well, when he indicated -- I shouldn't say he.  When

 20    Abu Harb indicated to you that Muslims were being set up,

 21    what was your interpretation of that?

 22    A.    I mean, I believed it.

 23    Q.    By whom?  Who did you believe that he was referring

 24    were setting people up?

 25    A.    Oh, the government.
```

1    Q.    Okay.  Now, you never saw sham_reason or Abu Harb.

2    You never saw this person in person, correct?

3    A.    No.

4    Q.    You personally have no idea who that American may be?

04:34:55 5    A.    No idea.

6    Q.    But you believe that this person was American because

7    instead of using mujahideen, he used jihadi, and that was

8    the expression used on American newscasts?

9    A.    I believe he was either a person from the west or the

04:35:18 10   real deal.  You know what I mean?  He would have been the

11   real deal, a real recruiter in the west.  Or I believed him

12   to be an FBI agent.  It could be either/or.

13            MR. DOUGHTEN:  One second, Your Honor.

14            THE COURT:  Yes, you may.

04:35:42 15   BY MR. DOUGHTEN:

16   Q.    Now, when you were answering questions with the

17   prosecutor, they showed you a list of people -- excuse me, a

18   list of accounts, one of which was sham_reason, that were

19   followers of you on Twitter.

04:35:58 20       Do you remember that?

21   A.    Yes.

22   Q.    And they also showed you a list of people you were

23   following, correct?

24   A.    I don't believe he said that.

04:36:07 25   Q.    I'm asking you.  Were you following people on Twitter?

1    A.    Yes.

2    Q.    Were many of those people espousing support for ISIS?

3    A.    Yes.

4    Q.    And the people that were contacting you weren't some

04:36:20  5    of those people espousing support for ISIS?

6    A.    Who was contacting me.

7    Q.    The there were a list of accounts --

8    A.    You mean people that were following me?

9    Q.    Yes.

04:36:34  10    A.    Yes.

11    Q.    So Abu Harb wasn't that different from many other

12    people.  The only different with him was he wanted to meet

13    you, correct?

14    A.    Yes.

04:36:43  15    Q.    That made you nervous?

16    A.    Yes.

17    Q.    Because it was bad either way.  Either it's ISIS or

18    it's the FBI?

19    A.    Yes.

04:36:48  20    Q.    Now, why was it bad if it was ISIS, because you were a

21    supporter of theirs at that time?

22    A.    Yes, but not really.

23    Q.    Okay.  So this was more venting your anger than what

24    you really meant?

04:37:02  25    A.    Yes.

1    Q.    And you indicated that this person, Abu Harb, had

2    said -- or I want to get this straight.

3          Did you indicate to Abu Harb that ISIS was in Texas,

4    or did he indicate to you that ISIS was in Texas?

04:37:24  5    A.    He indicated to me that he had brothers in Texas.  He

6    never used the term "ISIS."

7    Q.    He just said brothers?

8    A.    Yes.

9    Q.    And, again, he didn't say, "I had radicals"?

04:37:33  10    A.    No.

11    Q.    "I had people breaking the law"?

12    A.    No, of course not.

13    Q.    And, in fact, he said, whoever, or she, that there's

14    nothing illegal about what we're doing, correct?

04:37:41  15    A.    I don't remember saying that.

16    Q.    Okay.  You said that he said that he -- was there

17    anything in your conversations in the exhibits indicating

18    that "They're trying to set us up.  We're not doing anything

19    wrong"?

04:38:00  20    A.    He said that they set up innocent people, people that

21    aren't doing anything wrong.

22    Q.    Okay.  And at no time in these conversations with Abu

23    Harb -- and we're giving him a real name -- the only thing

24    that he said or she said that might be illegal was

04:38:19  25    recruiting, and you interpreted that word to mean ISIS, even

1    though ISIS was never said, correct?

2    A.    Yes.

3    Q.    Now, you indicated that you're here to atone?

4    A.    Yes.

04:38:30  5    Q.    But let me ask you this:

6        If you weren't offered the plea agreement, would you

7    still be sitting here today?

8    A.    Yes.

9    Q.    So if the government would have said, "Look, we would

04:38:38  10   like you to come in and testify on our behalf," you would do

11   it even if you had no agreement?

12   A.    Yes.

13   Q.    And isn't it fair to say that without -- without

14   getting in specifics, that the agreement as it is, provides

04:38:57  15   you with a basically half the sentence you could have

16   received otherwise?

17   A.    That's what they say.

18   Q.    Okay.  And isn't there also something in that

19   agreement that if the Judge doesn't accept the 16 years,

04:39:11  20   that you have an option to withdraw from the plea?

21   A.    I don't know.  I think so.

22   Q.    Okay.

23   A.    I'm not --

24   Q.    You don't remember what the actual words are?

04:39:24  25   A.    I'm not positively succinctly sure.

1    Q.    And do you know what a Rule 35 is?

2    A.    No.

3    Q.    Does your agreement include a Rule 35 provision?

4    A.    I'm not sure.

04:39:55  5          MR. DOUGHTEN:  Your Honor, can I have one moment?

6          THE COURT:  Yes.

7          THE WITNESS:  Is that something that I should

8    know?

9          THE COURT:  Your attorney will discuss it with

04:40:10 10    you.  Yes, it's something you should know about.  You should

11    talk to your lawyer about that.

12    BY MR. DOUGHTEN:

13    Q.    Back to that, you indicate you were afraid of Abu

14    Harb.  Is that right?

04:40:56 15    A.    Yep.

16    Q.    If that's the case, why did you refer him to your

17    brother in Baltimore?

18    A.    Really, honestly, to get the heat off of me.

19    Q.    And did you say "brother" or "brothers" when referring

04:41:07 20    to people in Baltimore?

21    A.    Brother, single.

22    Q.    So you only communicated one person in Baltimore?

23    A.    Yes.

24    Q.    Okay.  Thank you.

04:41:16 25          MR. DOUGHTEN:  One second.

```
 1          THE COURT:  Any redirect of this witness?

 2          MR. DOUGHTEN:  Wait.  I'm sorry.

 3          THE COURT:  I'm sorry.  Just one moment.

 4   BY MR. DOUGHTEN:

 5   Q.   Your Honor, could I approach the witness with a --

 6          THE COURT:  Yes, you may.

 7        Is it something the government has seen or has a copy

 8   of?  Just make sure the government has seen it.

 9        Counsel, why don't you approach the sidebar real

10   quick.

11        (Discussion at sidebar as follows:)

12          THE COURT:  I don't want to interject myself into

13   this, but you can cross-examine on this.  You're certainly

14   free to do this.  Do you want to give him a chance to read

15   it?

16          MR. DOUGHTEN:  I want to give him a chance to

17   read it.  I think it's the same exhibit the government has.

18          THE COURT:  Do you want to take a break and let

19   him read it?  He looked at me and said, "Gee, is this

20   something I should know about?

21          MR. SHEPHERD:  And his attorney is in the back.

22          THE COURT:  Oh, Mr. Whitney.

23          MR. SHEPHERD:  Yeah, Mr. Whitney is his lawyer

24   and I do believe he has explained this to him.

