1493

1

2                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
3                         EASTERN DIVISION

4      UNITED STATES OF AMERICA,

5                Plaintiff,              Case No. 1:16CR265
                                         Akron, Ohio
6           vs.                          Wednesday, March 14, 2018

7      ERICK JAMAL HENDRICKS,

8                Defendant.

9

10                       TRANSCRIPT OF TRIAL
                  VOLUME 9, PAGES 1493 THROUGH 1622
11              BEFORE THE HONORABLE JOHN R. ADAMS
                   UNITED STATES DISTRICT JUDGE
12

13     APPEARANCES:

14     For the Government:  Matthew W. Shepherd
                            Office of the U.S. Attorney - Cleveland
15                          Carl B. Stokes U.S. Courthouse
                            801 Superior Avenue, West, Suite 400
16                          Cleveland, Ohio 44113
                            (216) 622-3600
17
                            Mark S. Bennett
18                          Office of the U.S. Attorney - Akron
                            2 South Main Street, Room 208
19                          Akron, Ohio 44308
                            (330) 375-5716
20
                            Rebecca A. Magnone
21                          U.S. Department of Justice
                            960 Pennsylvania Avenue, NW
22                          Washington, DC 20530
                            (202) 353-9472
23
       For the Defendant:   David L. Doughten
24                          Attorney at Law
                            4403 St. Clair Avenue
25                          Cleveland, Ohio 44103
                            (216) 361-1112

1494

1                  Stephen D. Hartman
                  Attorney at Law
2                  1st Floor
                  320 North Michigan Street
3                  Toledo, Ohio 43604
                  (419) 690-4604
4

5    Court Reporter:        Caroline Mahnke, RMR, CRR, CRC
                  Lori A. Callahan, RMR, CRR
6                  Federal Building & U.S. Courthouse
                  2 South Main Street, Suite 568
7                  Akron, Ohio 44308
                  (330) 252-6021
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.

1      (Wednesday, March 14, 2018.)

2

3      (Outside the presence of the jury, 9:05.)

4      THE COURT:  Counsel, it's my understanding that

5   the parties would like me to read to the jurors two

6   stipulations this morning, the one being the stipulation

7   regarding cellular telephone examinations and the second

8   being the stipulation regarding Surespot.

9      Counsel for the government; is that correct?

10      MR. SHEPHERD:  That is, Your Honor.

11      THE COURT:  On behalf of the defendant?

12      MR. DOUGHTEN:  That's correct, Your Honor.

13      THE COURT:  All right.  I'll read those

14   stipulations prior to the next witness's testimony as I

15   think is the parties' desire.

16      And then we'll proceed thereafter to call the witness.

17      Would you prefer to call the witness before I read the

18   stipulations, or do you care?  Do you have any preference?

19      MR. SHEPHERD:  Your Honor, we don't have a

20   preference.  Our witness in the back of the courtroom now

21   available to come to the witness chair whenever the Court

22   prefers.

23      THE COURT:  All right.

24      MR. DOUGHTEN:  We agree, Your Honor, whichever

25   the Court prefers we're fine with.

1      THE COURT:  I'll bring the jurors in, I'll read

2  the stipulation to the jury.  Then you can call your

3  witness.

4      All right anything else?  Anything other issues you

01:01:27  5  would like me to address before we call in the jury.

6      Counsel for the government.

7          MR. SHEPHERD:  No, Your Honor.

8          THE COURT:  On behalf of the defendant?

9          MR. DOUGHTEN:  Not at this point, but we have

01:01:38  10  some updates on scheduling, but we'll wait until after this

11  witness.

12          THE COURT:  All right.  That's fine.

13      Jurors, please.

14      (Jury in, 9:05 a.m.)

01:03:13  15          THE COURT:  Good morning, ladies and gentlemen.

16  Before we begin with our next witness, there are several

17  stipulations that I would like to read to you.  And during

18  the course of your deliberations, you will have a copy of

19  the stipulations with you in the jury room.

01:03:34  20      The stipulations read as follows:

21      The first is a stipulation regarding cellular

22  telephone examinations.

23      The United States of America by and through its

24  attorneys, Matthew Shepherd and Mark Bennett, Assistant

01:03:50  25  United States Attorneys and Rebecca Magnone, trial attorney,

1    National Security Division, and the Defendant, Erick Jamal

2    Hendricks, by and through his attorneys, Mr. Doughten and

3    Mr. Hartman, hereby stipulate and agree to the following

4    facts:

01:04:05   5        One, Government Exhibit 179 is a Samsung Galaxy

6    Cellular telephone, serial number RV8G10RJSWB that was

7    recovered by the FBI on May 4, 2015 from a vehicle used by

8    Nadir Hamid Soofi and Elton Simpson during an attack they

9    committed in Garland, Texas on May 3, 2015.  FBI forensic

01:04:40 10   examiner Thomas V. Tedder conducted a forensic examination

11   of the cellular telephone and created Government Exhibit 105

12   which is an extraction report describing the data obtained

13   from the cellular telephone.  Government's Exhibit 106, 107,

14   and 108 are detailed parts of the extraction report prepared

01:05:04 15   by Forensic Examiner Tedder.

16        Second, Government Exhibit 180 is a LG cellular

17   telephone, serial number 41CYBD965941-0 that was recovered

18   by the FBI on May 4, 2015 from the residence of Nadir Hamid

19   Soofi and Elton Simpson in Phoenix, Arizona, during the

01:05:39 20   execution of a search warrant.

21        FBI Forensic Examiner Robert Meshinsky conducted a

22   forensic examination of the cellular telephone and created

23   Exhibit 117, 117, which is a generic device analysis report

24   describing the data obtained from the cellular telephone.

01:05:58 25   Government's Exhibit 119 is a photo obtained from that

1    report.

2        We have an additional stipulation regarding Surespot.

3        And once again, I won't reread the name of counsel for

4    the government and the defendant, having read them to you

01:06:16 5    previously.  They both stipulate and agree to the following:

6        Surespot is a secure mobile messaging application

7    which uses end-to-end encryption for users to communicate

8    securely.  It allows people to send and receive encrypted

9    messages anonymously to ensure privacy.  Users pick a unique

01:06:40 10    user name to send and receive those messages.  If a user

11    deletes her account, the user name and all communications

12    sent and received through that account is also deleted

13    through Surespot.  Once an account is deleted, there is no

14    record of that account having ever existed.  Surespot,

01:06:59 15    however, will allow a deleted user name to be reused after a

16    period of time.

17        Number two.  On Surespot, there is a private key

18    stored on a device that is the key to unlocking all of the

19    data.  In the case of a lost or stolen device, if the key is

01:07:18 20    lost along with it, so is all of the data.  Identity

21    backup/restore and key versioning help to mitigate this

22    problem.  A user may backup their encrypted identity, user

23    name, and key pair history to device storage or the cloud

24    and restore them upon demand.  The security is only as

01:07:41 25    strong as the password used to store the identity and

1    whatever cloud service and the Surespot password.

2         That is the second stipulation.

3         With that, counsel for the government, you may call

4    you're next witness.

01:07:57 5         MR. SHEPHERD:  The United States calls Amy

6    Vaughan.

7         THE COURT:  Ms. Vaughan, if you would approach

8    the witness stand here, please, and remain standing while I

9    administer the oath.

01:08:15 10                   AMY VAUGHAN,

11      of lawful age, a witness called by the United States,

12         being first duly placed under oath, was examined

13                 and testified as follows:

14         THE COURT:  All right.  Please be seated in the

01:08:30 15    witness stand.  A couple of brief instructions.

16         Please wait until the attorneys complete their

17    questions before you begin to respond to the question.  It's

18    difficult for the listeners and the jurors and the court

19    reporters when two individuals are speaking at the same

01:08:47 20    time.

21         If there is an objection to any question, please do

22    not respond to the question until I rule on the objection.

23    Of course, if I sustain the objection, you will not answer

24    the question.

01:08:58 25         Thank you very much.

1           Counsel, you may inquire.

2                MR. SHEPHERD:  Thank you, Your Honor.

3                DIRECT EXAMINATION OF AMY VAUGHAN

4    BY MR. SHEPHERD:

01:09:04 5    Q.    Could you please state your name and spell your last

6    name?

7    A.    My name is Amy Vaughan.  My last name is spelled

8    V-A-U-G-H-A-N.

9    Q.    Ms. Vaughan, where do you live certainly?

01:09:16 10    A.    I live in the Washington, D.C. metro area.

11    Q.    And what's your current job?

12    A.    I'm an intelligence analyst for the counterterrorism

13    division of the Federal Bureau of Investigation.

14    Q.    How long have you had that job?

01:09:30 15    A.    Just coming up on eight years here.

16    Q.    What do you do in that job?

17    A.    As an intelligence analyst, I'm a research specialist

18    essentially, and what I do is help the investigators with

19    all of the information they collect.

01:09:47 20         So as they collect information through interviews or

21    other investigative means, I will take that information, try

22    to verify it and assess its importance and use it to make

23    recommendations on what actions they should take next.

24    Q.    Do you have a certain specialty in your job?

01:10:06 25    A.    Yes.  I specialize in technical analysis.

1    Q.    And what does that mean, technical analysis?

2    A.    Anything that touches technology or large quantities

3    of data, that will frequently come to me or someone like me.

4    Anything that deals with the Internet or computers, that's

01:10:26  5    what I specialize in.

6    Q.    Does that include social media applications?

7    A.    Yes, it does.

8    Q.    Ms. Vaughan, your current job is in Washington, D.C.;

9    is that right?

01:10:37 10    A.    Yes.

11    Q.    How long have you been in that specific position?

12    A.    Just over a year.

13    Q.    And where were you assigned before that?

14    A.    I was assigned today Phoenix field office of the FBI.

01:10:47 15    Q.    What's the difference between the two jobs that you

16    held in Phoenix and in Washington D.C.?

17    A.    Now that I work at FBI headquarters, I provide support

18    to field offices all over America and the world with the

19    most difficult technical problems.

01:11:05 20          When I was an analyst in Phoenix, I worked more

21    directly with the agents in the Phoenix field office in

22    their specific case.

23    Q.    Do you have any particular training from the FBI?

24    A.    Yes.  I attended the FBI academy analyst training

01:11:21 25    program in 2010.

1     Q.    Do you have any additional training related to your

2     jobs with technical analysis?

3     A.    Yes.  I've taken an a variety of courses on computers,

4     information technology as well as what we call open source

01:11:36 5     intelligence, including the Comptia A plus course.

6     Q.    That last one, could you please spell that and explain

7     that a little further?

8     A.    It's a C-O-M-P-T-I-A, A plus.  That's just a -- it's

9     one of the baseline certifications that anyone who works in

01:11:55 10    information technology would acquire.

11    Q.    What's your educational background?

12    A.    I have a Bachelor's degree in linguists from Reed

13    College in Portland, Oregon.

14    Q.    And did you write a senior thesis?

01:12:12 15    A.    I did.

16    Q.    What was the topic?

17    A.    The topic was -- it was a linguistic ehnography, which

18    is essentially a chronicle of the use of language, slang

19    terms and other behaviors of a group that would later become

01:12:29 20    known as anonymous.

21    Q.    So is it relevant to social media and the Internet?

22    A.    Absolutely.

23    Q.    Do you provide any training as part of your duties?

24    A.    I do.  I am a certified instructor for the FBI and I

01:12:45 25    provide instruction on open source intelligence topics.

1        I'm also a member of the adjunct faculty of the FBI

2   academy on open source intelligence.

3   Q.    And as an adjunct faculty member, do you get to create

4   your own courses?

01:12:59 5   A.    I do.

6   Q.    Do you also provide presentations at any conferences?

7   A.    I do.  I have attended several national and

8   international conferences in the intelligence community and

9   law enforcement communities on social media topics.

01:13:13 10   Q.    Do you have receive any ongoing training regarding

11   social media applications?

12   A.    Yes.  Generally speaking, whenever something becomes

13   available, I try to take it.

14   Q.    Do you also ever have any contact with the companies

01:13:28 15   themselves regarding their social media applications?

16   A.    On occasion, yes.

17   Q.    Now, as part of your job, do you also analyze data

18   related to social media accounts?

19   A.    Yes, I do.

01:13:43 20   Q.    And as part of the purpose of that is to try to

21   identify the locations and identities of users?

22   A.    Yes.

23   Q.    Generally what's the methodology that you use?

24   A.    One of the things I'm frequently asked to do by field

01:13:58 25   offices is to analyze IP address data.  So log-in records

1    from social media accounts in order to assess whether the

2    user of those accounts may be located and identified.

3    Q.    And could you just briefly walk through how that

4    process works?

01:14:19 5    A.    Yes.  So the first step in that process is you

6    accumulate all the data for the accounts that you're

7    interested in and you do what's called a resolution, which

8    is essentially translating those IP addresses, which are

9    typically a bunch of numbers, into human readable metadata,

01:14:39 10    especially about what company administers that IP address,

11    as well as where they are located, their contact information

12    and such and such and host name information which generally

13    tells you a lot more about the location and function of that

14    IP address.

01:14:59 15        And we also have a commercial database that we use

16    that provides an approximate geolocation for those IP

17    addresses.

18    Q.    How do you then use that data?

19    A.    I'll take all of the resolved IP addresses and I'll

01:15:16 20    look them and assess them for anonymization trade crafts.

21    So typically once you see those, you can't do anything more

22    with them so you've got to exclude them from any follow on

23    analysis.

24        And then with what's left, I'll look for patterns of

01:15:30 25    usage and behavior and data points that are most likely to

1    provide a useful result for investigators.

2    Q.    And is this the methodology that's generally accepted

3    in the field of this kind of analysis?

4    A.    Yes.

01:15:43 5    Q.    If we could pull up Government's Exhibit 183, please.

6          What is Government's Exhibit 183?

7    A.    That is my resume.

8    Q.    And is it a three-page document?

9    A.    Yes.

01:15:56 10   Q.    And does this have a more detailed form, the

11   information you've just told us about yourself today?

12   A.    Yes.

13   Q.    And as part of your -- something I neglected to ask.

14         Does your experience also include computer

01:16:12 15  programming?

16   A.    Yes, it does.

17   Q.    Do you have formal training, or is that on-the-job

18   experience?

19   A.    No, I am self taught.

01:16:27 20   Q.    Regarding social media applications, have you had to

21   learn about specific applications themselves?

22   A.    Yes.

23   Q.    And does that include applications such as Twitter?

24   A.    Yes.

01:16:35 25   Q.    And Wickr?

1    A.    Yes.

2    Q.    And Surespot?

3    A.    Yes.

4    Q.    And Chat Secure?

01:16:45  5    A.    Yes.

6    Q.    Ms. Vaughan, I would like to talk about some of

7    the -- first the more general topics of social media.

8          When you hear the term "social media," what do you

9    take that to mean?

01:16:58  10   A.    To me it means any Internet-based platform where you

11   can establish relationships with other people and share some

12   kind of content amongst yourselves, be it text, pictures,

13   videos, whatever you like.

14   Q.    And what are some -- the most common examples of that?

01:17:18  15   A.    The most popular one in the world would be Facebook

16   which is a site where you can make friends and share lots of

17   different kinds of content.

18         Twitter is one of my favorites.

19         Instagram is another one I greatly enjoy myself.

01:17:36  20   Q.    And when we're talking about social media, do you

21   include messages applications within that definition of

22   social media?

23   A.    I do.  Some people don't.  But I would include them,

24   yes.

01:17:45  25   Q.    We've also heard in this trial usage of the terms

            1    "encrypted" or "unencrypted."

            2         What does that mean?

            3    A.    Encryption is a way of protecting data in computers.

            4    There's a few different forms.  But all of them focus on

01:18:04    5    essentially two different things which is either protecting

            6    data in transit, so as it's going from you to another person

            7    or you to a company, and then the other thing they focus on

            8    is protecting data that's called at rest.  So files that are

            9    stored on your computer or on to server somewhere.

01:18:22   10    Q.    And do different applications have different types of

           11    encryption?

           12    A.    Yes.

           13    Q.    If the -- the term "end-to-end encryption" is used,

           14    what does that mean?

01:18:33   15    A.    End-to-end encryption usually means that from its

           16    origin point, so usually you, sending a message to someone

           17    else, it's encrypted all the way through.  So no one is able

           18    to read the content of that communication except the sender

           19    and the receiver.

01:18:51   20    Q.    Does that include the service provider themselves?

           21    A.    Sometimes it does and sometimes it doesn't.

           22    Q.    Let's talk about some specific applications.

           23         Twitter.  Are you familiar with Twitter?

           24    A.    Yes.

01:19:03   25    Q.    What is a tweet?

1    A.    A tweet is the typical post that you can make on

2    Twitter.  So you can usually -- usually you type something

3    in and now you have 280 characters to do that.  And you can

4    also share photos, links, videos, poles, and those are

01:19:27  5    typically visible to the public or to the people that you

6    have allowed to follow you.

7    Q.    Are you still able to have a kind of a conversation

8    with someone else through tweets?

9    A.    Absolutely, yes.  You can -- "at mention" is the term

01:19:42 10    that's used on Twitter, another user.  You essentially

11    invoke their user name and then they get a notification that

12    you're tweeting at them, and they can respond.

13    Q.    Is there another more private way to communicate

14    directly with someone?

01:19:55 15    A.    Yes.  You can have private direct messages between two

16    or more users.

17    Q.    And does Twitter maintain the content of those

18    communications on their servers?

19    A.    Yes, they do.

01:20:10 20    Q.    What is Chat Secure?

21    A.    Chat Secure is a secure messaging application.  It's a

22    client for a protocol that's call XMPP, which is just

23    another way of communicating.

