1      UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF OHIO
2            EASTERN DIVISION

3

UNITED STATES OF AMERICA,

4
          Plaintiff,          Case No. 1:16CR265
5                             Akron, Ohio
       vs.                    Monday, March 19, 2018
6
ERICK JAMAL HENDRICKS,

7
          Defendant.

8

9
              TRANSCRIPT OF TRIAL
10      VOLUME 10, PAGES 1623 THROUGH 1729
       BEFORE THE HONORABLE JOHN R. ADAMS
11         UNITED STATES DISTRICT JUDGE

12

APPEARANCES:

13

14  For the Government:  Matthew W. Shepherd
                        Office of the U.S. Attorney - Cleveland
                        Carl B. Stokes U.S. Courthouse
15                      801 Superior Avenue, West, Suite 400
                        Cleveland, Ohio 44113
16                      (216) 622-3600

17                      Mark S. Bennett
                        Office of the U.S. Attorney - Akron
18                      2 South Main Street, Room 208
                        Akron, Ohio 44308
19                      (330) 375-5716

20                      Rebecca A. Magnone
                        U.S. Department of Justice
21                      960 Pennsylvania Avenue, NW
                        Washington, DC 20530
22                      (202) 353-9472

23  For the Defendant:  David L. Doughten
                        Attorney at Law
24                      4403 St. Clair Avenue
                        Cleveland, Ohio 44103
25                      (216) 361-1112
                        Stephen D. Hartman

```
 1                              Attorney at Law
                                1st Floor
 2                              320 North Michigan Street
                                Toledo, Ohio 43604
 3                              (419) 690-4604

 4
         Court Reporter:        Caroline Mahnke, RMR, CRR, CRC
 5                              Lori A. Callahan, RMR, CRR
                                Federal Building & U.S. Courthouse
 6                              2 South Main Street, Suite 568
                                Akron, Ohio 44308
 7                              (330) 252-6021

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription;
25
```

1   (Monday, March 19, 2018)

2        (Outside the presence of the jury:)

3        THE COURT:  Good morning, Counsel.  Are we ready

4   to proceed?

00:55:25 5        On behalf of the government?

6        MR. SHEPHERD:  Yes, Your Honor.

7        THE COURT:  On behalf of the defendant?

8        MR. DOUGHTEN:  Yes, Your Honor.

9        THE COURT:  All right.  Let's have the jurors,

00:55:30 10  please, at this time.

11       (Jury in, 9:05.)

12       THE COURT:  Good morning, ladies and gentlemen.

13       Members of the jury, now it's time for me to instruct

14  you about the law that you must follow in deciding this

00:57:48 15 case.  I will read these instructions to you.  Counsel will

16  then present their closing arguments.  Then I will have some

17  file instructions to give you with regard to your

18  deliberations in this case.

19       Each of you will have a copy of the instructions I'm

00:58:06 20 about to read with you in the jury room.  You may take

21  notes, but it may not be necessary to take detailed notes as

22  you will be able to refer to the instructions again during

23  your deliberations.

24       As I've indicated, now it's time for me to instruct

00:58:23 25 you about the law that you must follow in deciding this

1  case.  I will start by explaining your duties and the

2  general rules that apply in every criminal case.

3       Then I will explain the elements or parts of the crime

4  that the defendant is accused of committing, in this case

00:58:39  5  crimes.

6       You will be told about some rules that you must use in

7  evaluating particular testimony and evidence.  And last, I

8  will explain the rules that you must follow during your

9  deliberations in the jury room, and the possible verdicts

00:58:52  10  that you may return.

11       Please listen very carefully to everything I say.

12       Jurors' duties.

13       You have to main duties as jurors.  The first one is

14  to decide what the facts are from the evidence that you saw

00:59:07  15  and heard here in court.  Deciding what the facts are is

16  your job, not mine, and nothing I have said or done during

17  this trial was meant to influence your decision about the

18  facts in any way.

19       Your second duty is to take the law I give you, apply

00:59:26  20  it to the facts, and decide if the government has proved the

21  defendant guilty beyond a reasonable doubt.  It is my job to

22  instruct you about the law, and you are bound by the oath

23  that you took at the beginning of the trial to follow the

24  instructions that I give you, even if you personally

00:59:43  25  disagree with them.

1    This includes those instructions that I gave you

2    before and during the trial, and these instructions.  All

3    the instructions are important, and you should consider them

4    together as a whole.

5    The lawyers may talk about the law during their

6    arguments.  But if what they say is different from what I

7    say, you must follow what I say.  What I say about the law

8    controls.

9    Perform these duties fairly.  Do not let any bias,

10   sympathy, or prejudice that you may feel towards one side or

11   the other influence your decision in any way.

12   Presumption of innocence, burden of proof, reasonable

13   doubt.

14   As you know, the defendant has pleaded not guilty to

15   the crimes charged in the indictment.  The indictment is not

16   evidence of guilt.  It is just the formal way that the

17   government tells the defendant what crimes he is accused of

18   committing.  It does not even raise a suspicion of guilt.

19   Instead, the defendant starts the trial with a clean

20   slate with no evidence at all against him, and the law

21   presumes that he is innocent.

22   This presumption of innocence stays with him unless

23   the government presents evidence here in court that

24   overcomes the presumption, and convinces you beyond a

25   reasonable doubt that he is guilty.

1    This means that the defendant has no obligation to

2 present evidence or to prove to you in any way that he is

3 innocent.  It is up to the government to prove that he is

4 guilty, and this burden stays with the government from start

01:01:22  5 to finish.

6    You must find the defendant not guilty unless the

7 government convinces you beyond a reasonable doubt that he

8 is guilty.

9    The government must prove every element of the crime

01:01:38 10 charged beyond a reasonable doubt.  Proof beyond a

11 reasonable doubt does not mean proof beyond all possible

12 doubt.  Possible doubts or doubts based purely on

13 speculation are not reasonable doubts.

14    A reasonable doubt is a doubt based on reason and

01:01:55 15 common sense.  It may arise from the evidence, the lack of

16 evidence, or the nature of the evidence.

17    Proof beyond a reasonable doubt means proof which is

18 so convincing that you would not hesitate to rely and act on

19 it in making the most important decisions in your own lives.

01:02:14 20    If you are convinced that the government has proved

21 the defendant guilty beyond a reasonable doubt, say so by

22 returning a guilty verdict.  If you are not convinced, say

23 so by returning a not guilty verdict.

24    Evidence defined.

01:02:30 25    You must make your decision based only on the evidence

1    that you saw and heard here in court.  Do not let rumors,

2    suspicions, or anything else that you may have seen or heard

3    outside the Court influence your decision in any way.

4         The evidence in this case includes only what the

5    witnesses said while they were testifying under oath, the

6    exhibits that I allowed into evidence, the stipulations that

7    the lawyers agreed to, and the facts, if any, that I have

8    judicially noticed.

9         Nothing else is evidence.  The lawyers' statements and

10   arguments are not evidence.  Their questions and objections

11   are not evidence.  My legal rulings are not evidence.  And

12   my comments and questions are not evidence.

13        During the trial I did not let you hear the answers to

14   some of the questions that the lawyers asked.  I also ruled

15   that you could not see some of the exhibits that the lawyers

16   wanted you to see.  And sometimes I ordered you to disregard

17   things that you saw or heard, or I struck things from the

18   report.

19        You must completely ignore all these things.  Do not

20   even think about them.  Do not speculate about what a

21   witness might have said or what an exhibit might have shown.

22   These things are not evidence, and you're bound by your oath

23   not to let them influence your decision in any way.

24        Make your decision based only on the evidence, as I

25   have defined it here, and nothing else.

1       Consideration of evidence.

2       You should use your common sense in weighing the

3   evidence.  Consider it in light of your everyday experience

4   with people and events and give it whatever weight you

5   believe it deserves.

6       If your experience tells you that certain evidence

7   reasonably leads to a conclusion, you are free to reach that

8   conclusion.

9       Direct and circumstantial evidence.

10      Now, some of you may have heard the terms direct

11  evidence and circumstantial evidence.

12      Direct evidence is simply evidence like the testimony

13  of an eyewitness which, if you believe it, directly proves a

14  fact.  If a witness testified he saw it raining outside and

15  you believed him, or her that, would be direct evidence that

16  it was raining.

17      Circumstantial evidence is simply a chain of

18  circumstances that indirectly proves a fact.  If someone

19  walked into the courtroom wearing a raincoat covered with

20  drops of water and carrying a wet umbrella, that would be

21  circumstantial evidence from which you could conclude that

22  it was raining.

23      It is your job to decide how much weight to give the

24  direct and circumstantial evidence.

25      The law makes no distinction between the weight that

1  you should give to either one or says that one is better

2  than the other.

3      You should consider all the evidence, both direct and

4  circumstantial, and give it whatever weight you believe it

01:05:37 5  deserves.

6      Credibility of witnesses.

7      Another part of your job as jurors is to decide how

8  credible or believable each witness was.  This is your job,

9  not mine.  It is up to you to decide if a witness's

01:05:53 10  testimony was believable and how much weight you think it

11  deserves.

12      You are free to believe everything that a witness said

13  or only part of it or none of it at all.  But you should act

14  reasonably and carefully in making these decisions.  Let me

01:06:09 15  suggest some things for you to consider in evaluating each

16  witness's testimony.

17      Ask yourself the following questions:

18      One.  Was the witness able to clearly see or hear the

19  events?  Sometimes even an honest witness may not have been

01:06:26 20  able to see or hear what was happening and may make a

21  mistake.

22      Two.  How good did the witness's memory seem to be?

23  Did the witness seem able to accurately remember what

24  happened?

01:06:38 25      Three.  Was there anything else that may have

1    interfered with the witness's ability to perceive or

2    remember the events?

3         Four.  How did the witness act while testifying?  Did

4    the witness appear honest?  Or did the witness appear to be

5    lying?

6         Five.  Did the witness have any relationship to the

7    government or the defendant or anything to gain or lose from

8    the case that might influence his or her testimony?

9         Six.  Did the witness have any bias or prejudice or

10   reason for testifying that might cause the witness to lie or

11   to slant the testimony in favor of one side or the other?

12        Seven.  Did the witness testify inconsistently on the

13   stand or did the witness say or do something or failed to

14   say or do something at any other time that is inconsistent

15   with what the witness said while testifying?

16        If you believe the witness was inconsistent, ask

17   yourself if this makes the witness's testimony less

18   believable.  Sometimes it may.  Other times it may not.

19   Also consider whether the inconsistency was about something

20   important or about some unimportant detail.  Ask yourself if

21   it seemed like an innocent mistake or if it seemed

22   deliberate.

23        Eight.  Finally, ask yourself how believable the

24   witness's testimony was in light of all the other evidence.

25   Was the testimony supported or contradicted by other

1    evidence that you found believable?  If you believe that a

2    witness's testimony was contradicted by other evidence,

3    remember that people sometimes forget things and even two

4    honest people who witness the same event may not describe it

5    exactly the same way.

6         These are only some of the things that you may

7    consider in deciding how believable each witness was.  You

8    may also consider other things that you think shed some

9    light on the witness's believability.  Use your common

10   sense, your everyday experience in dealing with other

11   people.  And then decide what testimony you believe and how

12   much weight you think it deserves.

13        Number of witnesses.

14        One more point about witnesses.  Sometimes jurors

15   wonder if the number of witnesses who testified makes any

16   difference.

17        Do not make any decision based only on the number of

18   witnesses who testified.  What is more important is how

19   believable the witnesses were and how much weight you think

20   their testimony deserves.  Concentrate on that, not the

21   numbers.

22        Lawyers' objections.

23        There's one more general subject I want to talk to you

24   about before I begin explaining the elements of the crime

25   charged.

1      The lawyers for both sides objected to some of the

2   things that were said or done during the trial.  Do not hold

3   that against either side.  The lawyers have a duty to object

4   whenever they think that something is not permitted by the

5   rules of evidence.  Those rules are designed to make sure

6   that both sides receive a fair trial.

7      Also, do not interpret my rulings on their objections

8   as any indication of how I think the case should be decided.

9   My rulings were based on the rules of evidence, not on how I

10   feel about the case.  Remember your decision must be based

11   only on the evidence that you saw and heard here in court.

12      Stipulations.

13      Statements and arguments of counsel are not evidence

14   in the case.  However, if the attorneys on both sides

15   stipulate or agree to the existence of a fact, you may

16   accept this fact as having been proven.  You are not

17   required to do so, however, as it is up to you to determine

18   what proof you will accept.

19      Ladies and gentlemen, there have been a number of

20   stipulations.  They are in writing.  They'll be submitted to

21   you in the jury room.  So you'll have them with you.

22      Defining the crime and related matters.

23      That concludes the part of my instructions explaining

24   your duties and the general rules that apply in every

25   criminal case.  In a moment I will explain the elements of

1       the crimes that the defendant is accused of committing.

2              But before I do that, I want to emphasize that the

3       defendant is only on trial for the particular crimes charged

4       in the indictment.  Your job is limited to deciding whether

01:11:16 5      the government has proved the crimes charged.

6              Separate consideration, single defendant charged with

7       two crimes.

8              The defendant has been charged with two crimes.  The

9       number of charges is no evidence of guilt and this should

01:11:35 10     not influence your decision in any way.  It is your duty to

11      separately consider the evidence that relates to each charge

12      and to return a separate verdict for each one.  For each

13      charge, you must decide whether the government has presented

14      proof beyond a reasonable doubt that the defendant is guilty

01:11:53 15     of that particular charge.

16             Your decision on one charge, whether it is guilty or

17      not guilty, should not influence your decision on any of the

18      other charges, or in this case, the other charge.

19             Nature of the offenses.

01:12:10 20     General allegations applicable to both counts in the

21      indictment.

22             At all times relevant to the indictment, the

23      government alleges as follows:

24             Erick Jamal Hendricks was a citizen of the United

01:12:25 25     States.

           1          Amir Al-Ghazi, a coconspirator, not charged herein,

           2    was located within the Northern District of Ohio.

           3          An undercover law enforcement employee, Agent Steven

           4    Jane, was located within the Northern District of Ohio.

01:12:42   5          The Islamic State of Iraq and the Levant, hereinafter

           6    ISIL, was a designated foreign terrorist organization under

           7    Section 219 of the Immigration and Nationality Act and a

           8    Specially Designated Global Terrorist Entity under Section

           9    1(b) of Executive Order 13224.

01:13:10  10          Throughout this matter, the parties and the Court have

          11    interchangeably used the acronyms ISIL and ISIS to refer to

          12    this organization.  For all intents and purposes, you should

          13    consider both acronyms as fully interchangeable.

          14          Charges set forth in the indictment.

01:13:32  15          Defendant Erick Jamal Hendricks is charged with one

          16    count of conspiracy to provide material support and

          17    resources to a foreign terrorist organization in violation

          18    of Title 18, United States Code, Section 2339B(a)(1), and

          19    one count of attempting to provide material support and

01:13:58  20    resources to a foreign terrorist organization, in violation

          21    of Title 89 -- Title 18, excuse me, United States Code,

          22    Section 2339B(a)(1).

          23          The defendant has pleaded not guilty to the charges.

          24          The indictment charges the offenses as follows:

01:14:17  25          Count 1.