25          MR. DOUGHTEN:  Why don't we take a break and let
```

1    him read it.

2            THE COURT:  I think that's fair.  I'm going to

3    excuse the jury and I'm going to tell Mr. Whitney to come

4    back and review the plea agreement with his client again.

04:42:57 5            MR. SHEPHERD:  Yes, Your Honor.

6        (The following proceedings were had in the hearing of

7    the Jury:)

8            THE COURT:  Ladies and gentlemen of the jury,

9    we're going to take a break.  I have a couple of issues to

04:43:05 10   discuss with the attorneys.  So please, no inference, just

11   procedural issues that we have to clear up.

12       So, please leave your notepads on your chairs.

13   Remember all admonitions I've just given you about not

14   discussing the case among yourselves or with anyone else.

04:43:20 15       We'll take about 20 minutes, and then we'll reconvene

16   hopefully for the balance of the day.  And I'll try to do

17   something -- is it a little warm for all of you.

18            JURORS:  No.

19            THE COURT:  It's fine?  Then it's me.

04:43:33 20       Thank you very much.  We appreciate your courtesy.

21       (Jury out, 1:55 p.m.)

22            THE COURT:  Counsel, just as we discussed at

23   sidebar, Mr. Al-Ghazi, in fairness to you, your attorney is

24   present.  We're going to ask your attorney to go over with

04:44:15 25   you -- we'll give him and you a copy of your plea agreement

1    and we'll let your attorney speak to you.  Make sure you're

2    fully informed about the nature of your plea agreement, all

3    the details of same.

4         Otherwise, you're going to be getting asked questions

04:44:27  5    about it.  And I think in fairness to you, you have -- it

6    would be perhaps better that you be fully educated about it.

7         All right?

8              THE WITNESS:  Okay.

9              THE COURT:  All right.

04:44:40 10              DEPUTY U.S. MARSHAL:  Staying here?

11              THE COURT:  No, let him go refresh himself if

12    need be.  Let Mr. Whitney meet with him and then we'll go

13    from there.

14         Thank you very much.  Would you prefer to stay here?

04:44:54 15    I mean, I could use the -- potentially use the jury room,

16    but I'm -- not the jury room, potentially use the conference

17    room, but I don't logistically -- why don't you take some

18    time with him.

19         All right.

04:45:06 20         All right, Counsel.  We'll allow Mr. Al-Ghazi to meet

21    with his attorney, go over the plea agreement.  Then we'll

22    resume the balance of his cross-examination and any redirect

23    that you might have.

24         What's the government -- do we have another witness

04:45:25 25    today?

1          MS. MAGNONE:  Yes, Your Honor.

2          THE COURT:  Lengthy, short.

3          MS. MAGNONE:  We have one that's lengthy and two

4    that can be short.

04:45:34 5          THE COURT:  Are you going to use the short ones

6    or the long one.

7          MR. SHEPHERD:  So, Your Honor, our plan had been

8    to do the long one then the short ones.  However, based on

9    the timing -- we would like to discuss it.  There's some

04:45:49 10   travel implications that we would like to discuss.

11         THE COURT:  Discuss it.  We're going to go to

12   4:30.  No later than 4:30.  I have an arraignment at 4:30?

13         MR. SHEPHERD:  Yes, Your Honor.

14         THE COURT:  So thank you very much.  That's how

04:46:02 15   we'll proceed.

16         (Recess taken, 1:55 p.m.)

17         (Jury in, 2:20 p.m.)

18         THE COURT:  Counsel, you may resume your

19   cross-examination.

05:10:32 20        MR. DOUGHTEN:  Thank you, Your Honor.

21   BY MR. DOUGHTEN:

22   Q.    I just have a couple more things, Mr. Al-Ghazi.

23   During the break, you've had time to kind of think about

24   what a Rule 35 was?

05:10:41 25   A.    Sure.

1    Q.    What was your understanding of that?

2    A.    My understand of a Rule 35 is after -- the prosecution

3    or the government has an opportunity, or a chance to talk to

4    the judge after a year to get more time off, I believe.

05:10:55 5   Q.    Based on your cooperation, correct?

6    A.    Right.

7    Q.    Okay.  So basically the -- you're going to get quite a

8    benefit for assisting the government, correct?

9    A.    I hope so.

05:11:05 10  Q.    Hopefully.  Hopefully.

11         And it's your understanding that in order to do so,

12   you're required under the agreement to tell the truth,

13   correct?

14   A.    Absolutely.

05:11:14 15  Q.    Who determines what the truth is?  It's the

16   government, isn't it?

17              MR. SHEPHERD:  Objection, Your Honor.

18   BY MR. DOUGHTEN:

19   Q.    In this instance?

05:11:25 20             THE COURT:  Ladies and gentlemen -- go ahead and

21   answer the question.  I'll give you some further explanation

22   and instructions as we go along.  Go ahead, Counsel.

23              THE WITNESS:  I believe the truth is determined

24   by evidence and corroboration that the government has.

05:11:38 25  BY MR. DOUGHTEN:

1   Q.    But ultimately whether the government moves for the

2   departure, moves for you to get less time is based upon

3   whether they believe you're being honest with them, correct?

4   A.    In accordance with evidence and corroboration.

05:11:52 5   Q.    Okay.  And, again, you never met Abu Harb, correct?

6   A.    No.

7   Q.    And you've never met Erick Hendricks until today,

8   correct -- or you didn't meet him but you've never seen him

9   until today, correct?

05:12:07 10   A.    I've seen him.

11   Q.    Prior to recently you never saw Erick Hendricks,

12   right?

13   A.    If your asking me if I know that he's Abu Harb, I have

14   no idea who Abu Harb is.

05:12:20 15   Q.    Okay.  That's good.  Thank you very much.

16         THE COURT:  Counsel any redirect?

17         MR. SHEPHERD:  Yes, Your Honor.

18         REDIRECT EXAMINATION OF AMIR AL-GHAZI

19   BY MR. SHEPHERD:

05:12:40 20   Q.    Mr. Al-Ghazi, I just want to follow up on a few

21   questions that you were asked by Mr. Doughten.  Okay?

22   A.    Yes.

23   Q.    First, sir, how old are you?

24   A.    I'm currently 41 years old.

05:12:52 25   Q.    And under the terms of your plea agreement, if you

        1   fully cooperate, how much time is it that you would serve,

        2   if the Judge follows the plea agreement?

        3   A.    Sixteen years.

        4   Q.    Sir, your you were also asked if Abu Harb, in the

05:13:09 5   conversation, had talked about any illegal activity.

        6         Do you remember that question?

        7   A.    Yes.

        8   Q.    Did he -- I think earlier -- is it correct that he did

        9   talk to you about waging jihad on the Kuffar?  Is that what

05:13:25 10  you previously stated?

       11   A.    Yes.  Excuse me.  Yes.

       12   Q.    So what do you take wage jihad on the Kuffar to mean?

       13   At that time?

       14   A.    At that time, I take wage jihad on the Kuffar would be

05:13:39 15  to struggle against the Kuffar, which could probably involve

       16   violence.

       17   Q.    And during these conversations, did he also talk to

       18   you about military training?

       19   A.    Yes.  He asked me if I had training.  So what am I

05:13:51 20  training for if it's not -- you know, why ask me for

       21   training if it's not to train for something.

       22   Q.    And, sir, under the terms of your plea agreement, you

       23   were just asked about this Rule 35 request the government

       24   could make.

05:14:10 25        Have you been promised that the government will make

1    such a request?

2    A.    No.

3    Q.    Does your plea agreement include a promise that the

4    government will make such a request?

05:14:19  5    A.    No.

6              MR. SHEPHERD:  Your Honor, I have no further

7    questions.

8              THE COURT:  Thank you.  May I see the plea

9    agreement, please?

05:14:39 10              MR. SHEPHERD:  Yes, Your Honor.

11         (Pause.)

12              THE COURT:  Ladies and gentlemen, I think I will

13    provide you some background information that may be helpful

14    in understanding the issues regarding the defendant's plea

05:15:36 15    agreement.

16         The defendant has entered into a written plea

17    agreement with the government.  The government and the

18    defendant -- this is not unusual -- have negotiated the

19    agreement.  It's in writing.  The agreement calls for a

05:15:50 20    specific sentence.

21         However, the agreement also calls, contains a

22    provision for what is so-called substantial assistance

23    and/or cooperation.  The nature of that type of provision is

24    that if the defendant, in this case Mr. Al-Ghazi, testifies,

05:16:09 25    provides the government with information, testifies

1    truthfully at trial and assists the government, then the

2    government may make a motion asking that this defendant

3    receive a reduced sentence.

4            The government must make the formal request, however.

5            Additionally, the agreement contains a provision

6    called a Rule 35(a).  Rule 35(a) is a rule of criminal

7    procedure that allows the government, within one year after

8    the defendant has been sentenced, to seek a further

9    reduction.

10           These matters are subject to the discretion of a

11   Judge, whether or not to grant the request for substantial

12   assistance, whether to grant the Rule 35, is subject to the

13   discretion of a judge.

14           However, in fairness, you should be made aware the

15   government must make the request.  The government must make

16   a formal motion or request for the defendant to receive the

17   benefit of either substantial assistance or the Rule 35.

18           This defendant does not know what type of sentence he

19   will receive yet.  He has not yet been sentenced.

20           I offer that to you only by way of background.  You

21   rely upon the testimony, of course, and there may be further

22   instructions regarding the nature of the agreement at the

23   time we provide you instructions of law.

24           Thank you.

25           Any other questions of this witness, please?

1          MR. SHEPHERD:  Not from the United States, Your

2    Honor.

3          MR. DOUGHTEN:  We're fine, Your Honor.  Thank

4    you.

05:17:39 5          THE COURT:  Thank you.

6       Mr. Al-Ghazi, you're excused.

7       Thank you very much, sir.

8          THE WITNESS:  Thank you.

9          THE COURT:  Good luck to you, sir.

05:17:47 10          THE WITNESS:  Thank you.  Have a great day.

11          THE COURT:  Counsel, does the government have

12   another witness, please?

13          MR. SHEPHERD:  We do Your Honor.  The government

14   calls Janet Lynn Miller.

05:18:13 15          THE COURT:  All right.  Just one moment.

16       Ms. Miller, if you would just approach the witness

17   stand, please, and remain standing for me.

18                     JANET LYNN MILLER,

19       of lawful age, a witness called by the United States,

05:18:48 20          being first duly placed under oath, was examined

21                   and testified as follows:

22          THE COURT:  Please be seated.  Be careful.

23          THE WITNESS:  Thank you.

24          THE COURT:  There's a couple steps there.  Take

05:19:09 25   your time.

1           Are you ready?

2                THE WITNESS:  Yes, sir.

3                THE COURT:  All right.  Thank you.

4           Just a couple brief instructions.  Please wait until

05:19:18 5   the attorneys complete their questions before you begin to

6    respond.  The court reporters here have to take down,

7    transcribe what you're saying.  It's difficult for them when

8    two individuals are speaking at the same time.

9           Also, if there is an objection to any question, do not

05:19:33 10  answer the question until I rule on the objection.  Of

11   course, if I say sustained, you'll not answer the question.

12          You'll need to respond verbally, not through nods,

13   shakes of the head, things of that nature to all the

14   questions.

05:19:47 15               THE WITNESS:  I'm sorry, didn't understand.

16               THE COURT:  I'm sorry, you'll have to speak

17   verbally, respond to the questions verbally, not through

18   shaking your heads or nods or things of that nature.

19               THE WITNESS:  Okay.

05:19:59 20               THE COURT:  All right.  Thank you very much.

21          Counsel, you may proceed.

22               MR. SHEPHERD:  Thank you, Your Honor.

23               DIRECT EXAMINATION OF JANET LYNN MILLER

24   BY MR. SHEPHERD:

05:20:03 25  Q.    Would you please state your name?

1    A.    Janet Lynn Miller.

2    Q.    And ma'am, where do you currently live, what city and

3    state?

4    A.    Colombia, South Carolina.

05:20:13 5    Q.    And, ma'am, are you a practicing Muslim?

6    A.    Yes, I am.

7    Q.    For how long?

8    A.    Twenty-four years.

9    Q.    And, ma'am, could you please explain for the jury your

05:20:23 10    dress today?

11    A.    It's traditional Islamic wear.  And I chose to

12    practice my religion wearing this.

13    Q.    Is that something you've done all your life?

14    A.    I took off after 9/11.  I took my veil off and I put

05:20:41 15    it back on last year, but, otherwise, it's the same dress

16    almost every day.

17    Q.    Is there a reason you decided to put your veil on

18    again last year?

19    A.    Because I could.  Because I was in a situation where I

05:20:55 20    no longer had to deal with the public day-to-day.  I do most

21    of my work on the phone.  And Lynn Miller is a -- sound

22    pretty Baptist, and people don't expect me when they meet

23    me.  So since I don't have to work in the public, I felt

24    like I could practice my religion the way I'm most

05:21:14 25    comfortable with.

1     Q.    And is your dress today of your own choosing?

2     A.    Oh, yes, sir.

3     Q.    Has anyone asked you to dress that way?

4     A.    No, sir.

05:21:23  5     Q.    And what do you do for a living currently?

6     A.    I'm a headhunter, which means I recruit for warehouse

7     managers, plant managers, I even, when I came to Columbia, I

8     was doing nurses.

9     Q.    And do you have any other jobs that you do as well in

05:21:47 10    Columbia?

11    A.    I manage a home for a 91-year-old brother that, and

12    his 86-year-old wife.  I pay their bills and have 24-hour

13    care.  I do that.  And I also work with the refugees.

14    Q.    Refugees from where?

05:22:05 15    A.    All often the country -- I'm sorry, world,

16    Afghanistan, Iraq, Iran, Syria.

17    Q.    Where are you originally from?

18    A.    Orlando, Florida.

19    Q.    And, again, how many years ago did you become a

05:22:17 20    Muslim?

21    A.    Twenty-four.

22    Q.    Besides living in Columbia, where did you live before

23    moving to Columbia?

24    A.    Baltimore.

05:22:31 25    Q.    And approximately how long did you live in Baltimore?

```
 1    A.    One year.

 2    Q.    Do you know a person named Erick Hendricks?

 3    A.    Yes.

 4    Q.    Are there any other names that you know him by?

 5    A.    Abu Merriam and Mustafa.

 6    Q.    How is it that you know him?

 7    A.    I met him through a friend and one of his wives.

 8    Q.    And how long have you known him?

 9    A.    I met him -- I think it was the beginning of March of

10    2015 -- 2016 or 2015.

11    Q.    And have you seen him since that time?

12    A.    Around a masjid in Columbia, South Carolina.

13    Q.    And what is a masjid?

14    A.    That's where we worship, like a church.

15    Q.    Did you attend the same masjid as him then?

16    A.    Yes.  I was been going in and out of Columbia for 12

17    studying under a sheikh.

18    Q.    And is he the person in charge of the masjid?

19    A.    The imam, like the pastor.

20    Q.    I would like to ask you whether you see Mr. Hendricks

21    in the courtroom today?

22    A.    Yes, he is behind you.  I've never seen him dressed

23    like that, but that's him.

24          MR. DOUGHTEN:  Your Honor, we'll stipulate to the

25    identification.
```

```
         1              THE COURT:  We'll note the stipulation and the

         2       identification as well.

         3       BY MR. SHEPHERD:

         4       Q.    Now, Ms. Miller, I want to take you back to the first

05:23:52 5       time you met Mr. Hendricks.

         6              Where was that?

         7       A.    At my home in Baltimore.  It was -- it's a three-level

         8       house.  And I lived in the middle section along with my

         9       daughter.  And on the top floor was my friend that had moved

05:24:09 10      there from Columbia, Jenny.

        11       Q.    And was that on March 19, 2015?

        12       A.    Approximately.

        13       Q.    And what were the circumstances of meeting Mr.

        14       Hendricks?

05:24:20 15      A.    My friend called me on the phone and said, "I want you

        16       to meet a friend of my from Columbia."  So I went upstairs

        17       to meet her.  She was very nice.  We started talking.  And

        18       then she left.  I don't know how detailed -- the whole

        19       thing.

05:24:40 20      Q.    I want to back up a minute.