24    Q.    And could you say that again, the client protocol?

01:20:27 25    A.    XMPP is the name of the protocol.

```
        1   Q.    Does it have a form of encryption as well?

        2   A.    Yes, Chat Secure has a couple of different security

        3   features on top of XMPP to make it safer.

        4   Q.    What is Surespot?

01:20:44 5  A.    Surespot is an encrypted messaging application.

        6   Q.    And does that have the end-to-end encryption?

        7   A.    Yes, it does.

        8   Q.    Is content of those messages visible on the Surespot

        9   servers?

01:20:59 10 A.    No.

        11  Q.    So does Surespot keep any content of communications on

        12  their servers?

        13  A.    Not to my knowledge, no.

        14  Q.    How do you access your account if you're using

01:21:08 15 Surespot?

        16  A.    You have to download the Surespot application of

        17  course, and then you type in your user name and your

        18  password.

        19        Now, if this is an account that already exists, you

01:21:22 20 also have to have this identity file, without which you will

        21  not be able to log into the account.

        22  Q.    And what is that identity file?

        23  A.    It's a -- essentially the keys and other things that

        24  are required to verify your identity because to Surespot, a

01:21:41 25 user name and a password is not enough.
```

1     Q.    Are you able to essentially move an account from one
2     device to another device?
3     A.    Only if you have that identity file.
4     Q.    If you move a device or an account from a device to a
01:21:56 5     new one successfully, would you be able to see prior
6     communications from that account?
7     A.    No, you would not.
8     Q.    So would it be fair to say that the communications are
9     essentially device specific?
01:22:09 10     A.    Yes, they are stored locally on that device.
11     Q.    Is there a way to set those communications to
12     automatically destruct?
13     A.    For Surespot, I'm not sure if that's a feature.
14     Q.    Are you able, though, to delete communications that
01:22:25 15     you're having with someone from the other person's phone?
16     A.    Yes, you are.
17     Q.    So would that essentially mean that if you delete it
18     on your phone, it's also deleted on the other person's
19     phone?
01:22:36 20     A.    Yes.
21     Q.    What about Wickr, what is Wickr?
22     A.    Wickr is another encrypted messaging application.
23     Q.    Does its also use the end-to-end encryption?
24     A.    Yes, it does.
01:22:53 25     Q.    And are Wickr communications visible on the Wickr

1    servers?

2    A.    No, they are not.

3    Q.    Do they store content of communications on their

4    servers?

01:23:01  5    A.    No, they do not.

6    Q.    How do you access a Wickr account?

7    A.    For that one, all you need there is a user name and

8    password.

9    Q.    In you want to move your account to a new device, what

01:23:10 10    do you need to do that?

11    A.    All you need is the user name and password.  But if

12    you don't have that, you're not getting in.

13    Q.    And like with Surespot, would prior messages be

14    visible on the new device?

01:23:23 15    A.    No, they would not.

16    Q.    Is there a feature for destruction of messages?

17    A.    Yes, that's one of Wickr's main selling points is that

18    it automatically is set to self-destruct after a certain

19    period of time.

01:23:40 20    Q.    And would that mean it's deleted from, in a two-part

21    conversation, both devices?

22    A.    Yes.

23    Q.    Do they also have a feature in which it can be

24    detected if someone takes a screen shot of your

01:23:55 25    communications?

1512

1    A.    Yes.

2    Q.    Ms. Vaughan, what's an IP address?

3    A.    An IP address or Internet Protocol Address, it's a

4    string of numbers, and now you can have one string of

01:24:11  5    numbers and letters, as well.  It identifies any computer

6    that's connected to a network, in this case, the Internet

7    would be the most important one, without which you can't use

8    that network.

9    Q.    And does IP address data get stored by service

01:24:28  10    providers?

11    A.    Yes, it does, they have to know who to route the

12    packet to.

13    Q.    When you say packet, is that a technical term?

14    A.    Yes.

01:24:37  15    Q.    What does that mean?

16    A.    A packet, that's the unit of information by which

17    you -- so if you access a website or anything on the

18    Internet, you get -- your computer gets that back from the

19    server where the website is running in the form of packets.

01:24:54  20          And it's a particular format that's established by the

21    protocol that's used by all computers.  I'm sure you don't

22    want to hear the technical information of the composition of

23    a packet.

24    Q.    Ms. Vaughan, you said service providers keep this

01:25:12  25    data.  Does Twitter keep IP address data?

```
 1    A.    Yes, they do.

 2    Q.    What about Wickr?

 3    A.    Wickr does not.

 4    Q.    And what about Surespot?

 5    A.    Surespot does not retain that information.

 6    Q.    You mentioned earlier about what IP addresses look

 7    like.  Are there to different kinds of IP addresses?

 8    A.    Yes, there's IPB4, which is the traditional one which

 9    is four numbers separated by dots, and there's IPB6, which

10    is -- they're numbers written in a different standard.  So

11    eight numbers separated by colons.

12    Q.    If we could pull up Government's Exhibit 135, please.

13          And if you could just enlarge sort of the top third of

14    the chart here.

15          Okay.  Taking a look at Government's Exhibit 135, does

16    this show examples of those two kinds of IP addresses?

17    A.    Yes.  It does.  So the longer ones with the letters,

18    those are IPV6.

19    Q.    So I'm going to underline.

20          Is that the IPV6 address you're talking about?

21    A.    Yes, it is.

22    Q.    You are you able to -- what kind of information can

23    you obtain from that kind of IP address?

24    A.    So for the purposes of IP analysis, as I've defined it

25    previously, it's essentially exactly the same.  You can get
```

1    the exact same information about who owns it, who runs it,

2    what -- where are they, what are they doing, etcetera.

3    Q.    And then I'm going to underline something right above

4    it, which is all digits.  Is that the more traditional IPV4

01:26:56 5  IP address you referenced?

6    A.    Yes.

7    Q.    And of the two of these, is one easier to obtain a

8    geolocation than another?

9    A.    If it's -- if the question is just between IPV4 and

01:27:10 10  IPV6, the answer is no, it's the same sort of process.

11   However, for those specific IPs, one of them -- actually one

12   of them can be geolocated to a country and the other one is

13   not geolocatable at all.

14   Q.    And that's a good very.  You said not geolocatable at

01:27:29 15  all.  Why would that be?

16   A.    So the top one that stands with the number 10, that's

17   an internal IP address.  So it's not actually associated to

18   any one computer.  It's something that is reserved for

19   everyone to use internally.

01:27:46 20       We have this issue with Google legal process returns

21   where we see internal IP addresses instead of external ones

22   which is what you would normally expect.

23   Q.    So when you're getting this data, is it fair to say

24   not all of the data is usable?

01:28:01 25  A.    Yes.  And part of the analysis process is taking out

1515

1    the ones that are the not usable.

2    Q.    Now, can IP addresses be masked or hidden?

3    A.    Yes.  You can essentially supplant your time IP

4    address is someone else's that isn't yours.  And that's what

01:28:21 5    the Internet will see instead of your true IP.

6    Q.    How does that work?

7    A.    There are a number of different products available

8    that will do this for you.  We call them broadly proxies.

9    So there are commercial ones that you can just buy,

01:28:39 10    including even for your phone, where you buy this app, you

11    install it.  You turn it on, and instead of seeing your true

12    IP address, any site that you go to on the Internet or any

13    app that you use will see the IP address of that company

14    instead.

01:28:54 15        And there are other free products that use a number of

16    different anonymization protocols in various different ways.

17    Q.    Is this also known as using a proxy server?

18    A.    Yes.

19    Q.    And what is TOR?

01:29:10 20    A.    TOR, the TOR protocol is one of these more complex

21    proxy techniques that we see.

22        So in TOR's case, it is a very complex, very advanced

23    method where it essentially bounces you around the Internet

24    and encrypts all of your communications for you.

01:29:35 25        And then so you're coming out of a -- not truly

1    random, but sort of random place on the globe that -- and we

2    call that a node, a TOR node.  So anyone who is watching

3    your traffic, all they see is traffic from TOR, which you

4    can't really do anything with that in terms of IP analysis.

01:29:58 5    Q.    Is there a known list of TOR IP addresses?

6    A.    Yes.  The TOR protocol is administered by a nonprofit

7    organization called the TOR Project.  And they maintain

8    what's called the consensus of TOR nodes, which is just a

9    list of all of them.  And they do that so that people can

01:30:18 10    verify that, yes, that's a TOR node.

11          And also so that if they believe that someone is

12    abusing the TOR protocol, they can kick them off.

13    Q.    So if you see IP addresses that are using -- that are

14    TOR IP addresses, you're able to identify them?

01:30:34 15    A.    Yes.

16    Q.    Now, in this case, were you asked to do some specific

17    analysis in this case?

18    A.    Yes, I was.

19    Q.    And did that include analysis of data obtained from

01:30:46 20    some cellular telephones?

21    A.    Yes.

22    Q.    And were those phones related to Elton Simpson?

23    A.    Yes, they were.

24    Q.    Were you also asked to examine or review results data

01:31:00 25    collected from Elton Simpson's Twitter account?

                1    A.    Yes, I was.

                2    Q.    And then second, were you also -- second category,

                3    were you also asked to analyze IP data related to some

                4    specific Twitter accounts in this case?

01:31:16        5    A.    Yes.

                6    Q.    Let's talk about the cell phones first because that's

                7    the, I think, the simpler one.

                8          So, first, if we could, pull up Government's Exhibit

                9    105.

01:31:27       10          Did you review a report that was done from an

               11    examination of a cell phone recovered at the scene of the

               12    Garland, Texas shootings in May of 2015?

               13    A.    Yes.

               14    Q.    And on the screen is Government's Exhibit 105.  What

01:31:45       15    is that?

               16    A.    That is an extraction report from one of those phones.

               17    Q.    And have you previously reviewed this?

               18    A.    Yes, I have.

               19    Q.    This is a three-page document.  Does this consist of

01:31:56       20    all of the data in that report?

               21    A.    No.  There's more.

               22    Q.    If we could move forward to page 2.

               23          And then page 3.

               24          So if we could enlarge sort of the center part?

01:32:18       25          What does this part of the report show you?

1518

1    A.    This is a summary of the -- of what is in the report.

2    So it gives you the straight numbers of what type of data

3    was recovered.

4         As you can see, there's different types of messages,

01:32:37 5    there's applications, different types of files, and then

6    there's some analytics that that particular tool provides.

7    Q.    And so based on -- first based on the examination of

8    the data from this report, were you able to determine whose

9    cellular telephone it was?

01:32:54 10    A.    Yes.

11    Q.    And whose was that?

12    A.    It belonged to Elton Simpson.

13    Q.    And then did you review also for your testimony today

14    some of the, I guess, sub-reports described here?

01:33:07 15    A.    Yes.

16    Q.    If we could please pull up Government's Exhibit 106.

17         What is Government's Exhibit 106?

18    A.    This is what the tool was able to extract from -- it's

19    under instant messages, but really what it is showing are

01:33:31 20    things that it was able to extract from the Twitter

21    application that was installed on that phone.

22    Q.    And when you say able to extract, was this extraction

23    done by somebody else?

24    A.    Yes.

01:33:41 25    Q.    And so would it be fair to say you just reviewed the

           1    results of the extraction done by a forensic examiner?

           2    A.    Yes.

           3    Q.    And have you reviewed this 44-page document?

           4    A.    Yes, I have.

01:33:56   5    Q.    And is this part of that extraction report?

           6    A.    Yes, it is.

           7    Q.    I would like to move forward within this to page 5.

           8          And taking a look at page 5 of this report, if we

           9    could enlarge sort of the center of this.

01:34:17  10          So specifically what is shown by these entries?

          11    A.    So these are tweets that were posted by the Twitter

          12    account atawaakul, which also belonged to Elton Simpson.

          13    Q.    And then if we look at entry number 42, there's --

          14    over to the right there's a body of a message listed.

01:34:40  15          What does that say?

          16    A.    Which?

          17    Q.    I'm sorry, I'm going to circle entry 42.

          18    A.    So that one says "@UmmahOneLove@ksaistah."

          19    Q.    And would you spell atawaakul for us?

01:35:00  20    A.    That is A-T-A-W-A-A-K-U-L.

          21    Q.    And is there a time stamp as well?

          22    A.    Yes, it's the 21st of April, 10:00 p.m., UTC.

          23    Q.    And the body of this message, what does that mean?

          24    A.    I'm not actually sure outside of the context.  But it

01:35:19  25    is a conversation that is occurring between three Twitter

1    users and we are seeing one third of that.

2    Q.    I guess when I said what does it mean, is that a

3    tweet?

4    A.    Yes, that's a tweet.

01:35:30 5    Q.    So would this and conversation occurring through

6    publicly -- possibly publicly viewable tweets?

7    A.    Yes.

8    Q.    And if we could move to page 8, please.

9          And if we could, on page 8, sort of enlarge the body

01:35:56 10    here.

11          Were there further tweets involving that @UmmahOneLove

12    account?

13    A.    Yes, there were.

14    Q.    And do you see those on this page?

01:36:09 15    A.    I do.

16    Q.    What entries do you see that in?

17    A.    I see it in all of the entries that you've zoomed in

18    on here, which is about six.

19    Q.    Would that be entries 75 through 81?

01:36:23 20    A.    Yes.  Sorry, that's actually seven.

21    Q.    So who would these tweets be from in this

22    circumstance?

23    A.    They are from Elton Simpson as @atawaakul.

24    Q.    And, again, that's A-T-A-W-A-A-K-U-L?

01:36:45 25    A.    There's to A's in the last.

1    Q.    So A-T-A-W-A-A-K-U-L?

2    A.    Yes, that's correct.

3    Q.    So these kind of tweets aren't necessarily about

4    terrorism or any of criminal activity, would you agree with

01:37:00 5    that?

6    A.    Yes, I would agree with that.

7    Q.    Now, when you look at evidence in a case, is that

8    something that is still relevant to you?

9    A.    Yes, of course.

01:37:07 10    Q.    What does this tweeting show relative to atawaakul and

11    UmmahOneLove?

12    A.    So they're having a conversation about women and about

13    getting married.  The fact that they're having this

14    conversation suggests to me that they're somewhat friendly.

01:37:32 15    The tone of it is -- they're commiserating.

16    Q.    And if we could move to page 10, please.

17          And if we could blow up or enlarge entries 96 and 97.

18          What do these entries show?

19    A.    So this was a tweet from Elton Simpson highlighting to

01:38:01 20    his followers the fact that there was a group in Texas that

21    was planning on having a Draw the Prophet Muhammad contest.

22    And he was quite upset about that.

23    Q.    What was the date of these tweets?

24    A.    The 23rd of April, 2015.

01:38:19 25    Q.    And there's also a time listed there.  What time zone

```
           1    is that referring to?
           2    A.    So these are in UTC time which is Greenwich Mean Time.
           3    If you change that to Arizona time, it would be about almost
           4    1:00 a.m.
01:38:36   5    Q.    And if we could move back to page 9, please.
           6          And sort of generally highlight the body of page 9.
           7          I just skipped 9 as I was going forward.
           8          Are there additional tweets to that @UmmahOneLove
           9    account on page 9?
01:38:56  10    A.    Yes, there are.
          11    Q.    What's the date of the tweets on page 9?
          12    A.    So this is the 23rd of April, accounting for the time
          13    zone it might have been the 22nd of April as well.
          14    Q.    And would that be entry 84?
01:39:13  15    A.    There's a few more.  Yeah, starting at 84 and going
          16    down to 91.
          17    Q.    So scattered within 84 and 91 are several more of
          18    these tweets to @UmmahOneLove?
          19    A.    Yes.
01:39:31  20    Q.    If we could pull up Government's Exhibit 107, please?
          21          What is Government's Exhibit 107?
          22    A.    This is the section of the report, the extract report,
          23    that shows what applications were installed on the device at
          24    the time of extraction.
01:39:57  25    Q.    And if we could move forward to page 10, please.
```

```
 1              I'm sorry.  Page 6.
 2              And if we could enlarge the top part.
 3              What does entry 68 tell you about this telephone?
 4    A.       It tells me that the Surespot application was
 5    installed on it.
 6    Q.       And on what date?
 7    A.       The 22nd of March, 2015.
 8    Q.       Now, in addition to this phone, did you also review
 9    records obtained from Twitter for that atawaakul account?
10    A.       I did, yes.
11    Q.       In we could please pull up Government Exhibit 145,
12    please.
13              If we can enlarge the top.
14              Do you recognize this in Government's Exhibit 145?
15    A.       Yes.
16    Q.       What is this account information for?
17    A.       This is the account metadata and registration
18    information for @atawaakul Twitter account.
19    Q.       Does it also have an account I.D. number?
20    A.       Yes, it does.
21    Q.       And would that be where I underlined?
22    A.       Yes, that's it.
23    Q.       Now, in your review of records obtain from Twitter for
24    this account, were you able to review the content of any
25    direct communications?
```

          1    A.    Yes, I was.

          2    Q.    And were there direct communications to that

          3    UmmahOneLove account?

          4    A.    Yes, there were.

01:41:35  5    Q.    If we could pull up first Government's Exhibit 145,

          6    page 203?

          7          Page 203.

          8          If we could enlarge down here at the bottom, the

          9    bottom three entries.

01:42:04  10          So is this data that you would have received direct

          11    from Twitter?

          12    A.    Yes.

          13    Q.    And what is this data telling you here?

          14    A.    These are direct messages between atawaakul who is the

01:42:18  15    one that ends in 8545, and the other user, @UmmahOneLove,

          16    which is the one that ends in 4593.

          17          And this is part of a larger conversation.

          18    Q.    And up said the other user was the UmmahOneLove.  Have

          19    you reviewed records from Twitter for the account

01:42:40  20    UmmahOneLove?

          21    A.    Yes, I have.

          22    Q.    Are we able to pull up side by side Exhibit 143.

          23          143, page 1.

          24          And then if we can pull up 145, page 203.

01:43:18  25          And are you able to enlarge the bottom portion?

1          And then enlarge the top portion over here.

2          So on the left is Government's Exhibit 143.

3          Is that the account information for the UmmahOneLove

4     account?

01:43:37 5    A.    Yes.

6     Q.    And does that have the account ID where I underlined?

7     A.    Yes.

8     Q.    And then on the right on Exhibit 145, page 203, is

9     that same account information listed as the recipient ID?

01:43:54 10   A.    Yes, it is.

11    Q.    So does that tell you that the recipient in this case

12    of this message was the UmmahOneLove Twitter account?

13    A.    Yes.

14    Q.    Were there additional messages in Exhibit 145 that

01:44:10 15   were between these two accounts?

16    A.    Yes, unfortunately, Twitter sends them to us in a not

17    chronological order.

18    Q.    And is there also a date and time listed for these

19    messages?

01:44:22 20   A.    Yes, there is.

21    Q.    And what would be the date and time of this one at the

22    top that I just underlined?

23    A.    That is the 23rd of April, 2015.

24    Q.    There's also a time listed as well?

01:44:36 25   A.    Yes, this is 20:56, and that's also in UTC time.

1    Q.    Have you reviewed the messages within the Twitter

2    records?

3    A.    Yes, I have.

4    Q.    Have you also reviewed a transcript that was created

01:44:53  5    to put those messages in chronological order?