1       From on or about December 1, 2014, through on or about

2   May 31, 2015, in the Northern District of Ohio, Eastern

3   Division and elsewhere, Defendant Erick Jamal Hendricks, a

4   citizen of the United States, and others known and unknown

5   to the grand jury, knowingly did combine, conspire,

6   confederate and agree to provide material support and

7   resources as that term is defined in Title 18, United States

8   Code, Section 2339A(b), including personnel and services to

9   a foreign terrorist organization, namely the Islamic State

10  of Iraq and the Levant, hereinafter ISIL, which at all

11  relevant times was designated by the Secretary of State as a

12  foreign terrorist organization pursuant to Section 219 of

13  the Immigration and Nationality Act, knowing that ISIL was a

14  designated foreign terrorist organization and that ISIL

15  engages in and has engaged in terrorist activity and

16  terrorism.

17      Object of the conspiracy.

18      The objects of the conspiracies were to, number one,

19  recruit individuals in the United States to form a cell of

20  ISIL supporters.

21      Number two, train individuals recruited for the cell

22  of ISIL supporters to commit acts of violence in the United

23  States on behalf of the ISIL; and

24      Three, commit acts of violence in the United States on

25  behalf of ISIL.

1       Manner and means of the conspiracy.

2       To attain the objects of the conspiracy, defendant and

3   his coconspirators took the following steps and employed the

4   following manner and means as part of the conspiracy:

01:16:18  5       A, defendant used social media applications to

6   communicate with individuals known and unknown to the grand

7   jury, including Amir Al-Ghazi, who appeared to support ISIL.

8       B, defendant vetted individuals he communicated with

9   to determine if they were suitable for joining a cell of

01:16:38 10   ISIL supporters.

11       C, defendant vetted individuals he communicated with

12   to determine if they were working on behalf of the law

13   enforcement.

14       D, defendant directed individuals he had previously

01:16:52 15   vetted to vet other potential recruits through

16   communications on social media applications.

17       E, defendant provided advice to individuals he

18   recruited for his cell about methods of avoiding detection

19   by law enforcement, including methods to safely communicate

01:17:13 20   using social media applications and to conduct

21   counter-surveillance of law enforcement.

22       F, defendant attempted to conceal his communications

23   with potential recruits from possible law enforcement

24   surveillance.

01:17:27 25       G, defendant directed individuals such as Amir

1    Al-Ghazi, and others known and unknown, to connect defendant

2    to other like-minded individuals for recruitment by

3    defendant.

4         H, defendant distributed documents to recruits that

01:17:43  5    provided advice on how to avoid law enforcement detection.

6         I, defendant provided suggestions to recruits about

7    materials they should read, including lectures by Anwar

8    Al-Awlaki, and materials that contained bomb-making

9    instructions and information on law enforcement surveillance

01:18:05 10    methods.

11         J, defendant attempted to purchase land to be used for

12    training in military tactics for members of the cell he was

13    recruiting.

14         K, defendant met in person with potential recruits to

01:18:19 15    discuss the creation of a cell to conduct attacks in the

16    United States on behalf of ISIL.

17         L, defendant claimed that he obtained guidance from

18    senior brothers in ISIL.

19         M, defendant suggested that Agent Steven Jane travel

01:18:37 20    to Garland, Texas, to a contest for drawing the Prophet

21    Muhammad.

22         N, defendant asked Agent Steven Jane about security

23    measures at the contest for drawing the Prophet Muhammad in

24    Garland, Texas.

01:18:56 25         And O, defendant caused a document to be posted online

1    that claimed Islamic State in America committed the attack

2    at the Garland, Texas contest for drawing the Prophet

3    Mohammad and warned of future attacks.

4         Count 2 alleges that from on or about December 1,

01:19:17 5    2014, through on or about May 31, 2015, in the Northern

6    District of Ohio, Eastern Division, and elsewhere, Defendant

7    Erick Jamal Hendricks, a citizen of the United States, did

8    knowingly attempt to provide material support and resources,

9    as that term is defined if Title 18, United States Code,

01:19:40 10    Section 2339A(b), including personnel, specifically himself,

11    Amir Al-Ghazi, Agent Steven Jane, and others, and services,

12    to a foreign terrorist organization, namely Islamic State of

13    Iraq and the Levant, which at all times relevant was

14    designated by the Secretary of State as a foreign terrorist

01:20:08 15    organization pursuant to Section 219 of the Immigration and

16    Nationality Act, knowing that ISIL was a designated foreign

17    terrorist organization and that ISIL engages in and has

18    engaged in terrorist activity and terrorism.

19         Statute defining the offense in Counts 1 and 2.

01:20:29 20         Section 2339B(a)(1) of Title 18 of the United States

21    Code provides that whoever knowingly provides material

22    support or recourses to a foreign terrorist organization, or

23    attempts or conspires to do so, be guilty of a crime.

24         To violate this paragraph, a person must have

01:20:54 25    knowledge that the organization is a designated terrorist

1  organization, and that the organization has engaged or

2  engages in terrorist activity, or that the organization has

3  engaged or engages in terrorism.

4       Elements of Count 1.  Conspiracy to provide material

01:21:13  5  support and resources to a foreign terrorist organization.

6       The defendant is charged in Count 1 of the indictment

7  with conspiracy to provide material support and resources to

8  a foreign terrorist organization.  In order for the

9  defendant to be found guilty of this crime, the government

01:21:37 10  must approach each of the following elements beyond a

11  reasonable doubt.

12       First, from on or about December 1, 2014, through on

13  or about May 31, 2015, two or more persons reached an

14  agreement or came to an understanding to provide material

01:21:57 15  support or resources to a designated foreign terrorist

16  organization, namely the Islamic State of Iraq and the

17  Levant, ISIL, also known as the Islamic State of Iraq and

18  Syria, ISIS, al-Qa'ida in Iraq and the Islamic State.

19       Second, that the defendant became a member of the

01:22:22 20  conspiracy knowing of its object and intending to help

21  accomplish it.

22       Third, at the time the defendant knew that ISIL was a

23  designated foreign terrorist organization or had engaged or

24  was engaging in terrorist activity or terrorism, and;

01:22:40 25       Four, the defendant is a national of the United States

1    or the offense occurred in whole or in part within the

2    United States, or the offense occurred in or affecting

3    interstate or foreign commerce.

4        Detailed instructions on the elements of the crimes

5    charged.

6        Next I will give you more detailed instructions on

7    some of these elements.  However, if you are convinced that

8    the government has proved all of the above elements, taking

9    into consideration the definitions provided below, say so by

10   returning a guilty verdict on this charge.

11       If you have any reasonable doubt about any one of

12   these elements, then you must find the defendant not guilty

13   of this charge.

14       Conspiracy.

15       Count 1 of the indictment charges a conspiracy crime.

16   I shall now discuss with you briefly the law related to

17   conspiracies.

18       Agreement.

19       With regard to the first element, a criminal

20   agreement, the government must prove that two or more

21   persons conspired, or agreed, to cooperate with each other

22   to commit the crime of providing material support or

23   resources to a designated foreign terrorist organization,

24   namely ISIL.

25       This does not require proof of any formal agreement,

1643

1       written or spoken, nor does this require proof that everyone

2       involved agreed on all the details.  But proof that people

3       simply met together from time to time and talked about

4       common interests or engaged in similar conduct is not enough

01:24:18  5       to establish a criminal agreement.

6       These are things that you may consider in deciding

7       whether the government has proved an agreement.  But without

8       more, they are not enough.

9       What the government must prove is that there was a

01:24:33  10      mutual understanding, either spoken or unspoken, between two

11      or more people, to cooperate with each other to commit the

12      crime of providing material support or resources to a

13      designated foreign terrorist organization, namely ISIL.

14      This is essential.

01:24:51  15      An agreement can be proved indirectly, by facts and

16      circumstances which lead to a conclude that an agreement

17      existed.  But it is up to the government to convince you

18      that such facts and circumstances existed in this particular

19      case.

01:25:12  20      Defendant's connection to the conspiracy.

21      If you are convinced that there was a criminal

22      agreement, then you must decide whether the government has

23      proved that the defendant knowingly and voluntarily joined

24      that agreement.  To convict the defendant, the government

01:25:29  25      must prove that he knew the conspiracy's main purpose, that

1    he voluntarily joined it, intending to help advance or

2    achieve its goals.

3        This does not require proof that a defendant knew

4    everything about the conspiracy, or everyone else involved,

01:25:45  5    or that he was a member of it from the very beginning.  Nor

6    does it require proof that a defendant played a major role

7    in the conspiracy, or that his connection to it was

8    substantial.  A slight role or connection may be enough.

9        But proof that a defendant simply knew about a

01:26:03  10   conspiracy, or was present at times or associated with

11   members of the group, is not enough, even if he approved of

12   what was happening or did not object to it.

13       Similarly, just because a defendant may have done

14   something that happened to help a conspiracy does not

01:26:20  15   necessarily make him a conspirator.  These are all things

16   that you may consider in deciding whether the government has

17   proved that a defendant joined a conspiracy.  But without

18   more, they are not enough.

19       A defendant's knowledge can be proved indirectly by

01:26:39  20   facts and circumstances which lead to a conclusion that he

21   knew the conspiracy's main purpose.  But it is up to the

22   government to convince you that such facts and circumstances

23   existed in this particular case.

24       Unindicted, unnamed, or separately tried

01:26:57  25   coconspirators.

1       Now, some of the people who may have been involved in

2   these events are not on trial.

3       This does not matter.  There's no requirement that all

4   members of a conspiracy be charged and prosecuted or tried

01:27:12  5   together in one proceeding.

6       Nor is there any requirement that the names of the

7   other conspirators be known.  An indictment can charge a

8   defendant with a conspiracy involving people whose names are

9   not known, as long as the government can prove that the

01:27:28  10  defendant conspired with one or more of them.  Whether they

11  are named or not does not matter.

12      Venue.

13      Now, some of the events that you have heard about

14  happened in other places.  There's no requirement that the

01:27:43  15  entire conspiracy take place here in the Northern District

16  of Ohio.  But for you to return a guilty verdict on the

17  conspiracy charge, the government must convince you that

18  either the agreement or one of the acts in furtherance took

19  place here in the Northern District of Ohio.

01:28:01  20      Unlike all of the other elements that I have

21  described, this is just a fact that the government only has

22  to prove by a preponderance of the evidence.  This means the

23  government only has to convince you that it is more likely

24  than not that part of the conspiracy took place here.

01:28:18  25      Remember that all the other elements I have described

1    must be proved beyond a reasonable doubt.

2         Elements of Count 2, attempting to provide material

3    support and resources to a foreign terrorist organization.

4         The defendant is charged in Count 2 of the indictment

01:28:39  5    with attempting to provide material support and resources to

6    a foreign terrorist organization, namely the Islamic State

7    of Iraq and the Levant, also known as the Islamic State of

8    Iraq and Syria, ISIS, al-Qa'ida in Iraq, and the Islamic

9    State.

01:28:57 10         In order for the defendant to be found guilty of this

11    crime, the government must prove each of the following

12    elements beyond a reasonable doubt:

13         First, that the defendant attempted to provide

14    material support or resources to a foreign terrorist

01:29:14 15    organization.

16         Second, that the defendant knew or intended that the

17    support or resources was going to the organization commonly

18    known as ISIL.

19         Third, at the time the defendant knew that ISIL was a

01:29:29 20    designated foreign terrorist organization or had engaged or

21    was engaging in terrorist activity or terrorism.

22         And fourth, the defendant is a national of the United

23    States, or the offense occurred in whole or in part within

24    the United States, or the offense occurred in or affecting

01:29:48 25    interstate or foreign commerce.

1    A defendant may be found guilty of an attempt if he

2    intended to provide material support to a designated foreign

3    terrorist organization and voluntarily and intentionally

4    carried out some act which was a substantial step toward

01:30:07  5    that crime.

6    A substantial step must be something more than mere

7    preparation, yet may be less than the last act necessary

8    before the actual commission of the substantive crime.

9    In order for behavior to be punishable as an attempt,

01:30:24  10    it need not be incompatible with innocence, yet it must be

11    necessary to the consummation of the crime and be of such a

12    nature that a reasonable observer, viewing it in context,

13    could conclude beyond a reasonable doubt that it was

14    taken -- or it was undertaken in accordance with a design to

01:30:46  15    violate the statute.

16    Relevant definitions.

17    As I noted above, the government must prove beyond a

18    reasonable doubt that the defendant knowingly conspired or

19    attempted to provide material support or resources to a

01:31:02  20    foreign terrorist organization.

21    Here, the government has alleged that the material

22    support included personnel, specifically the defendant

23    himself, Amir Al-Ghazi, Agent Steven Jane, and others, and

24    services to a foreign terrorist organization, namely ISIL,

01:31:22  25    which at all relevant times was designated by the Secretary

1   of State as a foreign terrorist organization.

2          Material support or resources.

3          The term "material support or resources" means any

4   property, tangible or intangible, or service, including

5   currency or monetary instruments or financial securities,

6   financial services, lodging, training, expert advice or

7   assistance, safe houses, false documentation or

8   identification, communications equipment, facilities,

9   weapons, lethal substances, explosives, personnel, and

10  transportation, but does not include medicine or religious

11  materials.

12         Training.

13         The term "training" means instruction or teaching

14  designed to impart a specific skill, as opposed to general

15  knowledge.

16         Expert advice and/or assistance.

17         The term "expert advice or assistance" means advice or

18  assistance derived from scientific, technical, or other

19  specialized knowledge.

20         Personnel.

21         The term "personnel" means one or more persons, which

22  can include the defendant's own person.  However, no person

23  can be convicted for a violation of this statute in

24  connection with providing personnel unless that person has

25  knowingly attempted to provide a foreign terrorist

1    organization with one or more individuals, who may include

2    the defendant, to work under that terrorist organization's

3    direction or control or to organize, manage, supervise, or

4    otherwise direct the operation of that organization.

5        Individuals who act entirely independently of the

6    foreign terrorist organization to advance its goals or

7    objectives are not considered to be working under the

8    foreign terrorist organization's direction and control.

9        Foreign terrorist organization.

10       The term "foreign terrorist organization" has a

11   particular meaning under this statute.  In order for an

12   organization to qualify as a foreign terrorist organization,

13   the organization must have been designated by such -- or as

14   such by the Secretary of State through a process established

15   by law and have been designated at the time the crime

16   occurred.

17       Knowingly.

18       For an alternate to act "knowingly" means that he

19   realized that what he was doing and was aware of the nature

20   of his conduct, and did not act through ignorance, mistake,

21   or accident.

22       Additional relevant definitions.

23       The government must prove beyond a reasonable doubt

24   that, in conspiring to provide or in attempting to provide

25   material support or resources to a designated terrorist

1  organization, the defendant knew that the organization was a

2  designated terrorist organization or that the organization

3  had engaged or was engaging in terrorist activity or

4  terrorism.

01:34:40  5      Specifically, the government must prove that at the

6  time the defendant conspired or attempted to provide the

7  material support or resources in question, he knew that they

8  would be provided to ISIL.