        21              So, again, who was your friend?

        22       A.    Jenny.

        23       Q.    And what was her last name?

        24       A.    Sepulveda.

05:24:48 25      Q.    And she lived in the same building?
```

1           THE WITNESS:  Yes, same.

2           THE COURT:  Can you spell the last name for us?

3           THE WITNESS:  I wish I could.  I apologize.

4           THE COURT:  I'm just trying to help our court

05:25:01  5    reporters.

6           THE WITNESS:  I'm sorry.

7           THE COURT:  That's fine.

8    BY MR. SHEPHERD:

9    Q.    So if I understood you right, was she an acquaintance

05:25:09 10   of Mr. Hendricks?

11   A.    She was one of his wives for a few days.

12   Q.    What do you mean by that?

13   A.    They married and it ended like after three days.

14   Q.    And is that an Islamic concept?

05:25:21 15   A.    Absolutely not.  No.  Marriages are very serious and

16   divorce is very tough.  It takes like three months to end a

17   marriage and you're supposed to have counseling and

18   guidance.  It's very odd to have married the way that they

19   married and ended it.

05:25:39 20   Q.    And after this happened, is that when you met Mr.

21   Hendricks?

22   A.    Yes.

23   Q.    What happened -- first who attended this meeting with

24   Mr. Hendricks?

05:25:51 25   A.    It was his other wife, Aaminah, it was Erick, it was

1  Jamillah, but Jenny's Muslim name is Jamillah and myself.

2  Q.    And when you say Aaminah, can you spell that?

3  A.    No.  Sorry.  It's something that's translated and so

4  everyone spells it differently.

05:26:11  5  Q.    And was Aaminah her only name that you can knew her

6  by?

7  A.    That's all I knew her by.  That's the only name I knew

8  her by.  But she has an American name.

9  Q.    Do you know of any -- or have you met any other wives

05:26:28  10  of Mr. Hendricks?

11  A.    Yes, he's got currently two wives, another Aaminah in

12  South Carolina.

13  Q.    And do you know the other Aaminah's, I guess, American

14  name?

05:26:40  15  A.    No, I don't.  We don't really -- no.  I'm Lynn.  I'm

16  Lynn everywhere I go.  But some Muslims are, if they're in

17  the masjid they go by one name and if they are at work, they

18  go by their legal name.  I don't ever see that, though.

19  Q.    So who arranged for this meeting in Baltimore?

05:27:00  20  A.    You know, it's really strange.  It was very unexpected

21  when Aaminah called Jamillah, I guess, and they called me up

22  there.  And then Aaminah arranged the meeting for me to meet

23  Mustafa, which is very unusual.

24  Q.    Why is that unusual?

05:27:17  25  A.    Well, men and women don't sit together normally.

1    Q.    Is that something that you take as a part of your

2    faith?

3    A.    Yes, separation.

4    Q.    Ms. Miller, what happened during this meeting with Mr.

05:27:32 5    Hendricks or Mustafa?

6    A.    When his wife was with Jamillah and I before he came,

7    we were talking about the Khalifa, and the Islamic State,

8    Twitter, Facebook, different methods of being able to

9    communicate that can't be tracked.

05:27:52 10    And I -- and she left, and I thought that was odd, you

11    know.

12    Then I get this call, I need you to meet my

13    husband -- excuse me.  She didn't call me.  Jenny called me

14    and said they wanted me to meet Mustafa, which I thought was

05:28:07 15    odd.  And I cooked dinner, and they came over.

16    Q.    And then what happened during the actual dinner where

17    Mr. Hendricks was there?

18    A.    He talked about how we needed to prepare as Muslims

19    for the time that nonbelievers would pick us up and harm us,

05:28:25 20    that they were going to have land that we could all live on

21    to prepare for the pick up.

22    He was very interested in my contacts with overseas

23    people and he wanted to meet some of them.

24    Q.    Did he discuss anything about weapons?

05:28:41 25    A.    Yes.  We had to be trained.  We had to protect

1    ourselves.

2    Q.    And what kind of training was he talking about?

3    A.    Guns.

4    Q.    Did he indicate whether he already had land?

05:28:54 5    A.    He did.  He said he already had the land.

6          At one point I was told it was done and the camp was

7    ready.

8    Q.    Did he talk about getting more land as well?

9    A.    Yes.  He was out scouting land.

05:29:07 10    Q.    Did he mention anything about ISIS or the Islamic

11    State during this meeting?

12    A.    Well, of course, it was a large conversation about the

13    Islamic State, about the Khalifa, about our responsibility

14    as Muslims to, you know, protect each other.

05:29:23 15    Q.    Did he express any opinions about the Islamic State?

16    A.    He definitely did.  He supported the Islamic State.

17    Q.    Now, at that time, were you a supporter of the Islamic

18    State?

19    A.    He would talk to me and believe I was, yes.

05:29:37 20    Q.    What do you mean by that?

21    A.    I support the establishment of caliphate, not the way

22    it's been established or how it's being established.  I

23    support Islamic society overseas, certainly not here, and

24    the ability to make a choice to go there or not.

05:29:55 25          But many people think I'm an IS supporter.  I'm not an

1    IS supporter.  I just support the dream of an Islamic

2    country.

3    Q.    You've used a couple terms I believe, Khalifa or

4    Khalifa.  What does that mean?

05:30:13 5    A.    It's where you have a Muslim lead the country based on

6    Islamic law.

7    Q.    And is that something you support?

8    A.    Of course I do, but without the violence.

9    Q.    I was just going to ask you, what about the Islamic

05:30:27 10    State makes you say that's not what you support?

11    A.    The killing of innocents, the killing of innocents.

12    Q.    And during this conversation, what was the

13    defendant -- I'm sorry, Mr. Hendricks saying about the

14    Islamic State?

05:30:43 15    A.    That he wanted to meet more people like me and he

16    wanted to -- he asked me -- I have to apologize.  It was a

17    text, so I don't know who sent the text.  It came from his

18    wife's phone.  They had people -- they wanted me to set up

19    meetings with like-minded people.

05:31:01 20    Q.    Did he talk at all about recruiting?

21    A.    Yeah.

22    Q.    What did he say about recruiting?

23    A.    Finding like-minded people so that he could talk with

24    them, go make sure they're all on the same team, and bring

05:31:15 25    them out to the facility -- sorry, I'm nervous.

1    Q.    And that's okay, Ms. Miller.

2          If you could just try to slow down a little as you

3    talk.  That's okay.

4          And, Ms. Miller, during this conversation, did he

05:31:31 5    actually ask you about contact with anyone overseas?

6    A.    Abu Haleema.

7    Q.    And how is that?

8    A.    Abu Haleema is -- at least what the U.K. says is a

9    hate preacher.  And I've been in a lot of contact with him.

05:31:50 10   Also, he wanted to meet him because he is a straight guide

11   into the Islamic State.  He'll introduce you to people

12   there.  He'll help you get there.  Currently he's in prison

13   in the U.K.

14   Q.    During this meeting with Mr. Hendricks, what was your

05:32:08 15   reaction to all of this?

16   A.    I wasn't quite sure.  I thought, is he real?

17         But then I became fearful after the whole thing ended

18   and I went and I replayed it in my mind.  These are probably

19   the most dangerous people, in my mind, is the ones that very

05:32:30 20   charismatic and seem to understand the Din.  I knew he was

21   quoting things that incorrect because I study, but I found

22   him to be scary.

23   Q.    Did you do anything because you were scared?

24   A.    I don't understand.

05:32:45 25   Q.    Excuse me.  After this meeting, did you do anything as

1    a result of what Mr. Hendricks told you?

2    A.    I still don't understand.  I'm sorry.

3    Q.    I'll rephrase.

4          After this meeting, did you contact anyone?

05:32:58 5    A.    I did.

6    Q.    About the meeting?

7    A.    I did.

8    Q.    Who did you contact?

9    A.    The back story or the whole --

05:33:06 10    Q.    Just immediately, who did you contact?

11    A.    A contact I had in North Carolina with the FBI.

12    Q.    Why did you do that?

13    A.    Because I was afraid.

14    Q.    And you said a back story.  What was the -- I'll

05:33:21 15    rephrase.

16          Had you previously talked to this FBI agent in North

17    Carolina?

18    A.    Yes.  They came to my home because I ran a charity out

19    of Florida in Tampa called the Al-Ansar right at 9/11 when

05:33:37 20    it happened.  It was a Syrian-based like most of our doctors

21    were Syrian and I raised money and I would put it out to

22    women that were alone, that couldn't pay their rent or

23    couldn't pay their light bill.

24          And they said they've been looking for me since like

05:33:51 25    9/11.  So they found me like 2011.

1    Q.   Were you charged were any crimes in relation to that?

2    A.   No.  No.  But they had a lot of questions where money

3    went.

4    Q.   And did you participate in this interview with the

05:34:02  5    FBI?

6    A.   It took me -- took them five minutes to get in my

7    house.  Then I was very cooperative.

8    Q.   And did that have anything at all to do with Mr.

9    Hendricks?

05:34:11 10    A.   No, it was just questioning about the Tampa charity.

11    Q.   So then after you had this meeting with Mr. Hendricks,

12    you contacted the same agent, if I understood you earlier?

13    A.   Yes.

14    Q.   At that time, were you working for the FBI in any way?

05:34:29 15    A.   No.

16    Q.   Were you getting paid by the FBI in any way?

17    A.   No.

18    Q.   At a later time, did you indeed work for the FBI?

19    A.   Yes.

05:34:39 20    Q.   At some point after this meeting in this Baltimore,

21    did you move from Baltimore?

22    A.   Yeah.  In October, like 17th of the same year.

23    Q.   And where did you move to?

24    A.   Back to -- I moved to Columbia, South Carolina, where

05:34:57 25    my friend had moved up from, she moved back.  And I moved

1    there to Columbia.

2    Q.    And while you were in Columbia, were you working for

3    the FBI?

4    A.    I do a -- yeah, um-hum.

05:35:10  5    Q.    And were you paid?

6    A.    Some, yes.

7    Q.    Between approximately May of 2015 and the present,

8    have you received a little over $89,000?

9    A.    I couldn't tell.  If that's what you say.  I don't

05:35:28 10   have any money, so, if you paid me that, that must have been

11   what you paid me.

12   Q.    When you say you couldn't tell, you don't have any

13   money, what do you mean by that?

14   A.    I don't have any money.  I would have hoped I would

05:35:38 15   have saved some, but -- I did put my money back into

16   community so I don't know what I've been paid.  But if you

17   say that, it must be right.

18   Q.    Ms. Miller, at the time you had this meeting and

19   called the FBI about Mr. Hendricks, what were your

05:35:59 20   expectations about what would happen?

21   A.    That -- I didn't think anymore with me.  I thought

22   that somebody would follow the information and hopefully

23   check him out to see if he was as threatening as I felt he

24   was.

05:36:16 25   Q.    Did you have any expectation that you would be paid at

1    that time?

2    A.    No, I didn't even know that existed.

3    Q.    Did you later receive any money specifically because

4    of what you reported on this meeting in Baltimore?

05:36:30  5    A.    I don't think so.  I think it was like the whole

6    everything I do.

7              MR. SHEPHERD:  Your Honor, may I have one moment,

8    please?

9              THE COURT:  You may.

05:37:11  10    BY MR. SHEPHERD:

11    Q.    Ms. Miller, you mentioned earlier that you're nervous?

12    A.    I am.

13    Q.    Why are you nervous today?

14    A.    Just because there's a lot of people here.  And I just

05:37:21  15    haven't talked in a large group in a long time.

16    Q.    Is this something you enjoy doing?

17    A.    I enjoy sharing and teaching, but on a smaller scale.

18              MR. SHEPHERD:  Your Honor, I have no further

19    questions.

05:37:37  20              THE COURT:  Thank you.

21         Counsel.

22              MR. SHEPHERD:  Your Honor, can we approach?

23              THE COURT:  Yes.

24         (Discussion at sidebar as follows:)

05:38:05  25              MR. HARTMAN:  Judge, this witness has a prior

1    criminal record.  She has a felony conviction that is more

2    than ten years old.  However, I think under Rule 609 it's

3    more probative than prejudicial, and supported by facts and

4    circumstances being that it happened after she converted to

05:38:26  5    being Muslim, she was charged and convicted of grand theft.

6          I would like to inquire about that.  The government

7    objects.  We thought we would bring it to you before we

8    started just so I didn't have to ask the question.

9               THE COURT:  What's the basis of the objection?

05:38:38  10              MR. SHEPHERD:  Your Honor, it's a conviction for

11   grand theft, and although, a felony, from 1995, it's --

12   under Rule 609, it's outside the ten-year window and we

13   believe a conviction this remote in time, now over 22 years

14   ago, is too remote in time to have the probative value

05:38:58  15   outweigh the prejudicial value of an inquiry into a felony

16   conviction.

17              THE COURT:  What is the probative value?

18              MR. HARTMAN:  Judge, I think it's probative of

19   the fact that it was after she converted to be a Muslim.

05:39:11  20   She still wasn't living a life according to the beliefs that

21   she is espousing.

22              THE COURT:  Well, it's a close question.  I think

23   given the nature of the case and the issues involved, I'll

24   allow the question.

05:39:29  25        Again, it's a close question, but I'll allow.

```
            1              MR. SHEPHERD:  Yes, Your Honor.