6    A.    Yes, I have.

7    Q.    And would that be Government's Exhibit 145A, which

8    we're -- we're going to pull up Exhibit 145A actually on the

9    elmo.

01:45:32 10        Do you recognize Government's Exhibit 145A?

11   A.    Yes, I do.

12   Q.    This is the first page.  And then the second page.

13   A.    Yes.

14   Q.    What is 145A?

01:45:44 15   A.    This is a transcript of all of the messages between

16   those two accounts.

17   Q.    And does it have the date and time and the account and

18   the message listed?

19   A.    Yes, it does.

01:46:00 20   Q.    And are these times also in the UTC time zone you just

21   described?

22   A.    Yes.

23   Q.    As it was listed on the records from Twitter

24   themselves?

01:46:09 25   A.    Yes.

1    Q.    So within the conversation itself, is there first

2    greetings between the two parties?

3    A.    Yes.

4    Q.    And then as we move forward, is there a discussion

01:46:26  5    about where the individuals are located?

6    A.    Yes.

7    Q.    Where does UmmahOneLove indicate they're located?

8    A.    Montana.

9    Q.    And where does atawaakul indicate they're located?

01:46:40 10    A.    In the southwest.

11    Q.    And then if we move to page 2, what does UmmahOneLove

12    ask of atawaakul?

13    A.    He says, "Surespot," which he's asking him for his

14    Surespot account.

01:47:00 15    Q.    And what is the response?

16    A.    Atawaakul provides his account which is Juba8021.

17    Q.    Now, is that account name that you've become familiar

18    with?

19    A.    Yes, it is.

01:47:12 20    Q.    Who whose account is that?

21    A.    That is Elton Simpson's Surespot account.

22    Q.    Now, this transition from first tweets to direct

23    messages to now discussion of Surespot, is that something

24    you've seen before in your work?

01:47:29 25    A.    Oh, yes.

1    Q.    In what kinds of cases?

2    A.    I work all counter-terrorism cases.  So that is the

3    context in which I've seen it.

4    Q.    Now, have you also reviewed the content of a cell

01:47:46  5    phone that was recovered from Elton Simpson's residence in

6    Phoenix, Arizona?

7    A.    Yes.

8    Q.    And if we could pull pickup Government's Exhibit 117.

9          This is a 240-page document.  Are you familiar with

01:48:11 10    it?

11    A.    Yes, I am.

12    Q.    What is this?

13    A.    This is -- it's not an extraction report

14    because -- because of the type of phone, they were not able

01:48:17 15    to perform an extraction as with the other phone.

16          So what the examiners did is they essentially took

17    pictures of the screen of the phone for each possible screen

18    that shows what data is in the phone.

19    Q.    Generically, what kind of phone was it?

01:48:39 20    A.    It was a clam shell or flip phone.

21    Q.    So is that an older style of phone?

22    A.    Yes, or just less expensive, I suppose.

23    Q.    How would that compare to what's known as a smart

24    phone?

01:48:54 25    A.    If you were to continue with the colloquialism, it

          1   would be a dumb phone.  It doesn't run any applications or

          2   access the Internet.

          3   Q.    If we could move forward upon Exhibit 117 to page 3.

          4         So on this screen, are these examples of the photos of

01:49:14  5   the phone that were taken?

          6   A.    Yes.

          7   Q.    The bottom half, there's a category called "Pictures."

          8   Could we enlarge that.

          9         What are these category of -- or what is this part of

01:49:29 10   the report signify?

         11   A.    These are the pictures that were found on the phone.

         12   So most likely taken with the phone's camera.

         13   Q.    So it appears to be some writing there.  Is this

         14   pictures on this phone of another phone's communications?

01:49:49 15   A.    Yes.

         16   Q.    And have you reviewed these photos more closely than

         17   here?

         18   A.    Yes, I have.

         19   Q.    What kinds of communications are depicted in these

01:50:00 20   pictures on the phone?

         21   A.    These are pictures of someone using Surespot.

         22   Q.    And is there any way you can easily tell that just

         23   from looking at this?

         24   A.    Yes, I recognize the format of Surespot.  It's very

01:50:10 25   distinct.

1    Q.    And is there blue bar that is part of that format?

2    A.    Yes.

3    Q.    Were you able to tell what Surespot account was being

4    used in these communications?

01:50:23 5    A.    For most of them, yes, it's included in the screen

6    shot at the top.  For some of them it's cut off or not fully

7    visible.

8    Q.    Okay.  If we could move first to Government's Exhibit

9    119.

01:50:39 10          Is Government's Exhibit 119 a blowup of one of those

11   photos that we were just talking about?

12   A.    Yes, it is.

13   Q.    Now, taking a look at this, it still looks like it was

14   very difficult to read.

01:50:57 15          Do you see that?

16   A.    Yes.

17   Q.    As part of the analysis of this phone, was a better

18   picture taken of this screen?

19   A.    Yes.  As you can imagine, the analysts in Phoenix were

01:51:10 20   not particularly pleased with the size of this picture.  So

21   we asked them to make a bigger one.

22   Q.    And was a bigger picture created?

23   A.    Yes.

24   Q.    If we could move to Government's Exhibit 118.

01:51:24 25          Were you able -- is this the better photo that you

1    were referring to?

2    A.    Yes.

3    Q.    Now, taking a look at the top of the screen, if we can

4    blow up just sort of the very top.

01:51:35    5    Actually if we can go back and blow up even higher,

6    all the way to the edge.

7    So taking a look at this, were you able to determine

8    who this message was to?

9    A.    Yes.  It was to the Surespot user UmmahOne.

01:51:54   10    Q.    Now, normally in Surespot, would there be the user of

11    the sender at the top?

12    A.    Yes.

13    Q.    And are you able to see a portion of that?

14    A.    Yes.  It's quite difficult to read.  In some of the

01:52:09   15    other pictures it's easier.  You can see the whole thing.

16    Q.    What is the bottom of this -- what user name is the

17    bottom of this consistent with?

18    A.    Juba8021.

19    Q.    And what are the dates of these messages?

01:52:23   20    A.    It is the 23rd of April.

21    Q.    There's a time listed here.  Do you know what time

22    zone that would be in?

23    A.    It's -- as we believe this was Elton Simpson's phone,

24    it is most likely Arizona time, which is Mountain Standard

01:52:40   25    Time.

1  Q.    Would these be communications be after those Twitter

2  direct messages that we were referring to earlier?

3  A.    Yes, I believe so.

4  Q.    And if we could go back and enlarge -- enlarge it to

01:52:58  5  the full screen.

6        What is being said in this conversation?

7  A.    So Juba8021 says, "Are you working in law enforcement

8  or any branch of the government?"

9        And UmmahOne responds, "No, I am not, no way, shape

01:53:19  10  form or fashion working with any government or law

11  enforcement."

12  Q.    Okay.  Were there any further pictures of

13  communications that appeared to be related to this

14  conversation on that cell phone?

01:53:28  15  A.    There were pictures of conversations with other people

16  which didn't necessarily pertain to UmmahOne.

17  Q.    And were there any that appeared to be a direct

18  continuation of this conversation?

19  A.    Not that I recall, no.

01:53:44  20  Q.    And would Surespot have kept any content on their

21  servers of the rest of this conversation?

22  A.    No.

23  Q.    So in addition to review of these phones, did you also

24  do an analysis of data related to IP addresses in this case?

01:54:02  25  A.    Yes, I did.

1    Q.    And were you asked to focus on a couple -- of series

2    of Twitter accounts as part of that analysis?

3    A.    Yes, I was.

4    Q.    And did that include the -- did that include the

01:54:18  5    UmmahOneLove account?

6    A.    Yes, it did.

7    Q.    Were you also asked to take a look at data related to

8    @sham_reason?

9    A.    Yes.

01:54:29 10    Q.    If we can please pull up Government's Exhibit 19?

11          Taking a look at Government's Exhibit 119 at the top,

12    is this one of the accounts you were asked to look at?

13    A.    @sham_reason, yes.

14    Q.    And if we -- were you also asked to examine

01:54:57 15    sahabahtimesnow?

16    A.    Yes.

17    Q.    In we could please pull up Government's Exhibit 2,

18    please?

19          Is this the account listed here as well,

01:55:09 20    sahabahtimesnow?

21    A.    Yep.

22    Q.    So is this another account you were asked to examine?

23    A.    Yes, it is.

24    Q.    And were you finally also asked to examine

01:55:19 25    @abucommander?

```
 1    A.    Yes.

 2    Q.    If we could please pull up Government's Exhibit 13,

 3    please.

 4          Does this show that -- one of those accounts on

 5    Exhibit 13?

 6    A.    Yes, ma'am.

 7    Q.    Which one?

 8    A.    It's @abucommander.

 9    Q.    So for those four accounts, were you asked to examine

10    IP address and related data to determine who the users might

11    be?

12    A.    Yes.

13    Q.    As part of that, did you review any records?

14    A.    Yes, I did.

15    Q.    Did you review a lot of records?

16    A.    Yes, I did.

17    Q.    If we can -- we can take that down, please.

18          So I'm going to just go through some of the records or

19    exhibits in this case you might have reviewed.

20          Did you review records related to Facebook accounts

21    Charles May, erickjhendricks, and mustafa100?

22    A.    The second one is Erick.Hendricks.1.

23    Q.    I'm sorry, Erick.Hendricks.1, which are Government's

24    Exhibit 127, 128, 128, and 130?

25    A.    Yes.
```

1    Q.    Did you also review Exhibits 131, 132, 133, 134, and

2    135 which had records of Google Emails

3    erickjhendricks@gmail.com, erickjhendricks100@gmail.com,

4    Mustafa, abumaryam100@gmail.com, pageplussc@gmail.com, and

01:57:06  5    sham_reason at gmail.com?

6    A.    Yes.

7    Q.    Did you review records from Twitter?

8    A.    Yes, I did.

9    Q.    Did that include the records obtained related to

01:57:17 10    sham_reason, sahabahtimesnow, abucommander and UmmahOneLove?

11    A.    Yes.

12    Q.    And what those be Exhibits 140, 141, 142 and 143?

13    A.    Yes.

14    Q.    Although you didn't have IP address information, did

01:57:38 15    you also review Surespot records in this case?

16    A.    I did.

17    Q.    And would those be Exhibits 147 through 151 related to

18    accounts sham_reason, lovethehaqq, cantdeny, wilayahtx,

19    W-I-L-A-Y-A-H-T-X and terwatch, T-E-R-W-A-T-C-H?

01:58:09 20    A.    Yes.

21    Q.    Did you also review Exhibit 153 related in reference

22    to Wickr?

23    A.    Yes, I did.

24    Q.    And did you review records from service providers in

01:58:19 25    this case?

           1    A.    Yes, I did.

           2    Q.    What that include Exhibits 154 through 157, which

           3    included records related to CenturyLink, Comcast, and two

           4    returns from Time Warner respectfully?

01:58:32   5    A.    Yes.

           6    Q.    Finally, did you review records from a Rest Inn in

           7    Arkansas?

           8    A.    Yes, I did.

           9    Q.    Which is an Exhibit 158.  Extended Stay records from

01:58:45  10    Columbia, South Carolina, which is Exhibit 159?

          11    A.    Yes.

          12    Q.    And records related to I Tech Medic lease records and

          13    Emails, Exhibit 162?

          14    A.    Yes.

01:58:57  15    Q.    Now, taken together, would you describe these records

          16    as somewhat voluminous?

          17    A.    Yes.

          18    Q.    And difficult for somebody to understand just in their

          19    raw form?

01:59:10  20    A.    Absolutely, yes.

          21    Q.    And are there other sources of information you would

          22    have referred to as part of your analysis such as open

          23    source records?

          24    A.    Yes.

01:59:21  25    Q.    And what do you mean by open source records?

1   A.   The FBI's definition of open source essentially means

2   all information that's available to the public, whether that

3   means it's just out on the Internet for anyone to look at or

4   if it's something that you have to pay for, but anyone can

01:59:35 5   buy it.  All of that is included in the definition of open

6   source.

7   Q.   So would you have done some Internet research

8   essentially as part of your analysis?

9   A.   Yes.

01:59:45 10   Q.   And to assist with your testimony, did you prepare a

11   chart and PowerPoint?

12   A.   Yes, I did.

13   Q.   And would that chart assist the jury in understanding

14   your analysis?

01:59:57 15   A.   Yes, it would.

16   Q.   We would like to pull up Government's Exhibit 188.

17        As you just noticed, if you need to draw on this, you

18   can draw on it, which happens if you accidently bump it as

19   well.

02:00:23 20   A.   Yes, sorry.

21   Q.   What's Exhibit 188?

22   A.   There's my PowerPoint presentation.

23   Q.   And does this relate to the analysis you did in this

24   case of those Twitter accounts?

02:00:31 25   A.   Yes, it does.

```
 1        Q.    So I'm going to ask you to sort of walk us through
 2    what you did in that case.
 3              So taking a look at page 2 -- actually just one
 4    moment, please.
 5              Can you take that down, please?
 6              Ms. Vaughan, on the screen is Exhibit 188 again.  Do
 7    you recognize this?
 8        A.    Yes.
 9        Q.    And this is actually in PowerPoint, not in other trial
10    director software.
11              So we're going to move in order to the next slide.
12              What is does the first slide here represent?
13        A.    So these first view slides are essentially a summary
14    of all of the information that I took into account for this
15    analysis.
16              So this first one is all of the Email accounts and
17    their relations to the other social media accounts that I
18    looked at.
19        Q.    And why are you trying to understand these other
20    accounts besides what you're directly looking at?
21        A.    So for every social media account, you have to
22    register it using a phone number or an Email address.  And
23    those Email addresses also contain IP information.
24              So if you say have someone who uses a Twitter account
25    and they exclusively anoymize all of their traffic, well, I
```

                1  can still look at the Email address that was used to make

                2  that Twitter account and see if maybe they aren't so

                3  fastidious on that account, and then use that to make my

                4  determination that this person who uses this Twitter account

    02:02:53    5  is, you know, somewhere in the U.S. or what have you.

                6        So these are important connections.

                7  Q.   Now, are you looking for just sort of common usages

                8  that occur over time?

                9  A.   Yes.  I'm looking for things that link all of these

    02:03:07   10  accounts together.

               11  Q.   And so for these accounts that are listed here, did

               12  you get records for many of these accounts?

               13  A.   Yes.

               14  Q.   If we could move forward to the next page, please.

    02:03:23   15        What does this show?

               16  A.   These are the Twitter and Facebook accounts that were

               17  part of this analysis.

               18  Q.   And are the first four the Twitter accounts that you

               19  were specifically asked to look at?

    02:03:34   20  A.   Yes.

               21  Q.   And then the other four, are those Facebook accounts

               22  that are develop to your examination?

               23  A.   Yes, they are.

               24  Q.   If we could move to the next page, please.

    02:03:45   25        What does this chart show, or this graph show?

1540

1    A.    So this is a graph of log-ins to the four Twitter

2    accounts.  So what it mostly shows us is that there was

3    concurrent usage of some or all of the accounts.

4          So whoever was using them may have been switching back

02:04:07 5    and forth during the day.

6    Q.    And as sort of and baseline, is this one of sort of

7    the baseline things that you would first look at in doing

8    this analysis?

9    A.    Yes.

02:04:19 10   Q.    In yellow, there's log-ins or activity for

11   sham_reason.  Do you see that?

12   A.    Yes, I do.

13   Q.    And those seem to end on March 1?

14   A.    Yes, they do.

02:04:29 15   Q.    Do you know the reason for that?

16   A.    So that was the totality of the records I received,

17   unfortunately.

18   Q.    So do you know whether there might have

19   been -- whether there were or were not later log-ins for

02:04:43 20   that account?

21   A.    I suspect there were.  Of course, I don't have the

22   records to confirm that.

23   Q.    And would that be based just on the timing possibly of

24   when those records were obtained?

02:04:53 25   A.    Yes.

1541

1    Q.    And if we could please move to the next page.

2          Explain what you're trying to illustrate here, please?

3    A.    Normally, when doing this type of analysis, it's not

4    normal for someone to use multiple accounts at the same

02:05:12  5    time.  Or at least that's how things used to be.  Things

6    have changed quite a bit in the intervening years.

7          But so we have to ask, are there use cases where you

8    would have someone doing that and what would those use cases

9    look like, because each one of these data points tracks back

02:05:33 10    to something that a person did.

11          So the point of the analysis is to try to figure out

12    what it was that person did that made that happen.

13          So if you have multiple Twitter accounts, which is

14    something that you can do, you are allowed to do that, you

02:05:46 15    can use a Twitter mobile application to access all of those

16    accounts, and you can essentially set up however many

17    accounts you want in those apps, and then you can switch

18    between them whenever you feel like it.  It's very, very

19    easy.  It is actually, in fact, a push of a button.

02:06:06 20          So if you were doing that, you would, whatever account

21    you were most frequently using, so the one you're actually

22    looking at, scrolling through and typing things, etcetera,

23    that account is going to accumulate the most log-ins.

24          However, any account that is set up in that

02:06:27 25    application will have a periodic refresh that's done

1    automatically by the application without the user's

2    knowledge or permission.

3         So that will also cause a log-in event.

4         So even if you had four accounts and you never, ever

02:06:46  5    touched three of them, just the fact that you had them set

6    up in the same app that you were using means there would be

7    log-ins to all four of those accounts together.

8         And for some of those, those log-ins would be

9    simultaneous or nearly simultaneous.

02:07:05 10    Q.    Okay.  If we can move forward, please.

11         Are the things that you're trying to look for, are

12    they commonalities among the accounts?  Is that sort of how

13    you're trying to approach this?

14    A.    Yes.  So if the hypothesis is that this is a person

02:07:24 15    who has multiple accounts in a mobile application, then

16    naturally, we would need to see if there is any evidence

17    that that person is, in fact, using a mobile application.

18         So this is a pull from the Twitter API interface,

19    which is basically just a sort of back end, public back end

02:07:43 20    that anyone can use to get data from Twitter.  So that means

21    the tweets, the user profiles and so on.

22         So within the Twitter API response for tweets, there's

23    a field called source.  And that tells you what application

24    the person used to make the tweet.

02:08:01 25         So if you use Twitter for Android, it comes up in that

1    source field.  And, in fact, two of the accounts that I

2    looked at for this analysis, the ones I could find tweets

3    for with this information, it indicated that the user was

4    using Twitter for Android.