9      Further, you must find beyond a reasonable doubt

01:35:00  10  either that the defendant knew that ISIL had been designated

11  by the United States government as a foreign terrorist

12  organization, or that he knew that the organization had

13  engaged or was engaging in terrorist activity or terrorism.

14      Terrorist activity.

01:35:17  15      The term "terrorist activity" means any activity which

16  is unlawful under the laws of the place where it is

17  committed, or which, if it had been committed in the United

18  States, would be unlawful under the laws of the United

19  States or any state, and which involves any of the

01:35:34  20  following:

21      The highjacking or sabotage of any conveyance,

22  including an aircraft, vessel or vehicle, the seizing or

23  detaining and threatening to kill, injure, or continue to

24  detain another individual in order to compel a third person,

01:35:53  25  including a governmental organization, to do or abstain from

1   doing any act as an explicit or implicit condition for the

2   release of the individual seized or detained; a violent

3   attack upon an internationally protected person or upon the

4   liberty of such a person; an assassination; the use of any

01:36:15  5   biological agent, chemical agent or nuclear weapon or device

6   or explosive, firearm, or other weapon or dangerous device,

7   other than for mere personal monetary gain, with intent to

8   danger, did -- or endanger, directly or indirectly, the

9   safety of one or more individuals or to cause substantial

01:36:39 10   damage to property; or a threat, attempt, or conspiracy to

11   do any of the foregoing.

12        Engage in terrorist activity.

13        The term "engage in terrorist activity" means in an

14   individual capacity or as a member of an organization, to

01:36:57 15   commit or to incite to commit, under circumstances

16   indicating an intention to cause death or serious bodily

17   injury, a terrorist activity; to prepare or plan a terrorist

18   activity; to gather information on potential targets for

19   terrorist activity; to solicit funds or other things of

01:37:18 20   value for a terrorist activity or a terrorist organization.

21        Terrorism.

22        The term "terrorism" means premeditated politically

23   motivated violence perpetrated against noncombatant targets

24   by subnational groups or clandestine agents.

01:37:41 25        National of the United States.

1       The term "national of the United States" means, A, a

2   citizen of the you had, or B, a person who, though not a

3   citizen of the United States, owes permanent allegiance to

4   the you had.

01:37:55   5       Interstate commerce.

6       The term "interstate commerce" includes commerce

7   between one state, territory, possession, or the District of

8   Columbia and another state, territory, possession or the

9   District of Columbia.

01:38:11  10       Foreign commerce.

11       "Foreign commerce" means commerce with a foreign

12   country.

13       Inferring required mental state.

14       Ordinarily, there's no way that a defendant's state of

01:38:24  15   mind can be proved directly because no one can read another

16   person's mind and tell what that person is thinking.

17       But a defendant's state of mind can be proved

18   indirectly from the surrounding circumstances.  This

19   includes things like what the defendant said, what the

01:38:42  20   defendant did, how the defendant acted, and any other facts

21   or circumstances in evidence that show what was in the

22   defendant's mind.

23       You may also consider the natural and probable results

24   of any acts that the defendant knowingly did or did not do,

01:39:00  25   and whether it is reasonable to conclude that the defendant

1    intended those results.  This, of course, is all for you to

2    decide.

3        On or about, explained.

4        Next, I want to say a word about the dates mentioned

01:39:16  5    in the indictment.  The indictment charges that the crimes

6    happened on or about certain days.  The government does not

7    have to prove that all the crimes happened on those days.

8    But the government must prove that the crime happened

9    reasonably close to those days.

01:39:32 10        Consideration of testimony and evidence.

11        Next I will explain some of the rules that you must

12    use in considering some of the testimony and evidence.

13        Defendant's election not to testify or present

14    evidence.

01:39:47 15        A defendant has an absolute right not to testify or

16    present evidence.  The fact that he did not testify or

17    present any evidence cannot be considered by you in any way.

18    Do not even discuss it in your deliberations.

19        Remember that it is up to the government to prove the

01:40:09 20    defendant guilty of beyond a reasonable doubt.  It is not up

21    to the defendant to prove that he is innocent.

22        Witnesses testifying to both facts and opinions.

23        You have heard the testimony of Dr. Lorenzo Vidino,

24    Special Agent Steven Jane, and Amy Vaughan, who testified to

01:40:31 25    both facts and opinions.  Each of these types of testimony

1    should be given the proper weight.

2         As to the testimony on facts, consider the factors I

3    discussed earlier in these instructions for weighing the

4    credibility of witnesses.

01:40:49  5    As to the testimony on opinions, you do not have to

6    accept the opinions of Dr. Vidino or Special Agent Jane or

7    Ms. Amy Vaughan.

8         In deciding how much weight to give an opinion, you

9    should consider the witness's qualifications and how he or

01:41:06 10  she reached their conclusions, along with other factors

11   discussed in these instructions for weighing the credibility

12   of witnesses.

13        Remember that you alone decide how much of a witness's

14   testimony to believe and how much weight it deserves.

01:41:25 15  Testimony of law enforcement officials.

16        The testimony of a law enforcement official is

17   entitled to no special or exclusive sanctity.  An officer

18   who takes the witness stand subjects his or her testimony to

19   the same examination and the same tests that any other

01:41:46 20  witness does, and in the case of law enforcement officials,

21   you should not believe them merely because they are in law

22   enforcement.

23        You should recall their demeanor on the stand, their

24   manner of testifying, the substance of their testimony and

01:42:04 25  weigh and balance it just as carefully as you would the

1    testimony of any other witness.

2         People employed by the government, including law

3    enforcement officials, do not stand in any higher station in

4    the community than other persons, and their testimony is not

01:42:19  5    entitled to any greater weight.

6         Ladies and gentlemen, this conclusion my preliminary

7    instructions.  You will now hear the closing arguments of

8    counsel, and thereafter, I will give you a much briefer set

9    of instructions about your conduct during the course of

01:42:39 10    deliberations.

11         As I've indicated, you will now hear the closing

12    arguments of counsel.  The procedure for closing arguments

13    is as follows:

14         First, the government will present its closing

01:42:49 15    argument.  Once the government's closing argument, initial

16    closing argument is presented, we will take a break.

17         Second, counsel for the defendant will present his

18    closing argument.

19         Finally, the government will be given an opportunity

01:43:04 20    to present rebuttal arguments in response to the closing

21    argument of the defendant.

22         Like opening statements, closing arguments are not

23    evidence.  They are permitted for the sole purpose of aiding

24    you, the jury, in analyzing the evidence.

01:43:20 25         After the parties make their closing arguments, you'll

1   retire to the jury room and begin your deliberations.

2        At this time, counsel for the government, you may

3   proceed with your closing argument.

4        Ladies and gentlemen of the jury, for your

01:43:32 5   understanding, I've allocated for each side no more than one

6   hour for closing argument, or thereabouts.

7        The government may reserve as much time as it likes of

8   its hour.  And we will, again, take a break after the

9   government presents its initial portion of the closing

01:43:50 10   argument.

11        Counsel, you may proceed.

12        MR. SHEPHERD:  Thank you, Your Honor.

13        Good morning, ladies and gentlemen.

14        JURORS:  Good morning.

01:43:59 15        MR. SHEPHERD:  At its core, this case is about

16   the defendant's efforts to recruit a cell of ISIS supporters

17   to extend the Islamic State or ISIS to the United States, to

18   train them, to get land for them, commit attacks within the

19   United States.

01:44:15 20        And from the testimony and the evidence, you heard

21   from the defendant's own communications what his ultimate

22   role in this was.

23        Every team has a recruiter brother.  That was the

24   defendant.  The recruiter.  And the team he's talking about

01:44:34 25   is that cell of ISIS supporters in the United States.

1    And the evidence and the testimony showed you that he

2    met -- he attempted to perform this recruiting role online,

3    in person, and through the spread of propaganda, all on

4    behalf of the Islamic State.

01:44:56  5    Now, this morning, as I try to pull all this evidence

6    together for you, there's going to be three broad topics

7    that I deal with.

8    First, I'll talk briefly about the elements that the

9    Judge just explained to you.

01:45:08  10    Then most of my time will probably be spent on what

11    really seems to be the biggest issue in this case, identity.

12    Proving that the defendant was the person behind all of

13    these communications from the evidence you heard.

14    And then after we show how the evidence proves he was

01:45:24  15    that person, I'm going to talk to you about the conduct in

16    this case and how it fits into the charges.

17    So first, the first count, conspiracy.  Up on the

18    screen are the elements that the Judge just read with a few

19    summaries.  But the key is in that first part, the

01:45:41  20    agreement.

21    In this case, the evidence shows that the defendant

22    entered into an agreement.  As the judge explained, it

23    doesn't have to be a formal contract.  It doesn't have to be

24    something written down, or a formal handshake.  But from all

01:45:53  25    the facts and circumstances, you can determine that the

1    defendant was part of an agreement to commit these offenses.

2         And who did he conspire with?  Well, he conspired with

3    senior brothers of ISIS.  In the communications, he talks

4    about being touch with senior brothers.

5         He conspired with the other individuals that he refers

6    to in the communications who were part of this cell that he

7    says he already has.

8         So it's unnamed people.

9         And now the unnamed people he also conspired with.

10   You heard from Amir Al-Ghazi who in talking with him said he

11   agreed to send him the name of another person as a further,

12   future recruit.  That's conspiracy there, that sending of

13   the name for that purpose, an agreement for that plan,

14   that's part of the conspiracy.

15        His wife, Tyrinda Hendricks, who wrote the GPS for the

16   Ghuraba document, another coconspirator, who went with him

17   twice to meet in person with potential recruits.

18        First, Janet Miller in Baltimore in March, and then

19   Hamza Ansari in Baltimore in May.

20        And there's other individuals you can pick out from

21   the evidence.  Those are just a few of the examples to show

22   that he was conspiring, he was part of this agreement.

23        A couple other facts here, just to quickly point out.

24        So one of the elements has to do with showing that the

25   defendant knew that ISIL was a designated foreign terrorist

1     organization or was engaging in terrorist activity or

2     terrorism.

3          And from the evidence that should be apparent.  All

4     the talk of martydom, all the talk of, "Well, we'll go to

01:47:26 5     jail or be -- go to our graves."  Those communications.  The

6     clandestine nature of how he communicated, showing that how

7     he knows that in the support for ISIS, there's something

8     illegal about it.

9          The involvement with sending somebody to the Garland

01:47:43 10    attack and then afterwards training to take credit for it

11    the.  Manuals that suggest or provides to people that

12    include evidence or include advice on how to build bombs,

13    advice on what to do if law enforcement comes.

14         What this shows is that the defendant knows that ISIS

01:47:58 15    is about violence and terrorism and it meets that element.

16         And then finally, there's really no dispute about this

17    taking place in the United States.  All the testimony you

18    heard, the defendant's actions were in the United States.

19    Also he lives in the United States.  So there's really no

01:48:15 20    dispute about that last part.

21         And then Count 2, the attempt.  Again, the key here is

22    attempt.  And when we are talking attempt, as the judge

23    explained, it's about intent plus those substantial steps.

24         And here the indictment, as you heard, charges that he

01:48:30 25    attempted to recruit members for ISIS such as the undercover

1    officer, Steven Jane, and Amir Al-Ghazi.  All those

2    communications with him, those specific communications

3    asking for specific things are taking this kind of case,

4    this recruitment, into the element of substantial steps

01:48:46  5    towards accomplishing his goal, as opposed to just idle

6    chatter in a bar or idle chatter online.  He starts asking

7    for specific things, for them to do specific things.

8         And for Officer Jane, or Agent Jane, the most specific

9    is he directs him to actually travel to Garland, Texas.

01:49:07  10   That's a very specific substantial step.

11        Those are just a few follow-ups on the elements.  Now

12   let's get into what's probably most important for you to

13   decide.  The identity of the defendant as the person who's

14   behind all of this.

01:49:19  15   So during the course of this trial, you heard evidence

16   about all sorts of online communication accounts and names.

17   On Twitter, sham_reason, abucommander, sahabahtimesnow,

18   UmmahOneLove, on Wickr names such as hereafter,

19   hidingmyrights, accepted, and so forth.

01:49:40  20   On Surespot, names such as WillayaTX and lovethehaqq.

21   And terwatch.

22        So we went through all of these different names.  And

23   what they all have in common is that it was the defendant

24   who was using them.

01:49:56  25   So here is what we're going to talk about, how the

1    evidence overwhelmingly shows that.

2         We're going to start with the most important piece.

3    The in-person meeting on May 2, 2015.

4         We're going to talk about how these accounts are

5    common among these different users and witnesses you heard

6    from and how they transitioned.

7         We will talk about the IP address analysis, the common

8    phrases that show it's the same person communicating.  Then

9    some specific facts that really corroborate everything else,

10   like how he set his own step-daughter up with one of the

11   informants in this case.

12        This charlesmaydot.com Email, which I'll come back to

13   in a little bit to explain its important, that he traveled

14   to look for off-the-grid land, and that he had spotted

15   surveillance in May of 2015.

16        So on May 1, 2015, accepted is texting Hamza

17   Al-Ansari.  The purpose of that communicating on Wickr,

18   accepted is the account.  The purpose of those

19   communications is to set up a meeting the next day in

20   Baltimore.

21        And you can see from what's highlighted here, there's

22   communications about going to Baltimore.

23        And about coming tomorrow.

24        And, further, there's further details through some of

25   these communications about specific times coming from

1    accepted, and even locations, like about doing breakfast in

2    the morning.  Then there's talk about a restaurant that

3    follows.

4        And ultimately what happens?

5        On May 2, 2015, the defendant shows up for the meeting

6    that's set up through this accepted account on Wickr with

7    Ansari.

8        The next day who comes to the meeting?  The defendant.

9    And you know that because there's photographic evidence.

10   Mr. Ansari identified him in Court.  You have a photo of

11   him, a couple close-ups.  That's the defendant.

12       So that should be your baseline in determining

13   identity for all of this, is we know the defendant met with

14   Hamza Al-Ansari on May 2, 2015.

15       You also know that meeting was set up by the accepted

16   Wickr account, so thus, you know that the defendant was

17   using accepted.

18       And you corroborate that because the license plate of

19   the vehicle that he drove came back to Tyrinda Hendricks,

20   who also, you heard from the testimony, that his wife was

21   present.  Well, the vehicle does come -- indeed, comes back

22   to Tyrinda Hendricks.

23       Confirmed, again, less than a month later when the

24   defendant and his wife Tyrinda are stopped in Georgia in the

25   same vehicle with the same plates and they're in the car.

1663

1        So you know the defendant was there on May 2.

2        You also know that when he was there talking in

3   Baltimore, that that same day accepted is telling Steven

4   Jane, the undercover agent, that he's in Baltimore meeting

01:53:03 5   with their friend from Pennsylvania, which was a reference

6   to Ansari.

7        So what does that tell you?  That tells you not just

8   that accepted is talking to Ansari.  That tells you that

9   accepted is talking to Jane.  And accepted is Erick

01:53:21 10  Hendricks.