            2              MR. HARTMAN:  Thank you.

            3          (The following proceedings were had in the hearing of

            4      the Jury:)

05:39:43    5              CROSS-EXAMINATION OF JANET LYNN MILLER

            6      BY MR. HARTMAN:

            7      Q.   Good afternoon.

            8      A.   Good afternoon.

            9      Q.   You're a convicted felon, correct?

05:39:50   10      A.   I am, yes.

           11      Q.   What was that conviction for?

           12      A.   I write bad checks, 20 some years ago.

           13      Q.   After you converted to Muslim, correct?

           14      A.   No, the checks were before.

05:40:02   15      Q.   I thought you said you converted 24 years ago?

           16      A.   I did.  I was charged after I was Muslim.  They

           17      weren't written as a Muslim.

           18      Q.   Okay.  And now you get paid by the FBI?

           19      A.   I do a lot of things, but yes, I have received payment

05:40:21   20      if the FBI.

           21      Q.   And that started in May of 2015, correct?

           22      A.   I thought the first payment was October of 2015.

           23              MR. SHEPHERD:  Your Honor, just discussing with

           24      defense counsel, we'll stipulate that her payment began in

05:41:04   25      May of 2015 on this particular issue.
```

```
          1              THE COURT:  All right.  We'll note the
          2     stipulation.  That's the agreement that, in fact, the
          3     payments did begin in May of 2015.
          4              All right.  Thank you, Counsel.
05:41:14  5              Go ahead.
          6     BY MR. HARTMAN:
          7     Q.   And, ma'am, isn't it a fact that when you first
          8     contacted the FBI about your so-called concerns about Mr.
          9     Hendricks was in May of 2015?
05:41:27 10     A.   No, it wasn't.  I called the day after he left the
         11     house.
         12     Q.   Okay.  When did you first have a formal interview with
         13     the FBI?
         14     A.   I can't remember.  I'm being honest.  I can't
05:41:40 15     remember.  Within a few days.
         16     Q.   You understand, don't you, as an informant, that if
         17     you don't produce results you won't get paid as much?
         18     A.   No, I didn't know that.  No.
         19     Q.   Do you understand that if you don't produce results,
05:42:01 20     you can actually be closed as a source?
         21     A.   I'm sure that's true.  I never thought about it.  But
         22     it's not the reason I started this, was not money.
         23     Q.   But you would agree with me $90,000 is a lot of money,
         24     wouldn't you?
05:42:22 25     A.   I would agree would you, I would agree with anybody on
```

1    that, yeah.

2    Q.    Okay.

3          Now, earlier on direct examination you testified that

4    many people think you're an IS supporter?

05:42:44  5    A.    Yes, they do.

6    Q.    Why do they think that?

7    A.    Because of the way I speak, because of the way I speak

8    and how -- you know, the sheikhs that I follow.

9    Q.    Because of the things you say, you mean?

05:42:56 10    A.    Well, and the lectures I listen to.

11    Q.    Are they considered radical?

12    A.    Yes.

13    Q.    And would people -- prior to the time you ever met

14    Erick Hendricks, would it be true also then that people

05:43:10 15    would have thought you were an IS supporter?

16    A.    Absolutely.

17    Q.    And just to be clear, you support the establishment of

18    an Islamic State overseas?

19    A.    Absolutely.

05:43:22 20    Q.    Did you at any point before you were hired as an

21    informant for the FBI inform anyone that you were a

22    supporter of ISIS?

23    A.    I don't remember being hired by the FBI.  And I

24    would -- I got a phone call after the shootings in France by

05:43:49 25    one of the FBI agents that had come to my home.  And I told

1    him I was up on Twitter and other sites and getting the real

2    news.

3         But I was not hired by the FBI.

4    Q.    You were paid by the FBI?

05:44:03 5    A.    I was -- I received payment, but none of -- months

6    after I was giving information.

7    Q.    You were paid by the FBI, yes or no?

8    A.    Yes.  I said yes.

9    Q.    Okay.  So before the time that you started getting

05:44:14 10   paid by the FBI, did you ever tell anyone that you were a

11   supporter of ISIS?

12   A.    Of course, I did.  I told Erick.

13   Q.    Did you ever use the social media platform called

14   Wickr?

05:44:37 15   A.    Who?  Wickr?  No, I don't know Wickr.  Twitter.

16   Q.    Twitter?

17   A.    Twitter.

18   Q.    Did you ever use one called Surespot?

19   A.    Did not using Surespot.  Used Twitter, Facebook,

05:44:50 20   Telegram, Whatsapp.

21   Q.    Now, in May of 2015, you got texts from my client

22   indicating to you to be careful of radicals and terrorists,

23   correct?

24   A.    Yeah, um-hum.

05:45:11 25   Q.    And he also stated to you that he wasn't a radical,

1    correct?

2    A.    Yes, he did in that text, yes.

3    Q.    And he stated to you in another text that he believed

4    Islam to be a peaceful religion, correct?

05:45:23 5    A.    I think so, yes.  Okay.  But at this point, he thought

6    I was FBI?

7              MR. HARTMAN:  I'm going to move to strike.  There

8    was no question pending.

9              THE COURT:  Yes.  Disregard the answer, ladies

05:45:35 10   and gentlemen.

11        Ma'am, do not volunteer information not called for by

12   the question.  Answer only the question that's been posed by

13   counsel, please.

14        Next question, please.

05:45:45 15   BY MR. HARTMAN:

16   Q.    Didn't he also tell you that he had never taken an

17   oath of allegiance to ISIS or Bay'ah?

18   A.    It's Bay'ah.

19   Q.    Bay'ah, I'm sorry?

05:45:57 20   A.    And I don't remember that being said.

21   Q.    Okay.

22              MR. HARTMAN:  Judge, can I have a moment?

23              THE COURT:  Yes, you may.

24              MR. HARTMAN:  Your Honor, I have no further

05:46:16 25   questions at this time.