02:08:20  5    But, likewise, if you use Twitter for iPhone, that's

6    something that you can see, or any other Twitter application

7    that's out there.

8    Q.    So obviously, there are millions of people who use

9    Twitter for Android, correct?

02:08:31 10    A.    Yes.

11    Q.    So is this data point very conclusive in your

12    analysis?

13    A.    Not by itself.

14    Q.    But is it one of the facts that you're looking at as

02:08:42 15    you move forward?

16    A.    Yes.  Yes.

17    Q.    And if we could move forward to the next slide,

18    please.

19    What does this chart show?  And we're going to go

02:08:52 20    forward, sort of move around after you give a general

21    explanation?

22    A.    So this is a chart of known IPs.  So each little house

23    icon is an IP address where we served legal process to the

24    Internet service provider and they told us exactly where

02:09:11 25    that IP was at that time.  They are the only people who can

1    tell you that definitively because they're the ones who, you

2    know, take your credit card payment and the like.

3         And the blue icons are accounts.  So each line drawn

4    between one of the little houses and a blue circle is a

02:09:32  5    log-in event or a series of log-in events.  And I've

6    provided the day for those and the number.

7    Q.    So, again, are you looking for those commonalities of

8    IP usage?

9    A.    Yes.  So when these -- when this chart shows a

02:09:48 10    connection between two blue accounts by way of a little

11    house, that means that those two accounts were logged into

12    from the same IP.

13    Q.    So let's start in the upper left corner.  I'm going to

14    circle the first one we're starting at.

02:10:04 15         What's the little house or hotel building there?

16    A.    So that IP address was assigned to the suburban

17    Extended Stay Hotel in Albuquerque, New Mexico.

18    Q.    And what accounts were shown as logging into that IP

19    address?

02:10:21 20    A.    So you have one log-in each on the 2nd of January,

21    2015, to the sham.reason Facebook account, as well as the

22    sham_reason@gmail.com Email address.

23    Q.    And was the sham_reason@gmail.com Email related to any

24    of the Twitter accounts?

02:10:39 25    A.    Yes.  It was used to register sham_reason.

1   Q.   Okay.  Next, I'm going to circle icon here, sort of

2   over to the right and down a little bit.

3        Which one is that?

4   A.   So we have the Rest Inn, Little Rock, Arkansas.

02:11:01   5   Q.   And what did you learn about the Rest Inn?

6   A.   So on the period of time we're looking at also

7   includes, if I can add this part here, so it's from the 17th

8   of January to the 20th of January.

9        We have multiple log-ins to PageplusSC@gmail.com, and

02:11:24  10   also during that time period we have one long-in a piece to

11   the Erick.Hendricks.1 Facebook account and the

12   sham_reason@gmail.com Email account.

13        So all of those things are happening around the same

14   time.

02:11:38  15   Q.   And, again, the sham_reason@gmail.com account is

16   related to which Twitter account?

17   A.   That is sham_reason.

18   Q.   Then we'll move to -- there's three houses here listed

19   for a Linda Woods in Woodson, Arkansas.

02:11:59  20        Can you sprain those?  And I'll try to circle the

21   whole bunch.  I think I got them all.

22   A.   Thank you.

23        So we have three IP addresses here that were assigned

24   to Linda Woods at the same location.

02:12:13  25   Q.   What do you mean by three IP addresses?

1    A.    So what happens in America commonly, when you buy

2    Internet from an Internet service provider, they assign you

3    an IP, whether you know it or not.  And that IP is

4    associated with your account and your physical location

02:12:33 5    where you receive that service.

6          Now, unless you pay them extra, they will change that

7    IP periodically which, for most people, is a nonissue.  It

8    doesn't really change anything for how you use the internet.

9          So in this case, we have three different time periods.

02:12:50 10   So it begins with the 30th of January, which is actually, in

11   this case, the day that Linda Woods' IP address was rotated

12   to a different CenturyLink address.

13         So we have two that are in the same time period which

14   is the 30th of January to the 1st of February.  And then the

02:13:12 15   second time period that we're looking at is in April where

16   she, again, they changed her IP address and now she has a

17   new one.

18         So it's all the same physical location.  It's just a

19   different IP address.

02:13:23 20   Q.    And do you know who Linda Woods is?

21   A.    I believe this is Erick Hendricks's mother.

22   Q.    So what accounts were logged in through the IP

23   addresses assigned to her home?

24   A.    So from the 30th of January to the 1st of February we

02:13:42 25   have a couple of log-ins to pageplussc@gmail.com.

1547

1   We also have a log-in to Facebook account

2   Erick.Hendricks.1, and we also have a log-in to the

3   mustafa100 Facebook account.  Actually about one minute

4   after looking into Erick.Hendricks.1.

02:14:04 5   Q.   What else later in April do you see?

6   A.   So from -- starts with the 27th of April to the 30th

7   of April, we have several log-ins to mustafa100 Facebook

8   account.  We also have some log-ins to the abucommander

9   Twitter account.

02:14:26 10   Q.   And clear that.

11   The next building over is the -- is this one here,

12   which I'm going to circle, the Andrea Hansen house.  What do

13   you know about that?

14   A.   So here again we have quite a bit of data spanning

02:14:45 15   quite a bit of time.

16   The first important thing to note is that in early

17   February you have a bunch of log-ins to pageplusSC@

18   gmail.com.

19   Then you have this time period which is the 27th of

02:14:58 20   February to the 1st of March where you have log-ins to

21   pageplusSC again.  Then you also have log-ins to

22   sham_reason, the Twitter account at around the same time.

23   You also have log-ins to sham_reason from a hotel that

24   is also located in Columbia, South Carolina, which is this

02:15:23 25   part.

1    Later on, just moving through time, we have some more

2    log-ins in mid-March to pageplusSC.  In April, there's a

3    log- in to sahabahtimesnow, the Twitter account.  And then

4    in May and July, we see log-ins from -- or to, rather,

02:15:49   5    Erick.J.Hendricks100@gmail.com.

6    Q.    Now, a couple things here.  I notice you don't have

7    anything connecting the UmmahOneLove account?

8    A.    Yes, so this is the odd one out.

9    Q.    What's one the oddities about that?

02:16:00  10    A.    So all the IP data that we have for this account is

11    either anoymized, so it is actually using Tor protocol so

12    just TOR nodes.  And then what remains are IP addresses that

13    are -- they belong to a company that handles transport of

14    data between mobile networks.

02:16:21  15    So all you can really say from that is, it was some

16    kind of a mobile device using a, you know, cellular data

17    connection.  You can't say what subscriber because -- or

18    what network because in this case, this was a company that

19    contracts to multiple networks, but in the United States

02:16:42  20    somewhere.

21    So that was the extent of geolocation we were able to

22    do for that account, is in the United States on a mobile

23    phone somewhere.

24    Q.    What's the significance of what, to you, of what

02:16:52  25    you've put together here?

1    A.    So to me, this shows there are clear connections

2    between essentially all of these accounts.  And they

3    are -- this is high confidence data here, you know, we know

4    that these IP addresses were definitely associated with

02:17:09 5    these locations at that point in time.  And it is, I

6    believe, not a coincidence that you see all of these

7    accounts coming from these places and the people that are

8    associated with these locations.

9    Q.    If we could move forward for a few more details.

02:17:31 10          So what's this next slide giving?

11    A.    Yes, so just to go back over the specific locations

12    that we do know about with high confidence, so we have the

13    Linda Woods' IPs.  So, again, you saw on the chart there

14    were log-ins to abucommander on the 30th of April.  And we

02:17:54 15    also saw the Facebook account of mustafa100 logging in there

16    around the same time.

17          So in order for these connection to be possible, the

18    human behavior that's associated with this data, is you

19    have -- these two accounts are being accessed in the same

02:18:09 20    place at the same time.

21          So you may infer from that that it was being accessed

22    by the same person or the same computer, or phone.

23    Q.    Now, from the data that you're putting together here,

24    are you able to definitively say who was sitting behind that

02:18:26 25    computer?

1    A.    No, I can't do that.

2    Q.    If we could move to the next slide, please.

3          So what does this illustrate?

4    A.    So this is some more data from the Linda Woods'

02:18:38  5    address.  So, again, we have mustafa100 and we have

6    Erick.Hendricks.1 together at the same time or close to the

7    same time.

8          We have pageplussc@gmail.com, and we, you know, have

9    the two different or three different IP addresses associated

02:18:58 10    with Linda Woods, all associated with these accounts.

11    Q.    So if we can move to the next page, please.

12          This relation to Andrea Hansen.

13          What can you explain again about Andrea Hansen?

14    A.    So, again, here we have four different accounts being

02:19:16 15    logged into from that location.  We have sham_reason.  We

16    have pageplusSC.  Those two are about the same time

17    approximately.  We have sahabahtimesnow, and we have a

18    Erick.J.Hendricks100@gmail.com also from this one location.

19    Q.    Move forward, please.

02:19:40 20          Relative to the rest, what did you find?

21    A.    So from approximately the 17th to the 20th of January

22    we had lots of log-ins to pageplusSC from the Rest Inn and

23    then we had log-ins to Erick.Hendricks.1 and

24    sham_reason@gmail.com.

02:19:57 25          Additionally, a subpoena to the Rest in indicated that

1   Erick Hendricks was a guest from the 17th to the 20th.  So

2   during that time period.

3   Q.    If we can move forward to the next slide which talks

4   about the Extended Stay in Columbia.  What did you learn

02:20:12  5   about that?

6   A.    So there we had five log-ins to sham_reason.  That hoe

7   tell was also subpoenaed, and there was a record that

8   Tyrinda Hendricks was a guess there during that time period

9   and she had booked a room for two people.  Two adults

02:20:30 10   specifically, no children.

11   Q.    If we can move forward, please.

12         What did you learn just specifically about the

13   sham.reason Facebook account?

14   A.    So, again, we have that next with the sham_reason at

02:20:46 15   gmail.com Email account.  In fact that Email account was

16   used to register that Facebook account as well as that

17   Twitter account.

18         And at the time of the creation of the Twitter

19   account -- which this actually should had say December 2014,

02:21:04 20   so I apologize for that, but at the time of the creation of

21   the Twitter account, that Email address had been logged into

22   five minutes before and four minutes after.

23         And, of course, when you register a Twitter account

24   and you use an Email address, you are supposed to, at least,

02:21:19 25   confirm that that Email address exists and that you're the

1    user.  They send you an Email with a link and you have to

2    click on it.

3         So you would have to log in and then do the thing and,

4    log out.

02:21:34 5    Q.    Did you prepare any maps to sort of illustrate where

6    geographically some of these locations were?

7    A.    Yes, I have.

8    Q.    If we could move forward to the next page, please?

9         What does this illustrate?

02:21:45 10    A.    So this is an overview of the data we have for

11    Erick.Hendricks.1.  So first we have two types of data.  We

12    have the high confidence data of that in the chart.

13         So those are the errors that you see.  So each arrow

14    points directly to a location where we can say for absolute

02:22:04 15    certain that that IP address belonged to that location at

16    that time.

17         The circles are approximate geolocations.  So what

18    happens is when we have not had an opportunity to or we're

19    no longer able to go to the ISP and get that information, in

02:22:23 20    some cases they, you know, you just can't get it, there are

21    a couple of commercial database that is will provide

22    approximate geolocations based on their ability to observe

23    like network traffic and things like that, which they sell

24    to lots of different companies that need to be able to

02:22:46 25    goelocate their customers who are coming in over the

1    Internet.

2    Q.    Let me stop you for a second.

3          Are these geolocation commercial databases, are they

4    the types of databases you've previously relied on in your

02:22:58  5    career in this field?

6    A.    Yes.

7    Q.    And are they commonly relied on within the field?

8    A.    Yes they are.

9    Q.    Please continue with your explanation of the

02:23:09  10   geolocations?

11   A.    So those geolocations that they provide are most

12   accurately understood as a radius, so a big circle.  And the

13   company basically asserts that there's an 80 to 90 percent

14   chance that the user of that IP is somewhere in that circle,

02:23:25  15   so they can't say for sure.

16         They will attempt to because they obviously they want

17   to you buy their product.

18         But for the best accuracy, we have to keep it to that

19   circle.

02:23:38  20   Q.    So if we move forward to the next slide.

21         Is this just a close-up of the previous slide?

22   A.    Yes.  So this is a zoomed in to the area around Little

23   Rock, Arkansas.

24   Q.    And does this show the same IP log-in data for

02:23:57  25   Erick.Hendricks.1 on Facebook?

1    A.    Yes.

2    Q.    And if we could move forward to the next slide.  What

3    does this map show?

4    A.    So this is the same treatment given to pageplusSC@

02:24:09 5    gmail.com.  So you can see there's -- there's still a strong

6    focus in the area of Little Rock, Arkansas, but there's some

7    movement across the U.S.

8    Q.    If we can move forward, please.

9          Is this a close-up of the same slide?

02:24:26 10    A.    Yes.  Something appears to have happened to it, but

11    you can see the outline of the circle.  This is, again

12    Little Rock, Arkansas and Memphis, Tennessee.

13    Q.    If we could please move toward to the next one.  What

14    does this illustrate?

02:24:46 15    A.    So this is a close-up of geolocation where we're

16    combining a couple of different accounts data.  So here,

17    again, we have the arrows because these are known locations.

18    So we have pageplusSC, sahabahtimesnow, and sham_reason, all

19    showing up at Andrea Hansen's apartment.

02:25:07 20          We also have, during -- during and overlapping time

21    period, we have log-ins from that ESA Columbia west, and I

22    did punch this into Google Maps and they're about seven

23    miles apart from each other which is about 15, 20 minutes

24    drive.

02:25:25 25    Q.    If we can move forward, please.

1        What does this last map show?

2   A.    So here, again, we have a couple of different

3   accounts, and their geolocations.

4        So we have pageplusSC, Erick.Hendricks.1 and

02:25:44 5   abucommander.  So, again, you can see the arrows or the

6   bases where we know they absolutely were there at that point

7   in time.

8   Q.    If we can move forward to the next slide?

9        What are you explaining here?

02:25:55 10  A.    The log-in activity for Erick.Hendricks.1 and

11  mustafa100 are essentially identical over -- from January to

12  April of 2015.  It's the exact same log-ins, the exact same

13  IPs, there's in some cases differences of only a few minutes

14  between log-ins.  So I would strongly assess that this is

02:26:20 15  the same person, just switching back and forth throughout

16  the day.

17       So there is almost no point in putting it on a map

18  because it would just be overlapping circles.

19  Q.    If we can move forward, please.

02:26:31 20       What's the relevance of Verizon wireless log-ins?

21  A.    So when I'm looking at different accounts and trying

22  to assess whether they're potentially the same person,

23  besides just looking for shared IPs, one of the things I

24  look for are patterns of usage.

02:26:48 25       So most people these days, you don't just log in to

1    the Internet from one place.  We're using the Internet all

2    day, every day there some way, shape or form.

3         So you know, you don't -- and you don't just stay in

4    one place either.  You log in from your house, you -- you

02:27:07  5    might log in from your work computer.  And you might log in

6    on your phone while you're traveling around.

7         So what I look for are those patterns of movement

8    during the day.  And whether or not they match up.

9         So in this case, for three of these accounts we have

02:27:23 10    quite a few log-ins from a Verizon wireless subscriber.  So,

11    again, I can't say who that subscriber is because I can't

12    get that from this information.  But I know that whoever

13    this was, they used Verizon.

14         So I look to the other accounts to see if they also

02:27:40 15    used Verizon.  And, in fact, for three of them, that's the

16    case.

17         For sahabahtimesnow, we have this unidentified mobile

18    carrier.  So I think I misspoke earlier when I said that was

19    ummahonelove that had the issue with the third party who

02:28:00 20    accesses this medium between two different carriers.  So

21    that is sahabahtimesnow that that was the case for.

22         For UmmahOneLove, there were Verizon wireless log-ins.

23    Q.   So for these log-ins, are you able to get a further

24    geolocation?

02:28:16 25    A.   No.  Essentially you can say that they are in the

1    United States because it's a Verizon wireless United States

2    marked -- it's -- it identifies itself as being Verizon in

3    the U.S.  And when you see carriers in our countries, it's

4    marked as such typically.

02:28:37  5        Essentially from this IP data, there's no more you can

6    do than to say that.  It's up to the carrier to give you

7    anymore definitive geolocation.

8    Q.    Okay.  If we can move forward, please.

9         Did you notice Verizon wireless log-ins from other

02:29:00 10   accounts?

11   A.    Yes.  So most of the accounts I reviewed -- and I've

12   written out the Emails and the Facebook accounts that I

13   looked at -- they all had the same pattern of intermittent

14   use by someone who has a Verizon wireless mobile device.

02:29:16 15   Q.    And if we can move to the next slide, please.

16   A.    Yes.  So this final piece, or second to last piece is

17   about the use of TOR.  So we discussed TOR a little bit

18   earlier, that it's an anonymization protocol that

19   essentially makes it extremely difficult to impossible to

02:29:37 20   trace back where someone is when they're using the Internet.

21   And it encrypts their traffic so they can't be eavesdropped

22   upon in transit and the like.

23        So this is -- it is available to everyone, but it is

24   something that has been recommended extensively by ISIS and

02:29:56 25   al-Qaeda and essentially every terrorist group on the planet

1    uses TOR.

2    Q.    What is an exit node just so we define that what

3    means?

4    A.    So a TOR node is a point through which your traffic

02:30:11  5    transits.  So whether you come from your real IP and you go

6    on to the TOR network, they call those entry nodes.  So your

7    computer talks to the entry node.  The entry node talks to

8    nodes in between that, relay your traffic to the next node

9    in sort of a relay race.

02:30:30 10         Then there's a final node, which is called the exit

11    node.  And that's where your traffic goes out the TOR

12    network and back to the Internet.  So exit node is the TOR

13    IP address that we see when someone is using TOR.

14    Q.    And did you see TOR usage in the accounts that you

02:30:48 15    analyzed?

16    A.    Yes, I did.  Three of these Twitter accounts, for the

17    data that I had, abucommander, UmmahOneLove,

18    sahabahtimesnow, they all used TOR quite extensively.  And I

19    also saw that the Erick.Hendricks.1 Facebook account did use

02:31:09 20    TOR in early and mid-May.  I did have the dates for that but

21    I think it might have gotten taken off this PowerPoint.  So

22    I apologize for that.

23    Q.    In we can move to the next page, please much.

24         What's this graph show?

02:31:21 25    A.    So this is just a graph of all of the log-ins and

1    whether or not they were TOR nodes.