11       So through this series of events, you know that Erick

12  Hendricks is accepted.

13       And once you know that Erick Hendricks is accepted,

14  and you know that Erick Hendricks is the person at that

01:53:34 15  meeting, all the other accounts you could follow forward or

16  follow backwards, and they must be the same person.

17       So you know that's a big fact for showing that Erick

18  Hendricks is the person who is on all of these accounts.

19       And some further communications here showing how they

01:53:56 20  referred -- accepted referred to the undercover to the

21  person in Pennsylvania.

22       So then moving on from that, there's all these

23  accounts in common with these individuals.  So you heard

24  testimony from Special Agent Jane, Hamza Ansari, Amir

01:54:13 25  Al-Ghazi, Amanda Amaro, and Matthew Palmer who had all

1    communicated with accounts at issue in this case.  And they

2    all talked about -- and you saw screen shots from the same

3    accounts.

4         There's this reference to this user name Abu Harb,

01:54:32  5    Amir Al-Ghazi, Steven Jane, Matthew Palmer who received the

6    communication saying "I'm Abu Harb."

7         That @sham_reason account.  Same thing.  Amir

8    Al-Ghazi, Steven Jane.  They found the account through this

9    sham_reason Twitter account.

01:54:46  10        Matthew Palmer also received a message saying that the

11    person he was talking to used that account.

12        Abucommander.  Steven Jane used that to set up some of

13    the communications.  Hamza Ansari was told the person he was

14    talking to was abucommander.  Hereafter was used by Jane and

01:55:06  15    Palmer.  Nowhaq by Jane, Ansari and Palmer.  Hidingmyrights,

16    by Jane and Ansari.  Accepted, by Jane and Ansari.

17    Itsmehere, by Ansari.  And according to her testimony,

18    Amanda Amaro, I'm going to come back to that.  So remember

19    that.

01:55:24  20        And then dontcatch17, the last account we had, on

21    Wickr, used to communicate with both Steven Jane and Hamza

22    Al-Ansari.

23        An example of how this worked was with the

24    abucommander Twitter account that took it even a little bit

01:55:41  25    further.  So Steven Jane, this is one of the accounts that

1   he had communicated with directly on Twitter, this helped

2   further user names for other communications.  And

3   abucommander, as I said, had identified himself as being in

4   communication with Hamza Al-Ansari.

01:55:57  5   Well, the photo on the left is that photo that was

6   sent to the Nowhaq Wickr account.  That photo of a guy in

7   the Middle East, it appears.  Looks like some kind of

8   stocked photo.

9   Well, so that photo is sent on Wickr to the

01:56:12 10   undercover, and it's the same photo that's being used that's

11   the profile shot for the abucommander.

12   What are the odds that two different people pull out

13   same stocked photo of and -- of all the photos of guys in

14   the Middle Eastern garb in the world, they pull out the same

01:56:27 15   one?  It's the type of coincidence in this case that isn't a

16   coincidence, it's corroboration, and this case is full of

17   them as we're going to see moving forward.

18   And then the transition.  How did they change from

19   account to account?

01:56:42 20   You heard this happen in a couple different ways.  A

21   lot of times it happened with the user saying a new account

22   is coming.  Minutes later, there would be a new account,

23   sending a new communication to the undercover, or whoever it

24   was, and the conversation would continue.

01:56:58 25   There's also these user names typically, you heard

1    especially from the undercover agent, they're limited in who

2    has access to them.

3         These communications on encrypted applications like

4    Wickr and Surespot, they're being sort of held and only

01:57:18  5    provided to certain people.  That's the nature of how this

6    is working frequently.

7         So part of the transitions and part of how you know

8    this is the same set of communications with the same person

9    is that these just aren't names that -- or user names that

01:57:32 10   could be pulled out of thin air.

11        You also knows that the continuity of the

12   conversations is occurring.

13        So conversations starts on, for example, when there's

14   an initial change between early on for the undercover, they

01:57:46 15   were talking about off the grid and what that meant.  There

16   was a change in user name from I believe lovethehaqq to

17   cantdeny is what I think it was.

18        And in doing that, they pick up the conversation about

19   off the grid on the new account.

01:58:02 20        Well, you heard testimony that these aren't the types

21   of accounts where, if you were hacking into someone's

22   account or using someone else's account on a different

23   device, where you would have the previous conversation.

24        So the only way that you can continue a conversation

01:58:18 25   is if you were a part of it.

1     And then later, they used a code word system.  The

2  undercover agent testified that they used this number 17 to

3  verify it was the same person.  And later on used the image

4  of the crossbow from the -- one of the lectures he had been

5  referred to.  And that shows that's the same person.

6     So as you look at these transitions, it's clear it's a

7  solid set of communications with the same person.

8     Then there's some technical stuff that sort of

9  corroborates this.

10     So the IP address analysis.  The clearest is with the

11  sham_reason account.  In early 2014, that account was logged

12  into from physical locations associated with both of the

13  defendant's Islamic wives, from Andrea Hansen's apartment

14  and a hotel where Tyrinda Hendricks was staying as a guest.

15     The two different Islamic wives.  What's the common

16  denominator?  It's Erick Hendricks.  So what's the

17  reasonable inference on who is logging in when you have

18  log-ins from these two locations and there's one person who

19  is commonly affiliated with both?  It's that Erick Hendricks

20  is the person doing that logging in.

21     And that's important because that's the account that

22  first contacted Amir Al-Ghazi.  It's also the account that

23  Steven Jane first used to get in touch with him.

24     And then later, to show the continuity of this, at the

25  end, after the Garland attacks, when Agent Jane needed to

1   get back in touch with this person, what did he do?  He

2   direct messaged sham_reason with his new Wickr account to

3   tell him how to contact him.

4        And then what happened?  The person contacted him.

5        So that's very important corroboration in this IP

6   address analysis.

7        Similarly, there were log-ins at locations for

8   abucommander and sahabahtimesnow affiliated with Andrea

9   Hansen and the defendant's mother, Linda Woods.

10        Now, we also had testimony about this chart.  And I'm

11   not going to try to re-explain all of this other than to

12   make this point:

13        This shows from all these different accounts that are

14   affiliated with each other and with Erick Hendricks, what it

15   shows is that they're all connected.  You can't -- this

16   isn't the type of set of connections that just appear

17   randomly out of thin air.  They're all connected.  And they

18   all support the conclusion that it was the defendant using

19   all of these accounts and the defendant who was behind them.

20        Something else that was consistent with the

21   defendant's behavior that you heard about from Amy Vaughan.

22        So throughout the text messages and the other

23   communications, there were -- there was advice given by the

24   person communicating to use TOR as a means to hide your

25   identity, and you heard what TOR was.

1        What's important, it's a way to hide where your IP

2   address comes back to, to prevent that type of analysis that

3   we were able to do with that sham_reason account.

4        And so what you heard also was that all of these

5   Twitter accounts were regularly using TOR.  And so it's very

6   consistent with what the content of the communications was.

7        It's also important, this analysis done that out of a

8   thousands of exit nodes that TOR uses that you have all

9   these pairs of log-ons within minutes of each other of these

10  Twitter accounts.

11       And what that tells is you that it suggests that the

12  same person is doing those log-ins, and that these accounts

13  are all connected.

14       So the sum of all of the IP address analysis is it

15  corroborates that it was one person using all of these

16  accounts, and it corroborates it was the defendant was that

17  person.

18       Then let's talk about language.  In your common

19  experience, you know people talk a certain way.  When you're

20  communicating with someone, you might recognize the voice,

21  but you also recognize how they talk.

22       It could just be people like certain phrases.  It

23  could be where they're from, all sorts of reasons.

24       And what you see throughout this case are the same

25  phrases, the same words, being used over and over again.

1      And what we're going to go through is just a sample of

2  some of these.

3      So there's this saying, "Tie our camels," which you

4  heard about.  Yes, it's just some kind of Arabic proverb or

02:02:47  5  saying, but it's used all the time by the person

6  communicating.

7      So Special Agent Jane is told, "We must tie our

8  camels."

9      Al-Ansari is told, "Tie your camel.  Tie your camel.

02:03:02  10  Trust in Allah."

11      Matthew Palmer is told, "I'm all about tying the

12  camel."

13      And even beyond that, even Amanda Amaro recalled in

14  her communications with the other person about The New Era

02:03:16  15  document, that the person who had told her to post it had

16  made a reference to "Tying our camels."

17      And that's in Exhibit 49, if you take a look, that you

18  can find that.

19      The brain to operate limbs.

02:03:28  20      There's this analogy about the brain and the limbs and

21  the body.

22      Well, it was most clearly in most detail used with the

23  undercover, Special Agent Jane, about each body having a

24  brain in order to operate the limbs.

02:03:42  25      And then at the meeting on May 2 that you know was

1    Erick Hendricks with Mr. Ansari, "We have to be the brain so
2    we have to get somebody to do the job."
3          On Wickr, with Matthew Palmer, again, "Like every
4    body, the body has to have a brain before it can function.
5    Bro and sis here need to develop the brain before the limbs
6    can make move.  You dig."
7          Consistent phrasing.
8          Breaking up the -- the advice to break up Islamic
9    words.
10         He tells Special Agent Jane not to use Islamic terms
11   and don't use any Islamic terms without breaking up.
12         Mr. Ansari, "Try not to use Islamic words, even
13   breaking up Islamic without breaking them up.  This is to
14   trick the trolls," and giving an example.
15         The Matthew Palmer, "Brother, don't use Islamic terms
16   without splitting them."
17         Also consistent request what Mr. Al-Ghazi testified to
18   and what was in his communications on Twitter about being
19   told when he set up a Chat Secure account, "Don't use
20   Islamic terms," that's why he called himself Bobby Mack
21   instead of an Islamic term.  Very consistent.
22         Rules about when communicating with other brothers.
23   And this one is even more interesting, because what you have
24   is on April 8, 2015, the defendant, and at the end of this,
25   you should all agree it's the defendant, based on this

1    evidence, can't -- using cantdeny tells Special Agent Jane

2    to observe these rules when communicating with someone.

3    This is on April 8.

4        He then goes through and starts asking, "What's your

5    user name on Wickr?"  And you may recall he first spelled it

6    wrong, Al for An without a Q, and then he later said it's al

7    Furqaan with a Q.

8        Well, at the same day, at the same time, Wickr

9    hereafter is telling Matthew Palmer the exact same advice as

10   he's telling him to communicate with this other person to

11   vet him out.

12       And when he goes through that chain of events, he

13   gives him the undercover's new user name, the al Furqaan.

14       So as you see, first Special Agent Jane, about

15   "Observe these rules, brother."  And then the same advice is

16   given to Mr. Palmer about no personal details.

17       Even the same things are capitalized.

18       The obvious conclusion from that is that's the same

19   person talking to both people.

20       All this advice about "Get off the grid," to Special

21   Agent Jane, "Plan your life to get off the grid."

22       To Mr. Ansari at their meeting, "My advice for you to

23   to get off the grid."

24       To Mr. Palmer, "My advice to" -- I believe that's

25   brothers.  It was just a misspelling where it says

1  brothers."

2       "Unplug yourself from the grid.  That makes your moves

3  predictable."

4       Advice about counter-surveillance.  Special Agent Jane

02:06:50  5  on April 8 encouraging the counter-surveillance and

6  misinformation, all going through this, you know, in-depth

7  advice about how to set up a fake, I guess, a storage

8  facility.  And you may recall, "Do something suspicious and

9  set up a camera so you'll see then if the police come."

02:07:10  10       Well, similar advice to Mr. Ansari.

11  Counter-surveillance issues, saying, "Go in circles, circle

12  rounds and rounds, constantly watching my mirror."

13       To Matthew Palmer on Wickr, gives an example about

14  "Setting traps for them by pretending something they want to

02:07:28  15  know about is there," again, the same kind of advice, even

16  using some of the same language.

17       "We have land and we are building."  Tells Special

18  Agent Jane, "We have land and are building.  We are in need

19  of money and referrals."

02:07:42  20       In his meeting with Mr. Ansari, "We have weapons, we

21  have a little weapon," and then at the bottom, "We got a

22  little land."

23       On Surespot to Mr. Palmer, "We got land, house,

24  intentions."

02:07:57  25       Also, when Ms. Miller, Janet Miller met in person with

1    the defendant in March in Baltimore, that first meeting, she

2    also testified she was told that he had land.

3        Mr. Al-Ghazi, when he testified, explained that he was

4    told that there were brothers with land in Texas.

02:08:18  5    So now we're going to talk about the use of the phrase

6    "100 percent.  Brother, 100 percent."

7        Telling Special Agent Jane, "If brothers are not 100

8    percent, then they are up the wrong street."

9        Telling Mr. Ansari, "Brother, I know you look 100, but

02:08:38 10   I must ask you a few questions."

11       Telling Matthew Palmer, "Curiosity matter, or are you

12   100 percent."

13       And then there's another one that was used twice that

14   is another example of this sort of odd phrases or odd

02:08:55 15   language to use to describe someone.  During his meeting

16   with Mr. Ansari in person, he talks about having experience

17   with the big boys.  He says, "I call them the initial boys,

18   the FBI, the FBI."

19       In your own sort of common experience, just think

02:09:11 20   about that kind of phrase, calling the FBI the initial boys.

21       And then that's used again in his communication

22   between user name itsme17 on Wickr after the Garland attack,

23   another reference to the initial boys reopening old cases.

24       Explanation that war is deception.  In the meeting

02:09:32 25   with Mr. Ansari when they're talking about misinformation,

 1    explains that "It's Halah, because the prophet said war is

 2    deception."

 3         He goes further and explains, "When we're

 4    face-to-face, we don't lie to each other at all because

 5    we're in this not to trick each other but to be brothers."

 6    Same type of languages, very similar used with Special Agent

 7    Jane previously, saying, "War is deception and all comes

 8    contain information, but never face-to-face."

 9         So you look at all of this language.

10         Once might be just be a coincidence.  Twice must just

11    seem a little odd.  But all of these examples, the logical

12    conclusion is it's the same person talking.

13         And in addition to that meeting, which clearly pointed

14    to Erick Hendricks, a few other facts that clearly point to

15    Erick Hendricks, after that meeting when he continues to

16    communicate with Hamza Al-Ansari, he tries to set him up

17    with his own step-daughter.  And we know that.  That's a

18    fact that goes directly to Erick Hendricks.

19         He sends this photo which you heard testimony was his

20    step-daughter.

21         He says, "It's my daughter."

22         Sends another photo.  Gives her age, which is correct.

23         Gives her Email, which is correct.

24         And you heard the testimony from Jasmine Bevany that

25    this communication, this set-up, was arranged by her

1  stepfather, Erick Hendricks.

2       And as part of that, he made it clear, "Never leave

3  the path of jihad no matter how many children you have."

4       Then there's this charlesmaydot Email which is

02:11:15  5  related, but another fact that points directly to the

6  defendant.

7       It's an Email that on its face has nothing to do with

8  the defendant.  Charles May, Erick Hendricks, who knows

9  what -- where the name came from, but what we do know is he

02:11:27  10  sent that Email to Hamza Al-Ansari.  And then we know that

11  later when he gets pulled over, he's got a notebook in his

12  car with that same Email written down.  That's a connection

13  to Erick Hendricks.