```
         1              THE COURT:  Thank you.  Any redirect of this
         2    witness?
         3              MR. SHEPHERD:  Yes, Your Honor.
         4              REDIRECT EXAMINATION OF JANET LYNN MILLER
05:46:20 5    BY MR. SHEPHERD:
         6    Q.    Ms. Miller, I just want to clarify, in the spring of
         7    2015, were you actually a supporter of ISIS or the supporter
         8    of the concept of a --
         9    A.    The concept of a Khalifa.  It was never I supported
05:46:42 10   ISIS.  I supported the establishment of Khalifa.  Currently
         11   those were the only people that we're trying to establish.
         12   Q.    And you were just asked about some text messages that
         13   were received from Mr. Hendricks in which -- in May of 2015
         14   in which he indicated that, according to the questioning,
05:47:02 15   comments about Islamic being peaceful and related texts.  Do
         16   you remember those?
         17   A.    Yeah, I do, um-hum, some of them.  I didn't remember
         18   what he said, some of it.
         19   Q.    Were those text messages consistent with what he told
05:47:16 20   you in person when you met with him?
         21   A.    Absolutely not.
         22   Q.    And what was different about what he told you in
         23   person?
         24   A.    He wanted to support the establishment of Islamic
05:47:33 25   State, weapons, training area, and now he's saying how
```

1    peaceful Islam is in the texts.  They weren't.  It was

2    almost to wipe away what he said to me.

3    Q.    During any of the text messages, did he indicate

4    whether he thought the FBI was following him?

05:47:50 5    A.    Yes, he said the FBI was following him.  He was going

6    to get an attorney and sue the FBI for following him.

7              MR. SHEPHERD:  No further questions, Your Honor.

8              THE COURT:  Thank you.

9         Anything else?

05:48:02 10              MR. HARTMAN:  No recross, Your Honor.

11              THE COURT:  All right.

12         Ma'am, you can step down.  You're excused.

13         Be careful.  Just take a moment.

14         Counsel, you may call your next witness.

05:48:29 15              MR. BENNETT:  Thank you, Your Honor, at this time

16    the government would call Jeffrey Reese.

17              THE COURT:  Sir, if you would approach the

18    witness stand over here to my right, please.  Just remain

19    standing.

05:48:49 20         Raise your right hand, sir.

21                     JEFFREY REESE,

22         of lawful age, a witness called by the United States,

23           being first duly placed under oath, was examined

24                    and testified as follows:

05:49:04 25              THE COURT:  All right.  Be seated in the witness

1       stand, if you would.  Just some brief instructions.

2              Please wait until the attorneys complete their

3       questions before you begin to answer.  It's difficult for

4       listeners and the court reporters when two individuals are

05:49:19  5   speaking at the same time.

6              If there is an objection by either side, please wait

7       until I rule on the objecting objection before you answer

8       question.  Of course, if I sustain the objection, you'll not

9       answer the question.

05:49:32 10           You need to respond verbally for the court reporter,

11      not through shakes of the head, nods or other forms of

12      response.

13             Thank you for your cooperation.

14             Counsel, you may proceed.

05:49:44 15           MR. BENNETT:  Thank you, Your Honor.

16                 DIRECT EXAMINATION OF JEFFREY REESE

17      BY MR. BENNETT:

18      Q.    Mr. Reese, can you please introduce yourself to the

19      ladies and gentlemen of the jury and spell your last name

05:49:50 20      for the court reporter?

21      A.    Absolutely.  Good afternoon.  My name is Jeff Reese.

22      My last name is R-E-E-S-E.

23      Q.    And, Mr. Reese, are you here pursuant to a subpoena

24      today?

05:50:01 25      A.    That is correct, sir.

1    Q.    And prior to today, had you and I had an opportunity

2    to meet?

3    A.    I have never met you before today.

4    Q.    Have you had an opportunity to talk to the government

05:50:10  5    on the phone prior to your testimony today?

6    A.    Yes, sir.

7    Q.    Had an opportunity to review some documents prior to

8    today?

9    A.    Yes, sir, that is true.

05:50:17 10    Q.    Okay.  Can you tell the members of the jury where you

11    currently live, just the city and state?

12    A.    I live in Beloit, Wisconsin.

13    Q.    And what exactly do you do for a living?

14    A.    So I have kind of an unusual profession.  I sell real

05:50:39 15    estate out west for a living.

16    Q.    And where in particular, the states?

17    A.    The majority of -- I've got several thousand acres in

18    northern Nevada spread through eight different counties.  I

19    also dabble a little bit in California, Colorado, Arizona,

05:50:52 20    Mexico and Utah.

21    Q.    And, in general, can you describe this land, what kind

22    of land it normally is?

23    A.    The land I sell is remote.  So it's usually larger

24    properties, from 20 acres up to 640 acres.  But it is remote

05:51:07 25    land.

1    Q.    When you say remote, is there running water on most of
2    the land?
3    A.    Most of them there's not.  Some of the properties will
4    have power and stuff.  But most of them are off grid, no
05:51:16 5    running water.  They will require a well and septic and that
6    kind of thing.
7    Q.    And as far as ability to get to or ease to get to this
8    property?
9    A.    It varies because I do have thousands of acres.  But
05:51:30 10    most of them are quite remote and difficult to reach.
11    Four-wheel drive in most cases.
12    Q.    And do you own this land outright?
13    A.    I do.  Every property I own, I own outright.
14    Q.    And how do you market this land?
05:51:45 15    A.    So I don't sell strictly through eBay.  I sell through
16    my website as well.  But Ebay is probably half of my sales.
17    Q.    So I would like to bring your attention to
18    Government's Exhibit 121.  And we'll start at 211, page 211
19    for now.
05:52:01 20          So I'll represent to you that Exhibit 121 is
21    approximately 257 pages.
22          Prior to your testimony, did you have an opportunity
23    to review this document?
24    A.    Yes, sir, I did.
05:52:19 25    Q.    Or series of documents.

1          And what in general are these documents?

2     A.    So these are basically a series of Emails between

3     myself and the defendant, with his -- which started, you

4     know, when he started to purchase property from me.  It's

05:52:35 5     just an exchange of a few messages.

6     Q.    And can we blow up the middle from "you" down to

7     "56 people"?

8          And can you identify what information is being shared

9     here?

05:52:52 10    A.    So in the bottom of this, it's got the title of the

11    property that he was buying.  It's a 20-acre property in

12    northern California located in Lassen County.  He was buying

13    it on land contract.

14         So that 295 you see in the lower left-hand corner was

05:53:06 15    his down payment.  I believe the purchase price was 18,295.

16         But so anyway, that upper Email is him writing saying

17    he's excited about the purchase and he's not established

18    his -- our mailing address is not current on PayPal.  And he

19    says he's going to establish a P.O. box tomorrow.

05:53:27 20    Q.    And is the lower part, under Erick, the description of

21    the land itself?

22    A.    That would be the title in the Ebay auction.  So you

23    limit it to 80 characters.  So I'm guessing that's 80

24    characters.  And that looks to be one of my auction titles.

05:53:44 25    Even though it's a few years old, it does look familiar.

1    Q.    All right.  And then can we go to Exhibit 121, page

2    210.

3    A.    All right.

4    Q.    And, again, you've seen, in reviewing this, this

05:54:02  5    initial portion is kind of like metadata of your Email.

6          Can we focus on in the middle there date?

7    A.    That appears to be December --

8    Q.    Let me blow it up for you.

9    A.    What I'm seeing is December 23, 2014.  And I believe

05:54:17 10    that's at 5:46 a.m.

11    Q.    All right.  And it's from whom to whom?

12    A.    And that is from me.  I would be -- escapetheratrace.

13    And his Email address was that pageplussc@gmail.  And that

14    is -- looks like a reply from me to him.

05:54:39 15    Q.    Okay.  And there's also a reference in the middle to

16    Ebay.  Does this give you any idea as to how you were

17    marketing this particular piece of property?

18    A.    Well, given the subject line, it's that same title,

19    the 20-acre property.  This does appear to be a

05:54:58 20    message -- because some of the messages I send with

21    customers is through the Ebay format.  Others are via Email.

22    And I had both with him.  I think this is an Ebay message.

23    Q.    Okay.  And then midway through, you talk about a full

24    checkout Email.  What is that in particular?

05:55:13 25    A.    So initially when a buyer purchases a property from me

 1    through Ebay, I send them a message like this because Ebay

 2    provides me their full name and Email address.  So I'll send

 3    them an initial checkout message through Ebay letting them

 4    know that I'll send a real and detailed checkout via regular

05:55:34 5    Email, which I did with him as well, which explains all the

 6    payment options and that kind of thing.

 7    Q.    All right.  So I want to go now, Exhibit 121 page 162.

 8          And if we're just looking -- leave this up as it is

 9    right now.

05:55:53 10         What's the date and the time on this particular?

11    A.    The date on this is Tuesday, the 23rd of December,

12    2014 at 5:58 a.m.

13    Q.    And do you know, would that be Eastern Standard Time,

14    Pacific Time, Mountain?

05:56:10 15    A.    I'm pretty sure that would be -- I'm an early riser.

16    At 5:58 that was probably my time, Central Standard Time.

17    Q.    Okay.  In Wisconsin?

18    A.    Correct.

19    Q.    And this was just slightly after the Email we just

05:56:23 20    saw?

21    A.    Exactly.  This would be that follow-up Email that I

22    told him I would send, a checkout Email.  And this is that

23    Email which is more than that page here.  But yes.

24    Q.    And what is the Email address that's being used here

05:56:35 25    at the top?

1    A.    Again, this is that pageplussc@gmail.com.

2    Q.    And then underneath it, next to the date, there's a

3    new Email address there?

4    A.    And that is my personal Email and that's the

05:56:51  5    jeff@nevadainvestmentland.com.

6    Q.    And what, in essence, are you explaining to Mr.

7    Hendricks in this particular Email?

8    A.    So when I send them a checkout Email, I tell them a

9    little bit about me so they can know they're not dealing

05:57:04 10    with a bottom feeder.  So I explain I've been around a long

11    time.

12          Then I provide them with their full name and address

13    that Ebay has provided with me.  I ask them to confirm that.

14          I ask them how they would like to pay the down

05:57:17 15    payment.

16          And I ask them which monthly payment plan they would

17    like to repay the balance.

18    Q.    And are you making it clear to him as far as your role

19    in ownership of the land?

05:57:28 20    A.    Actually that's true, as well.  I'm letting him know

21    I'm not a realtor or broker, that I own all the land that I

22    sell.  I own it free and clear, keep the taxes, paid current

23    and everything.

24    Q.    And looking at the bottom of this particular Email,

05:57:40 25    there's a reference to an address that Ebay sent you.  What

1    was that?

2    A.    So the address they gave me for Mr. Hendricks was the

3    1210 Augusta Road, and that's West Columbia, and that is

4    South Carolina.

05:57:54 5    Q.    And what do you do with that information?  Do you need

6    that information?

7    A.    The majority of the time it is correct, but some

8    people have moved and not updated their PayPal -- or their

9    Ebay information, so I just ask them to confirm it because

05:58:07 10    it's all I was given by Ebay.

11        And so I provide them that.  And sometimes they'll

12    update it and other times they will not.

13    Q.    All right.  And this Email goes onto the next page.

14    We'll bring that up in a second.

05:58:18 15        But at the very bottom there, what are you referencing

16    there?

17    A.    So then at the bottom, he would be paying this 295

18    down of the total 18,295 purchase price.

19        I then finance the 18,000 balance and I provide

05:58:32 20    usually a half dozen different monthly payment plan options.

21    And in that bottom statement, I'm asking him which one he

22    wants.  It does cut off.  There's more options on the next

23    page.

24    Q.    So let's turn to that.  Exhibit 121, page 163.

05:58:46 25        And looking at the top, do you see a continuation of

1    that information?

2    A.    That is correct.  It had a couple payment plan options

3    on the last page.  And then it shows three here.  And then I

4    also provide him with the tracking information because I

05:59:01  5    send a document package priority mail.

6    Q.    All right.  And then in the middle there, there's a

7    reference to a dollar amount, and how that could be paid.

8          What's being provided there?

9    A.    So then I'm outlining, again, the deposit.  In this

05:59:15 10    case was 295.  And then I let him know the different options

11    to make the down payment and we can process credit cards, we

12    do wire transfers, he can do PayPal, personal checks.  I

13    provide my address.  And just let him know basically his

14    options and then they get back to me.

05:59:31 15    Q.    And do you provide any suggestion on how to provide

16    the credit card information?

17    A.    Yes, I do.  And then if they're going to send the

18    credit card, I ask them to send it in three different Emails

19    for security reasons and most people do.

05:59:45 20    Q.    Okay.  I would like to take you to Government's

21    Exhibit 121, page 156.

22          Can we blow up the kind of very bottom, just the date?

23          So if we're looking at the very bottom, because then

24    it goes on on the next page and we'll go there next, but

06:00:11 25    what's the date and time, and who is this from?

```
 1   A.    All right.  So this one is -- this is on Tuesday,
 2   December 23, again, 2014, and this time at 10:56 a.m.  This
 3   is from Mr. Hendricks at that same pageplussc@gmail address,
 4   and in this Email he is sending me his credit card
 5   information in different parts.  It looks like one part came
 6   through at 10:52 and then 10:54 and then I think 10:56 is
 7   the final piece.
 8   Q.    So let's go to Government's Exhibit 121-157, page 157
 9   for the first part.
10         And just at the top there.  Come down about halfway.
11         That's good.
12         So at the bottom here of the screen, is that a
13   continuation of the Email that we've just looked at?
14   A.    Correct.  That appears to be the top portion of my
15   Email in which I'm telling him, you know, I'm not a realtor
16   or broker and -- yeah.
17   Q.    Okay.  And the top part is his response, what's he
18   telling you?
19   A.    He's acknowledging that he would like to do the
20   credits card route.  He'll be sending the information
21   shortly, and he thanks me for the quick reply and also let's
22   me know he is traveling to the property now to take a look
23   at the area.  And he asks me if there is any clear markers
24   to distinguish the property.
25   Q.    And did you provide him with information about the
```

1    actual location of the property?

2    A.    I do provide -- certainly it was in my listing.  I

3    provide a number of good maps, including plat maps, GPS

4    coordinates, so he would have had those things already.  If

06:01:51  5    someone asked me to Email them additional maps and

6    coordinates, I do that at well.

7         But I do provide a great amount of information in my

8    listing.

9    Q.    Okay.  So can we go to Government's Exhibit 121, page

06:02:05 10    9.

11         And, again, if we go in the middle there, "From Jeff,"

12    down to the end of the page.

13         It got cut off there a little bit.  But who is this

14    from?  Who is it to, the date and time?

06:02:24 15    A.    All right.  So this is from myself, again, to Mr.

16    Hendricks at the same Email address I've been quoting.  This

17    took place on Thursday, December 25, 2014 at 7:12 a.m.  And

18    again, I suspect that Central Standard Time because it's

19    from myself.

06:02:41 20         And this Email is, I'm saying, "Good morning, Merry

21    Christmas."  Apparently he had sent me an Email previously

22    that he was having trouble, or difficulty in finding or

23    reaching the property.  So I'm asking if he had any luck

24    reaching, at least I think that's the sequence here.

06:02:58 25         Then I go into the property on Opossum Trail.  I

1    purchased it in 2012.  I explain that I visited it in June

2    of '12 and sold it in August of '12 via land contract.

3        Anyway, it appears I'm offering him a different

4    property, if he wasn't happy with that particular property.

5    Q.   Okay.  You mentioned correspondence regarding

6    difficulty finding the piece of property.

7        Can we go to Exhibit 121, page 11?

8        Can we pull up the Email itself?

9        Looking at this, is this the Email you're referencing?

10   A.   That is correct.  And this is his Email telling me

11   that he was having a difficult time getting to Opossum Road.

12   The locals have some roads blocked with private fencing and

13   no trespassing signs.  We managed to get within a mile.  We

14   need a jeep or a truck.

15       He said "The weather is not cooperating.  The roads

16   are muddy.  We left South Carolina in search of a property

17   out west.  At this point, we've not seen either property.

18   We are going to try find a way to Aspen Trail one more name.

19   If you have any properties with better access, we are

20   definitely interested.  We will get back to you as soon as

21   we can view the property.  Other than maps, do you have

22   turn-by-turn directions?"

23   Q.   Again is this kind of typical?  Properties you're

24   selling and kind of they're out there and difficult to get

25   to?

1    A.    That is correct.  I mean not all of them, but I would

2    say 70 percent of them you should take a four-wheel drive.

3    And they're remote.

4    Q.    And then can we turn to Exhibit 121, page 7.

06:04:40  5          And it would be just the bottom part there.

6          Can you for the record say who this is from and who

7    it's to and the date and the time?

8    A.    Absolutely.  Again this Email is to me from Mr.

9    Hendricks.  It's from his pageplussc@gmail to me at my

06:05:06 10   jeff@nevadainvestmentland account.

11          This is, again, Christmas day, Thursday, December 25,

12   2014 at 12:03 p.m.  And, again, that one it could be Western

13   or Pacific time.

14   Q.    Okay.  But anyway, this is slightly later in the day

06:05:19 15  from what we've seen?

16   A.    That is correct.

17   Q.    And what information is Mr. Hendricks providing to

18   you?

19   A.    So it appears he's saying, "I know your day is busy."

06:05:29 20  It was Christmas.  "I appreciate your Emails this morning.

21   It's a bit cold up here in Lassen County.  We do like this

22   area.  We have all of our things packed up and would like to

23   settle as soon as possible.  Nevertheless, we want to make

24   sure we are comfortable here for the long-term.  Here are

06:05:43 25  some things we're looking for in the property."

1          He outline three, number one being privacy; two, "We

2     prefer trees, vegetation on the property, and preferably not

3     totally baron.  Roads accessible by car, even in wet

4     conditions."

06:05:57 5     Q.    If we go to Exhibit 121, page 8, and to the top.

6          Is this a continuation of that Email?

7     A.    It is.  In fact, his last line on the previous page is

8     "We do not mind," and then it would be "dirt roads.  We're

9     too far from a country maintained road.  We don't mind

06:06:18 10    wilderness locations, we would like to be within 15 to 20

11    miles of gas, food and water.  Land suitable for gardening

12    is also a preference, but not a deal breaker and little or

13    no building restrictions."

14    Q.    And with regard to this Email, did you, in fact, then

06:06:32 15    start looking at other pieces of properties?

16    A.    I did.  Then I offered him up -- my selection in

17    northern California is not as great.  So I offered him a

18    number of properties, the same size, in Pershing County,

19    Nevada which is the same distance from Reno as Lassen

06:06:48 20    County, roughly.

21    Q.    So if we go to Exhibit 121, page 5, at the bottom.  Is

22    this the Email you're referencing?

23    A.    That is correct.  And this is the topography of these

24    pieces of land.  These would be much the same aside from the

06:07:14 25    three in Nevada, but they're equally as remote.  Off grid.