2         So if you can see the yellow or orange color, that

3    is -- those log-ins are from TOR nodes, and the blue ones

4    are from nonTOR nodes.  So you can pretty clearly see that

02:31:43  5    for all of these we have -- or except for sham_reason, we

6    have lots of TOR use.  In fact, the overwhelming usage is

7    through, you know, via TOR.  And in only a few instances for

8    those three where the person was not using TOR.

9    Q.   And does this explain why there was a relatively

02:32:04 10    limited number of identifiable IP addresses that went back

11    to a specific location on the previous charts?

12    A.   Yes.  When we see TOR, there's nothing more we can do

13    with that information.  When we exclude TOR from the

14    analysis, we're only left with, you know, probably 30 to 50

02:32:26 15    events for -- in total for these.

16    Q.   But is that still enough in your analysis for you to

17    draw some conclusions?

18    A.   Yes.

19    Q.   Okay.  Even though you can't find a geolocation, is

02:32:42 20    there still some relevance to looking at the TOR log-ins?

21    A.   Yes.  So it can help you establish a pattern of life,

22    for instance.

23    Q.   Can we move not next slide, please.

24         What is a TOR correlation analysis?

02:32:56 25    A.   So the way the TOR works, you can have -- a lot of

1    people use TOR.  Not all of them are terrorists and there's

2    a limited, albeit quite large number, of TOR exit nodes.  So

3    when you are coming out of one of these exits nodes, there

4    are, at any given time, there are some people who are using

02:33:19  5    the same exit node as you.

6         So, you know, when you're looking at a very popular

7    website, it's entirely likely that you'll have multiple TOR

8    users coming out of the same IP address.

9         However, when you're looking at things where you only

02:33:39 10    expect to see one person logging in, or very, very few

11    people logging in, you can see all of those -- the activity

12    on those accounts, over time, if you start to see the same

13    TOR exit nodes showing up within a time window, which is

14    very, very short, you can establish these -- this

02:34:00 15    correlation.

16         So essentially, we're seeing the same TOR exit node

17    within about ten minutes or less accessing the same

18    accounts.

19         So it's essentially increasing the likelihood, the

02:34:12 20    more times we see this, the more likely it is that it's the

21    same person.

22         It's not a certainty, but it becomes less and less

23    coincidental when we see it over and over and over again

24    over time.

02:34:24 25         And if you remember the explanation of how Twitter

1    handles multiple Twitter accounts, if you are using TOR on

2    your phone and that automatic refresh was happening, you

3    would get simultaneous log-ins to each of those accounts

4    from that whatever TOR node your phone was on at that time.

02:34:42 5    Q.    And did you do a TOR correlation analysis of the

6    accounts in this case?

7    A.    Yes, I did.

8    Q.    If we can move not next slide, please?

9          THE COURT:  Counsel, why don't we take a few

02:34:53 10   minutes?  I know you've got -- I'm trying to find a place

11   here to break.

12         But I think it's been quite some time.  So we're going

13   to take our morning recess for the jurors.

14         We'll take about 15 minutes.

02:35:05 15   Ladies and gentlemen, leave your notepads on your

16   chairs.  Remember all the admonitions I've given you.  We'll

17   take a break and then we'll convene for the balance of the

18   morning.

19         Thank you very much.

02:35:14 20   All rise.

21         (Jury out, 10:40 a.m.)

22         (Recess taken, 10:40 a.m.)

23         (Jury in, 11:00 a.m.)

24         THE COURT:  You may proceed at this time.

03:00:41 25   MR. SHEPHERD:  Thank you, Your Honor.

1    BY MR. SHEPHERD:

2    Q.    Ms. Vaughan, we were -- we're still talking about

3    Government's Exhibit 188.  There's currently up here a slide

4    marked TOR correlation analysis.

03:00:58  5         I believe that's where we left off.

6         Did you analyze the correlation of TOR nodes within

7    the data in this case?

8    A.    Yes.  So what I did was I took all of the IP events

9    for these accounts and I look for log-ins that occurred from

03:01:16 10   the same IP address within ten minutes or less.

11        So for sahabahtimesnow and abucommander, I found 52

12   pairs of log-ins within ten minutes from the same TOR node,

13   of which 23 of those 52 were within one minute or less.

14        For UmmahOneLove and abucommander, I found 66 such

03:01:41 15   pairs from the same TOR node within ten minutes.

16   Thirty-nine of which were within one minute.

17        So the question as an analyst I ask, keeping in mind

18   that if you have the same TOR nodes accessing two accounts

19   at one time, that could very well be a coincidence.  So what

03:02:00 20   is the likelihood that there are 118 coincidences and it's

21   not very likely that that's a coincidence anymore.

22   Q.    Did you also do an analysis of usage times on some of

23   these Twitter accounts and some of the Wickr user names and

24   when they were created?

03:02:18 25   A.    Yes, I did.

1    Q.    And if we can move to the last slide, please.

2          If you could explain what you noticed in doing that

3    examination?

4    A.    So generally speaking, what these show are that the

03:02:33  5    either last use or creation dates of these Wickr accounts

6    coincide roughly with some other activity on the other

7    accounts so that person was on the Internet around the same

8    time that those Wickr accounts were created or in use.

9          So the first set are here after, which was last used

03:02:53 10    at 10:38 p.m., EDT.  It seems like I might have put the p.m.

11    and the a.m. -- let me see what my -- because that's -- 12

12    hours is certainly not the time window I intend.  I think I

13    meant 11:00 p.m.  So I apologize for that.

14          You had activity on the Wickr account at 10:38 p.m.

03:03:16 15    And then you had activity on abucommander and

16    sahabahtimesnow approximately one hour later, or less.

17          For lovethebird Wickr account, again, 10:40 p.m.  You

18    have log-ins to abucommander 20 minutes before approximately

19    or 16 minutes before on five minutes after.

03:03:40 20          For Nowhaq, that was created on -- created at 11:24

21    p.m. on the same day you have a log in to sahabahtimesnow

22    about 11 minutes before.

23          For hidingmyrights, the time there was 12:40 p.m.

24          Your abucommander logging in both 12 minutes before

03:04:05 25    and four minutes after.

1    And then the last use of that Wickr account was at

2    3:04 p.m.  And you have a second Wickr account created at

3    one minute after that, which is quite interesting.

4        Then terrorwatch17 created at 5:43 p.m.  Same day you

03:04:31  5    have Erick.Hendricks.1 logging in about 21 minutes before

6    and one minute before that account was used, last used,

7    rather.

8    Q.    Ms. Vaughan, you've gone through a lot of explanation

9    of the data you reviewed and some of the things that you

03:04:47 10    found from reviewing that data.

11        Now, based on your training and your experience and

12    your review of the data there this case, were you able to

13    form an opinion regarding whether the same person was using

14    Twitter accounts sham_reason, sahabahtimesnow, and

03:05:04 15    abucommander?

16    A.    Yes, I think it's quite likely the same person was

17    using all three accounts.

18    Q.    And I didn't mention UmmahOneLove in that question.

19    What would be your opinion about UmmahOneLove?

03:05:20 20    A.    So there are patterns of usage for UmmahOneLove that

21    are consistent with the usage patterns of the other

22    accounts.  But because of the quite heavy use of TOR, I

23    don't have anything that I can use to confirm that the way I

24    can with the other accounts which share log-ins from the

03:05:39 25    same IPs.

1    But on the other hand, I also don't have anything that

2    excludes that account from being associated with those other

3    accounts.  So it's just sort of a random -- a middle spot

4    where you can't really confirm confidently or deny

03:05:53 5    confidently that they're related.

6    Q.   And as you just explained, there's the TOR correlation

7    evidence that you just -- or analysis you just described

8    involving UmmahOneLove, however, correct?

9    A.   Yes, that is true.

03:06:11 10        MR. SHEPHERD:  Your Honor, we have no further

11   questions.

12        THE COURT:  All right.  Thank you.  Counsel, you

13   may cross-examine.

14        MR. HARTMAN:  Thank you, Your Honor.

03:06:38 15        CROSS-EXAMINATION OF AMY VAUGHAN

16   BY MR. HARTMAN:

17   Q.   Ms. Vaughan, good morning.

18   A.   Good morning.

19   Q.   In your obviously extensive work in this case, did you

03:07:04 20   review any extractions from any cell phones belonging to

21   Erick Hendricks?

22   A.   No, I did not.

23   Q.   Why not?

24   A.   I'm not aware if they have any extractions of those

03:07:19 25   cell phones.  If they do, I didn't see them.

1566

1    Q.    Okay.  So you have no knowledge about whose device

2    these various apps were stored on?

3    A.    No, I don't.

4    Q.    You would agree with me, would you not, that it's

03:07:31  5    possible for a mobile device to be hacked?

6    A.    Yes, I would agree.

7    Q.    Do you know what a trojan is?

8    A.    Yes, I do.

9    Q.    Or is it a trojan virus?  What is more correct?

03:07:45 10    A.    A trojan is fine.

11    Q.    Okay.  Can you explain to the jury what that is?

12    A.    A trojan is sort of a colloquialism for a type of

13    virus that masquerades as an nocuous file, but once you

14    download or accessed that file, your computer is infected

03:08:04 15    with a virus.

16    Q.    Or your mobile device, right?

17    A.    Yes, I suppose the same thing could happen on a mobile

18    device.

19    Q.    Because it's possible to insert malware into a link

03:08:14 20    that gets put on to a social media platform that then

21    someone could open and then download the malware?

22    A.    I suppose that's possible.  You would probably have to

23    download something and install it on your phone in order to

24    make it happen, but that could happen -- you could be linked

03:08:31 25    to that on social media.

1  Q.    Okay.  And if a phone were hacked or if malware were

2  installed on a mobile device, it could be used just for

3  connections and traffic, isn't that true?

4  A.    How do you mean?

03:08:47 5  Q.    Well, I mean it could be used, rather than taking over

6  the phone, it could be used just for connections and

7  Internet traffic, isn't that correct?

8  A.    If you mean to monitor the connections from that

9  phone, then yes, you could do that, I suppose.  It would

03:09:05 10  depend on the type of malware, but --

11  Q.    And if someone hacked a phone, they could also use

12  TOR?

13  A.    I'm not sure.  You could -- many types of malware use

14  TOR as part of their communicating back to their controller,

03:09:28 15  so to speak.

16        Whether or not a malware installed on a phone could

17  activate a TOR program on that phone, I couldn't say.  I'm

18  not sure.

19  Q.    Okay.  And just to be clear, TOR isn't just used by

03:09:45 20  terrorists, right?

21  A.    No, it's not just used by terrorists.

22  Q.    Lots a people use TOR?

23  A.    Yes, that's true.

24  Q.    For a variety of reasons?

03:09:54 25  A.    Yes, that's true.

1    Q.    Okay.  So you testified about atawaakul and

2    UmmahOneLove tweeting each other, correct?

3    A.    Yes.

4    Q.    And the tweets that Mr. Shepherd showed you had

03:10:09 5    nothing to do with terrorism, correct?

6    A.    They didn't have much substance to them at all, but

7    there's no direct mention of terrorism, no.

8    Q.    Okay.  And there was no mention of an attack in

9    Garland, Texas, correct?

03:10:25 10    A.    Elton Simpson did tweet about knowing about the event

11    that he would later attack.  But he didn't say he was going

12    to attack it, no.

13    Q.    Okay.  And neither did UmmahOneLove say anything about

14    an attack, correct?

03:10:41 15    A.    No, not that I know of.

16    Q.    And on the maps that were part of Government's Exhibit

17    188, there were no -- there were no log-ins from Garland,

18    Texas, correct?

19    A.    No.

03:11:04 20    Q.    Now, you looked at other Wickr accounts as well

21    related to this case, did you not?

22    A.    Yes.

23    Q.    And one of those was itsmehere17?

24    A.    I believe so, yes.

03:11:33 25    Q.    Or itsme17, I should say?

1      A.    I think it's itsme17, yes.

2      Q.    Yeah.  And this slide here, you have instances where

3      these Wickr accounts were last used.

4            Are you aware that itsme17 -- or aren't you aware that

03:11:52 5   itsme17 was last used as recently as this past month,

6      meaning February of 2018?

7      A.    Yes, I'm aware of that.

8      Q.    Okay.

9            MR. HARTMAN:  Your Honor, can I have a moment?

03:12:15 10          THE COURT:  Yes, you may.

11     BY MR. HARTMAN:

12     Q.    Just a couple more quick points.

13           in your analysis of itsme17, did you go through the

14     same analysis did you with the other Wickr accounts?

03:14:02 15  A.    I looked at the creation and last use dates that I had

16     at the time which did not include the more recent activity

17     that occurred last month.

18     Q.    Okay.  And did you come to the conclusion that itsme17

19     was also connected to sham_reason and its progeny, all these

03:14:22 20  other user names?

21     A.    For these Wickr accounts, I don't have any hard, you

22     know, excellent high confidence evidence that connects them.

23     But all I have that I can show, because of the way that

24     Wickr works, is that these accounts were being used at these

03:14:37 25  times and this person was also on the Internet at roughly

1    the same time.

2         So the answer would be no, I suppose.

3    Q.    So itsme17, you didn't analyze versus the times that

4    these people were on the Internet, or this person was on the

5    Internet?

6    A.    I did include that, the data that I had, which was a

7    less recent legal process than what you had.

8         So I had an older date of last use.

9    Q.    Okay.  All right.

10         And these encryption platforms, they don't have built

11   in virus protection or anything like that, do they?

12   A.    Could you elaborate a little on what you mean by that?

13   Q.    Yeah.  If I send you a message over Wickr, it's not

14   going to be scanned for a virus or for malware by Wickr,

15   correct?

16   A.    No.

17   Q.    Same thing with Surespot?

18   A.    I don't believe so, no.

19   Q.    Okay.

20             MR. HARTMAN:  I don't have anything further, Your

21   Honor.

22             THE COURT:  All right.  Thank you.

23        Any redirect of this witness?

24             MR. SHEPHERD:  Yes, Your Honor.

25             REDIRECT EXAMINATION OF AMY VAUGHAN

BY MR. SHEPHERD:

Q.    Ms. Vaughan, you were asked a little bit about malware and hacking a moment ago.  Do you recall that?

A.    Yes.

Q.    So specifically talking about Wickr and Surespot, how would hacking that account work?

A.    For Wickr, the only way that you could get into someone's Wickr account would be if you had the user name and password.  And you would have to get it exactly correct or you would be locked out.

For Surespot, it is essentially impossible to get into a Surespot account without that identity file.  In fact, it was fairly common, and it even happened to me, I'm afraid to admit, that if you misplace your identity file, you fail to back it up, you would be locked out of your account forever and you would have to make a new one and that's just -- there's nothing that can be done about that.

Q.    And if somebody was able to get that information, would they be privy to any of the prior communications?

A.    They would not, they would only see things going forward.

Q.    What about if somebody stole the actual phone?  Would they be able to get into a Wickr or Surespot account on that phone?

A.    It would depends very much on whether or not the phone

1    had reasonably been used to that effect.

2         So if you were standing there and you were using Wickr

3    or Surespot, and I ripped the phone out of your hand, I

4    could probably still access those messages.

03:17:22  5         But if a significant amount of time has passed since

6    you last used those apps, you would be prompted to enter a

7    password in order to see the content on the phone.  And it

8    would be extremely difficult, if not impossible, to decrypt

9    the files that are stored on your phone that are associated

03:17:39 10   with those apps, independently of the app.

11              MR. SHEPHERD:  Your Honor, I have no further

12   questions.

13              THE COURT:  Thank you.

14        Anything else?

03:18:09 15        Anything else?

16              MR. HARTMAN:  No.  Thank you, Your Honor.

17              THE COURT:  All right.  Ma'am, you may step down.

18   You're excused.

19        Counsel, why don't you approach the sidebar?

03:18:16 20        (Discussion at sidebar as follows:)

21              THE COURT:  Do you intend to call another witness

22   on behalf of the government?

23              MR. SHEPHERD:  Your Honor, the answer is not in

24   our case in chief, but we likely will have a rebuttal

03:18:36 25   witness.

1     THE COURT:  So is the defendant ready to proceed?

2     MR. DOUGHTEN:  Yes, Your Honor, but what's our

3   case, the client is choosing not to testify.  We have

4   decided not to call the agent we were going to

03:18:52  5   yesterday -- it's the same person the government's going to

6   call in rebuttal -- in our case.

7     We're going to ask for the two stipulations to be

8   read, but then we're going to rest without putting on any

9   actual witnesses.

03:19:03 10     I understand you're going to put a rebuttal witness

11   on.

12     MR. SHEPHERD:  That's correct, Your Honor.

13     THE COURT:  Then there wouldn't be any rebuttal.

14     MS. MAGNONE:  We can't rebut the stipulation?

03:19:13 15     THE COURT:  Well, how can you rebut what you

16   already agreed to and accepted as evidence?

17     MS. MAGNONE:  We agreed to that with the

18   understanding that --

19     THE COURT:  We'll have to excuse the jurors and

03:19:23 20   then have a discussion about this.

21     MR. SHEPHERD:  Well, Your Honor, then we'll just

22   call him in our case in chief right now.

23     THE COURT:  I don't know the answer to the

24   question.  I'm just asking myself as we stand here, if the

03:19:35 25   defendant doesn't put on any evidence other than we just put

1    on a stipulation that the parties already agreed to and

2    entered into the record, I don't know what rebuttal there

3    will be.

4         You're not going to rebut the stipulations you agreed

03:19:47 5    to?

6         MR. SHEPHERD:  No, Your Honor.  We are going to

7    rebut the implication of the stipulation, Your Honor.

8        So, Your Honor, to simplify, we'll call the witness in

9    our case in chief.

03:19:55 10         THE COURT:  You know, I don't know the answer to

11    the question.

12         MR. SHEPHERD:  And we'll let it go ahead and have

13    the stipulation read now, Your Honor, and we'll call the

14    witness.  We're fine with that.

03:20:10 15         THE COURT:  Okay.

16       (The following proceedings were had in the hearing of

17    the Jury:)

18         THE COURT:  Counsel, come up again.

19       (Discussion at sidebar as follows:)

03:20:31 20         THE COURT:  The only stipulation obviously that

21    we have left is the one regarding Mr. Hendricks is a paid

22    confidential source.