14       There's no other explanation for why Erick Hendricks

02:11:45  15  would have that Email in his possession if he wasn't the one

16  who sent it, the one who was using it.

17       Then we have this travel to visit land in the

18  southwest.  This is relevant because early on in the

19  communications with Special Agent Jane, he had

02:12:03  20  posted -- Jane had posted on Twitter a picture of a tent in

21  the desert or something and there was criticism back and

22  both about, "Why did you post that.  They can find your

23  location."

24       Then when the communication shifted to Surespot, they

02:12:18  25  started to talk about -- he started to get quizzed about

1    where that was.

2            And ultimately he's told, "I like that desert."  And

3    the person says, "I was just through that way not long ago."

4            Further discussion about where it was.  "Brother, I

5    believe that is either Arizona or New Mexico.  Truly

6    Arizona, I think."

7            And then, "Anyway, I seen it because I was looking for

8    off-the-grid locations."

9            What we know is that Erick Hendricks, at the end of

10   2014, shortly before these communications would have

11   occurred, was traveling out that way getting directions to

12   visit off-the-grid locations to buy in New Mexico.  We saw

13   pictures and you heard that testimony.

14           Again, a fact that points to the defendant as being

15   the user of all of these accounts.

16           And then the fact that he spotted surveillance.

17           So Steve Conley testified that he received text

18   messages and a call from Erick Hendricks in which he

19   complained he had spotted surveillance.

20           We also know that the user of these accounts, the

21   itsme17 account after Garland also complained about

22   surveillance being spotted.  Saying I'm -- "More money is

23   needed.  Our person is under surveil."

24           So, again, that's a fact that fits with the real

25   life -- the in-person Erick Hendricks spotting surveillance

1       is the same person complaining about it online.

2              All of those factors, all of that evidence, the

3       logical conclusion is that Erick Hendricks was the user of

4       those accounts, was the same person, and it was Erick

02:13:53 5      Hendricks.

6              Now, let's talk about some of the conduct and why it's

7       important.

8              The land -- efforts to purchase land in New Mexico and

9       California.

02:14:01 10             You heard testimony that Erick Hendricks reached out

11      to two different landowners to buy land in New Mexico, in

12      the middle of nowhere, and land in California in the middle

13      of nowhere.

14             That fits with all of the other testimony about having

02:14:17 15     land for military training, land to set up a compound to

16      train people.

17             And most importantly about the New Mexico land, what

18      did he ask the landowner?  "Can you shoot guns there at

19      night?"

02:14:29 20             Why would that be important?  If you're going to

21      conduct military training for possible nighttime operations,

22      that's what you may want to be able to do, shoot guns at

23      night.

24             So as we move in order in time to early 2015.

02:14:42 25             2015, March 19, we have the testimony from Janet

1    Miller about the meeting she had.

2          Again, identifies Erick Hendricks as the person at

3    that meeting along with his wife, Tyrinda, who was there.

4    Expresses support for the Islamic State.  These are some of

02:14:58 5    the things he said.

6          Talked about recruiting, finding like-minded people.

7          Talked about training with guns, about getting land

8    for training, was really interested in any overseas contacts

9    you would have.  It scared Miller so much she contacted the

02:15:13 10    FBI.

11          And as you'll recall, the testimony at that time was

12    that she was not working as an informant at that time.  This

13    was before she was getting paid by anybody, before she had

14    signed up as an informant.  She immediately contacted the

02:15:26 15    FBI because she was so frightened by the things that she had

16    heard from the defendant, all of which is consistent with

17    all of the other communications in this case.

18          And then you have Mr. Al-Ghazi and his communication

19    with Mr. Hendricks, again, consistent.

02:15:43 20          They start on Twitter, transition to a more secure.

21    Stated he was a recruiter.  He would be willing to -- asked

22    if he would travel to Texas for his military training, if he

23    was willing to wage jihad on Kuffar was the testimony, asked

24    for information on other brothers, and Al-Ghazi then

02:16:01 25    provided the name of another brother.

1       Al-Ghazi also testified he was a little scared by this

2  guy because he thought he was the real deal.

3       And even though Mr. Al-Ghazi was clear what they said

4  he was -- when the other person said he was a recruiter, he

02:16:14 5  didn't say it was for ISIS, that he was pretty clear on who

6  he was, who he would be recruited for.  He was the

7  equivalent on Twitter of a big neon sign that says, "I

8  support ISIS."

9       And then you have the communication, "I'm sort of

02:16:29 10  looking for you," was their communication.  So what do you

11  think he was being recruited for?

12       Then we had further communications on social media

13  with the undercover, Steven Jane, starting on March 24.

14       April 1 with Matthew Palmer.  April 8, Steven Jane was

02:16:47 15  able to renew contacts.  And then in mid-April, Hamza

16  Al-Ansari, and also in April, Amanda Amaro, all going

17  through sort of the middle part of May, 2015.

18       So what are the things they were talking about that

19  are important here?  Well, first, there is this same pattern

02:17:03 20  of contact where they start on Twitter, less secure, and

21  move to more secure, which is entirely consistent with the

22  way you would operate if you're trying to do something

23  clandestine or illegal.

24       There's this vetting of new recruits.  Are they

02:17:19 25  working for law enforcement?  Are they appropriate for this

1    type of a cell?

2         Using those recruits to vet others.

3         Sharing information about supervise, telling the

4    people he's talking to, "Hey, that person is a fed.  Don't

02:17:31  5    talk to them.  That person is a spy."

6         Giving detailed instructions on counter-surveillance.

7         Discussing weapons.

8         Discussing martyrdom.

9         Discussing this goal of creating a team or a cell in

02:17:42  10   the United States.

11        And how does this all relate to ISIS?  What are these

12   connections?

13        Well, first, you heard expert testimony from Dr.

14   Vidino that the ideology expressed in these communications,

02:17:54  15   the methodology, is consistent with ISIS.  And how ISIS

16   operates, that in this world of ISIS, where it's a more

17   bottom-down organization, how people join, not a, you know,

18   formal application process within Syria, necessarily, that

19   this type of online recruitment is entirely consistent with

02:18:17  20   how ISIS operates.

21        In the communications, he says he's in communication

22   with and getting guidance from senior brothers.

23        Who would that be?  Well, in the overall context, the

24   inference is senior brothers in ISIS.

02:18:32  25        He explains the goal is to act in the United States.

1    Not to make hijrah, the term used for going to Syria, is to

2    stay here in the United States.  Sometimes it's directly

3    that the guidance is to stay here.  Other times it's through

4    use of analogy to try to talk around the topic.  But the

5    message, if you read these communications, it's clear that

6    it's to happen in the United States.  Not for travel

7    overseas.

8         He also used, and the most clear example of saying

9    this, is for the Islamic State, this reference to the brain

10   and the body and the limbs.  And when explicitly asked, "Who

11   is the ultimate brain?"  The answer was the khilafa, which

12   is ISIS, and when asked further, "Who are we doing this on

13   behalf of?  Who are we working for?  The ultimate brain?"

14   The answer was, "Yes, the ultimate brain."

15        And the purpose is to create these provinces, like, he

16   says like a headquarters and outpost analogy.  You bring the

17   Islamic State to the United States through this cell

18   creating an outpost of the Islamic State.  That's what's

19   explained.

20        And further, at the end of the evidence in this case

21   chronologically, when that New Era document is posted, it's

22   done with explicit references to ISIS.

23        He uses the ISIS flag in the second version, reference

24   to the Islamic State in America, a reference to the ISIS

25   leader in it, and then in posting it, asked Amanda Amaro to

1    run it by Sally Jones who you heard is from the expert

2    testimony, is or was a member of ISIS in Syria.

3         These are solid connections for what the defendant was

4    attempting to do in this case.

5         Part of what he did with propaganda spread on their

6    behalf and instructions, one of the more important documents

7    you heard was this GPS for the Ghuraba.

8         So what do we know about it?  Came in April of 2015.

9    He pushed it on Steven Jane, pushed it on Hamza Al-Ansari,

10   wanted it further distributed online.

11        We also know it was written by Erick Hendricks.

12        If we take a look at what the purpose was, had all

13   this advice on counter-surveillance, ways to support the

14   mujahideen, and also had advice on what to do if the police

15   come for you, boobie trap your house and have your AK.

16        And how do we know he wrote it?  Well, in the

17   recording of the meeting between him and Hamza Al-Ansari, he

18   says, "I gave you my writing.  Actually me and my wife wrote

19   that."  And then later follow-up explaining the title, GPS

20   of the Ghuraba.

21        So you know Erick Hendricks wrote it.

22        It's also consistent with his other communications.

23   In the document it talks about how the advice is, "We

24   suggest that all brothers keep the groups of 7 to 12 with

25   one Amir."  What he told Steven Jane about the team that

1    should be created, "A solid team is between 7 to 12."  Very

2    consistent with what he's advising.

3         Then we have the meeting with the CHS on May 2.

4    Consider that meeting.  Consider how they get there.  First,

02:21:50 5    he sends him to a park and ride.  Then he direct him to a

6    Burger King.  He meets him in the bathroom.  And you heard

7    this on tape, tells him to take the battery out of his cell

8    phone, gives him a two-way radio, and then he uses that to

9    communicate to direct him to a third location, this office

02:22:08 10   park, with no one around where they can see all around them

11   to actually have their meeting.

12        Who does that?  Why would you do that?  If this isn't

13   part of an effort to do something illegal, to do something

14   that you don't want law enforcement to know about, you don't

02:22:24 15   take those steps.

16        And what was the topic?  Was that all about creating

17   the cell.

18        What do they discuss?  They discuss weapons.  They

19   discuss land.  They discuss raids.  Future attacks on

02:22:39 20   military and recruiting stations.

21        They discussed the Prophet Mohammad cartoon contest

22   coming up in Garland, Texas, the following day and Pamela

23   Geller, military training, getting land for some kind of

24   compound.

02:22:53 25        He admits to writing the GPS document and refers him

1    to a bunch of other resources.

2         Now, the recording, you heard testimony, isn't that

3    great.  And there are parts where it's not.  But within

4    there, within that recording are nuggets that corroborate

02:23:09  5    this, and you heard several of those.  About the GPS for the

6    Ghuraba, about having weapons and land, about the Garland

7    cartoon contest.

8         And think of the resources he referred him to.

9    Resources that are consistent with what was done with

02:23:27  10    others.

11         An-Awlaki.  You heard expert testimony about

12    Al-Awlaki.  Why is that person?  Because it places the

13    ideology in the right location that this is ideology that is

14    consistent with what ISIS and the Islamic State.

02:23:42  15         You heard him described by Dr. Vidino as essentially a

16    kind of rock star for people who believe in violent jihad

17    and how important he was.

18         And he told Special Agent Jane, referred him to this

19    kalamullah website to find Awlaki lectures and talked about

02:24:01  20    the 12 lectures in the series.

21         Gave the same advise to Al-Ansari both in person and

22    asked him again about the 12 lectures.

23         And here at the meeting he talked about going to a

24    lecture by Sheikh Awlaki, and specifically the same 12

02:24:18  25    lectures.

1       And there's the How to Survive in the West manual, a

2   manual that got referenced in the earlier communications

3   with Steven Jane, with the other people he was communicating

4   with, and then in person.  This is the manual he's pushing

02:24:34  5   on people for guidance.

6       And what's in it?  Take a look.  Hiding the extremist

7   identity, Internet privacy, modern weapons and bomb-making,

8   guidance on creating a sleeper cell, about weapons, similar

9   to what he had told others, an AK-47 is preferred, various

02:25:04 10   examples of bomb-making, pressure cookers, gas canisters,

11   mail bombs, highly flammable materials, and mobile phone

12   detonators.

13       Advice on why not to use certain mobile phones, the

14   iPhone being a spy phone.  Exactly consistent with what he

02:25:27 15   tells Mr. Al-Ansari in their meeting about taking batteries

16   out, and why he doesn't like the iPhone.

17       And then we move up to the terrorist attack in

18   Garland, Texas.  May 3, two individuals attack this cartoon

19   contest, Elton Simpson and Nadir Soofi.  ISIS claims

02:25:48 20   responsibility afterwards.

21       What do we know?  Beforehand, we know through Twitter

22   and then on Surespot and also through the explanation with

23   Steven Jane that he was in contact with him, that the

24   defendant was in contact with Elton Simpson.

02:26:01 25       He's also talking to Agent Jane.  He said he was in

1    contact with senior brothers in ISIS.  The defendant puts

2    Steven Jane in contact with Elton Simpson, asked him to vet

3    him, essentially to determine, "Is he a good recruit?"

4    That's sort of the purpose of that.

5         And then on May 2, he starts telling Agent Jane to go

6    to Garland to harass them during the night, to do a good

7    solid protest, a unique one-man protest.

8         And from the context -- you can read the context of

9    these communications -- all the other evidence, and know

10   he's not talking about carrying a sign.  And he says, "Go

11   find your brother Juda," a reference to Elton Simpson who

12   also went by juba.  So there's a little misspelling here.

13        And then once he is there, once the undercover is at

14   the event, what's he asking him?  All these questions about

15   how big this gathering is, are there snipers, do you see

16   feds there, is there media there, all these questions about

17   information about the event.

18        And then the event itself happens.  And as you heard,

19   Special Agent Jane drives by.  And as he drives by the

20   circled intersection, the attack happens.

21        Then what does Hendricks do after the attack?

22        He tells Agent Jane, "I thought you were dead."  Why

23   would he do that if he didn't think Agent Jane had taken

24   part in that attack?  And why would he think that?  Because

25   he sent him there to do more than just protest.  That's the

1    only reason he would think he was dead.

2        And then he says, "You've been saved for some future

3    plan by Allah."

4        He discusses safe houses, changing social media

02:27:40  5    accounts, tells Al-Ansari to remove stuff from his Twitter,

6    and links him to the New Era document.

7        So The New Era document.  A couple important things

8    here.  The first draft refers to attack any target, a new

9    Muslim of two years, another of 11 years.

02:27:59 10        Agent Jane testified that his role was he had been a

11    Muslim for two years.  In the communications with Elton

12    Simpson, it was disclosed he was a Muslim of 11 years.

13        Appears to be a reference to Elton Simpson and Steven

14    Jane.  Would be consistent.

02:28:16 15        Volume 2.  There's no longer reference to the two

16    brothers in version two.

17        And how do we know that Hendricks authored that

18    document?  You heard the testimony from Amanda Amaro that he

19    was first contacted on UmmahOneLove, which was consistent

02:28:35 20    with that TOR correlation, was also how he had first

21    contacted the account that first contacted Elton Simpson and

22    led up to the undercover being put in touch with Elton

23    Simpson.

24        Then she says the actual document was sent to her on

02:28:52 25    Surespot, itsmehere.  That's the same account that Hamza

1    Al-Ansari testified he was contacted on after he met with

2    Erick Hendricks in Baltimore.

3         How does Amanda Amaro pick out of thin air the

4    itsmehere account?  There's no explanation other than it was

5    the same person who is communicating with her and that when

6    she is saying it's itsmehere, that's corroborated by the

7    fact that that same account is used with Mr. Ansari after

8    the meeting with Erick Hendricks.