```
          1    Same kind -- everything I offered him to replace the Lassen
          2    County property.  It would have been in the same price range
          3    and characteristics of the other property.
          4    Q.    And then do you know what happened then or what the
06:07:30  5    status of the California land was?
          6    A.    I believe he abandoned hopes on that one.  And I think
          7    he went down in Nevada.  I offered -- I think to put him up
          8    in the cabins at the Humbu River Ranch, but I don't think it
          9    ever materialized.
06:07:47 10    Q.    So let's look at Government's Exhibit 121, page 79.
         11    And this is just the bottom portion there.
         12          So the date down.
         13          What's the date of this particular Email?
         14    A.    That one is dated Friday, the 26th of December, 2014.
06:08:10 15    And that one is at 3 -- or 15:54.  Listed at UTC.
         16    Q.    So this is a day later?
         17    A.    Correct.
         18    Q.    And who is Amy?
         19    A.    That would be my wife.
06:08:21 20    Q.    Okay.  So the same address?
         21    A.    Correct.
         22    Q.    On the back end and Amy that's there.
         23          And what's the subject line here?
         24    A.    Let's see.  The subject line is "California land."
06:08:35 25    Q.    So let's go in the continuation of that Email.  If we
```

1  go to Exhibit 121, page 80.

2          And then from the top down to Amy.

3          And what is being communicated here?

4  A.    So this is my wife writing back to Mr. Hendricks.  She

06:08:57 5  says, "Erick, good morning."  Would you like knee to go

6  ahead and read a little?

7  Q.    No, just in general.

8  A.    She's basically saying apparently that property in

9  California is not going to work for them.  Jeff -- that I

06:09:08 10  would be sending him some other options.  I'm going to go

11  ahead and cancel the transaction on Ebay.  We'll leave you

12  some nice feedback.

13          And then just explained that he'll get an automated

14  Email from Ebay.  "If you have any questions, let me know.

06:09:26 15  And have a safe weekend."

16  Q.    And if we pull back out and stay on this page, if

17  you're reviewing it, does it look like this is the same

18  Email just in kind of different fonts?

19  A.    That's correct.

06:09:41 20  Q.    In your review of this Exhibit 121, did you see that

21  occurring a lot?

22  A.    Do you mean where people would be out on a property?

23  Q.    No, like there's multiple versions of the same Email.

24  A.    Oh, yes.

06:09:58 25  Q.    So let's go to Exhibit 121, page 74.

791

1              And go from the date in the middle, down a little
2      bit -- all right.  Date and across down to the bottom.
3              And what's the date of this particular Email?
4      A.      Again, this one is the 26th of December, being a
06:10:24  5   Friday, 2014.  And that one is at 8:56 a.m.
6      Q.      All right.  And in the middle, it's directed to whom?
7      A.      This appears to me -- this is to Mr. Hendricks from
8      Ebay.
9      Q.      All right.  And there's a reference of a canceled
06:10:40 10   order by whom?
11      A.      Let's see.  We've got -- it appears that I canceled on
12      my end.
13      Q.      Okay.  So that's you?
14      A.      Correct.  That would be -- I canceled -- as I told him
06:10:54 15   I would, to cancel the transaction through Ebay.
16      Q.      So looking at the plot of land itself, can we bring up
17      Government's Exhibit 123.
18              Can you identify this document?
19      A.      I can.  That would be a plat map overlaid on the Earth
06:11:19 20   and the property I was selling outlined in red.
21      Q.      And, again, what's the description of this -- do you
22      own all these properties of land?
23      A.      No, I do not.
24      Q.      So the one in red is the particular property we're
06:11:32 25   talking about?

1    A.    That is correct.

2    Q.    And what's the description of this property itself, or

3    I guess the plat that's there?

4    A.    So this property would be roughly 660 feet wide, 1,320

06:11:42 5    feet long.  It's a 20 acre property.

6          And it looks to be wooded and semi-rugged.

7    Q.    And do you know whether there's running water,

8    electricity?

9    A.    Yeah, I do know and there's not.  There's no power.

06:11:56 10    This is an off grid.  There's no water.  You would have to

11    drill a well and install septic.

12    Q.    Was this something that you prepared?

13    A.    This plat map overlay, I did create that.

14    Q.    So let's look at Exhibit 122.

06:12:11 15          And is this the plat itself?

16    A.    That is correct.  And this is issued by the county of

17    last send.  So this -- I didn't create but this is an

18    official plat map.

19    Q.    And then can we look at Government's Exhibit 124.  Can

06:12:28 20    you identify this document?

21    A.    This, again, is a Google Earth satellite with a plat

22    map made to scale overlay on the Earth.

23    Q.    And is this particular piece of property near anything

24    unique?

06:12:43 25    A.    Well, it's very remote.  There's very little out here.

1    There's probably no homes within four or five miles

2    excluding maybe a ranch.  The nearest town -- if this is

3    what you're, Susanville would be the nearest town.  And the

4    closest real town would be Reno, which is roughly an hour

06:13:01  5    and a half away.

6    Q.    Any military establishment?

7    A.    The Herlong military ammo depot is right in this area.

8    I think it's to the east.  But, yeah, so there's a large

9    army depot where they store ammunition up there.

06:13:16  10    Q.    At any point ultimately did you sell any land to Mr.

11    Hendricks?

12    A.    I did not.

13    Q.    Did you ever actually meet him face-to-face?

14    A.    I did not.

06:13:25  15    Q.    Did you ever actually talk to him on the phone?

16    A.    I did not, that I can recall.  I'm pretty sure I did

17    not.

18            MR. BENNETT:  No further questions.  Thank you,

19    Your Honor.

06:13:37  20            THE COURT:  All right.  Thank you.

21        Counsel, you may cross-examine.

22            MR. DOUGHTEN:  Thank you.

23              CROSS-EXAMINATION OF JEFFREY REESE

24    BY MR. DOUGHTEN:

06:13:46  25    Q.    Good afternoon, Mr. Reese.

1    A.    Good afternoon.

2    Q.    The weather much better back where you are at this

3    time of year?

4    A.    No, Wisconsin is about the same, maybe worse.

06:13:59  5    Q.    I only have a few questions for you.  And I'm

6    unfamiliar with how PayPal and such works so I want to kind

7    of go through that with you.

8    A.    Gladly.

9    Q.    Now, if I understand your business, you list

06:14:11  10    properties all over the country, but mostly in the west on

11    Ebay; is that correct?

12    A.    Correct, as well as Land Watch and I have a website.

13    But Ebay is -- I sell more lands and Ebay than any place.

14    Q.    So if somebody wanted to find some rugged property to

06:14:30  15    buy or whatever reason, what happens?  You go on a Google

16    Search and just put western land for sale?  How does that

17    happen?

18    A.    I think it varies from people to people.  But a lot of

19    people start searching land out west.  But typically, I

06:14:45  20    rarely have met any of them.  Most of them will Google ahead

21    of time and arrange things beforehand.  In this case, I

22    didn't know he was actually there at that time which is more

23    unusual.  But, yeah, that's almost all Internet.

24    Q.    Not unusual, but not unheard of either that someone

06:15:02  25    would want to look in the area and then call you, correct?

795