23         MR. DOUGHTEN:  That's correct.

24         MR. SHEPHERD:  Yes, Your Honor.

03:20:41 25         THE COURT:  So I'll read it, and you're going to

1    put your witness on?

2                    MR. DOUGHTEN:  Yes, Your Honor.

3                    MR. SHEPHERD:  Yes, Your Honor.

4                    THE COURT:  All right.  Thank you.

5         (The following proceedings were had in the hearing of

6    the Jury:)

7                    THE COURT:  All right, ladies and gentlemen of

8    the jury.  At this time I have a stipulation that I'm going

9    to read to you and then we have another witness to hear from

10   here.

11        Listen carefully.  This is a stipulation regarding

12   confidential human source.

13        The United States of America by and through its

14   attorneys, Matthew Shepherd, Mark Bennett and Rebecca

15   Magnone and the defendant here, Erick Jamal Hendricks by and

16   through his attorneys, David Doughten and Steven Hartman,

17   hereby stipulate and agree to the following facts:

18        From approximately 2009 to April 30, 2014, Erick

19   Hendricks was a paid confidential human source who worked

20   for the FBI and made efforts to provide the government with

21   information about multiple persons espousing radical

22   ideology.

23        You will have a copy of this stipulation with you in

24   the jury room.

25        Having read the stipulation, counsel for the

1    government, do you have an additional witness you would like

2    to call?

3              MS. MAGNONE:  Yes, Your Honor, the government

4    calls officer Steven Conley.

03:22:05  5          THE COURT:  Thank you.

6        Sir, if you would approach the witness stand and

7    please remain standing.

8                        STEVEN CONLEY,

9        of lawful age, a witness called by the United States,

03:22:10 10          being first duly placed under oath, was examined

11                    and testified as follows:

12              THE COURT:  All right, sir.  Be seated in the

13   witness stand.  Please, if you would, wait until the

14   questions are complete the by the attorneys before you begin

03:22:31 15   to respond.  It's difficult for the listeners and the court

16   reporters in particular if two individuals speak at the same

17   time.

18        Also, if there is any objection to any question, wait

19   until I rule on the objection before you respond.  Of

03:22:42 20   course, if I say sustained, you won't answer the question.

21        Thank you very much, sir.

22        Counsel.

23              MS. MAGNONE:  Thank you, Your Honor.

24                DIRECT EXAMINATION OF STEVE CONLEY

03:22:48 25   BY MS. MAGNONE:

1   Q.    Sir, can you please tell the jury your full name and

2   please spell your last name for the court reporter?

3   A.    Steven Conley, C-O-N-L-E-Y.

4   Q.    And, sir, are you currently employed?

03:22:59 5   A.    Yes, I am, I'm a senior Special Agent with South

6   Carolina State Law Enforcement Division.

7   Q.    And how long have you been with that organization?

8   A.    I've been with SLED for almost six years now.  Prior

9   to that I was with the Columbia Police Department for 30

03:23:18 10  years in Columbia, South Carolina, AND I retired in 2006 as

11  chief of detectives.

12  Q.    And do you know the defendant in this case, Erick

13  Jamal Hendricks?

14  A.    I do.

03:23:26 15  Q.    What is your relationship to him?

16  A.    He had come to my attention back in 2011 in Columbia.

17        I met with him on May 26 in 2011.  At that time, he

18  agreed to become a confidential human source for the FBI.

19  And he was admonished at that time by myself and another

03:23:50 20  Agent.

21  Q.    And what do you mean by admonished?

22  A.    He was told, you know, we would always be honest with

23  him, that he would have to always be honest with us, and

24  that although we couldn't promise that his identity would

03:24:04 25  never be revealed, we would do everything we can to keep

1    that confidential and just between us.

2    Q.    Okay.  And as of June 2014, was the defendant closed

3    as an FBI source, your FBI source?

4    A.    That's correct.  We met with him again, myself and

03:24:21 5    other agent, and informed him that we were closing him.  He

6    was no longer an open CHS, and that was due largely to the

7    fact that there was no substantial reporting being done and

8    we couldn't just keep someone open indefinitely.  That as

9    long as they were reporting, we could keep them open, but

03:24:39 10    there was no substantive reporting going on.

11    Q.    So he was closed because there was no substantive

12    reporting; is that what you're saying?

13    A.    Correct, there was no reporting going on.

14    Q.    Was any of the information that he provided to you

03:24:51 15    prior to June 2014 related to this case, why we're here

16    today?

17    A.    Nothing related to this case, no.

18    Q.    Was the defendant given the opportunity to tell you

19    about his actions between June, 2014 and June 2015?

03:25:07 20    A.    Yes.

21    Q.    Did you ask him about that time period?

22    A.    Yes.  I had not had any contact with him until

23    approximately May 16 in 2015.  At which time I received a

24    text from him.  And he then was talking about that he was

03:25:26 25    under constant surveillance by both vehicles, airplanes,

1    helicopters, everywhere he turned he was being followed, his

2    family was followed, why were they following him.  He

3    couldn't understand why this was going on.

4         Subsequent to that text message, we did finally manage

03:25:43  5   to speak on the phone on or about the 18th of May, 2015.  At

6    that point I asked him specifically if he had traveled

7    anywhere that would be -- bring suspicion to himself and he

8    stated no.  That he had traveled somewhere around Arkansas,

9    but that was the extent of it.  I asked him --

03:26:03 10   Q.   I'm sorry.  I'm going to ask you to slow you down a

11   little bit, so the court reporter can get it and I'm going

12   to ask you a couple more questions.

13        So you said he told you he traveled around Arkansas

14   but no other locations; is that correct?

03:26:15 15   A.   That's correct.

16   Q.   Did he tell you that he went to Baltimore, Maryland?

17   A.   No, he did not.

18   Q.   Did he tell you that he went to New Mexico?

19   A.   No, he did not.

03:26:24 20   Q.   Did you ask him if he communicating with anyone online

21   at that point?

22   A.   I did.  I asked him if he had communicate online with

23   anyone that might have brought suspicions to himself.  He

24   stated no, he had not.

03:26:33 25   Q.   Did he tell you that he met with a potential ISIS

1  recruit while he was in Baltimore?

2  A.    No, he did not.

3  Q.    And I think you mentioned this already, but between

4  June 2014 and May of 2015, did you hear from this defendant

03:26:48  5  at all?

6  A.    No, I did not.

7  Q.    Now, he mentioned -- you mentioned that in his text

8  messages to you he brought up surveillance.  Were you aware

9  that the FBI was conducting surveillance on the defendant in

03:27:01  10  early may, 2015?

11  A.    Yes, I was.

12  Q.    And how did you know that?

13  A.    I had been informed of it by other agents that he had

14  come to their attention.  He was currently being

03:27:10  15  investigated.

16  Q.    And did you -- did those agents tell you whether or

17  not he had spotted surveillance?

18  A.    Yes.

19  Q.    And when did he spot surveillance, according to your

03:27:22  20  knowledge?

21  A.    It was sometime just before the text message that I

22  received on the 16th of May in 2015.

23  Q.    Okay.  So just to be clear, in 2015, was the defendant

24  an FBI source?

03:27:36  25  A.    No, he was not.

1  Q.   Did he provide you with any credible evidence after

2  June 2014?

3  A.   No, he did not.

4  Q.   And did you give him the opportunity to do so?

03:27:46 5  A.   Yes.

6  Q.   Thank you.

7            MS. MAGNONE:  Your Honor, no further questions.

8            THE COURT:  Thank you, Counsel.

9       Cross-examination.

03:27:54 10           MR. DOUGHTEN:  Thank you.

11             CROSS-EXAMINATION OF STEVEN CONLEY

12  BY MR. DOUGHTEN:

13  Q.   Good morning, sir.

14  A.   Good morning.

03:27:57 15  Q.   Is it accurate that prior to -- let me -- I'm sorry,

16  let me start over again.

17       When he began working for you, your title was handler;

18  is that correct?

19  A.   I beg your pardon?

03:28:14 20  Q.   I'm sorry, were you known as his handler?

21  A.   I was a co-case agent, yes.

22  Q.   But what is a handler?

23  A.   That's just someone who can meet with the source,

24  write up reports, any reporting, documented it to the file,

03:28:28 25  do payments to sources, so forth.

1    Q.    And so we understand what a handler -- the

2    relationship is, when Erick started with you, was there any

3    formal training?

4    A.    No.

03:28:40  5    Q.    And was this just -- well, what exactly did you tell

6    him, you know, to be on the look for people that might be

7    radical specifically, or any type of crime?

8    A.    No.  It was specifically with terrorism, if he was to

9    become aware of someone who expressed a desire to

03:29:00 10    participate in acts of terrorism or to learn more about

11    terrorism or to become part of a group that would do

12    something against society or people, individuals, would be

13    something we would be interested in.

14    Q.    Now, without being specific, was it your understanding

03:29:18 15    before he came to South Carolina he had worked in a similar

16    capacity elsewhere?

17    A.    Yes.  Once I got his identity, I looked -- had done

18    some research and found where he had at one point been

19    operating somewhat as a CHS with another office in the

03:29:38 20    bureau.

21    Q.    And when he left, when he was terminated, you sat down

22    and discussed the situation, correct?

23    A.    About the closing?

24    Q.    Yes.

03:29:50 25    A.    Yes, sir.

1    Q.    In person, correct?

2    A.    Yes.

3    Q.    And did you tell him, you know, to keep his eyes and

4    ears open for any reason?

03:29:58  5    A.    Not in those terms, no.  Upon parting, he was

6    instructed that that was -- the closing was no reflection on

7    him.  That it was simply there was no reporting going on and

8    we couldn't keep somebody open all the time.

9         I did -- he was informed, however, that if in the

03:30:14 10    future, if he should come across someone who expressed a

11    desire to operate in some sort of a terrorist capacity, or

12    do something to create harm to the citizens or this country,

13    that all he would have to do is reach out to us and that it

14    was simply a process that we had went through earlier in May

03:30:32 15    of 2011 and we could open him up as a source again at that

16    time.

17    Q.    And so you already described for us your conversations

18    in May.  Did there come a time in June or July of 2015 that

19    he reported some Russian activity, suspected Russian

03:30:51 20    activity to you?

21    A.    Yes, he did.

22    Q.    Okay.  And I know you can't get specific, but in

23    general, can you tell us what that was about?

24    A.    Yes.  He had -- this was on July 1, I believe, 2015.

03:31:07 25         We had already expressed text messages back and forth

1    several times.  Then suddenly -- and I talked with him on

2    the phone.  And he had again denied traveling anywhere or

3    communicating with anyone online or any telephone

4    conversations.  But then he did indicate me that he had been

03:31:26  5    in a flee market in Florence, South Carolina, and that

6    someone had approached him at his booth and stated that he

7    believed the gentleman was Russian and that he may or may

8    not be involved in counterfeit goods.  But he carried on

9    extensive conversation with him and had, in fact, given him

03:31:46 10    some artificial bags, counterfeit bags, if you will.

11    Q.    So this wasn't directly connected to terrorism.  It

12    was more of a consumer fraud situation?

13    A.    Correct.

14            MR. DOUGHTEN:  Could I have one second, Your

03:32:00 15    Honor?

16            THE COURT:  You may.

17    BY MR. DOUGHTEN:

18    Q.    I just have one final question.

19            In general in the usage of informants, I think you

03:32:58 20    said there was no formal training.  Is it kind of left up to

21    them what to do to attract, are they told to attract?

22            Explain how that happens, if you can.

23    A.    There was no training involved, specifically do A, B,

24    and C.  That didn't happen.

03:33:19 25            He was already familiar with the terrorism aspects

1    from his involvement with the Washington field office and it

2    was more or less a continuation of same.

3         The only type of -- there was no type of training.

4    The only thing that there was instruction.  And not as far

03:33:36 5    as what to do, but just how we would meet.

6         For example, I would have a photograph of a particular

7    business, and so that way if we wanted to meet, he was told,

8    you know, you go to that business at such and such a time.

9    You enter through that door.  You can go through this

03:33:53 10   business, exit the other door at specifically a certain

11   time.  I'll be there to pick you up, get in the car and

12   we'll go down the road.  That's the extent of the training.

13   Q.   I have no further questions.  Thank you very much?

14             THE COURT:  Thank you.

03:34:07 15        Counsel, any redirect?

16             MS. MAGNONE:  Yes, Your Honor.

17             REDIRECT EXAMINATION OF STEVEN CONLEY

18   BY MR. MAGNONE:

19   Q.   Officer Conley, the Russian person or the person in

03:34:17 20   the flee market that you were referring to, who was that

21   person?

22   A.   That person was a confidential human source of the

23   FBI.

24   Q.   And did he actually commit any crimes?

03:34:28 25   A.   No, he did not.

1    Q.    And the thing that was reported to you or the thing

2    that he was allegedly doing was selling fake purses; is that

3    correct?

4    A.    That's correct.

03:34:36  5    Q.    So did it have anything to do with terrorism or ISIS?

6    A.    No, it did not.

7    Q.    The defense counsel asked you about your parting

8    message with the defendant in regards to when you informed

9    him that he was being closed as a source.

03:34:53  10        Do you recall that?

11    A.    Correct.

12    Q.    The message that you gave him about if in the future

13    there was something that came up, was that any kind of

14    license to continue working as a source rogue on his own?

03:35:07  15    A.    No.  In no way.  That simply meant that if something

16    come about that he was alerted to, that could potentially be

17    an act of terrorism or something, all he would have to do

18    would call and we could go through the process of opening

19    him up as a confidential human source once again.

03:35:25  20    Q.    In your experience doing -- working with undercovers,

21    is it possible that they could ever turn bad or become the

22    type of people that aren't m necessarily helping the FBI?

23                MR. DOUGHTEN:  Objection.

24                THE COURT:  Sustained.

03:35:53  25                MS. MAGNONE:  Thank you.  No further questions.

1       THE COURT:  Thank you, counsel.

2          Anything else?

3          MR. DOUGHTEN:  Nothing further.  Thank you.

4          THE COURT:  Sir, you can step down.  You're

5   excused.  Thank you.

6          Counsel for the government, does the government have

7   any additional witnesses at this time.

8          MR. SHEPHERD:  No, Your Honor.  Subject to the

9   admission of exhibits, we would rest.

10         THE COURT:  All right.  Thank you.

11         Ladies and gentlemen, the government having completed

12  its case, we're going to take an early break for lunch.  I

13  will need to meet and discuss with the attorneys how we're

14  going to proceed.  There's certainly procedural issues that

15  we're required to follow.

16         So at this time, you've only heard the government's

17  case.  The defendant has no obligation to present any case.

18  That's entirely up to him whether he chooses to do that,

19  present any case or any evidence.  That's something that,

20  again, he has a right to do or not to do as he sees fit.

21         So please, however, remember all the admonitions I've

22  given you about not discussing the case among yourselves,

23  not forming or expressing any opinions on the matter until

24  you've received all the information you need, all the

25  evidence, instructions of law, the arguments of counsel,

1    until you have all that information, it would be

2    inappropriate for you to begin forming any opinions about

3    your verdict in this case.

4         Again, remember the admonitions I've given you about

03:37:16  5    research and all of the other admonitions, please, they all

6    apply.

7         Enjoy your lunch.  We'll try to get back with you as

8    quickly as we can and give you some guidance about our

9    schedule going forward.

03:37:34  10         Thank you very much.

11         (Jury out, 11:40 a.m.)

12         THE COURT:  The government having rested, what I

13   would like counsel to do, at your earliest convenience, is

14   to attempt to work together and organize your exhibit, the

03:38:11  15   government's exhibits for presentation.

16        I don't believe that based on what we've discussed

17   that there has been any objection to any exhibits, based on

18   the stipulations and the Court's earlier rulings.  I already

19   ruled on the photos from the Garland, Texas area and things

03:38:26  20   of that nature.

21        So I would appreciate if you would do that.

22        Next issue then is -- and we'll talk about timing in a

23   moment, is counsel for the defendant, how does the defendant

24   wish to proceed, the government having rested.

03:38:42  25        MR. DOUGHTEN:  Your Honor, we're going to rest

1  also.  We have discussed on a number of occasions whether

2  Mr. Hendricks wants to testify.  We've informed him it's his

3  right to.  We couldn't keep him off if we wanted to and it's

4  his right not to.

03:38:59  5      Based on the evidence and our discussion, Mr.

6  Hendricks has indicated to us that he knows that it's

7  absolutely his right and nobody can persuade him one way or

8  the other, but he was choosing not to testify.

9          THE COURT:  All right.  Thank you.

03:39:11  10      Mr. Hendricks, I'm going to inquire of you personally

11  at this time.  I want you to understand, sir, that none of

12  my questions -- you can remain seated.  That's fine.  That's

13  just for your comfort.

14      None of my questions are designed to influence your

03:39:27  15  decision whether to testify or not to testify.  It's

16  entirely a decision that you need to make along with and in

17  consultation with your attorneys.

18      Ultimately the decision is yours.  You can receive

19  advice by your attorneys.  I don't know want to know what

03:39:41  20  that advice is, but I do need to inquire, make sure of your

21  decision.

22      You do have a constitutional right not to testify.

23  The jury will be instructed they can not consider your

24  silence or your failure to testify in any way, shape, or

03:39:56  25  form or use it against you.  That will be part of my

1    instructions to the jury.

2         In the alternative, if you chose to, you do have a

3    right, if you wish to testify in your own defense, to do so.

4    And we would certainly honor that request and you would be,

03:40:13 5    of course, permitted to testify here in open court.

6         First of all, sir, have you had adequate time to

7    discuss this issue with your attorneys?

8              THE DEFENDANT:  Yes, sir, I have.

9              THE COURT:  You've had a thorough discussion with

03:40:23 10   them about this issue.

11             THE DEFENDANT:  Yes, sir, I have.

12             THE COURT:  And your decision is to testify or

13   not to testify?

14             THE DEFENDANT:  Not to testify.

03:40:29 15            THE COURT:  All right.  We'll note that for the

16   record.

17        I'm satisfied based on my inquiry the defendant has

18   made a voluntary, freely and voluntarily made a choice to

19   not testify in this case.