9         The author is listed as the same as the GPS for the

10   Ghuraba document.  A little fact, but still consistent.

11        And the changes in the deceased terrorists, that

12   points again to Erick Hendricks because he's the one who

13   knew Steven Jane was there.  He's the one who sent him

14   there.  He's the only one who would know to make that

15   change.

16        Ands what happens after that as we move into May?

17        Well, we know Hendricks spots surveillance.  We know

18   he ceases communication with Steven Jane and Hamza

19   Al-Ansari.  And then he uses this final account to talk to

20   both of them.  Dontcatch17.

21        He is taunting them.  He spotted surveillance.  He is

22   communicating one last time with both of these people and

23   he's taunting them about dontcatch17.  You won't catch me.

24        Ladies and gentlemen, based on the evidence in this

25   case, the evidence caught Mr. Hendricks.  The evidence shows

1    that he is guilty of conspiracy to provide material support

2    to ISIS and attempting to provide material support to ISIS.

3    Dontcatch17 didn't get away.

4         We ask you to return the verdict the evidence directs:

5    Guilty on both counts.

6         Thank you.

7              THE COURT:  All right.  Thank you, Counsel.

8         Ladies and gentlemen, we're going to take our morning

9    recess.  We'll reconvene at 11:00.  We're going to hear

10   closing argument at that point of counsel for the defendant.

11   We'll hear the rebuttal from the government.  I'll give you

12   some final instructions.  And then you'll begin with lunch

13   before we start the deliberations.

14        So we'll take 20 minutes.  We'll be back -- we want to

15   be back promptly at 11:00.

16        So we'll see you at that time.

17        Thank you very much, ladies and gentlemen.

18        (Jury out, 10:40 a.m.)

19        (Outside the presence of the jury:)

20             THE COURT:  Counsel, are we ready to proceed?

21             MR. DOUGHTEN:  Yes, Your Honor.

22             MR. SHEPHERD:  Yes, Your Honor.

23             THE COURT:  All right.  Let have our jurors,

24   please.

25        (Jury in, 11:00 a.m.)

1          THE COURT:  Counsel for the defendant, you may

2     present your closing argument.

3          MR. HARTMAN:  Thank you, Your Honor.

4      Good morning, ladies and gentlemen.

02:53:01  5          JURORS:  Good morning.

6          THE COURT:  I don't have a PowerPoint

7     presentation for you.  I'm doing this the old-fashioned way.

8     So I'm going to go back and refer to my notes a little bit.

9     I'm going to walk back and forth a little bit.  I hope that

02:53:14 10    doesn't distract you.

11         I want to thank you before we get started for your

12    attentiveness as does my cocounsel and my client.  You have

13    paid very close attention and we thank you for that.  As I'm

14    sure the government does as well.

02:53:28 15        I can't imagine that it's easy to serve on a jury like

16    this one.  And as a defense lawyer, I have this nagging fear

17    that you'll be back there and you'll be deliberating and

18    realize, "Well, this is a case about terrorism.  Terrorism

19    is scary.  We got to give the government the benefit of the

02:53:58 20    doubt, because this is scary to all of us."

21         But you can't do that.  You've got to follow the

22    instructions that Judge Adams gave you.  And you've got to

23    follow them to the letter.

24         And if the government doesn't prove each and every

02:54:14 25    element of each offense beyond a reasonable doubt, then you

1   have to find my client not guilty.

2        There's no question that you have a big job ahead of

3   you.  There are a lot of witnesses that you heard from.

4   There are a lot of exhibits to look over.  And that's going

02:54:37 5   to be tough to do.

6        But when you evaluate all those exhibits and you

7   consider the testimony of the witnesses who came up, we

8   believe you'll see that the government came up short.  And

9   they didn't prove every element of the offense beyond a

02:54:56 10  reasonable doubt.

11       And I'll tell you why.

12       First, as to Count 1, the government did not prove

13  that there was a criminal agreement made to provide material

14  support to ISIS.  They didn't prove that.

02:55:14 15  Now, remember -- I'm going to quote this so I get it

16  right.  Remember the judge told you that proof that people

17  simply met together and talked about common interests or

18  engaged in similar conduct is not enough to establish a

19  criminal agreement.

02:55:34 20  And that's a lot of what we have here.  Common

21  interests, similar conduct.  But that's not enough.

22       He also told you that proof that a person was present

23  at times or associated with members of a group, even if he

24  approved of what was happening or did not object, is not

02:55:54 25  enough to prove that someone joined a conspiracy.

1     And that's also what we have.

2          So how is there no agreement in this case?

3          Let's first talk about Agent Jane and his testimony.

4     And frankly, we don't know who he was communicating with.

5          Now, the government showed you a lot on its PowerPoint

6     about common words and common phrases.  But you heard

7     testimony that those words and phrases are common in the

8     Islamic world.  They come from famous proverbs, one came

9     from a famous speech.  And they're commonly used.

10         So the fact that they were used more than one time

11    doesn't mean that it was necessarily by the same person.

12         The other thing the government didn't mention when it

13    was running through all of those screen names, is the name

14    itsme17.

15         Now, you heard testimony that itsme17 was a Wickr

16    handle, a Wickr user name, if you will.

17         And that user name was active as recently as February

18    of 2018.  Last month.  That was still active.

19         And it couldn't have been Erick Hendricks.  So who was

20    it?  If all these user names are interconnected and one all

21    leads off to the other, who was itsme17?  And who has been

22    using it all this time?  We don't know the answer to that

23    question.

24         But it injects some serious doubt into the question of

25    whether or not these user names were really utilized by

1    Erick Hendricks.

2         Now, Agent Jane testified that the person on the other

3    end of these communications never told him to commit an act

4    of violence.  And we believe that even if you assume it was

02:58:33    5    Erick on the other end of these communications, that what

6    they spoke about and what they did back and forth never rose

7    to the level of a criminal agreement.

8         Agent Jane also testified that he wasn't agreeing with

9    Elton Simpson when he sent Simpson a message that read,

02:58:56   10    "Tear up Texas."

11         Of course, he wasn't agreeing to send Simpson a

12    message to tear up Texas.  Elton Simpson went with assault

13    rifle and tried to attack the Garland contest.  Of course,

14    the FBI wasn't agreeing with that.

02:59:13   15         The person on the other end of these communications

16    also said to Agent Jane, "Let's be clear.  We never plan to

17    do anything to anyone."  And that's in the exhibits.  You

18    can look that up for yourselves when you get back to the

19    jury room.  "We never plan to do anything to anyone."

02:59:41   20         There wasn't a meeting of the minds with any of the

21    paid informants.  How could there be?  They get paid by the

22    government to root out radicals, not to enter into

23    agreements to do things that are illegal.  In fact, I think

24    one of them even testified they weren't allowed to do that.

03:00:15   25         You'll have to check your notes.  I don't know if my

1    memory serves.

2          You know, frankly, you have to be skeptical about a

3    lot of what you heard in this case.  I don't mean from the

4    witnesses on the stand.  I mean the recordings, the

03:00:39  5    communications over social media.  You have to be skeptical

6    about a lot of that because a lot of it was lies.

7          You had an undercover agent putting out a false

8    persona.  You had paid informants trying to gather

9    information using false performance -- false personas,

03:01:03  10    excuse me.  And you had this other person on the other end

11    of the line saying things like "Misinformation is good."

12          And you heard Erick say, "War is deception," that day

13    in Baltimore.

14          So how can you believe all these texts going back and

03:01:24  15    forth, these messages going back and forth?

16          Everyone literally was pretending to be something that

17    they weren't.  All the paid informants and the agents, all

18    pretending to be something that they weren't.

19          Now, let's talk about Mr. Al-Ghazi.  Mr. Al-Ghazi has

03:02:03  20    a long criminal record.  He got arrested trying to buy an

21    AK-47 assault rifle.  We don't know what he was going to do

22    with that.  But after that arrest, he entered into a plea

23    deal with the government.

24          He was charged with material support for terrorists,

03:02:30  25    two counts of being a felon in possession of a firearm, and

1       multiple counts of drug trafficking.

2               And he entered into an agreement by which he's only

3       going to serve 16 years.  That's if the judge accepts it.

4       And his agreement says that if the judge doesn't accept it,

03:02:49 5      he can withdraw his guilty plea.

6               And what's more, there's a Rule 35 provision in his

7       plea agreement, which means the government can go back for a

8       year after the sentencing and ask for him to get less time.

9               Do you think he has a motivation to get up there and

03:03:06 10     lie?  Of course, he does.  A big one.

11              The amount of time he would have gotten, had he not

12      entered into this plea agreement, would have been

13      staggering.

14              But in order to get the benefit of that agreement, he

03:03:24 15     had to come in here and testify the way that he did.  And I

16      submit that you should look on his testimony with a great

17      deal of skepticism.

18              There was no meeting of the minds with Mr. Al-Ghazi.

19      He stated that he thought the person he was talking to was

03:03:52 20     the real deal or an FBI agent.  So he was scared.  Either

21      way, he was scared.

22              And Mr. Al-Ghazi testified that the only reason he

23      turned that person on to the Pennsylvania brother, as he

24      called him, the only reason he did that was to get the heat

03:04:13 25     off himself because he didn't want to be involved with this.

1    That doesn't constitute a criminal agreement with Mr.

2  Al-Ghazi, not by any means.

3    Now, Matthew Palmer.  Matthew Palmer was the informant

4  who has been paid almost a total of a quarter million

5  dollars.

6    He has a vested interest in producing things for the

7  government.  There's no question about that.

8    But we don't know who he was communicating with

9  either.

10    And, again, these connections between the various

11  platforms and the various user names, they're far more

12  tenuous than the government suggests.

13    Now, Janet Lynn Miller, in this meeting in Baltimore

14  on March 19, certainly there's no agreement with her.  She

15  flat out said on the stand she didn't agree with what he was

16  saying.  She was afraid of him.

17    As the government pointed out, she went and called the

18  FBI.  She called herself an ISIS sympathizer at times or

19  said she could be perceived that way.  But she didn't enter

20  into an agreement with Erick Hendricks.  Not by any means.

21    And despite what she claims he said -- and I believe

22  she wasn't the most credible witness, but you'll be the

23  judge of that -- despite what she claims he said, they never

24  entered into an agreement to do anything.

25    She said, I didn't believe in what he was saying.

1    Amanda Amaro.  Here is another one.

2    Her contacts was with UmmahOneLove or some variation

3    thereof.  And she testified that when she posted that New

4    Era document, that she only did so because she was afraid.

03:06:59 5    And she took it down twice because she was afraid, because

6    she didn't like the content of it.

7    She didn't make an agreement with whoever sent her

8    that document.  And I would submit it has not been proven

9    that it came from my client.

03:07:18 10    You know, she's a great example of why the instruction

11    that I read to you earlier is important.  Because she was a

12    supporter of ISIS.  She hasn't been charged for it, but she

13    admitted it on the stand.

14    But people having common interests, those instructions

03:07:49 15    I read earlier, which I won't go back and read again,

16    they're important because of witnesses like Amanda Amaro,

17    because just them being in a room together talking about

18    common interests doesn't rise to the level of a criminal

19    agreement.  And that doesn't get to you conspiracy.

03:08:06 20    By the way, Amanda Amaro also admitted that she was

21    lying throughout her communication with UmmahOneLove.

22    You'll recall that.

23    And she claims that she contacted this Sally Jones,

24    but she admitted that she had no idea who that person really

03:08:36 25    was.  She had heard it was Sally Jones, but I think on

1    cross-examination the question was, "It could have been the

2    person next door," and she said, "Yeah."

3         So we don't know.  There's no nexus there to get to

4    ISIS through Sally Jones because we don't know who it was

5    she was communicating with.

6         Now, we need to talk about Tyrinda Hendricks for a

7    little bit who is my client's wife, and the government

8    claims that she was a coconspirator.

9         But the only evidence that concerned her was when

10   Erick said, "Me and my wife wrote this."  She didn't adopt

11   that.  There's no other evidence of her conspiring.

12        Yes, she came to the meeting.  They were traveling

13   together.  Yes, she came to that meeting in Baltimore, but

14   they were traveling together.

15        And just Erick saying, "My wife and I wrote this" does

16   not get you to a criminal agreement beyond a reasonable

17   doubt.  It just doesn't get you there.

18        Now, let's talk about all the IP addresses with the

19   fancy maps and all the connections.

20        We don't have any devices that would prove whether or

21   not that was Erick Hendricks who was making those

22   communications.  We have none of those devices.

23        And I submit to you that the IP addresses and -- and

24   Ms. Vaughan, when she testified talked about possible

25   patterns, things like that, but if we had the devices, we

1    would know for sure.  And we don't.

2         I'll move on to the second count for a minute.

3         The second element of that count is that the defendant

4    knew or intended that the support or resources was going to

5    the organization known as ISIS.

6         Elsewhere in the jury instructions, they read,

7    "Individuals who act entirely independently of foreign

8    terrorist organization to advance its goals or objectives

9    are not considered to be working under the foreign terrorist

10   organization's direction and control."

11        So given what we know Erick did do, the meeting in

12   Baltimore, is there evidence that he intended the outcome of

13   that was going to go to the foreign terrorist organization,

14   was going to actually go to ISIS?

15        I don't think there's any evidence of that.

16        Even if you assume that these communications are him,

17   was something designed to go to ISIS?  Was there a goal at

18   the end that "We're going do this and then we're going to

19   send it to ISIS?  We're going to do this for ISIS?"

20        I don't believe so.

21        And acting independently to achieve the same goals and

22   objectives is not to be considered working under the foreign

23   terrorist organization.  And that means something.  So read

24   those instructions carefully when you get back to that jury

25   room.

1       Now, finally, you heard evidence about hacking.  You

2  heard from one witness who had hacked a website, hacked

3  websites as part of his training.  You heard that phones can

4  be hacked.  Phones can be taken over entirely.

03:14:11  5       Heck, Dr. Vidino told you that ISIS has an incredibly

6  sophisticated hacking enterprise.

7       So what happened with these phones?  Where did these

8  communications come from?  Could it have been a result of

9  hacking?  We just don't know.  We just don't know.  And

03:14:38 10  that's why there's not enough here to convict.

11       Now, I missed Mr. Ansari.  I need to talk about Mr.

12  Ansari and the meeting in Baltimore.

13       First of all, Mr. Ansari didn't agree to do anything,

14  I don't believe.  You can listen to that audio for

03:15:30 15  yourselves.  But I don't think he agreed to do anything but

16  read.

17       But the question is, why would Erick have that

18  meeting?  Why would he say the things that he did?  And the

19  answer to that question, I believe, lies in Erick's

03:15:56 20  interactions with Steve Conley, because later on, Erick

21  called Mr. Conley and said, "Hey, there's this Russian guy

22  who I think is peddling in illegal merchandise.  Are you

23  interested in that?"

24       Turns out that was a confidential human source, so

03:16:19 25  they weren't interested in that.  But Erick didn't know

1    that.

2         But I think it's safe to infer from that that Erick

3    was trying to get back into the good graces of the FBI.  And

4    why would he do that?  Money.  Money.  One paid informant

03:16:44 5    got $45,000.  Another got 90.  Another got almost 250.