```
  1    A.    Correct.
  2    Q.    And so when this happens, if I understand, do you
  3    just -- so let's say I call you and I say, Mr. Reese, you
  4    know, my wife and I are looking for property not
06:15:16  5    too -- within a couple hours of Reno, but we want to be away
  6    from everybody.
  7          Then what happens?  Do you give us the land area?  Or
  8    do you tell us how to get there?  Do we have to put to down
  9    payment.  How does that work out?
06:15:30 10    A.    First I try to narrow it down because Nevada is
 11    massive and I have land in eight counties.  So if some
 12    people like that everything is near Vegas, well none of my
 13    land is.  It's four or five hundred miles a way.  Others
 14    think it's near Reno.  Some of it is.  But if they are after
06:15:47 15    a certain area, and if they don't know, I find out do need
 16    water, power, main road access.
 17          I try to main -- and a lot of people do.  They want to
 18    build on it.  And other people do not.  Some people want to
 19    be out in the sticks.  I get a lot of preppers and things
06:16:03 20    like that.
 21    Q.    Is it unusual -- I got the feeling it wasn't, but
 22    correct me if I'm wrong, but people, the idea of having some
 23    rugged place sounds great until they actually go out and
 24    there and see how rugged it and then they're not interested?
06:16:14 25    A.    Sometimes I get somebody from like from New York City
```

1    and they picture it different than it's going to be.  But

2    for the most part, people have done some research and are

3    either planning a trip or, you know, set something up.

4    Q.    And you mentioned, just to get some perspective, now

5    Reno is kind of like on the western border near Lake Tahoe;

6    is that correct?

7    A.    Correct.

8    Q.    In northern Nevada?

9    A.    That is correct.

10   Q.    So I think I-80, you mentioned, just to give us an

11   example, how far south is I-80?

12   A.    I-80 goes right through the heart of Reno.  Runs

13   through there from San Francisco all the way east coast so

14   I-80 is the big artery through Nevada.

15   Q.    Go ahead.  I interrupted.

16   A.    No, I'm good.

17   Q.    So that if you were going to go out to run of your

18   properties, you would have to go out I-80, and I guess I'm

19   strike to get an idea, for instance, the exhibit what the

20   government showed you, when you got off I-80, how far a

21   drive would it be to these properties?

22   A.    To this property, if you left I-80, you would be a

23   solid two hours, maybe a little bit more.  And most of mine

24   will be that way.  In some counties, not as much.  In Elko

25   County, I have land that's within a few miles of I-80, but

1    in this case, it's two hours.

2    Q.    The idea is if they see it, then do you send them

3    directions, specific directions, how to get to a particular

4    parcel?

06:17:30  5    A.    In that scenario I would.  Most people have contacted

6    me before they've headed out there.  I would say 90 percent.

7    It's pretty rare that someone is standing there -- like I

8    didn't know he had -- you know, he was ready and he was

9    already there.

06:17:43  10    Most of the time, I'm going to be out there in two

11    months, can you send me some options?  And then they'll go

12    through coordinates, because it's a pain in the

13    ass -- excuse me.  It's a pain in the butt if somebody gets

14    to buy it, ends my option and says, "I'm standing there and

06:18:01  15    this one is not going to work for me.  I lose a hundred

16    bucks in Ebay fees."

17    So I prefer if they plan it, but I can't control it.

18    Q.    Let's say I want to go look.  I'm not sure I

19    understand the PayPal aspect of this.

06:18:12  20    So -- I guess so to make sure that they're, say

21    legitimate, but truly interested, you have them make a down

22    payment?  Or was this an actual down payment to purchase the

23    land.  How does this work?

24    A.    So the down payment does apply to the purchase.  So in

06:18:26  25    this case, it was 18,295.  So I wanted him to have a little

1    skin in the game.  And 295 would be that in this case.

2          PayPal is just one option for payment.  And it's used

3    regularly.  But credit card is probably more.  But PayPal is

4    an option.

06:18:43 5    Q.    Now, the way PayPal, I saw on there -- let me

6    put -- all the communications were Erick Hendricks, correct?

7    A.    Correct.

8    Q.    And in PayPal, I saw an address in Columbia, South

9    Carolina, does PayPal verify?  How does that work?  How do

06:19:00 10   you verify that's the person you're talking to?

11   A.    So in this case -- I don't think he paid PayPal.  I

12   think he used a credit card.

13   Q.    Credit card?

14   A.    But it really varies with PayPal.  Their security

06:19:11 15   measures are pretty good these days.  They haven't always

16   been, but I've never had any issues with PayPal as far as

17   the wrong person paying or being who they were.

18   Q.    Okay.  But in this instance, he always communicated to

19   you with Erick J. Hendricks, correct?

06:19:25 20   A.    Correct.

21   Q.    And the address you received was Columbia, South

22   Carolina, correct?  And I think there was a credit card for

23   Tyrinda Hendricks?

24   A.    Sounds correct.  I believe that was his wife.

06:19:36 25   Q.    So it didn't work out and they said they are not going

1    to go ahead with the purchase, and then you just refund the

2    money?

3    A.    Exactly.

4                MR. DOUGHTEN:  One second, Your Honor.

06:19:47 5          THE COURT:  While we're doing that, you

6    referenced the term "peepers."  Is that you said?

7                THE WITNESS:  Preppers.

8                THE COURT:  Just wanted to be sure.  The court

9    reporter needs to take that down.

06:20:08 10              MR. DOUGHTEN:  Your Honor, we have no further

11   questions.  Thank you much.

12               THE COURT:  Any redirect of the witness?

13                 REDIRECT EXAMINATION OF MICHAEL GILL

14   BY MR. BENNETT:

06:20:15 15  Q.    Let's just clarify that.  When you say prepper, what

16   are you referring to?

17   A.    So prepper would be, in my mind anyway, people that

18   the preparing for the end of the world or doomsday, people

19   that want to have a shelter and their supplies and food.

06:20:29 20  And there's all levels of them.  So I do encounter some

21   preppers.

22   Q.    Because it's so far away from?

23   A.    Yeah, they figure they will be away from the fallout.

24   Q.    But you wouldn't consider your property in this

06:20:42 25  particular one a tourist attraction?

1    A.    No.

2    Q.    And then you said that you normally have people that

3    will contact you in advance and get the info that's there?

4    A.    Yeah, almost always.  You know, people communicate

5    with me.  I'll send them different property options, GPS

6    coordinates so they can look at it on Google and I make it

7    so when they get out there, they're not wasting their time

8    and they are got a few different options because people are

9    usually limited on time and properties are spread out all

10   over the place.

11   Q.    So this isn't like you got a sign in front of the yard

12   and somebody says, "I was driving around the neighborhood

13   and I saw this house.  Can you show it to me?"

14   A.    That's correct there's no signs.  It's all -- they

15   need coordinates and they need to be in touch with me or

16   they'll never find it.

17             MR. BENNETT:  Thank you.  No further questions.

18             MR. DOUGHTEN:  Nothing further.

19             THE COURT:  All right, sir.  You can step down.

20   Safe travels back to your home state.

21             THE WITNESS:  Thank you.  All have a great

22   weekend.

23             THE COURT:  Counsel, do you have another witness

24   available?

25             MR. BENNETT:  We do.  At this time the government

1    would call Michael Gill.

2          THE COURT:  We're going to adjourn, ladies and

3    gentlemen of the jury at 4:30, or if we finish this witness

4    we'll adjourn earlier.  This will be our last witness of the

06:22:01 5   day.

6        Everyone okay?  Anyone need a break?

7          MR. BENNETT:  This should be short, Your Honor.

8    We should be done.

9          THE COURT:  All right.  Thank you.

06:22:08 10       Sir, if you would come in and please approach the

11   witness stand.

12                    MICHAEL GILL,

13        of lawful age, a witness called by the United States,

14          being first duly placed under oath, was examined

06:22:32 15                and testified as follows:

16          THE COURT:  All right, sir.  Be seated in the

17   witness stand here.

18        Just a few brief instructions.  Please wait until the

19   torn complete their questions before you begin to respond.

06:22:41 20   It's difficult for the court reporter and listeners when two

21   people speak at the same time.

22        If there is an objection, do not answer the question

23   until I rule on the objection.  Of course, if I say

24   sustained, you won't answer the question.  And you need to

06:22:55 25   respond verbally to all the questions for the court

1    reporter.

2              All right.  Thank you very much.

3              Counsel, you may inquire.

4                   MR. BENNETT:  Thank you, Your Honor.

06:23:01  5                   DIRECT EXAMINATION OF MICHAEL GILL

6    BY MR. BENNETT:

7    Q.    Mr. Gill, can you please introduce yourself to the

8    ladies and gentlemen of the jury and spell your last name

9    for the court reporter?

06:23:07 10   A.    My name is Michael Gill, it's G-I-L-L.

11   Q.    And, Mr. Gill, are you here pursuant to subpoena

12   today?

13   A.    Yes I am.

14   Q.    And prior to today, did we meet at any point?

06:23:19 15   A.    No.

16   Q.    Did we have the opportunity to speak or you spoke to

17   the prosecution prior to your testimony here today?

18   A.    Yes.

19   Q.    Had an opportunity to review some documents?

06:23:30 20   A.    Yes.

21   Q.    Can you let the members of the jury know what city and

22   state you live in?

23   A.    Phoenix, Arizona.

24   Q.    And what did you do for a living?

06:23:40 25   A.    I'm a teacher.

1    Q.    Did there come a time where you had some land in New

2    Mexico?

3    A.    Correct, yes.

4    Q.    How did that come about?

06:23:49  5    A.    I -- it was an impulse buy.  I was living in Japan and

6    I bought 20 acres of land in New Mexico with the hopes of

7    possibly retiring on it with my wife.

8    Q.    And where in New Mexico generally was this land?

9    A.    It's about 20 miles north of a city called Magdalena

06:24:11  10    which is about an hour and a half or two hours south of

11    Albuquerque.

12    Q.    Can you provide a general description of the land that

13    you had?

14    A.    Twenty acres.  There's nothing on it.  It is

06:24:28  15    surrounded by barbed wire offense.  Some hilly terrain, but

16    mostly flat shrubbery.

17    Q.    Would you consider it baron, desolate?

18    A.    Desert, yes, desert landscape.

19    Q.    Can we bring up Government's Exhibit 186?

06:24:49  20          Prior to your testimony here today did you provide us

21    with some photographs of the land?

22    A.    Yes, I did.

23    Q.    Can you identify what Government's Exhibit 186, page 1

24    is?

06:24:59  25    A.    Yes.  That is a view.  I took that picture.  I was

804

```
            1    standing on the north side.  And that picture is in the

            2    southerly direction.

            3    Q.    So would consider this a true and accurate depiction

            4    of this portion of the property?

06:25:18    5    A.    Yes.

            6    Q.    Can we go to Government's Exhibit 186, page 2?

            7          And can you identify this document?

            8    A.    Yes.  It's just -- I'm facing -- that should be facing

            9    towards the west of the property.

06:25:33   10    Q.    And if I'm looking at this -- so this is a true and

           11    accurate depiction of your land?

           12    A.    Yes, it is.

           13    Q.    And if I'm looking at it, there's a hill kind of in

           14    addition and a bush.  Does it go beyond that?

06:25:48   15    A.    No.  Actually there's a fence, a barbed wire fence,

           16    really hard to see there, that will prevent you from going

           17    beyond that.

           18    Q.    So let's look at Government's Exhibit 186, page 3.

           19          And, again, can you identify this picture?

06:26:06   20    A.    Yes.  Again, that would be in the southerly direction.

           21    The mountain was on the south side of the property.

           22    Q.    And then finally, Government's Exhibit 186, page 4.

           23          Can you identify this document?

           24    A.    Yes.  I'm now facing towards the north.  That would be

06:26:29   25    the only access road into the property.  And to the right is
```

1    my car.

2    Q.    So this is a picture you took and provided?

3    A.    Yes.

4    Q.    Did there come a time where you were attempting to

06:26:44 5    sell this particular piece of property?

6    A.    Yes.  Early on in about 2014, my wife and I decided

7    that we were planning to move back to Japan and that we

8    would not be using the property.

9    Q.    Okay.  So I want to bring up Government's Exhibit 187.

06:27:04 10    And just kind of pull up the middle there from the

11    date range down.

12    Stop right there.

13    Can you identify this document?

14    A.    Yes.

06:27:18 15    Q.    And what is this?

16    A.    I believe that was the ad that I had placed.

17    Q.    All right.  So there's a name there.  Is there a name?

18    A.    Yes, Mike Gill.

19    Q.    And there's a purchase price?

06:27:34 20    A.    Yes, 12,500.

21    Q.    And there's a reference in the middle to "off the

22    grid"?

23    A.    Yeah.

24    Q.    What were you referencing here as far as "living off

06:27:42 25    the grid"?

1    A.    Well, there are power lines to the property.  You

2    would have to bring those in.  It would be costly.  You

3    would have to drill for a well.  So you would have to pretty

4    much provide everything.  You wouldn't be able to get any

06:27:57 5    city services provided for you.

6    Q.    Okay.  And was there other websites or means in which

7    you were marketing this product?

8    A.    For a really short time, I explored a land website

9    that had cost money.  So I only took advantage of I believe

06:28:17 10   like a fee month of service.  And then I was primarily

11   focused on Ebay.

12   Q.    And did you get inquiries into purchasing this land

13   through Ebay?

14   A.    Yes, I did.

06:28:28 15   Q.    And is there any specific inquiry that stood out to

16   you?

17   A.    Yes, one did stand out.

18   Q.    All right.  So let's look at Government's Exhibit 120.

19   And actually we have to go to page 2.  I apologize.  120,

06:28:49 20   page 2.

21         Again, there is a lot of metadata that is there.  But

22   can we go from the date down.

23         What is the date at the to be there?

24   A.    It appears to be the 31 of December, 2014.

06:29:11 25   Q.    And was this the inquiry that you had said stood out

1    to you?

2    A.    Yes, sir.

3    Q.    Why did this particular inquiry stand out?

4    A.    The person who was inquiring about the land wanted to

06:29:26  5    know if they could shoot weapons on the land and even

6    inquired if they could shoot weapons at night.

7          I didn't know if that was possible or not.  So I

8    contacted the property owner's association just to verify if

9    that was allowed or not.  And it was not allowed.

06:29:47 10    Q.    Okay.  And if we're looking at the top here, there's

11    an Email address from.  Is that your Email address?

12    A.    It says, "Reply to Mike Gill, unlearnit@yahoo.com."

13    Yeah, that's mine.

14    Q.    And who were you sending the response to?

06:30:07 15    A.    The person who had inquired about the shooting on the

16    property.

17    Q.    And just for the record, that's listed there as

18    pageplussc@gmail.

19    A.    Yes.

06:30:19 20    Q.    What was your reaction to this inquire?  Did you have

21    a reaction to someone asking to shoot guns?

22    A.    Well, living -- people who like to live outside on

23    that property tend to also like to hunt and do things, so it

24    wasn't too surprising to me.

06:30:36 25          I guess it was the manner in which he was inquiring.

         1     Q.    What do you mean by that?

         2     A.    Well, he had gone into telling me that he had suffered

         3     from PTSD, that he really liked guns, that he wanted to live

         4     off -- you know, off the grid, and shoot and things like

06:31:03 5     that with -- along with his partner.

         6     Q.    Okay.  And did you know this particular Email address?

         7     Did you know who it belonged to?

         8     A.    No.  I don't recall.

         9     Q.    Did you ever meet the individual?

06:31:16 10    A.    No.

         11    Q.    And looking at the text of the Email itself, what are

         12    you doing with regard to the actual location of the

         13    property.  Providing him any information?

         14    A.    Yeah.  There was -- we had only spoke a few times, and

06:31:37 15    one of the times he had mentioned that he might want to go

         16    and look at the property.  And so I was providing directions

         17    to the property.  It was a little bit difficult to find.  So

         18    I'm not sure if the person ever went to see it or not.

         19    Q.    Did you have any kind of like for sale sign on the

06:31:57 20    land?

         21    A.    No.

         22    Q.    So if somebody was driving buy, would they be able to

         23    know you were selling it and contact you?

         24    A.    No.

06:32:04 25    Q.    Do you know whether this individual actually ever

1    visited the property?

2    A.    I don't know.

3    Q.    Did you end up selling your piece of property to this

4    individual?

06:32:14 5    A.    No.

6    Q.    Do you know why?

7    A.    I had inquired to the property owner's association if

8    they were allowed to shoot guns or not.  The person also

9    wanted to make payments on the land.  I at first was

06:32:30 10    hesitant, but then I said sure.  I would accept payments

11    because I really didn't want the land anymore.

12        And once -- after I had found out that it was not

13    allowed, I had tried to contact him back a few times

14    unsuccessfully, and then I got in contact with his partner

06:32:55 15    at that time.  And then I said that you are not allowed to

16    shoot at night and everything, and then she had told me, if

17    it was for shooting or not, I don't know.  But they were no

18    longer interested in purchasing the land.

19    Q.    And did you have a reaction to having the sale not go

06:33:15 20    through?

21    A.    I was relieved.

22    Q.    Why?

23    A.    I didn't -- I just felt that the individual was

24    unstable.

06:33:25 25    Q.    Did you ultimately sell this piece of property?