03:40:43 20        Now, in terms of timing and how we would like to

21   proceed, I'm going to solicit your opinions.  I am

22   conflicted, to be frank with you, about whether or not we

23   want to argue and charge on Friday.  I believe, I truly have

24   a strong belief that at least we're going to need -- I think

03:41:10 25   in fairness, the parties should probably have tomorrow to

```
 1    prepare.

 2          Now, I will honor your wishes if you say, "No, Judge,

 3    we want to go forward tomorrow, we want to argue tomorrow.

 4    We want to instruct tomorrow."  We have got the afternoon to

 5    deal with jury instructions and exhibits, and I'll honor

 6    that question.

 7          The other side of the equation, we can go on Friday,

 8    we can do argument and we can do instruction.

 9          Or at the extreme, which I'm not necessarily adversely

10    opposed to, if you would rather come back and Monday and

11    begin with, on Monday morning fresh with my instructions of

12    law and then closing arguments and then the jurors'

13    deliberations to begin, I'm not opposed to that schedule as

14    well.

15          So, in essence, I'm soliciting counsel's opinions

16    about how you would like to proceed in that fashion.

17          And I'll perhaps talk too much it.  As I've said, I

18    always have concerns in cases of jurors getting cases on

19    Friday with an idea that, well, if we get a verdict we won't

20    have to come back on Monday and I'm always a little

21    uncomfortable with charging a jury on a Friday.

22          So just my opinion, but I'll defer to counsel and

23    we'll try to work together to develop a schedule.

24          Counsel for the government, do you have any thoughts,

25    opinions, about how to proceed?
```

1          MR. SHEPHERD:  Your Honor, we definitely don't

2    like the idea of waiting until Monday.  So we're -- we

3    definitely are opposed to that.

4          Our preference would be to either go ahead and argue

5    follow, charge and argue tomorrow or charge and argue Friday

6    morning.  And perhaps the middle ground is to charge and

7    argue tomorrow afternoon and then they come back and have a

8    full day on Friday.

9          That might help the Court's concerns to give us a

10   little more time to prepare, but yet at the same time they

11   have a full day and Friday, so they don't have the same

12   pressure to get home after lunch.

13         THE COURT:  All right.  Thank you.

14         Counsel for the defendant.

15         MR. DOUGHTEN:  Well, Your Honor, we do not want

16   to start or charge and argue on Friday.  But Thursday would

17   be acceptable.  Mr. Hendricks has indicated to me he would

18   rather that the charge and argument be Monday, but we would

19   be okay with tomorrow.  We would object to Friday.

20         MR. SHEPHERD:  Your Honor, I also, if I might

21   add, if the Court wants to go forward, we'll being ready to

22   go tomorrow morning, as well if that's the schedule.  We can

23   be ready for that as well.

24         THE COURT:  Well, I understand that.  But, you

25   know, I want to be fair because of -- you know, the

1       government has three lawyers and representatives and, to be

2       candid, greater resources than the defendant, to be blunt.

3       And certainly -- I've been doing this 15 years.  That's just

4       the way it is.  You definitely have a greater ability to

03:44:03  5     muster and put things in place, whereas, defense counsel has

6       a challenge and they have challenges because of where their

7       client's situated.  They've got to deal with travel back and

8       forth.

9            So I think what we're going to do is, I think -- and

03:44:20 10    last but not least, I also, unfortunately, because of the

11      press of business, people get arrested and they need to be

12      arraigned, I have already lined up two or three other things

13      on Friday that I intended to deal with at 8:30 or 8:00 in

14      the morning and then the lunch hour.  And so our day would

03:44:40 15    be broken up no matter what I would do.

16           So we'll do the following.  We have time.  We will

17      take lunch.  I have a sentencing hearing at noon.  We'll

18      begin -- this afternoon we'll begin with admission of

19      exhibits, dealing with any motions, and then we can turn to

03:44:56 20    jury instructions tomorrow morning.  And then we'll begin on

21      Monday morning fresh with a 9:00 instructions of law.

22           I always give the jurors the bulk of the instructions

23      first.  Then the parties can argue.  And then we'll complete

24      the instructions on Monday morning, and the jury's

03:45:14 25    deliberations will begin.

1    I understand the government's position, but for all

2    the reasons I've just stated, I think Monday is perhaps

3    better.  It also gives the jurors a chance to take a break.

4    It's been a long trial.  That will give them a chance.

03:45:27  5    So, that's how we'll proceed.

6    Let's reconvene here -- I know you have -- I have use

7    of the -- I'm just trying to think whether I should bring

8    the jurors back in now and talk to them.

9    Let's let them have lunch.  I'll bring the jurors back

03:45:46  10   into the courtroom.  I'll advise them about our schedules

11   going forward, let them know they will be back on Monday

12   morning, but they will have tomorrow and Friday.

13   I'll explain to them the reasons why without -- my

14   schedule on other matters.  I'm not going to intentionally

03:45:58  15   mislead them, but I'm also not going to shift responsibility

16   on any of the parties.

17   MR. DOUGHTEN:  I have a question, Your Honor.  Do

18   you want us then to rest before the jury?  We'll do exhibits

19   and then rest before the jury?  Would that be this afternoon

03:46:11  20   then?

21   THE COURT:  I think that's appropriate.

22   MR. DOUGHTEN:  Okay.

23   THE COURT:  That way, again, just so I'm clear,

24   you've had adequate time to decide.  You're not going to

03:46:19  25   call any witnesses?

1       MR. DOUGHTEN:  That's correct.

2       THE COURT:  You're committed to that?

3       MR. DOUGHTEN:  That's correct.

4       THE COURT:  Because once you rest, it's over.

03:46:23 5       MR. DOUGHTEN:  I understand.

6       THE COURT:  Okay.  We'll let you rest this

7  afternoon in front of the injury.  Then I'm going to have

8  to, before I excuse them, give them some admonitions, some

9  extensive admonitions about your tentative time over the

03:46:28 10  weekend.

11       MR. DOUGHTEN:  Can we make that 29 motion before

12  the jury comes in this afternoon, just to have it on the

13  record?  We can do it now for that matter.

14       THE COURT:  I'll note that we're going to hold it

03:46:48 15  in abeyance until after the jury is excused.

16       MR. DOUGHTEN:  That will be fine.

17       THE COURT:  That way we can move the jury, and

18  you reserve the right to make the motion.

19       MR. DOUGHTEN:  Thank you.

03:46:56 20       THE COURT:  We'll see you about 1:00.

21       (Lunch recess taken, 11:50.)

22

23

24

25

```
 1     (Afternoon session, March 14, 2018.)
 2          (Outside the presence of the jury:)
 3              THE COURT:  Counsel, are we ready to proceed?
 4              MR. SHEPHERD:  Yes, Your Honor.
 5              MR. DOUGHTEN:  Yes, Your Honor.
 6              THE COURT:  As I've indicated, as we discussed
 7     earlier, we'll bring the jurors out.
 8          Counsel, you can rest.  I'm going to give them some
 9     instructions, fairly strong instructions about their conduct
10     over the next several days, and we will have them here on
11     Monday morning at 9:00 and begin as we discussed.
12          Ms. Kestner.
13          (Jury in, 1:05 p.m.)
14              THE COURT:  The government having rested, counsel
15     for the defendant, at this time, you may proceed.
16              MR. DOUGHTEN:  Your Honor, the defense would
17     rest.
18              THE COURT:  All right.  Thank you.
19          Ladies and gentlemen of the jury, let me explain to
20     you how we're going to proceed.  We're going to adjourn for
21     the day.
22          And before you leave here, I'm going to give you some
23     instructions about -- or admonitions, which I know you're
24     tired of hearing, but I'm going to read them to you again.
25     It's important that I do that.
```

1597

1       We are going to begin with instructions of law.  I

2  have some extensive instructions of law that I will give you

3  that you will use in your deliberations in this case.

4       I've given you some preliminary instructions at the

05:03:18  5  start of the case.  I will give you much more detailed

6  instructions before we begin with closing arguments of

7  counsel.

8       And counsel will begin -- I'll provide the

9  instructions, then we'll have the closing arguments of

05:03:34 10  counsel, and then your deliberations will begin.

11       The schedule that we're going to follow will be, as

12  follows:

13       I have to work with the attorneys, deal with admission

14  of exhibits and other procedural issues that have to take

05:03:48 15  place outside of your presence and your hearing.  That's

16  going to take us some time.

17       I also need to talk to the attorneys about the length

18  of time they might need for closing arguments and what have

19  you.

05:03:57 20       And then finally, I do have, unfortunately a number of

21  matters that have arisen, cases that require, that are time

22  sensitive that I have to address on Friday morning so what

23  we are going to do, I think -- and I apologize if it impedes

24  on any of your schedules.

05:04:14 25       I think what we would like to do, what we will do, is

1     start fresh on Monday morning at 9:00.  So we'll not go

2     forward tomorrow or Friday.  We will see you Monday morning

3     at 9:00 promptly, and then I'll begin with my instructions

4     of law.  The closing arguments will be completed, and then

05:04:37  5     you'll begin your deliberations.

6          So again, I apologize.  Things have moved along more

7     expeditiously than I thought.  It's sometimes difficult to

8     anticipate or estimate the amount of time that might be

9     needed.  I think we would all be better served to start

05:04:51 10    fresh on Monday rather than try -- because it will take time

11    to do instructions and arguments -- and let your

12    deliberations begin on Monday morning.

13         So, a couple things I would call to your attention.

14    We do provide -- I'll make it my practice, on Monday, the

05:05:08 15    day when deliberations begin, we'll provide lunch.  So we

16    typically go through a process of getting lunch for jurors

17    which will include going to Luigi's, the local Italian pizza

18    place, so everyone will get lunch on Monday.

19         We'll provide with you a menu and you can select what

05:05:31 20    you would like.  That includes our alternate jurors.

21    Alternate jurors will enjoy lunch.  I can assure you it will

22    take us from 9:00 in the morning until lunchtime to take

23    care of our business, meaning instructions of law, closing

24    arguments.  You'll have your lunch.  Then your deliberations

05:05:45 25    will begin on Monday.  I think that's likely the schedule

1    we're going to follow.  So everyone will be entitled to

2    lunch.

3        Secondly, it's important that you follow all the

4    admonitions I've given you.  There's a couple of admonitions

05:05:57  5    that I will give you and I will repeat again.

6        First of all, ladies and gentlemen, the defendant has

7    rested.  Remember the instructions I gave you early on.  The

8    defendant has no obligation to present evidence or to

9    testify.

05:06:08  10       You, at this point, you are -- please, follow,

11   remember that instruction I will give you again.  And I want

12   you to remember that instruction throughout this case until

13   your deliberations begin, and during your deliberations you

14   will have that instruction in writing.

05:06:24  15       So I want to, again, make sure you understand how

16   important that concept is.  The defendant is presumed

17   innocent.  Unless and until that presumption is overcome by

18   the government and whether or not that presumption has been

19   overcome will not be something to be decided until, until

05:06:41  20   you have everything that you need.  And that means the

21   instructions of law, which you will apply to the evidence in

22   the case, and until you heard the arguments of counsel.

23       The arguments of counsel are not evidence, but they're

24   important.  They help to summarize what the attorneys

05:07:00  25   believe the evidence has shown, not what they believe, what

1    they anticipate or what they think the evidence has shown

2    more or less.

3         So that's all important.  Al until you have all of

4    that, again, it would be improper to come to any

5    conclusions, decisions, about what your verdict in this case

6    must be, or should be.

7         And that verdict, of course, will be rendered in

8    consultation with all of you, when you're all assembled in

9    the jury room, that is what the deliberations and

10   discussions may be had.

11        Over the weekend, do not discuss the case with anyone

12   else.  Do not form or express any opinions on the matter.

13   Avoid discussing the case with family or friends.  Do not

14   let them attempt to discuss it with you.  If there is any

15   media accounts, do not read them.  Do not let anyone read

16   them to you or discuss them with you.  Avoid them entirely.

17        Once, again, I understand the temptation.  But do not

18   attempt in any way, shape, or form to research any of the

19   issues in this case via the Internet.  Do not attempt to

20   research any of the events that were described here.  Do not

21   attempt to research any of the technical issues that were

22   discussed here by experts or by witnesses.

23        I know it's tempting, but you cannot.  Again, you

24   cannot do that.  Your decision has to be based on the

25   evidence here in the courtroom.  It's very important you do

1    that.  And should you have any problems or issues, let us

2    know.

3         I'm not sure if anyone here in this jury enjoys adult

4    beverages.  It is St. Patrick's Day on Saturday.  I would

05:08:40 5    encourage you to be careful.  There will be individuals

6    driving on the roadway.

7         Hopefully everyone will follow the law and not drink

8    to excess, things of that nature.  It is an ongoing problem.

9    So be careful on Saturday, the holiday.

05:08:53 10        And other than that, we will see you on Monday.  And,

11   again, we'll have the menus available for you, I think.  Do

12   we have them this afternoon, or do you want to provide them

13   on Monday morning?

14        We'll give it to them on Monday morning.  So that way

05:09:12 15   you'll have some time to give us your request.  Then we'll

16   have to order the food and we'll have it brought in our

17   Monday at lunchtime.

18        So appreciate your patience, ladies and gentlemen,

19   appreciate your work for us, your service as jurors.  It's

05:09:24 20   greatly appreciated by all of us.  I can speak for counsel

21   and the parties, as well.

22        So leave your notepads on your chairs.  They will be

23   secured for you, and the jury room will be secured and we'll

24   see you on Monday morning at 9:00.

05:09:40 25        Thank you very much, ladies and gentlemen.

1602

1        (Jury out, 2:10 p.m.)

2             THE COURT:  All right, Counsel.  Be seated,

3    please.

4        Counsel, at this time on behalf of the defendant to

5    you wish to make any motion, please?

6             MR. DOUGHTEN:  Your Honor, we do.  We would move

7    for a motion to dismiss pursuant to Criminal Rule 29

8    pursuant to both Counts 1 and 2.

9        In particular, Count 1, the conspiracy, it is our

10   belief that, even taken in the light most favorable to the

11   government, that they have not established that there was a

12   meeting of the minds of coconspirators.

13       We believe the evidence has established at best that

14   there was an agreement as to philosophical thought.

15       In fact, most of the people that Mr. Hendricks spoke

16   to, allegedly, under the facts most favorable to the

17   government, were government agents who were very careful not

18   to agree to any formal actions or overt steps.

19       And based on this, we don't believe there was a

20   meeting sufficient to establish conspiracy.

21       As far as Count 2, again, we don't believe that the

22   user names that are attributed to Mr. Hendricks, which would

23   be sham_reason, its progeny, all the way through accepted

24   and Nowhaq and dontcatchme17, etcetera, that it hasn't been

25   sufficiently established that that's Mr. Hendricks.

1          And so the evidence doesn't establish material support

2     by him as an individual.  Thank you.

3          THE COURT:  All right.  Thank you, sir.

4          On behalf of the government?

05:11:45 5          MR. SHEPHERD:  Yes, Your Honor.  As defense

6     counsel noted, the Court is to take the evidence in the

7     light most favorable to the government, Your Honor.

8          We believe there's more than sufficient evidence for

9     this to go to the jury.

05:11:57 10          In considering both counts, responding to the specific

11     point about evidence of coconspirators, there's evidence of

12     multiple coconspirators in this case, Your Honor, who are

13     not government informants.

14          First, his own wife, Tyrinda, from the statements that

05:12:12 15     she assisted with him that they wrote together the document,

16     GPS and the Ghuraba, that's one easy example, Your Honor.

17          He also talks about his communications with senior

18     brothers and the like from ISIS.

19          There's -- we heard testimony from Amir Al-Ghazi who

05:12:33 20     agreed in the conspiracy in the sense of providing the name

21     of another potential recruit.

22          From Amanda Amaro who agreed to post a document on his

23     behalf.

24          He references in the communications other individuals

05:12:44 25     he has been communicating with who are also potential

1      coconspirators the jury could find in this case, Your Honor.

2              So we believe on that issue, there's more than enough

3      evidence in the light most favorable to the government, Your

4      Honor.

05:12:56  5      Regarding Count 2, if I understood defense counsel's

6      argument, that there's not enough evidence to determine it

7      was Mr. Hendricks in these communications, we believe that

8      considering all of the -- all of the testimony of the

9      individual he met in person who identified him, the

05:13:13 10     technical evidence related to IP address information, the

11     way in which the communications transitioned from account to

12     account and the similarity of the communications, all lead

13     to the conclusion that it was one person.

14             And there's more than enough evidence for the jury to

05:13:29 15     come to that conclusion that it was one person, and that it

16     was Mr. Hendricks, Your Honor.

17             THE COURT:  All right.  Thank you.

18             At this time, the motion will be overruled.  Of course

19     I am required to consider the evidence in the light most

05:13:41 20     favorable to the government and consider whether the

21     evidence is insufficient to sustain a conviction.

22             Here the issue is one for the jury and in many ways

23     the jury will be called upon to determine the credibility of

24     certain witnesses who have testified, including the

05:13:55 25     government's informant and the government's experts and what

1    have you, to determine the defendant's guilt or innocence.

2         But keeping in mind the requisite standard, the motion

3    is, at this time, overruled.

4         With regard to issues related to exhibits, Counsel,

05:14:14 5    how would you like to proceed with regard to admission?

6         We could deal with them this afternoon or tomorrow

7    morning, depending on how the parties have been able to work

8    together.

9              MR. BENNETT:  Your Honor, we've had the

05:14:28 10   opportunity to talk with counsel, go through all of the

11   exhibits, several of which are already handled by

12   stipulation.

13        So I think we're in a position now to go through each

14   one that we've offered.  We've discussed their objections

05:14:41 15   and we have decided, based on that, to not move for a couple

16   of exhibit to be admitted.

17        So I think we are in agreement at this point, Your

18   Honor.

19             THE COURT:  All right.  Counsel for the

05:14:52 20   defendant?

21             MR. DOUGHTEN:  That is correct, Your Honor.  We

22   had ample opportunity today and prior to today, we've been

23   discussing the exhibits.  So I believe that the

24   government's -- or excuse me, the exhibits the government is

05:15:04 25   going to put forward we would not be objecting to.

1          THE COURT:  Do we have a listing that we can read

2     into the record or make part of the record?

3          MR. BENNETT:  Yes, Your Honor.  I was ready to

4     read it, or would you like me --

05:15:14  5          THE COURT:  You can read it into the record,

6     please.

7          MR. BENNETT:  Yes, Your Honor.

8          THE COURT:  Just so it's clear for the record,

9     these are exhibits that will be admitted without objection?

05:15:22 10          MR. BENNETT:  Yes, Your Honor.

11          MR. DOUGHTEN:  Yes, Your Honor.

12          THE COURT:  Go ahead, please.  Just take your

13     time for the benefit of the court reporter.