6    Erick had been there.  Had been a paid informant before.

7    But was closed as a source.

8         But I think we can infer from his communications with

9    Agent -- with Officer Conley in the middle of May and

03:17:14 10   towards of end of May that Erick was trying to get back in

11   the good graces of the FBI.  And I think he was doing it so

12   he could become a paid informant again.

13        Ladies and gentlemen, there's a lot that looks bad

14   there this case, I'm not going to kid you.  I'm not trying

03:17:59 15   to pull the wool over your eyes.  But the fact of the matter

16   is the government has to prove each and every element beyond

17   a reasonable doubt.

18        And we don't believe that they've proved that there

19   was any criminal agreement in the conspiracy count.  And we

03:18:22 20   don't believe that they've proved that second element of the

21   attempt count, which is Count 2.

22        And in light of that, we think it's appropriate that

23   you go back and deliberate and then return a verdict of not

24   guilty as to each count in this indictment.

03:18:44 25        Thank you.

1      Thank you, counsel.

2      Counsel for the government, you have 15 minutes for

3  rebuttal, please.

4           MR. SHEPHERD:  Thank you, Your Honor.

03:18:55  5      Good morning, again, ladies and gentlemen.

6      There are several points I want to discuss with you so

7  I'm going to move pretty quickly.  I may not hit everything

8  defense counsel just stated, but I'm going to hit several of

9  them, and like him, I would also like to thank you for your

03:19:16 10  attention and service before I move on to responding to some

11  of his points.

12      So with that said, some of the things that the defense

13  counsel just talked about deserve some further consideration

14  by you.

03:19:28 15      Let's start with hacking.  Towards the end he said

16  there could have been hacking done in this case.  It's

17  really could have been.  Maybe.  In some way it's possible,

18  I guess.  But there has been zero evidence presented that

19  any of these accounts in this case were hacked.  Zero

03:19:47 20  evidence.  And your job is to look at the evidence.  It's

21  not to speculate on what could be or what might be.  It's to

22  look at what the evidence tells you.

23      And the evidence as to hacking is, one, there's no

24  evidence that any of these accounts were hacked.  And the

03:20:01 25  testimony from Amy Vaughan about these encrypted

1    communication apps, that to hack them you would have to have

2    a password and a user name or in the case of Surespot, this

3    other like identity key, you would either have to have all

4    that information or you would have to rip the phone from

03:20:19 5    someone's hand while they had the app open.

6    And even if you had all the information about all the

7    other accounts, you still wouldn't have any further

8    communication.  So you wouldn't have any continuity of

9    communications.

03:20:29 10    So we ask you to look at the evidence in this case.

11    Not the speculation.  Just the evidence.

12    And when we talk about Mr. Ansari and this meeting in

13    Baltimore, let's talk about, again, what the evidence tells

14    us about that meeting and this inference the defense counsel

03:20:49 15    just mentioned that maybe he was trying to get into Steve

16    Conley's good graces to get further -- to I guess further

17    work as an informant.

18    So the evidence about that meeting is after the

19    meeting is set up and before the meeting, there's no contact

03:21:05 20    with Mr. Conley, "Hey, I got a good meeting coming up with

21    this great possible target for you.  Is that worth some

22    money?"

23    No evidence, according to Steve Conley, no contact.

24    He has the meeting.  After the meeting, no contact.

03:21:20 25    That's according to Steve Conley's testimony.  Think of the

1       way he did all the counter-surveillance.  He's just trying

2       to do this so he can turn the information over to the FBI?

3       Why does he have to go through all the elaborate steps?

4       There's no reason for that if you're trying to let the FBI

03:21:35  5     know anyway because who cares if the police see you with

6       this person?  You're going to turn that information over as

7       soon as you get a chance.

8            We also have, if you consider that sort of the chain

9       of events, after that meeting, okay, he meets with the guy.

03:21:50 10     And if the intent is "I'm going to turn him over to the

11      FBI," and then after that meeting he tries to set that

12      person up with his step-daughter, really?

13           How in any conceivable universe does that make any

14      sense?  He's going to turn over the guy he's setting up with

03:22:05 15     his step-daughter to the FBI?

16           No, what makes sense, when you're asked the question,

17      why did he go to that meeting, is exactly what the evidence

18      shows, that it was part of his course of conduct to conspire

19      with -- to conspire to and attempt to support ISIS.

03:22:21 20          And if you go even further, Steve Conley testified he

21      talked to him on the phone, communicated with him by text

22      message, met with him in person, no mention of this meeting

23      in Baltimore or any other information.  No mention of any of

24      it.

03:22:35 25          Then, yes, he tells him about a Russian at a flea

1    market selling purses.  Okay.  There's a Russian -- he

2    provides that information.  Has nothing to do with

3    terrorism.  Nothing to do with ISIS.  Nothing to do with

4    anything else in this case.

03:22:50  5        And do you really believe that if he's just interested

6    in getting paid by the FBI he's going to turn in a guy who

7    is selling knock-off purses at the flea market, but not turn

8    in the guy he just met with who is an ISIS supporter in a

9    terrorism investigation?  That doesn't make any sense

03:23:05 10   either.

11        And when does he contact Steve Conley for the first

12   time?  It's after he's made surveillance because he's

13   complaining to him about it.  So what's the evidence suggest

14   is the likely course of event here?

03:23:18 15       The defendant meets with a person he thinks is a

16   legitimate bad guy and is part of his course of conduct.  He

17   meets with him, continues to interact with him, and when he

18   figures out that they're on to him, now he calls Steve

19   Conley and says, "Hey, why is the FBI following me?"

03:23:35 20       It's after the fact that he seems sees surveillance

21   and he figured out that the undercover he is talking to

22   isn't dead, that this whole things start to turn into,

23   "Well, I've got to call Steve Conley."

24        That's just a pure red herring in this case.  Nothing

03:23:50 25   to do with what actually happened.

1       Because what happened in this case is all the evidence

2   that you heard.

3       Further, let's pull up Government's Exhibit 153 to

4   respond to one more specific thing, which was about this

03:24:02  5   itsme17 account.

6       And actually, if we can just turn on the elmo, I'll do

7   it that way, if it won't come up.

8       So Government's Exhibit 153 are business records from

9   Wickr.  And the first set of business records that you'll

03:24:29 10   see in Government's Exhibit 153, the date is May 22, 2015.

11   That's on page 1.

12       Then there's page 2, shows that there's -- turn on the

13   auto focus maybe, and it will work -- shows that there's

14   attachment.

03:24:56 15       And then Government Exhibit 153, page 3, has the

16   actual records.

17       So itsme17 is in here.  So as of May 22, 2017, the

18   records that come back show that this account was created on

19   May 10, 2015 at 8:09:19 p.m.  And it shows that the last

03:25:20 20   usage as of then was May 14, 2015 at 11:08:27 a.m.

21       Then the next account that appears in the course of

22   communications you have is at the bottom, dontcatch17,

23   created on May 14, 2015, at 11:11:36 a.m.  Three minutes

24   later.  Fits perfectly, the chain of communications, and the

03:25:48 25   usages of these -- and the usages of these accounts.

1    But then you have this usage, testimony about a usage

2    of this account later in February of this year, February of

3    2018.

4    We would suggest you should look at these records as

03:26:04  5    the evidence that matters in this case.  Not the convenient

6    fact for the defendant, the incredibly convenient fact for

7    the defendant that this one account shows usage about a

8    month before trial.  That's an incredibly convenient fact

9    for the defendant.  A defendant who, by the course of all

03:26:23 10    these communications, you know, is taking steps to try and

11    create information here and there when it turns out that he

12    thinks someone might be a spy, he throws out a "Don't do

13    terrorism."

14    That's a convenient fact that fits perfectly with the

03:26:39 15    defendant's other behavior.

16    Stick to the records you have is what we would

17    suggest, which show the usage of this account to fit

18    perfectly with the regular chain of usages of accounts.

19    Now, on a big picture, what I'll finish up with is

03:26:56 20    some discussion of, in this case, when you're talking about

21    conspiracy and attempt.

22    So what's key in both of those, when you're talking

23    about the role of the Islamic State in all of this, is the

24    intent.  Because those aren't substantive completed crimes.

03:27:17 25    Conspiracy isn't a substantive crime.  It's the agreement to

1        do something.

2              And what's key to that is what is intended with that

3        agreement?

4              And with attempt, it's what you intend to do.  Not

03:27:28 5        what you completed.

6              So look at it from the perspective of what was

7        intended by these actions, not what was actually completed,

8        because if you start looking at the instructions and just

9        thinking, "Oh, well, Sally Jones, there's not -- there's not

03:27:44 10       perfect confirmation that Amanda Amaro sent this to the real

11       Sally Jones," that's not what's truly important.

12             What's important is that it was intended she send it

13       to Sally Jones.  She thought -- she testified she thought it

14       was going to Sally Jones.  The instruction was from the

03:28:02 15       defendant was to send it to Sally Jones.

16             So in the context of conspiracy and attempt, that's

17       what matters, the intent.

18             And when we talk about who he conspired with, what was

19       totally left out in the defense counsel's argument was that

03:28:19 20       he is telling Steven Jane that he's working -- he's

21       communicating with senior brothers.  He's telling them.

22       He's explaining in those communications what he's trying to

23       do, to create this headquarters with outposts, the limbs for

24       the brain and the brain to the ultimate brain.  He's

03:28:40 25       explaining it all of them.

1    He's being a little bit cagey about it, which is
2    consistent with how he operates, but he's explaining this is
3    all being done for that ultimate brain, for ISIS.

4    And he's communicating with and getting advice from
5    those senior brothers, and he's part of that operation.  And
6    that's conspiracy.

7    And when his wife helps him to write a document
8    and -- that's conspiracy.

9    And when Amir Al-Ghazi gives him the name of another
10    recruit, that's conspiracy.

11    And when Amanda Amaro posts a document taking credit
12    on behalf of the Islamic State in America for this terrorist
13    attack for him, that's conspiracy as well.

14    The judge also, referring to his instructions, advised
15    you that possible doubts or doubts based purely on
16    speculation are not reasonable doubts.  A reasonable doubt
17    is a doubt based on reason and common sense.

18    We ask that you use your reason and common sense.
19    Examine the evidence.  Don't look for doubts that are just
20    on speculation.  Use that common sense and the evidence in
21    this case, what you heard, what the documents say.

22    And if you do that, what common sense and reason will
23    lead you to is that the defendant is guilty of both counts.

24    Thank you, Your Honor.

25    THE COURT:  Thank you, Counsel.

1       Ladies and gentlemen.  Jury, let me finish up my

2  instructions by explaining some things about your

3  deliberations in the jury room and your possible verdict.

4       The first thing you should do in the jury room is to

03:30:20  5  choose someone to be your foreperson.

6       This person will help to guide your discussion, will

7  speak for you here in court.  Once you start deliberating,

8  do not talk to the courtroom deputy, to me, or to anyone

9  else except each other about the case.  If you have any

03:30:39 10  questions or messages, you must write them down on a piece

11  of paper, sign them, and then give them to the courtroom

12  deputy.  She will then give them back to me and I will

13  respond as soon as I can.

14       I may have to talk to the lawyers about what you've

03:30:54 15  asked, so it may take me some time to get back to you.

16       Any questions or messages normally should be sent to

17  me through my courtroom deputy or perhaps my law clerk in

18  her absence by your foreperson.

19       One more thing about messages.  Do not ever write down

03:31:12 20  or tell anyone how you stand on your votes.  For example, do

21  not right down or inform anyone that you are split six, six

22  or eight, four or whatever your vote happens to be.  That

23  should stay secret unless you're finished.

24       Experiments, research and investigation.

03:31:28 25       Remember that you must make your decision based only

1    on the evidence that you saw and heard here in court.  Do

2    not try to gather any information about the case on your own

3    while you are deliberating.

4         For example, do not conduct any experiments inside or

03:31:43  5    outside the jury room.  Do not bring any books, like a

6    dictionary, or anything else with you to help you with your

7    deliberations.

8         Do not conduct any independent research, reading, or

9    investigation about the case, and do not visit any of the

03:31:59  10    places that were mentioned during the trial.

11        Make your decision based only on the evidence that you

12    saw and heard here in court.

13        During your deliberations, you must not communicate

14    with or provide any information to anyone by any means about

03:32:13  15    this case.  You may not use any electronic device or media,

16    such as a telephone, cell phone, smartphone, iPhone,

17    Blackberry or computer, the Internet, or any Internet

18    service or any text or instant messaging service, or any

19    Internet chat room, blog, or website such as Google,

03:32:36  20    Facebook, MySpace, LinkedIn, YouTube or Twitter, to

21    communicate to anyone any information about this case or to

22    conduct any research about this case until I accept your

23    verdict.

24        Unanimous verdict.

03:32:49  25        Your verdict, whether it is guilty or not guilty, must

1    be unanimous.

2         To find the defendant guilty, every one of you must

3    agree that the government has overcome the presumption of

4    innocence with evidence that proves the defendant guilty

03:33:05  5    beyond a reasonable doubt.

6         To find the defendant not guilty, every one of you

7    must agree that the government has failed to convince you

8    beyond a reasonable doubt.

9         Either way, guilty or not guilty, your verdict must be

03:33:19 10    unanimous.

11         Duty to deliberate.

12         Now that the closing arguments are completed, you will

13    be free to talk about the case.  I'll explain to you when

14    your deliberations will begin in a few moments, but you will

03:33:32 15    then be free to talk about the case in the jury room.

16         In fact, it is your duty to talk with each other about

17    the evidence and to make every reasonable effort you can to

18    reach unanimous agreement.  Talk with each other, listen

19    carefully and respectfully to each other's views, and keep

03:33:49 20    an open mind as you listen to what you're fellow jurors have

21    to say.  Try your best to work out your differences.

22         Do not hesitate to change your mind if you are

23    convinced that the other jurors are right and that your

24    original position was wrong.

03:34:03 25         But do not ever change your mind just because other

1    jurors see things differently or just to get the case over

2    with.  In the end, your vote must be exactly that, your own

3    vote.

4         It is important for you to reach unanimous agreement,

03:34:18  5    but only if you can do so honestly and in good conscience.

6         No one will be allowed to hear your discussions in the

7    jury room, and no record will be made of what you say.  So

8    you should all feel free to to speak your minds.

9         Listen carefully to what other jurors have to say, and

03:34:35 10    then decide for yourself if the government has proved the

11    defendant guilty beyond a reasonable doubt.

12         Punishment.

13         If you decide that the government has proved the

14    defendant guilty, then it will be my job to decide what the

03:34:50 15    appropriate punishment should be.

16         Deciding what the punishment should be is my job, not

17    yours.  It would violate your oaths as jurors to even

18    consider the possible punishment in deciding your verdict.

19         Your job is to look at the evidence and decide if the

03:35:08 20    government has proved the defendant guilty beyond a

21    reasonable doubt.  If it has, say so.  If it has not, say

22    so.