```
 1    A.    Yes.
 2              MR. DOUGHTEN:  Objection, Your Honor.
 3              THE COURT:  Sustained.  Disregard the answer,
 4    ladies and gentlemen.
 5              MR. BENNETT:  No further questions, Your Honor.
 6              THE COURT:  Thank you, counsel.
 7         Counsel, you may inquire.
 8              CROSS-EXAMINATION OF MICHAEL GILL
 9    BY MR. DOUGHTEN:
10    Q.    what's on the screen, Government's Exhibit 120.2, did
11    you preserve the actual request from the person asking to
12    shoot the guns?
13    A.    I'm sorry?
14    Q.    Did you preserve the actual Email --
15    A.    Oh, no, that was done verbally on --
16    Q.    So there is no Emails of this request?
17    A.    No.
18    Q.    So let me make sure I get this straight.  Somebody
19    called you on the telephone?
20    A.    Um-hum.
21    Q.    And they -- how did they identify themselves?
22    A.    As a person who wanted to purchase the land.
23    Q.    Did they give a name?
24    A.    They might have.  I believe so at one time.  But I
25    don't remember the name.
```

1   Q.   And did you write down the phone number or anything

2   like that?

3   A.   It was in my cell phone at one time, a different cell

4   phone that I know longer have.

06:34:27 5   Q.   No longer have.  Okay.

6        So the only -- this person on the phone gave you this

7   pageplus address?

8   A.   They must have.  I don't recall.

9   Q.   You're not sure how you got that?

06:34:38 10   A.   Yeah.

11   Q.   Did anybody respond to this pageplus message?

12   A.   Not that I recall.

13        MR. DOUGHTEN:  Thank you.  No further questions,

14   Your Honor.

06:34:45 15        THE COURT:  All right, sir.  You may step down,

16   you're excused.  Thank you for being here this afternoon.

17        I assume you have no redirect of the witness?

18        MR. BENNETT:  No, Your Honor.  Thank you.

19        THE COURT:  Thank you.

06:34:58 20        Counsel, sidebar, please, just briefly.

21        (Discussion at sidebar as follows:)

22        THE COURT:  Your next witness is much longer, I

23   take it?

24        MR. SHEPHERD:  Yes, Your Honor.  Our next witness

06:35:16 25   would actually be the undercover officer who we would

1    request be able to start tomorrow morning.

2              THE COURT:  We're going to start tomorrow morning

3    with all of the protective order applying?

4              MR. SHEPHERD:  Yes, Your Honor.

06:35:31  5              THE COURT:  Are we going to be able to do that at

6    9:00, or do we need to start at 9:30.

7              MR. SHEPHERD:  Your Honor, what I would

8    propose -- the witness can be here at whatever time, but I

9    would propose that he be here sitting on the stand at 8:45.

06:35:45 10    The parties can then see what he looks like and determine if

11    they request an instruction for the disguise issue and that

12    be done outside the presence of the jury.  Because once they

13    see him, it may not be an issue.

14              THE COURT:  So we'll have to have the courtroom

06:36:03 15    closed at 8:30, thereabouts.

16              MR. SHEPHERD:  Yes, Your Honor, if you would like

17    to start at 9:30, that's fine with us as well.

18              THE COURT:  I'm just a little concerned.  I want

19    to be sure we don't have any issues about disguise and

06:36:14 20    delay.  So let's start at 9:30.  Just so we can clear all

21    that up in case there's an issue.  We'll be here at 8:45 or

22    9:00, but that way we can make sure there's no issues at

23    all -- if there is any issue we will deal with it.

24              MR. SHEPHERD:  We'll be here at 8:45 and whenever

06:36:31 25    you want the witness brought up, we'll bring him up.

813

1          THE COURT:  All right.  And I want to make sure

2    that we have the other adjoining room opened.

3          MR. SHEPHERD:  Yes, Your Honor.

4          THE COURT:  In case the media -- I don't know if

06:36:41  5    he'll come back.  Did he ask you about this witness coming

6    on?

7          MR. SHEPHERD:  He has asked when it's going to

8    be.  And indicated, which I take to mean he wants to come

9    back, Your Honor.  But I told him I didn't know yet because

06:36:55 10   I didn't know how today was going to finish up.

11          THE COURT:  He wrote a lengthy story already on

12   Cleveland.com.  So I'm just going to have to tell the jurors

13   that's where it's at so they can ignore it and not stumble

14   across it.

06:37:10 15          MR. SHEPHERD:  I anticipate he'll come back

16   tomorrow is my guess.

17          THE COURT:  Me too.  I hope he comes back timely;

18   otherwise, he'll miss it.  And that's -- it is what it is.

19      All right.

06:37:19 20      (The following proceedings were had in the hearing of

21   the Jury:)

22          THE COURT:  All right, ladies and gentlemen of

23   the jury.  We're going to adjourn for the day.  Let me give

24   you some instructions.

06:37:35 25      First of all, I've given you instructions throughout

1    the trial.  I want to reemphasize to you how important it is

2    that you do not form or express any opinions on the matter

3    until the case is submitted to you.

4        Do not discuss the case among yourselves or with

06:37:50  5    anyone else this evening.

6        Also, I want to stress to you how important it is that

7    you not use the Internet, do not attempt to obtain any

8    additional information about any of the issues in this case,

9    any of the events that you've heard described here.  None of

06:38:02  10    that type of research is appropriate.

11        Please, do not do any of those things.

12        Also, I will alert you to the fact that -- I am just

13    be very direct.  There's a news media account, a story on

14    Cleveland.com, which is also known as The Plain Dealer.

06:38:21  15    Please refrain from reading that story, ignore -- please

16    ignore it and not read it.

17        And I don't recall, I think The Plain Dealer is only

18    published four days a week now.  I don't know whether they

19    publish tomorrow or not.  Whatever, please ignore The Plain

06:38:39  20    Dealer, also ignore Cleveland.com which will have a story

21    about this case.

22        Additionally, we are going to begin tomorrow morning

23    at 9:30.  There's some procedural issues I need to cover

24    with getting ready for trial tomorrow and getting witnesses

06:38:54  25    and things organized here.

1           So rather than having you waiting in the jury room,

2     let's start at 9:30.  There will give you a little extra

3     time.  I don't know if there is going to be snow or not.  Be

4     in the jury room at 9:30.  We will proceed promptly.  We'll

06:39:07  5     beginning you in and start promptly at that time.

6           I'm getting ahead of myself.  So much I don't forget.

7     The other thing I think you're probably all aware of, but

8     I'll bring it to your attention anyway.  I've had jurors not

9     show up on time because of the time change, so we're going

06:39:22 10     to be springing ahead.  So we're all going to lose an hour

11     of sleep this weekend.  So keep that that in mind.  That

12     will have some bearing on Monday morning.  We will all have

13     an extra hour of sleep -- I'm sorry, we will lose an hour of

14     sleep.

06:39:36 15           So we'll see you tomorrow morning at 9:30.  Thank you

16     for your patience.  Leave your notepads on your chairs and

17     we will see you again tomorrow.

18           Thank very much.

19           (Jury out, 3:50 p.m.)

06:40:15 20           THE COURT:  All right, Counsel, just be seated

21     very briefly.

22           Any other issues, concerns, you wish to address with

23     me before we adjourn?

24           On behalf of the government?

06:40:25 25           MR. SHEPHERD:  No, Your Honor.

1          THE COURT:  On behalf of the defendant?

2          MR. DOUGHTEN:  No.  We got the issues hammered

3     out yesterday.  We're fine, Your Honor.

4          THE COURT:  Good.  Now, tomorrow morning, again,

5     I would ask counsel to be here between 8:45 and 9:00.  We'll

6     have a little bit of time.  We'll bring the witness in, make

7     sure we're completely organized and make sure we have

8     adequate time to make whatever record need to bed made.

9          I'll also alert our staff that we are going to be

10    using tomorrow morning the additional room for the audio

11    feed so that that's available for anyone who wishes to

12    listen to that testimony.

13         And so we want to be sure that occurs.

14         Also, I'll be instructing our staff to be certain that

15    in an abundance of caution, we will be double checking to

16    make sure there are no cell phones or any other type of

17    recording devices in the courtroom just as a matter of,

18    again, just to be sure.

19         And then beyond that, one other quick question, just

20    for my own understanding.  How long will this witness's

21    testimony be, at least on direct, do we know?

22    Approximately.

23         MR. SHEPHERD:  Your Honor, I believe it will take

24    all morning and into the afternoon.  I would say early

25    afternoon --

1      THE COURT:  Hours is what you're saying?

2      MR. SHEPHERD:  Yes.  I expect it will be hours,

3  Your Honor.

4      THE COURT:  All right.  I'm not sure -- hopefully

5  we'll be able to complete the cross-examination, hopefully

6  we'll be able to get the witness's testimony tomorrow in

7  full.

8      Again, not to belabor the point, but also be apprised,

9  and be aware, those alternate jurors are going to be right

10  there on top of this witness, so if anything he's wearing is

11  even close to visible, then we're going to be providing the

12  jurors with a limiting instruction.

13      So while I'm on that topic, you might want to meet and

14  confer.

15      I know you're all busy.  We do have a little time left

16  today.  You might want to meet and confer and discuss what

17  type of limiting instruction you would like the Court to

18  give, if for some reason we come to the conclusion that his

19  or her disguise is going to be apparent or visible.

20      So think about what exactly what kind of limiting

21  instruction you would like me to give because I think we

22  need to do that, and certainly contemplate that in any

23  event.

24      So think about that.  That way we can have that -- I

25  would really like to have that hammered out before 9:30 in

818

1    the event the disguise can be, again, at least even arguably

2    can be seen, just based on how close that witness is going

3    to be to those jurors.

4           All right?  Any other questions on behalf of the

06:43:03  5  government?

6                MR. SHEPHERD:  No, Your Honor.

7                THE COURT:  On behalf of the defendant?

8                MR. DOUGHTEN:  No, Your Honor.

9                THE COURT:  All right.  We'll see you tomorrow

06:43:10 10  morning.  Thank you very much for your courtesy.

11           (Proceedings adjourned at 3:50 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3    DIRECT EXAMINATION OF RYAN A. PRESLEY            656

4    BY MR. SHEPHERD

5    CROSS-EXAMINATION OF RYAN A. PRESLEY            681

6    BY MR. HARTMAN

7    DIRECT EXAMINATION OF AMIR AL-GHAZI             688

8    BY MR. SHEPHERD

9    CROSS-EXAMINATION OF AMIR AL-GHAZI              721

10   BY MR. DOUGHTEN

11   REDIRECT EXAMINATION OF AMIR AL-GHAZI           747

12   BY MR. SHEPHERD

13   DIRECT EXAMINATION OF JANET LYNN MILLER         752

14   BY MR. SHEPHERD

15   CROSS-EXAMINATION OF JANET LYNN MILLER          768

16   BY MR. HARTMAN

17   REDIRECT EXAMINATION OF JANET LYNN MILLER       773

18   BY MR. SHEPHERD

19   DIRECT EXAMINATION OF JEFFREY REESE             775

20   BY MR. BENNETT

21   CROSS-EXAMINATION OF JEFFREY REESE              793

22   BY MR. DOUGHTEN

23   REDIRECT EXAMINATION OF MICHAEL GILL            799

24   BY MR. BENNETT

25   DIRECT EXAMINATION OF MICHAEL GILL              802

1    BY MR. BENNETT

2    CROSS-EXAMINATION OF MICHAEL GILL                    810

3    BY MR. DOUGHTEN

```
1                    C E R T I F I C A T E
2
3          I certify that the forgoing is a correct
4    transcript from the record of proceedings in the
5    above-entitled matter.
6
7              S/Caroline Mahnke          3/8/18
8              Caroline Mahnke, RMR, CRR        Date
9
10             S/Lori A. Callahan          3/8/18
11             Lori A. Callahan, RMR, CRR        Date
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```