14          MR. BENNETT:  Does the Court want just the

05:15:30 15     exhibit number or the description as well?

16          THE COURT:  Just the numbers.

17          MR. BENNETT:  Thank you, Your Honor.

18     Exhibit 1, Government's Exhibit 2, Government's

19     Exhibits 3, 4, 5, 6, 7, 8.

05:15:43 20     And then Government's Exhibit 12, 13, 14.

21     Government's Exhibit 18, 19, 20, 21, 22, 23, 24, 25,

22     25A, 25B, 26.

23     Government's Exhibit 28, 29, 30, 31, 32, 33, 34, 35,

24     36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48.

05:16:45 25     Government's Exhibit 49, 50, 51, 52, 53, 54, 55, 56,

1    57, 58, 59, 60, 61, 62.

2         And then, Your Honor, for the clips, we have agreed

3    that we will produce them without the rolling transcripts,

4    so it would just be the clips themselves.

05:17:21  5         So 62A, 62B, 62C, 62D, 62F, 62G, 62H, 62I.

6         The defense did object to the transcript itself, and

7    we have agreed, so the transcript in its entirety will not

8    go back.

9         So the next will be Government's Exhibit 64, 64A, 64B,

05:17:54 10   64C, 64D, 65, 66, 68, 69, 70, and 71.

11        And then we move to Government's Exhibits 104, 105,

12   106, 107, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118,

13   119, 120, 121, 122, 123, 124.

14        And then Government's Exhibits 126, 127, 128, 129,

05:19:00 15   130, 131, 132, 133, 134, 135.

16        And Government's Exhibits 138, 139, 140, 141, 142,

17   143, 145, and 145 A, 147, 148, 149, 150, 151, 153, 154, 155,

18   156, 157, 158, 159.

19        And then Government's Exhibit 162, 163.

05:19:57 20        Government's Exhibit 179, 180, 181, 182, 183, 186, and

21   finally, 187.

22             THE COURT:  All right.  Thank you.

23        I would ask that you do -- first of all, counsel for

24   the defendant, I know you've been following along.

05:20:20 25        Is that an accurate recitation of the exhibits?

1       MR. DOUGHTEN:  It is an accurate recitation, Your

2  Honor.

3       THE COURT:  I would like, two things I want to

4  address.

05:20:26 5       Counsel for the government, if you would, just for any

6  reviewing court, make a copy of the exhibit list with

7  the -- not only the admitted exhibit, but with the

8  description of same, just make that --

9       MR. BENNETT:  Yes, Your Honor.  We plan to take

05:20:39 10  out those that were not admitted and move into an actual

11  exhibit list.  We also plan to go through the binders that

12  were there for the witnesses, pull out any of those that

13  were not admitted so that they have a complete set.

14       THE COURT:  So when the exhibits -- when that

05:20:54 15  process is completed, I have a certification that I would

16  ask both sides to sign indicating that you examined the

17  exhibits and only the exhibits that have been admitted are

18  going back to the jury.

19       So please make sure that takes place.

05:21:06 20       The second issue is, is there equipment that's going

21  to be provided for the jurors to play the audio recordings?

22       MR. BENNETT:  Yes, Your Honor.  We will also load

23  all the admitted exhibits into, in essence, a dummy lab top

24  that doesn't allow anyone to get on the Internet.  That they

05:21:22 25  will have an electronic version of all that.

1      We also talked to defense counsel with regard to

2  providing a CD with the aerial footage and the audio.

3  They've agreed that the CD would be admittable.  And we will

4  put that in the sleeves relative to those particular

05:21:38 5  exhibits that they can play on that laptop.

6           THE COURT:  I think I would ask that you make

7  sure that, Rich, is our technical person who's in the back,

8  that you go over with him, make sure that he's well

9  versed -- I'm sure he is well versed on the technical, but

05:21:54 10  so he is aware of how to go about instructing the jury how

11  to play those to the jury should they ask.

12           We need to make sure they have adequate instructions

13  so they can play the exhibits.

14           MR. BENNETT:  Yes, Your Honor.

05:22:05 15           THE COURT:  So we'll have those issues addressed.

16           I don't -- I know we have been going today.  You know,

17  I don't know what your thoughts are about addressing jury

18  instructions today or whether we address them tomorrow

19  morning.  I'm not sure how you feel about -- if you've had

05:22:23 20  enough time to go through them or what your thoughts are.

21           Counsel for the government?

22           MR. SHEPHERD:  Your Honor, before we -- I do have

23  one question regarding the exhibits.  Do the stipulations

24  themselves go back, that the Court read?

05:22:33 25           THE COURT:  They do.

```
 1              MR. SHEPHERD:  On the first stipulation the Court
 2     read regarding business records, there was a long list of
 3     exhibits on there, some of which neither party has offered.
 4          Would it be appropriate for us to go through and
 5     redact the ones that are not offered then?
 6              THE COURT:  I think that would be appropriate way
 7     to do it.  Just redact them.
 8              MR. DOUGHTEN:  We would agree.
 9              MR. SHEPHERD:  I just wanted to confirm that, and
10     then I'll let Ms. Magnone address jury instructions.
11              MS. MAGNONE:  Yes, Your Honor.  We've spoken with
12     defend counsel.  The government has had adequate time to
13     review them and does have some comments, and I believe that
14     defense counsel is also willing to discuss those this
15     afternoon.
16              MR. DOUGHTEN:  Yes, Your Honor.  As the Court
17     knows, we have been working on these prior to even when
18     trial started.
19          Although the charges are complex, the jury
20     instructions, I think, are relatively straightforward on
21     this.  We're not requesting any special instruction.  We do
22     have a couple objections, but they're relatively minor, if
23     you will, or simple.  And we're ready to go forward if the
24     Court wants to.
25              THE COURT:  All right.  Let's deal with the
```

1  government's objections, corrections, if any.

2  MS. MAGNONE:  Yes, Your Honor.  We have two

3  requests and just one addition.

4  Starting with the addition.  Page 22, I believe it's

05:23:43  5  appropriate to add Ms. Vaughan to that section which Your

6  Honor looks like he has already done.

7  THE COURT:  I have.

8  MS. MAGNONE:  Then we have two additional

9  requests.

05:23:52  10  One request would be an instruction from Your Honor

11  that any reference to ISIL is interchangeable with the

12  acronym ISIS.

13  Unfortunately, at the time this indictment was

14  drafted, ISIL was the appropriate government acronym.  And

05:24:09  15  then in this trial, we have only referred to it as ISIS.

16  I understand that the jurors, most likely, understand

17  that delineation.  But if Your Honor could say that those

18  two are interchangeable, that would be helpful for the

19  government.

05:24:26  20  Our second request is in the indictment we used

21  initials to protect identities of the individuals.  But at

22  this time, we would request that AA be changed to Amir

23  Al-Ghazi and that UCE be changed to Agent Steven Jane so

24  that they know who those people are in terms of what they

05:24:49  25  heard during this trial.

1      THE COURT:  Any objection by the defendant?

2      MR. DOUGHTEN:  No, Your Honor.  We were going to

3   ask -- we were going to make the same request.  So we are in

4   agreement.

05:24:56  5      THE COURT:  Those modifications are fine.  We'll

6   make sure those are done and completed.

7      MS. MAGNONE:  No other objections or additions,

8   Your Honor.

9      THE COURT:  Thank you.

05:25:04 10      On behalf of the defendant?

11      MR. DOUGHTEN:  Yes, Your Honor.  There are two

12   essentially.

13      On page 8, under the subheading of Separate

14   Considerations, it indicates the "defendant has been charged

05:25:14 15   with several crimes."  We'd just ask that "several" be

16   changed to "two," just to be a little more accurate.  There

17   are two offenses in this case.

18      THE COURT:  On page 8?

19      MR. DOUGHTEN:  Yes, the first subheading,

05:25:27 20   Separate Considerations.

21      THE COURT:  I agree.  We can correct that with

22   two crimes.  That's fine.

23      I assume the government has no objection to that.

24      MS. MAGNONE:  No objection, Your Honor.

05:25:36 25      MR. DOUGHTEN:  And the only other objection, Your

1    Honor, which might be a considerable one is we object to

2    considering the manner and means of the conspiracy.  We

3    don't think those are elements of the offense.  We think

4    that would only serve to confuse the jury.  We believe that

05:25:49  5    only the actual elements of the offense charged be included

6    in the actual jury instruction.

7         THE COURT:  Isn't that the information we have?

8    Isn't is it part and parcel of the indictment?

9         MR. DOUGHTEN:  It is the indictment, Your Honor.

05:26:04  10   But we don't believe the means and manner are necessary for

11   this instruction.

12        THE COURT:  Counsel?

13        MS. MAGNONE:  Your Honor, we do.  This is what

14   the defendant has been charged with.  We've proven up these

05:26:18  15   elements, and we've made it very clear that the indictment

16   is not evidence.

17      And we believe the rest of your instructions

18   adequately cover what the elements are and that they are to

19   make a determination on the elements.

05:26:30  20        THE COURT:  I agree.  The objection will be

21   overruled.  That portion of the indictment is appropriate

22   for consideration by the jury.  And I've stressed on

23   numerous occasions to the jurors that the indictment is not

24   evidence, and I think I've made that abundantly clear.

05:26:45  25      So I note the objection.  I'll overrule.  We'll

1614

1    incorporate that part of the instruction.

2         And I think the jurors, taking all of the instructions

3    as a whole, as they will be instructed, I think that

4    information is not prejudicial to the defendant.  So we'll

05:27:03 5    make sure that that's included.

6         We will provide you tomorrow -- Jonathan.

7         (Pause.)

8              THE COURT:  We'll have the instructions to you by

9    the end of the day, the modified instructions.  If there

05:27:22 10   becomes any issue that you -- my clerk is modifying them as

11   we speak.

12        If there is any kind of objections, corrections, any

13   issue, please reach out by Email, obviously copying both

14   sides, to let us know if there is any kind of typos or any

05:27:40 15   other issues.  Then we'll see to it that you get a final

16   draft so that you can use them in preparing your closing

17   arguments.

18        Now, before we adjourn for the afternoon -- I know

19   it's difficult.  I don't know if you've both been

05:27:54 20   anticipating closing arguments.  But in terms of time, how

21   much time would each side wish?

22        I'll be opinionated and say I would suspect each side

23   is going to need at least an hour.

24        But what -- and I'll just also be more opinionated and

05:28:12 25   tell you I doubt that you're going to hold a jury's

1615

1    attention, each side, for more than an hour.  Maybe 40, 45

2    minutes at best.

3        But counsel for the government, how much time would

4    you like?

05:28:24  5        MR. SHEPHERD:  And, Your Honor, just so I

6    understand how the Court divides up time, is the time I'm

7    requesting the total for both a first close and rebuttal

8    close?

9        THE COURT:  Yes.  I'm going to allocate -- just

05:28:36 10    to be fair, if you want an hour and they want an hour, each

11    side is going to have the same amount of time.  And then how

12    you chose to divide it up is up to you.

13        MR. SHEPHERD:  Your Honor, I would request an

14    hour and 15 minutes in that case, Your Honor.

05:28:48 15        THE COURT:  Counsel?

16        MR. DOUGHTEN:  My guess is we'll be between 45

17    minutes and an hour.  An hour is more than sufficient for

18    our position.

19        THE COURT:  I think an hour a fair, Counsel.  I

05:29:00 20    don't want to give the -- let me put it this way.  I'm going

21    to allocate an hour for each side.  If for some reason the

22    defense side goes longer or goes the full hour, then I might

23    modify that and grant the government some additional time.

24        But I don't do it -- I know other judges do -- who, if

05:29:18 25    the government uses 15 minutes and then tries to reserve 45

1616

1    for rebuttal, they won't allow that.

2          So I hope we don't have that kind of issue here.  So

3    we'll start with an hour for each side.  And, again, I think

4    that's going to be adequate.  I think that will be

5    sufficient time to hold the jury's attention.

6          We can reconsider whether there's some additional time

7    the government might be granted depending on how it goes.

8          The other thing I'm going to anticipate, I'm just

9    going to tell you in advance, just be prepared, be prepared

10   for the jury to say, "We would like to see the demonstrative

11   that the last agent, Vaughan, Agent Vaughan testified to."

12         I may be wrong, but I would venture to guess that

13   there is going to be a likelihood that they're going to ask,

14   if, depending on how closely they examine all the evidence,

15   they may be asking for that demonstrative.  So be prepared

16   to address that issue.  I'm getting way, way ahead of

17   myself.

18              MR. DOUGHTEN:  Your Honor, I will say along those

19   lines, we had the discussions.  Our objections were on some

20   of the pages they were conclusory opinions, but on others,

21   if it was strictly laying out what the evidence is -- there

22   are pages we wouldn't object to, so I guess we could go on a

23   page-by-page issue if that came up.

24              THE COURT:  The only way that it would go

25   back -- you know, to be candid with you, at least my

1617

1    thinking is the only way it would go back is if it goes back

2    with some sort of limiting instruction about how they use it

3    and how they consider it.

4         That would be something we would have to think about.

05:30:58  5  I may be proactive and you may want to be proactive and

6    think about exactly what kind of limiting instruction we

7    want to give the jury if they do ask for it.

8         Because, again, it would -- as we talked about before,

9    it would highlight, certainly highlight certain parts of the

05:31:15 10  evidence.  And I'm conflicted about it going back at all.

11   But given the technical nature of the testimony and the

12   technical nature of this case, the jury may be entitled to

13   it.

14        MR. SHEPHERD:  Your Honor, and when we considered

05:31:27 15  that and in discussing it with defense counsel, it was sort

16   of on the borderline between a straight demonstrative aid

17   and kind of a summary chart.

18        And we leaned more towards it was probably a

19   demonstrative aid, which is why we didn't push the issue.

05:31:42 20  But we'll do some issue and be prepared for it, if that

21   changes.

22        THE COURT:  Well, the demonstrative cuts both

23   ways.  It works -- in some respects you could argue it

24   benefits the government.  And then on the flip side, there's

05:31:56 25  some argument to be made that the defendant, likewise, might

1    benefit in some respects from the demonstrative.

2        But we don't need to deal with that today, but I do

3    want to be prepared if the jury has that question or that

4    issue, to deal with it without them being kept waiting.

05:32:11  5        So if anything comes up, we'll be here.  Obviously

6    we'll be in chambers tomorrow.  And I have proceedings, I

7    think, tomorrow, and I do have proceedings on Friday.  So

8    we'll be here if you need anything.

9        And we'll -- you can secure your materials here in the

05:32:24 10   courtroom somewhere, or we'll use my conference room.  If

11   you want to lock things down, we can lock things there, if

12   need be.

13       All right.  Any other questions, any other issues,

14   anything I can address on behalf of the government?

05:32:36 15       MR. SHEPHERD:  Your Honor, just one question.

16   Because of the change in schedule, there's a chance that Ms.

17   Magnone may be making a quick trip back to her home in

18   Washington in the next couple days.

19       If it turns out that we have to go to court, or we

05:32:45 20   have to come back and reconvene on either tomorrow or

21   Friday, I'd just ask the Court's permission to just have

22   myself or Mr. Bennett here.

23       THE COURT:  That's fine.  I understand.  Since

24   we're bringing her back, forcing her to come back on Monday

05:33:01 25   when she was hoping she would be able to put this

```
 1    matter -- I understand.  So that would be fine.  I'm sure
 2    you gentlemen will be able to hold up your end without her,
 3    hopefully.  Maybe not.  We'll find out.
 4              MR. SHEPHERD:  Your Honor, I make no promises in
 5    that respect.
 6         I just wanted to clarify for the Court, it would be no
 7    disrespect.
 8              THE COURT:  There must be a much better St.
 9    Patrick's day celebration in Washington, D.C.
10         There's an Irish pub somewhere near Capitol Hill, I
11    seem to remember.
12         Anyway, counsel for the defendants, likewise, is there
13    any issues, any concerns you have?
14              MR. DOUGHTEN:  No, we have no issues at this
15    point -- wait.  May I have just one second?
16         It may be asking a lot.  Is there any chance we could
17    have Mr. Hendricks be brought here tomorrow morning so we
18    could meet with him here?
19              THE COURT:  Yeah, I can make that happen.
20              MR. DOUGHTEN:  Thank you.  That was our only
21    question.
22              THE COURT:  You can have him here tomorrow.  You
23    can have him here Friday if you.
24              MR. DOUGHTEN:  Tomorrow would be better.  Mr.
25    Hartman will be going back to Toledo.  He'll be here
```

1       tonight.

2                       THE COURT:  What time would you like him here?

3                       MR. DOUGHTEN:  9:00, Your Honor.

4                       THE COURT:  Can we have him here by 9:00?

05:34:14  5             DEPUTY U.S. MARSHAL:  Yes.

6                       THE COURT:  All right.

7                       MR. DOUGHTEN:  Thank you very much.

8                       THE COURT:  All right.  Anything else, anyone?

9                       MR. SHEPHERD:  No, Your Honor.

05:34:19 10             THE COURT:  All right.  Enjoy the weekend.  Be

11      careful -- nobody laughed.  The jury didn't laugh when I

12      said about adult beverage.

13                      MR. SHEPHERD:  Not even the guy who likes green,

14      Your Honor.

05:34:35 15             THE COURT:  Probably teetotalers.  All right.

16              (Proceedings concluded at 1:40 p.m.)

17

18

19

20

21

22

23

24

25

1                 I N D E X

2                                                   1500

3   DIRECT EXAMINATION OF AMY VAUGHAN

4   BY MR. SHEPHERD

5   CROSS-EXAMINATION OF AMY VAUGHAN           1565

6   BY MR. HARTMAN

7   REDIRECT EXAMINATION OF AMY VAUGHAN         1570

8   BY MR. SHEPHERD

9   DIRECT EXAMINATION OF STEVE CONLEY          1576

10   BY MS. MAGNONE

11   CROSS-EXAMINATION OF STEVEN CONLEY          1581

12   BY MR. DOUGHTEN

13   REDIRECT EXAMINATION OF STEVEN CONLEY       1585

14   BY MR. MAGNONE

15

16

17

18

19

20

21

22

23

24

25

1622

1          C E R T I F I C A T E

2

3         I certify that the forgoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7              *S/Caroline Mahnke*              3/14/18

8              Caroline Mahnke, RMR, CRR        Date

9

10             *S/Lori A. Callahan*             3/14/18

11             Lori A. Callahan, RMR, CRR       Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25