23         I've prepared two verdict forms that you should use to

24    record your verdict.  And I'll read the forms to you at this

03:35:25 25    time:

1       It will be clearer when you have them in front of you.

2       The verdict form for defendant Erick Jamal Hendricks,

3   Count 1 will read as follows:

4       "With respect to Count 1 of the indictment, in which

5   Defendant Erick Jamal Hendricks, is charged with conspiracy

6   to provide material support and resources to a foreign

7   terrorist organization, in violation of Title 18, United

8   States Code, Section 2339B(a)(1), we, the jury, having been

9   dual impaneled and sworn, find the defendant, Erick Jamal

10  Hendricks," you will insert on the verdict form in ink,

11  guilty or not guilty.

12      And then each of the jurors must sign the verdict form

13  concurring in judgment.  It requires, of course, a unanimous

14  verdict by the jury.

15      The verdict form for Count 2 reads as follows:

16      "With respect to Count 2 of the indictment, in which

17  Defendant Erick Jamal Hendricks is charged with attempting

18  to provide material support and resources to a foreign

19  terrorist organization, in violation of Title 18, United

20  States Code, Section 2339B(a)(1), we the jury, having been

21  duly impaneled and sworn, find the defendant, Erick Jamal

22  Hendricks" -- you'll in insert in ink either guilty or not

23  guilty.  And then you will sign and date the verdict form.

24      And, again, the verdicts require the concurrence of

25  all 12 members of the jury.

1        Let me finish up by reseating something I said to you

2   earlier.  Nothing I have said or done during this trial was

3   men to influence your decision in any way.  You decide for

4   yourselves if the government has proved the defendant guilty

03:37:13  5   beyond a reasonable doubt.

6        Lastly, juror notes.

7        Remember, if you elected to take notes during the

8   trial, your notes should be used only as memory aids.  You

9   should not give your notes greater weight than your

03:37:30  10   independent recollection of the evidence.  You should rely

11   upon your own independent recollection of the evidence or

12   lack of evidence, and you should not be unduly influenced by

13   the notes of other jurors.  Notes are not entitled to any

14   more weight than the memory or impression of each juror.

03:37:47  15        Whether you took notes or not, each of you must form

16   and express your own opinion as to the facts of the case.

17        That concludes the Court's jury instructions.

18        Let me give you some guidance as to how we're going to

19   proceed.

03:38:01  20        We are going to adjourn for the lunch hour, which

21   means that all members of the jury, including our

22   alternates, will be free to enjoy lunch.  Your deliberations

23   will not begin until after lunch has been completed.  You

24   can signify by notifying the courtroom deputy when you're

03:38:20  25   finished with lunch.

1       At that time, you will then be provided with exhibits

2   that have been presented or that have been admitted, I

3   should say, along with a device to listen to any recordings,

4   to view any exhibits that may require, again, any electronic

5   means for your access.

6       As to -- and, again, those deliberations, your

7   deliberations cannot occur until that time.  Again, after

8   lunch, we'll provide you all the necessary information that

9   you need to begin those deliberations.

10      Our alternate jurors, of course, cannot participate in

11  the deliberations.  Once lunch is completed, you'll be

12  excused.

13      I want to thank you, all four of you, but your service

14  is not yet complete.  When you leave the Court, we'll give

15  you the following instructions.  You are not to discuss the

16  case with each other, among yourselves.  You are not to

17  discuss the case with anyone else.

18      You wait until such time as you receive a call from

19  the Court.  We will contact you and alert you if and when a

20  verdict is reached.

21      The reason I give you that instruction is because

22  there are occasions, and there are times, when emergencies

23  arise, other circumstances might arise in which one or more

24  of you may be called to come back and rejoin your fellow

25  jurors and complete deliberations in this case.

 1      So it's extremely important that all the admonitions

 2   I've given you throughout the case, speaking directly to our

 3   alternates, you must still follow them.  That means no

 4   Internet research.  That means no Facebook postings,

 5   whatever it might be, communication with others, no

 6   discussion with family, friends.  I'm not going to predict.

 7   There's no way of knowing how long your fellow jurors will

 8   take to reach a verdict.

 9      We will notify you promptly when that verdict is

10   reached so that you are then released from those

11   instructions.  And then at that time, you'll be free to

12   discuss the case, but not until you receive that

13   notification.

14      At this time, ladies and gentlemen, you may take your

15   notepads with you.  Do not, of course, refer to them as of

16   yet.  You won't be able to use them until you have all the

17   information, the exhibits, along with all the other items I

18   indicated, along with a copy of the jury instructions for

19   each of you.

20      And there will be one set of -- one verdict form for

21   each count.  One original that will require the signature of

22   all members of the panel.  So bear those things in mind.

23      And should you have any needs over the lunch hour,

24   anything that we haven't -- I'm not sure if the lunch has

25   arrived yet.  It might take a bit of time, given the volume,

1   but we'll get that lunch to you as quickly as we can.  Enjoy

2   your lunch.  And then immediately when that concludes, we

3   will proceed just as I've indicated.

4          Once, again, I want to thank all of you, including our

03:41:22 5   alternate jurors, for your time and your patience here.

6          We'll adjourn at this time for the lunch hour.  And

7   then we will proceed as I've just indicated.

8          Thank you very much, ladies and gentlemen.  Take your

9   notepads -- one other thing, I'm sorry, alternate jurors.

03:41:36 10   Give your notepads today clerk.  They'll be secured.  They

11   won't be viewed or used anything of that nature.  But they

12   will be secured, if the event you're called back, then we'll

13   give them back to you for your use.

14          All right.  Thank you very much.

03:41:49 15          (Jury out, 11:50 a.m.)

16          THE COURT:  All right, Counsel.  Make sure that

17   all of the exhibits are organized.  We have the

18   certification for you to sign verifying that both sides have

19   viewed the exhibit.  Only the admitted exhibits will be

03:42:27 20   going back to the jurors.

21          And then as soon as the lunch hour is completed, I

22   would suspect, depending on how quickly the food arrives, I

23   would suspect around 1:00 they will be ready to start.  So

24   we'll let you know as soon as those deliberations begin and

03:42:42 25   obviously make sure the clerk knows how to reach you in case

1    some question or other issue arises.

2                MR. SHEPHERD:  Excuse me, Your Honor.  Can I

3    approach with defense counsel on a matter, please?

4                THE COURT:  Yes.

5          (Discussion at sidebar off the record.)

6          (Recess taken, 11:55 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Outside the presence of the jury 4:05 p.m.:)

2   THE COURT:  All right, Counsel.  We have a jury

3   question.  However, the jury has asked to be excused for the

4   day.  I'm going to bring them out, provide them the

5   admonitions, send them home as they've requested and then

6   we'll take up the issue of the question.

7   COURTROOM DEPUTY CLERK:  The jurors asked for a

8   few more minutes before they come?

9   THE COURT:  All right.  That's fine.  Just have a

10  seat.

11  MR. BENNETT:  Your Honor, do you plan to

12  address --

13  THE COURT:  Not until we excuse them, then we'll

14  address the question.

15  MR. BENNETT:  I mean Matt's absence?

16  THE COURT:  Yes, I will do that.

17  MR. BENNETT:  Thank you, Your Honor.

18  (Pause.)

19  (Jury in, 4:10 p.m.)

20  THE COURT:  Ladies and gentlemen of the

21  jury -- ladies of the jury, it's my understanding at this

22  time you wish to be excused for the day and resume your

23  deliberations tomorrow morning.  We're going to honor that

24  request.

25  However, I'm required to explain to you as follows:

1    This evening, once you leave the courthouse, the courtroom

2    an the jury room, of course, and the jury room, of course,

3    you not to discuss the case among yourselves or with anyone

4    else.

08:01:30  5        All of your deliberations and discussions will take

6    place when all 12 of you are present in the jury room.

7    Deliberations can only occur at that time when all of you

8    are present to discuss the case in full.

9        So we'll honor that request.  We'll see you tomorrow

08:01:44 10   morning.  Be here shortly before 9:00.  At that time, I'll

11   respond to your question.  You'll be brought in the

12   courtroom and I'll respond -- I think that's the way we'll

13   do it.  Respond to your question.  I may simply respond in

14   writing.  But we'll address the question tomorrow.

08:01:58 15       I wanted to bring you in.  I know you wanted to leave.

16   So I wanted to excuse you as soon as possible.  So we'll see

17   you tomorrow morning shortly before 9:00 to resume

18   deliberations.

19       Again, deliberations tomorrow morning cannot begin

08:02:12 20   until all 12 of you are present in the jury room.

21       Thank you very much, ladies and gentlemen.  Have a

22   good drive home -- safe drive home.

23       Ladies and gentlemen, I'm sorry, one thing I should

24   say, Mr. Shepherd is not here on behalf of the government.

08:02:24 25   He has a family emergency matter to address.  And so his

1        apologies, or my apologies, he's not able to be with us.

2              All right.  Thank you very much.

3              (Jury out, 4:11 p.m.)

4              THE COURT:  All right.  Please be seated, ladies

08:02:55 5    and gentlemen.

6              For the record, we have a jury question.  I believe a

7        copy has been provided to both sides.  The jury question

8        reads as follows:

9              "Judge Adams, what does Abu Ibrahim Al Ameriki

08:03:10 10   translate to in English?  Thank you."

11             And it's signed by our juror foreperson.

12             Counsel, what's the government's position as to how

13       the Court should respond to the question?

14             MR. BENNETT:  Your Honor, we do not have a

08:03:23 15   problem with the translation going back to the jury.  We

16       discussed it briefly with defense counsel, and we were in

17       agreement that the proper translation would be Father

18       Abraham the American, so that would not be an objection to

19       the United States.

08:03:44 20            THE COURT:  Father Abraham the American.

21             Counsel for the defendant.

22             MR. DOUGHTEN:  Your Honor, in discussing this

23       with the client, he believes the actual translation -- and

24       we apologize to the government because we did have some back

08:04:01 25   and forth -- is Father of Abraham, the American.

1    It wasn't defined in the trial, but we are fine with

2    the stipulation that that's what it means.

3                THE COURT:  Father of Abraham?

4                MR. DOUGHTEN:  Yes.

08:04:19  5                THE COURT:  Father of Abraham, the American?

6                MR. DOUGHTEN:  Yes.

7                THE COURT:  Counsel for the government, do you

8    have any objection to that proposal?

9                MR. BENNETT:  No, Your Honor.

08:04:36 10                THE COURT:  Well, Counsel, just let me ask this

11   question:

12       I suppose if there is an agreement, it may be an

13   adequate resolution.  However, I don't believe there was any

14   evidence presented in the trial of the translation of the

08:04:56 15   term or the words.  So how do we get around that?

16                MR. BENNETT:  Your Honor, we agree we asked -- I

17   took a brief moment with the court reporters, did a word

18   search to see if we could find that the translation had

19   actually come into testimony.  It does not appear to have

08:05:10 20   come into testimony.  The name came up, by who was the

21   author of the GPS for the Ghuraba a couple times in the

22   testimony, but not the translation.

23       So we leave it to the Court.  We simply wanted to have

24   an agreement with the defense counsel as to what the

08:05:24 25   translation would be.  But whether it goes back to the jury

1    or not, we have no strong feeling one way or the other.

2    It's not in evidence.

3         THE COURT:  That's my question.  How do I give

4    the jury an answer to a question to which there's no

5    evidence in the record?

6         MR. DOUGHTEN:  We agree with the Court that it

7    wasn't given.  Our memory was that it wasn't given either.

8         And we don't find it prejudicial one way or another in

9    the context.  However, you know, in thinking about it, the

10   Court's probably right because it would be difficult to add

11   a stipulation at this time.

12        It doesn't -- who knows what the jury's thinking about

13   this.  I guess after thinking about it, you know, it's

14   probably best that we --

15        THE COURT:  Well, the flip side is, thinking out

16   loud, I can't refer them to the record or tell them to

17   recall -- to rely on their mind and memory as to what the

18   evidence has been because there's no evidence in the record

19   of the definition of the term.

20        Or do I want to mislead them, in essence mislead them

21   and tell them to rely on their mind and memory as to what

22   the evidence has been?  I don't find that to be --

23        MR. BENNETT:  Your Honor, we wouldn't want to

24   mislead them in any way.  It's not in evidence.  In my

25   thought process, it would only come in as a stipulation

1    between the parties to answer the jurors if the Court

2    thought it would be in the best interest to have the jurors

3    have this information.  Since it's not objectionable.

4         But I think the black letter of it is it's not in

08:07:19 5    evidence and they probably should not be provided with the

6    answer.

7              THE COURT:  Well, can the parties stipulate to a

8    response at this late date after deliberations has begun?  I

9    don't know the answer to that question.  I suspect we're not

08:07:35 10   going to find a lot of case law on that issue.

11        All right.  We'll take up the issue tonight.  We'll

12   take a quick look and see if there is any kind of case law

13   or any type of precedent we can look to.

14        My thinking is, to give you I guess a preview, is that

08:07:57 15   if the parties stipulate and agree, then I don't know how

16   it's prejudicial, reversible, if both sides agree that it is

17   the definition.  And I would prefer to have them have an

18   answer to a question rather than be back in the jury room

19   trying to determine and decipher something to which there

08:08:17 20   really is no answer.

21        Mr. Hendricks, is this something you would like me to

22   do?

23        You can answer the question, sir.  I know it's your

24   case.

08:08:29 25        (Pause.)

1       MR. DOUGHTEN:  Your Honor, the defense position

2   is -- and again, I have not had this issue before.  We would

3   rather have the jury have an accurate definition of a word

4   than have them speculating and trying to put together, for

08:09:23  5   instance, what Abu meant in one context, if it means the

6   same context here, that sort of thing.

7       But, again, I think Mr. Bennett is correct, I think

8   the black letter law is that, you know, if it wasn't defined

9   you're stuck with no definition.

08:09:39 10       We would, if it's proper in any way, we would rather

11  at least have the correct definition so that they're not

12  speculating on a term.  It may inure to us.  It may inure to

13  the government.  Who knows.  But we would rather it be an

14  accurate definition.

08:09:56 15       THE COURT:  The other alternative would be to

16  structure an answer advising the jury that they are to look

17  to the evidence to determine if, in fact, a definition was

18  presented.  I mean, essentially that's what we would be

19  asking them to do.

08:10:15 20       Let's think about it.  We'll reconvene tomorrow

21  morning at 8:45.  We'll discuss it tomorrow morning further

22  and come to a final conclusion shortly before the jurors

23  begin their deliberations.  That way they have adequate time

24  to give it some more thought and do some research to see if

08:10:32 25  there is any kind of, again, guidance we can find.

1       So we'll see you tomorrow morning about 8:45, maybe a

2  little earlier than that so we have time to put together an

3  answer and get it to the jurors.

4       All right.  Thank you very much.

08:10:43  5       Have a good evening.

6            MR. BENNETT:  Thank you, Your Honor.  You too.

7            THE COURT:  You're welcome.

8       (Proceedings concluded at 4:20 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1729

1       C E R T I F I C A T E

2

3           I certify that the forgoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7           *S/Caroline Mahnke*          3/19/2018

8           Caroline Mahnke, RMR, CRR          Date

9

10          *S/Lori A. Callahan*          3/19/2018

11          Lori A. Callahan, RMR, CRR          Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25